IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCH OF SCIENTOLOGY OF GEORGIA,  )
INC., a Georgia Corporation,       )
                                   )
      Plaintiff,                   )
                                   )
v.                                 )     CIVIL ACTION
                                   )     FILE NO. 1:10-CV0082 CAP
CITY OF SANDY SPRINGS, GEORGIA,    )
et al.                             )
                                   )
      Defendants.                  )

## CHURCH OF SCIENTOLOGY OF GEORGIA, INC.'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiff Church of Scientology of Georgia, Inc. (the "Church or the "Church of Scientology") hereby submits its Statement of Undisputed Material Facts in Support of Motion for Partial Summary Judgment as follows:

1.

The Church of Scientology is a religious organization. Affidavit of Allan Cartwright ¶¶ 3,4, attached hereto as Exhibit "A."

2.

Scientology religious services, which are essential to the practice of the Scientology religion, are provided at church facilities. Ex. "A," Cartwright Aff. ¶¶ 16 through 27.

153434.5

3.

At the date of filing of this lawsuit, the Church operated in leased space at 4480 North Shallowford Road, Dunwoody, Georgia. Affidavit of Deborah Danos ¶ 3, attached hereto as Exhibit "B."

4.

The Church subsequently moved its congregation to a new temporary location at 4588 Winters Chapel Road, DeKalb County, Georgia. Id. ¶ 4.

5.

Pending the outcome of the lawsuit, the Church intends to relocate to the building at 5395 Roswell Road, Sandy Springs, Georgia (the "Property"). Id. ¶ 5.

6.

The Church purchased the Property in 2005 to enable it to provide a full range of Scientology religious services and to allow for future growth, which it was unable to accommodate at the Dunwoody location or at its current Winters Chapel Road location. Id. ¶ 6.

7.

The physical space needs of the Church are dictated by the nature of Scientology and its religious beliefs and practices. Affidavit of Robert Wright ¶ 8, attached hereto as Exhibit "C."

8.

The Scientology religion is based upon the research, writings and recorded lectures of its Founder, L. Ron Hubbard, concerning Scientology, which collectively constitute its Scripture.  The Scriptures are the source of the beliefs, practices, rituals and policies of the religion. Ex. "A," Cartwright Aff. ¶¶ 6-10.

9.

The basic tenet of Scientology is that man is an immortal spiritual being, called a "thetan" (from the Greek letter which symbolizes "thought" or "spirit").  Id. ¶ 11.

10.

Scientology doctrine states that this spiritual being is inherently good, with potentially infinite capability.  Id. ¶ 12.

11.

However, thetans have lost their spiritual identity and operate at a small fraction of their native ability.  Id. ¶ 13.

12.

Scientologists believe that it is only through an exploration of his or her past that one can overcome the negative experiences that are affecting and reducing his or her inherent spiritual ability.  Id. ¶ 14.

13.

Scientology posits that spiritual renewal and progress can be achieved by participation in Scientology religious practices. Id. at 15.

14.

Scientology is a very exact faith. One of its fundamental doctrines is that spiritual freedom can be attained only if the path outlined in the Scripture is followed without deviation. Id. at 16.

15.

This path starts with the spiritual healing technology found in Dianetics and continues through increasing levels of spiritual enlightenment described throughout the Scientology Scripture. These levels are described in the "Scientology Classification, Gradation and Awareness Chart." Id; see Chart, Exhibit 16 to Deposition of Robert Wright, attached hereto as Exhibit "H."

16.

This path in Scientology is known as The Bridge to Total Freedom ("The Bridge"). Id. ¶ 17.

17.

The core religious services of Scientology are "Training" and "Auditing," which are designed to advance one's spiritual existence a step at a time by participation in these practices. Id. at 18.

18.

Each local Scientology church, such as Plaintiff, must have sufficient facilities to provide the full range of Training and Auditing for each gradient level on the Bridge, except for certain higher levels of spiritual advancement available only at more advanced Scientology churches.   Ex. "C," Wright Aff. ¶ 6; Ex. "B," Danos Aff. ¶ 14.

19.

Training is provided through Scientology religious courses at Scientology Churches. Ex. "A," Cartwright Aff. ¶ 19.

20.

Through Scientology Training one obtains the wisdom to understand who he is, what he is, where he comes from and his relationship to the Universe.   Mr. Hubbard is very clear in the Scripture that one-half of the spiritual gains in Scientology come from Training.   Id.

21.

Most courses are divided into Theory and Practical sections. The Theory course room is arranged for study at tables, with CD playing equipment for tapes, and larger tables for demonstrating principles using clay models. The Practical course rooms do not have CD equipment or clay tables, and so have a different arrangement. Some course rooms are set up for training drills that do not require any tables. Ex. "A," Cartwright Aff. ¶ 21; Ex. "C," Wright Aff. ¶¶ 14, 15.

22.

For example, a Theory course room for a specific course needs to be next to the Practical course room for that same course and the film room needs to be near all course rooms so that the students can easily see religious instructional films. Ex. "C," Wright Aff. ¶ 17.

23.

Many course rooms relate to one another such that as many as five (5) course rooms may be utilized by the students of one class, who migrate from room to room at their own pace during a study period; thus, not all course rooms will be used at any one time, and all course rooms will certainly not be at full capacity within any one time period. Id. ¶ 16; Ex. A," Cartwright Aff. ¶ 21.

24.

Scientology Auditing is a unique form of spiritual counseling.  Auditing is ministered at Scientology churches in confidential one-on-one sessions between a specially trained individual called an auditor and a parishioner.  Ex. "A," Cartwright Aff. ¶¶ 22, 23.

25.

Auditing must be provided in quiet and confidential surroundings, away from other activities that may be going on in a church.  Ex. "A," Cartwright Aff. ¶ 24; Ex. "C," Wright Aff. ¶ 18.

26.

Auditing is supervised by a trained "Case Supervisor," who must first be trained as an auditor.  The Case Supervisor's role is to see that the Auditing is ministered in a correct orthodox manner.  Ex. "A," Cartwright Aff. ¶ 25, 26; Ex. "C," Wright Aff. ¶ 19.

27.

The standard for an Auditing room is the culmination of many different policy letters of the Founder of the Church of Scientology.  Ex. "C," Wright Aff. ¶ 20.

28.

Scientology churches also hold congregational services on
Sundays, religious holidays, and certain other occasions.  Ex.
"A," Cartwright Aff. ¶ 27; Ex. "C," Wright Aff. ¶ 21; Ex. "B,"
Danos Aff. ¶ 15.

29.

Scientologists believe that the expansion and dissemination
of the religion is necessary to salvage human civilization. Ex.
"A," Cartwright Aff. ¶ 32.

30.

All Scientology churches have a religious obligation to
reach out to their community to spread the word of Scientology so
that new members may pursue the path to spiritual enlightenment.
Id. ¶ 33.

31.

Scientology churches, therefore, are mandated to include
large Public Display areas, including audio-visual presentations
on the religion and its social betterment campaigns such as for
human rights, drug and alcohol addiction prevention, literacy and
scholastic improvement. Id. at 34; Ex. "C," Wright Aff. ¶ 22; Ex.
"B," Danos Aff. ¶ 16.

32.

In order to provide Scientology Training courses, Scientology Auditing and case supervision, Scientology dissemination materials and displays, and church administration, Scientology churches must meet space requirements to house these activities.  Ex. "C," Wright Aff. ¶ 23.

33.

The Church of Scientology International ("CSI"), which is the senior ecclesiastical management church in the Scientology religion, has undertaken considerable study of the necessary facilities for a local Scientology church such as Plaintiff, consistent with Church Scriptures, to develop a standard of spaces and facilities that would be sufficient for a local Church of Scientology.  Id. ¶¶ 3 through 7; Ex. "A," Cartwright Aff. ¶¶ 35-38.

34.

CSI determined that a minimum of 40,000 square feet is required to provide all the necessary religious services, leaving no step of the Bridge omitted, although the ideal size is larger, such as 65,000 square feet.  Ex. "C," Wright Aff. ¶ 9.

35.

While there are many ways one can organize the facilities in a given building, it has been found from space planning nearly a

hundred Churches of Scientology that a building of less than
40,000 square feet will not provide adequate space for the
essential services and activities.  (Certain Scientology
Churches, designated as Celebrity Centers, do not require the
same amount of public displays as other Scientology Churches, and
accordingly their space requirements are somewhat less.)
Id. ¶ 26.

36.

All of the newest Church of Scientology buildings around the
world are fully and properly set up to minister all services of
Scientology.  Id. ¶ 27.

37.

In accordance with the procedures that CSI has promulgated,
any Class V Church that wishes to purchase a new building fills
out a checklist covering various points, which is submitted to
CSI's Building Investment Committee for approval.  The Atlanta
Church submitted a checklist for the building located at 5395
Roswell Road, Sandy Springs, Georgia in 2004. Ex. "C," Wright
Aff. ¶ 24.

38.

At this time, the Georgia Church of Scientology does not
have adequate space to provide the necessary Scientology training
courses, Scientology auditing and case supervision, Scientology

dissemination materials and displays, and church administration.
Ex. "B," Danos Aff. ¶ 17.

39.

The Property, as currently conditioned to the use of 32,053
square feet, is inadequate to meet the needs of the Church of
Scientology. Id. ¶ 18.

40.

It is a crucial function of the individuals who approve the
purchase of new, prospective Church buildings to consider how the
building will be able to be renovated to fit all of the essential
religious services and activities in a manner that is pursuant to
religious scripture. Ex. "C," Wright Aff. ¶ 28.

41.

The Property is currently developed with a 43,916 square
foot office building. Ex. "B," Danos Aff. ¶ 7.

42.

The building has four (4) floors, including an 11,193 square
foot basement, which was used for parking by the prior owner. Id.
¶ 8.

43.

In order to accommodate its growing needs and to provide an
adequate facility in which to exercise its religious precepts,
the Church developed plans to renovate the existing building on

the Property and to convert the 11,193 square foot basement to religious uses, including the Chapel, among other uses. Id. ¶ 9.

44.

The Church does not propose to operate a day-care center, pre-school, kindergarten, school or boarding house on the premises. Id. ¶ 10.

45.

Prior to purchasing the Property, the Church confirmed that a church was a permitted use in the Property's O-I zoning designation and that the number of existing surface parking spaces would satisfy the applicable parking regulations. Id. ¶ 11.

46.

Although a church is a permitted use in the City's O-I zoning district under the Zoning Ordinance, the Property's O-I zoning was conditioned on its use for office and accessory uses, thus preventing its use as a church without rezoning to modify and amend the existing zoning. Id. ¶ 12;  Exhibit 21, to Nancy Leathers, taken June 2, 2010 (R000246), attached hereto as Exhibit "D."

47.

Accordingly, on or about March 9, 2009, the Church submitted the Application, seeking a rezoning and requests for variances to

the City, requesting that the City approve use of the entire
43,916 square foot building as a church, including the 11,193
square foot basement area.   Ex. "B," Danos Aff. ¶ 13.

48.

The Zoning Ordinance provisions relevant to ""Churches and
other places of worship" require one (1) parking space for every
thirty (30) square feet of floor area in the largest assembly
area without fixed seats or one (1) parking space for every 3.5
seats in the largest assembly area with fixed seats. Zoning
Ordinance § 18.2.1, Ex. 16 to Ex. "D," Leathers' Depo.

49.

Applying the City's parking requirement to the Church of
Scientology, forty-one (41) parking spaces would be required,
based on the 1,218 square foot Chapel, which is the largest
assembly area proposed.   Kimley-Horn Traffic Study, June 2009,
page 1, attached hereto as Exhibit "E."

50.

The Property currently has eighty-one (81) parking spaces
(fifty-one (51) spaces on the main site, not counting the parking
spaces in the basement, plus a perpetual easement for thirty
(30) spaces, located immediately to its east).   Id.

51.

In its Staff Report prepared for the June 16, 2009 City Council, hearing, the Staff commented as follows:

> Article 18.2.1 indicates parking requirements are to be calculated based upon the proportion that each use contributes to the total.  For example, a building with multiple uses would be required to provide parking based upon the total parking requirement associated with each use.  On the other hand, parking requirements for uses with large public assembly areas relative to the remainder of the building (i.e. meeting halls or libraries) are based upon the largest assembly area. Normally, (emphasis added) staff would analyze the parking needs for the Church of Scientology building relative to the size of the sanctuary.  However, because proposed development will have a sanctuary which comprises less than 5% of the total net floor area, staff has instead analyzed the parking impact using an aggregate of the uses in the building (sanctuary, offices and classrooms).

Ex. 20 (R 000173) to Leathers' Depo. Ex. "D."

52.

Accordingly, the Staff initially applied a multi-use formula
by which it added the total number of spaces required by Zoning
Ordinance for the Sanctuary, classrooms and Church offices, as if
each were a separate and distinct principal use.  Id. at R000174.

53.

The Staff also assumed that all course rooms, offices, and
the assembly area would be utilized simultaneously at their
maximum capacity, contrary to the Church's showing.  Id.

54.

In recommending departure from the standard applicable to
"Churches and other places of worship" and making its alternative
calculations, the Staff ignored the City's own Zoning Ordinance
and the fact that all of the uses within the building are church
uses.  Id. at 00173.

55.

The Staff also commented that the entire 43,916 square foot
building could be "recommended for approval by staff if the
applicant can demonstrate that the on-site parking will be
sufficient to meet the full use of the proposed building
including the expansion through either a parking study or shared
parking analysis."  Staff Report, Ex. 21 (R000257) to Leathers'
Depo., Ex. "D."

56.

The Church sought and obtained a deferral to allow time to provide Staff with a parking study showing the present and future parking needs for the 43,916 square foot building.

57.

After discussing the parameters for a parking study with the Staff, the Church commissioned a parking study (the "Parking Study"), prepared by the national engineering firm of Kimley-Horn and Associates ("Kimley-Horn"). Ex. "E," Kimley-Horn Report.

58.

The Parking Study compared the needs of the proposed Sandy Springs Church to a Church of Scientology in Nashville, Tennessee and the existing Church of Scientology in Dunwoody to determine the parking actually required to meet the needs of a Church of Scientology. Id. p. 9.

59.

The chapel of the Nashville Church of Scientology has 1,782 square feet and is, therefore, slightly larger than the proposed Sandy Springs Church of Scientology. Id.

60.

Yet, when Kimley-Horn examined the actual need for parking, it found that the actual peak parking demand for weekdays and weekends at the Nashville site was for 41 spaces. Id. p. 5.

61.

To account for the difference in size of the two (2) churches, Kimley-Horn divided the number of spaces used into the total square footage of the Nashville Church and found actual usage to be a ratio of one (1) space per 927 square feet. Id. p. 9.

62.

At the Dunwoody site, the peak demand was 22 spaces, which equates to a ratio of one (1) space per 522 square feet. Id.

63.

Based on the Nashville parking demand per square foot of building, the Parking Study showed that the maximum number of parking spaces needed for the proposed Sandy Springs Church of Scientology, utilizing the entire 43,916 square foot building for religious uses, would be 52 parking spaces. Id.

64.

Before restriping, the Sandy Springs Church has 81 spaces available and after restriping the Church will have a total of 111 spaces available, which is a surplus of greater than 50% over the anticipated need and almost three (3) times more than required by the Sandy Springs Parking Code. Id.

65.

A blend of the Nashville and Dunwoody parking space requirements would result in one (1) space per 725 square feet or 60 spaces as applied to the Property.  Id.

66.

Upon review of the Kimley-Horn findings, the Staff revised its estimate of required parking for the Church in its July 16, 2009 report to the Planning Commission.

67.

The Staff opined that the parking ratio at the Nashville Church was 3.33 spaces per 1,000 square feet (114 parking spaces for a 38,000 square foot facility), which was merely a recognition of how many spaces exist at the Nashville church. Staff then concluded that the Church in Sandy Springs should provide 130 parking spaces.  Ex. 21 (R000253) to Ex. "D," Leathers' Depo.

68.

The revised Staff Report made no mention of the findings set forth in the Parking Study that the peak usage of parking spaces at the Nashville Church was only 41 of the 114 available spaces. Id.

69.

Nor did the Staff Report recognize that the Nashville Church was not required by the City of Nashville to provide 114 spaces; the 114 spaces simply existed at the site prior to the purchase and conversion of the property for church usage.  Id.

70.

The Staff Report thus justified its recommendation that the Church's use be limited to 32,053 square feet on a complete misrepresentation of the parking study at the Nashville Church. Id.

71.

On July 15, 2009, as a result of concerns expressed by Staff that the Nashville church was too new to form a basis for parking needs, Kimley-Horn supplemented the Parking Study with a parking study for a long established Church of Scientology in Buffalo, New York, which found that the Buffalo Church had a peak parking demand of one (1) space per 1,812 square feet of building space. Kimley Horn Report, dated July 15, 2009, attached hereto as Exhibit "F."

72.

Based on the Buffalo data, Kimley-Horn determined that the proposed Sandy Springs Church would need 29 spaces.  Id. p. 3.

73.

The Staff ignored the supplemental information and conclusions found by Kimley-Horn regarding the Buffalo parking ratio. Ex. 22 (R000294) to Ex. "D," Leathers' Depo.

74.

The Staff introduced a new methodology for calculating parking in its August 18, 2009 report to the Planning Commission. Id.

75.

The Staff created a graph that showed the ratios of parking spaces at the proposed Sandy Springs Church (1.87 spaces per 1000 square feet), the Nashville Scientology Church (3 per 1000 square feet) and four(4) other Sandy Springs churches. Id. (R000289).

76.

Based on the higher ratios for other places of worship in Sandy Springs, the Staff concluded that "there would be an inadequate amount of parking for the proposed 43,246[sic] square feet," again ignoring their own ordinance requirement. Id.

77.

After extended discussions between the Staff, the City Attorney and representatives of the Church, on September 1, 2009, Staff recommended approval of zoning 32,053 square feet of the building for use as a church with conditions or the approval of

the zoning and variance requests to allow the Church's use at 43,916 square feet with 81 parking spaces with Alternate Conditions that included, among others, a 283-person occupancy cap.  Ex. 23 (R000326) to Ex. "D," Leathers' Depo.

78.

In its October 6, 2009 report, Staff again recommended approval of both the 32,053 square foot building with conditions and the 43,916 square foot building with the Alternate Conditions, this time with a maximum capacity of 170 persons. Ex. 24 (R000405) to Ex. "D," Leathers' Depo.

79.

With the exception of the Church of Scientology, the City has never calculated parking for a church or place of worship on any basis other than set forth in Section 18.2.1 of the Zoning Ordinance.  Exhibit "G," Leathers' Depo. p. 229, taken October 14, 2010.

80.

According to the Director of Community Development (the "Director"), the Staff's justification for not applying the City's parking ordinance to the Church of Scientology's application is that the number of spaces required under the Code would be insufficient and "creates a public safety issue related

to the site, and that is the public interest that . . . was
involved."   Ex. "D," Leathers Depo p. 23.

81.

The City has approved the following rezonings, use permits,
modifications and variances for churches and other places of
worship issued since the City's formation on December 31, 2005:

a.   **Rezonings:** Second Church of Christ Scientist; Kadampa
Meditation Center.

b.   **Use Permits:**  Congregation Beth Tefillah; Mt. Vernon
Presbyterian School; Holy Spirit Preparatory School; Lutheran
Church of the Apostles; St. Andrews Presbyterian Church; Holy
Innocent's Episcopal Church and School; Sandy Springs United
Methodist Church.

c.   **Zoning Modification:**  Mount Vernon Presbyterian School.

d.   **Variance:**  Zanaida Islamic Education Center.

Ex. 26 to Ex. "D," Leathers' Depo.

82.

In each and every one of these cases, the City analyzed the
parking requirements for a church or place of worship under
Zoning Ordinance Section 18.2.1 and applied the parking standard
of one (1) parking space for every thirty (30) square feet of
floor area in the largest assembly area without fixed seats or

one (1) parking space for every 3.5 seats in the largest assembly
area with fixed seats. Ex. "G," Leathers Depo. p. 229

83.

On March 17, 2009 the City approved the application of the
Lutheran Church of the Apostles (the "Apostles Church") for a use
permit allowing an 8,770 square foot addition to its existing
19,552 square foot church.  Ex. "G," Leathers Depo., pp. 179-195;
and Ex. 35 to Ex. "G."

84.

The Apostles Church property consists of 4.68 acres zoned to
the R-2 Urban Overlay District and is designated as residential
(3 to 5 units per acre) under the Sandy Springs Zoning Ordinance.
Ex. 35 to Ex. "G,", page 5 of 359.

85.

The use of the Apostles Church property as a church is
inconsistent with the City's Future Land Use Plan.  Id.

86.

The Apostles Church described the seating for the new
sanctuary as follows:

The existing building has an approximate footprint of
20,000 square feet.  The existing sanctuary will house
a congregation of approximately 175 members.  The
proposed 8,770 square foot Family Life Center will

serve various functions and can accommodate 450
<u>removable</u> seats for regular services and special
events.  The main assembly room can also house
athletic, theatric, music and social functions.
<u>Additional parking is proposed to provide code</u>
<u>compliance 129 spaces for the potential 450 fixed</u>
<u>seats, as these will be in place 95% of the time</u>
(emphasis added).

Ex. 35 to Ex. "G," Leathers' Depo. p. 20 of 359.

87.

According to the Director of Planning and Community
Development, "fixed seats" are those seats that are:

either affixed to the facility or is difficult to move
and where the permanent arrangement remains in place.
And it's not where you move chairs in and out.  For
example, you wouldn't apply that if you had a gym that
doubled as an . . . assembly area because you would be
moving chairs in and out and there might be different
arrangements at different times and that would be a
non-fixed seating kind of arrangement.

Ex. "G," Leathers Depo.  pp. 173-174.

88.

Notwithstanding the Director's interpretation of "fixed seats" and disclosure by the Apostles Church that the seats are removable and would be in place less than 100% of the time, the Planning Staff applied Section 18.2.1 of the Zoning Ordinance and calculated the required off-street parking spaces to be 129 spaces, based on one (1) parking space per 3.5 fixed seats in their largest assembly area for a church or other place of worship.  Id.

89.

If the City had applied the correct calculation for a church or other place of worship without fixed seating, the Apostles Church would have needed 293 on-site parking spaces for its 8,770 square foot sanctuary.  Id. at p. 193.

90.

As approved, the Apostles Church is required to provide 129 spaces on-site for the 8,770 square foot sanctuary, its Sunday School classes, church offices, and any other church uses in the existing 19,552 square foot building. Id. at p. 181.

91.

No limitations or restrictions were placed on the use of the Apostles Church offices, classrooms and other accessory uses

while the largest place of assembly is in use at the Apostles Church.   Id. at p. 182.

92.

The Apostles Church may also use the former sanctuary for overflow seating for the largest place of assembly, effectively increasing its size considerably. Id.

93.

The Apostles Church was not required to provide parking for its former sanctuary, classrooms, offices or accessory uses over and above the number of parking spaces required based on the size of its proposed largest place of assembly.   Id.

94.

On April 17, 2007 the City of Sandy Springs Council approved a use permit and concurrent variances for Congregation Beth Tefillah (the "Congregation"), which is zoned to the R-2 Single Family Dwelling District.   Ex. 36 to Ex. "G," Leathers' Depo.

95.

The Congregation proposed to add a 13,600 square foot preschool to its existing 19,036 square foot synagogue.   Id.

96.

The Staff analyzed the parking requirement under Zoning Ordinance Section 18.2.1, Basic Off-Street Parking Requirements and determined that 76 spaces would be required for the synagogue

and 29 spaces would be required for the child care facility for a total of a minimum of 105 required spaces to accommodate the proposed development. Id.

97.

The Congregation proposed to meet the parking requirements by providing 71 parking spaces on site and the remainder under a shared parking agreement with a religious school to the north of the Congregation. Id.

98.

Under Section 19.3.6.1 (A),(B)2 and(B)3 of the Zoning Ordinance, shared parking may be approved via an Administrative Permit in the O-I, C-1, C-2, MIX, M-1, M-1A and M-2 zoning districts, provided no more than 20 percent of the total parking requirement may be provided off-site; and the property must be located no more than 300 feet from the principal use with pedestrian access provided between the sites, as may be required by the Department of Community Development. Zoning Ordinance § 19.3.6.1, Ex. 28 to Ex. "G," Leathers' Depo.

99.

The Congregation's property is not zoned to any of the zoning districts, which allow shared parking; the synagogue is located 1,056 feet from the school site; and thirty-two (32%)

percent of the total parking requirement for the Congregation is provided off-site.  Ex. "G," Leathers Depo. 199, 200.

100.

The Congregation did not meet the requirements for shared parking under § 19.3.6 and should have been required to obtain a variance.  Id. at p. 201.

101.

However, the City approved the Congregation's application without a variance and in contravention of the Zoning Ordinance § 19.3.6.  Id.

102.

In failing to require the Congregation to obtain a variance from the requirements of Section 19.3.6.1 (A), (B)2 and (B)3 of the Zoning Ordinance and by approving the Congregation's use permit and concurrent variance petition, notwithstanding the Congregation's failure to comply with the requirements of the Zoning Ordinance, the City Council gave favorable treatment to the Congregation.

103.

On October 8, 2009, the City approved a variance to reduce the parking requirement for the Zainabia Islamic Education Center from 57 to 42 on-site spaces, a 26% reduction.  Ex. 45 to Ex. "G," Leathers' Depo.

104.

The Sandy Springs Board of Appeals approved four (4) additional primary variances from the Zoning Ordinance to allow for the reconfiguration and expansion of an existing nonconforming parking lot.  Id.

105.

The Staff noted in its analysis of the Zainabia variance application that:

> parking requirements for a church are calculated by one
> (1) space for every 30 square feet located in the
> largest assembly area without fixed seats.  The largest
> assembly area is 1,700 square feet located in the
> existing congregation hall.  The site would require
> fifty-seven (57) spaces.  The applicant is proposing
> forty-two (42) spaces.

Id. p. 5 of 8.

106.

The Staff also noted that the Zainabia Islamic Center "has been located on the site for twelve (12) years with twenty parking spaces without a parking problem.  Therefore, staff is of the opinion this criteria has been satisfied."  Id. p. 7 of 8.

107.

The City approved the rezoning of the Kadampa property to allow a place of worship having accessory uses and to a boarding house, conditioned on providing in accordance with the Zoning Ordinance and on the owner's agreement that "[t]here shall be no parking in surrounding neighborhoods and office developments without written agreements." Ex. 31 to Ex. "G," Leathers' Depo.

108.

However, in the case of the Church of Scientology, the City did not consider a limit on parking in the neighborhood as a viable mitigation measure for overflow parking. Ex. "D" Leathers' Depo. pp. 23-28.

109.

The Director explained that "the inability of people to park on the site and to back up traffic on the road because they could not get in and out of the site because there is insufficient parking is a public safety issue." Id. p. 23.

110.

When asked if it were possible to alleviate that problem by putting someone at the entrance that would prohibit cars from going in if the lot were full, the Director acknowledged "[that] would be another option." Id. p. 24.

111.

When asked if putting a sign out that said "lot full" was another way to keep cars from backing up, the Director replied "it's a possible way to do it if someone is willing to do that during periods of operation of the facility." Id. p. 25.

112.

The Director admitted that the City never suggested either alternate and further stated that it was not the City's "obligation to prepare an application for an applicant." Id.

113.

The inability to utilize the entire 43,916 square feet of the existing building owned by the Church of Scientology is far more than an inconvenience. Affidavit of Deborah Danos, attached hereto as Exhibit "B," ¶ 19.

114.

The Church proposes locating the chapel in the basement of the building because the existing building is not engineered and constructed to allow a concentrated assembly of people on any other floor of the building.  Id. ¶ 20.

115.

Denying the Church the ability to utilize the basement would require the Church to revise its existing renovations plans (civil plans have been completed) and re-engineer the structural support of the building, which would be prohibitively expensive. Id. ¶ 21.

Respectfully submitted,

DILLARD & GALLOWAY, LLC

By:  G. Douglas Dillard
     Georgia Bar No. 221900
     dougd@dandglaw.com
     Andrea Cantrell Jones
     Georgia Bar No. 398440
     andrea@dandglaw.com
     Lauren M. Hansford
     Georgia Bar No. 497507
     lhansford@dandglaw.com
     Attorney for Plaintiff
     3500 Lenox Road, N.E., Suite 760
     Atlanta, Georgia 30326
     (404) 965-3680
     (404) 965-3670 (fax)