1          IN THE UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF GEORGIA
2                   ATLANTA DIVISION

3

4   CHURCH OF SCIENTOLOGY OF      )
    GEORGIA, INC., a Georgia      )
5   Corporation,                  )
                                  )
6              Plaintiff,         )
                                  )
7       vs.                       ) CIVIL ACTION FILE
                                  )
8                                 ) NO. 1:10-CV-0082-CAP
    CITY OF SANDY SPRINGS,        )
9   GEORGIA, et al.,              )
                                  )
10             Defendants.        )

11

12                     - - -

13          Deposition of NANCY J. LEATHERS, AICP,

14   Volume II, taken on behalf of the Plaintiff, pursuant

15   to Notice, in accordance with the Federal Rules of

16   Civil Procedure, before Debera J. Puckett, Certified

17   Court Reporter, at 7840 Roswell Road, Suite 500, Sandy

18   Springs, Georgia, on the 14th day of October, 2010,

19   commencing at the hour of 10:20 a.m.

20

21                     - - -

22            DEB PUCKETT & ASSOCIATES

23               636 OLD IVY ROAD

24          ATLANTA, GEORGIA   30342

25               (404) 365-9015

1               INDEX OF EXHIBITS

2    Plaintiff's
     Exhibit No.            Description              Page
3
     26   Defendant's Response to Plaintiff's       159
4         Second Interrogatories and Request for
          Production of Documents and Notice to
5         Produce to Defendants

6    27   Page from Zoning Ordinance                161

7    28   Parking Ordinance                         161

8    29   Documents produced by City                163

9    30   Meeting Minutes 2/16/10                   163

10   31   Staff Analysis                            163

11   32   Site Plan                                 176

12   33   Case Report, Lutheran Church of the       176
          Apostles
13
     34   Letter dated 3/18/09                      180
14
     35   Letter dated 3/18/09                      180
15
     36   Letter date 4/18/07                       196
16
     37   Site Plan, Congregation Beth Tefillah     201
17

18   38   Staff Report, St. Andrews                 206

19   39   Use Permit Petition, St. Andrews          207

20   40   Site Plan                                 210

21   41   Site Plan                                 211

22   42   Rezoning Petition                         212

23   43   Zoning Modification Petition              215

24   44   Use Permit                                216

25   45   Variance Petition                         219

Page 158

1      46   Site Plan, Mount Vernon Baptist          219

2      47   Meeting Minutes, 3/2/10                   227

3      48   Rezoning Request, Second Church of        229
            Christ Scientist

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the
     Plaintiff:              G. DOUGLAS DILLARD, Esq.
 3                           ANDREA CANTRELL JONES, Esq
                             3500 Lenox Road, Suite 760
 4                           Atlanta, Georgia  30326

 5   On behalf of the
     Defendants:
 6
                             LAUREL E. HENDERSON, Esq.
 7                           Henderson & Hundley, P.C.
                             160 Clairemont Avenue
 8                           Suite 430
                             Decatur, Georgia  30030
 9

10   Also present:           Ms. Deborah Danos

11                              - - -

12              MS. JONES:  We had 25 exhibits on that

13      first deposition.  We will start this deposition

14      with Plaintiff's Exhibit No. 26 then so we'll

15      have a nice orderly transition here.  And

16      Ms. Leathers, you are still under oath.  And

17      basically I want to ask you questions about some

18      of the prior church and places of worship

19      zonings and use permits that have been issued by

20      the City of Sandy Springs.

21              (Documents were marked for

22              identification as Plaintiff's Exhibit

23              No. 26.)

24      Q   (By Ms. Jones)  Now, I am going to show you

25   what has been marked as Plaintiff's Exhibit No. 26
```

1    which I received from your attorney.

2             Are you familiar with that document?

3        A    Yes, I am.

4        Q    And you verified -- these are the Second,

5    Response to Plaintiff's Second Interrogatories and

6    Request for Production of Documents.  You verified

7    the City's First Response to the, Response to the

8    First Interrogatories and Request for Documents, but

9    I don't see a verification on this document.

10             MS. HENDERSON:  There isn't because I

11        let it slip through the cracks when I was

12        working on Supreme Court briefs in another case.

13        It's my fault.

14        Q    (By Ms. Jones)  Do you represent today that

15    you will be the person who will verify the

16    information in these interrogatory responses and

17    these are your responses?

18        A    Yes.

19        Q    You provided them to Ms. Henderson?

20        A    Yes.

21        Q    Now, let me also get you to, I have here a

22    certified copy of the Sandy Springs zoning --

23        A    Good.

24        Q    -- that y'all gave me.  I am so happy to

25    have it too, I can't tell you.  I like to just

1    actually have a paper document instead of having to

2    look online for things.  But anyway, I have excerpted

3    out a couple of exhibits from that zoning ordinance,

4    27 and 28.  I just want to get you to identify them

5    so we can use them to talk from.  And you can look it

6    up in the zoning ordinance if you feel the need to.

7

8                    (Documents were marked for

9                    identification as Plaintiff's Exhibit

10                   Nos. 27 and 28.)

11                   MS. HENDERSON:  That is probably three

12        copies.

13                   THE WITNESS:  It is three copies of

14        the same thing.

15                   MS. JONES:  Oh, okay.

16                   THE WITNESS:  That's why I was

17        looking.  I kept --

18                   MS. HENDERSON:  And then my --

19                   THE WITNESS:  -- trying to figure it

20        out.

21                   MS. HENDERSON:  If that is something

22        that you can to identify by itself, but also

23        look at whether in terms of what it is it

24        appears to be complete in terms of, I don't know

25        what the purpose is on that.

1      Q    (By Ms. Jones)  Well, if you would like to

2   look in the zoning ordinances to make sure, this is

3   the parking off-site and shared provision is what I

4   am looking at which is that 19-3-6 paren 1 section.

5      A    Yes.  It's, it's an administrative permit

6   provision for, for shared parking off-site.

7      Q    And then the 28 is the parking ordinance.

8   And I believe I might have just copied the whole --

9      A    Uh-huh (affirmative), that appears to be

10  all of Article 18.

11     Q    Okay.  Good.  So we can have those to look

12  at while we are talking about all of these other

13  things.  Now, I am going to sort of follow the

14  questions that were asked in the interrogatories to

15  just create a little way that we can approach this.

16  The first question was point out where the maximum

17  capacity or maximum occupancy of each room other than

18  the largest assembly room within the proposed church

19  or place of worship was calculated.  And your first

20  response was the Kadampa Meditation Center.  And you

21  all have been so generous that I am almost

22  overwhelmed with information.

23     A    We aim to please.

24     Q    Well, you did please.

25

1

2              (Documents were marked for

3              identification as Plaintiff's Exhibit

4              Nos. 29 and 30.)

5      Q    (By Ms. Jones) 6860 Peachtree Dunwoody

6  Road.  Now, I'd like to look with you, and I am going

7  to call this No. 29 and 30.  Can you identify 29 and

8  30 as being documents that the City produced

9  regarding the rezoning of the Kadampa Meditation

10  Center?

11     A    Yes, this is the, site plan is Exhibit 29

12  and the actual case writeup is Exhibit 30.  Let me

13  make sure that we've got everything in it, however.

14  This does not include the staff analysis.

15     Q    All right.

16     A    Council wouldn't act on the staff analysis,

17  but if you are going to ask me about parking

18  calculations and so on, I would give you the staff

19  analysis.

20

21              (Documents were marked for

22              identification as Plaintiff's Exhibit

23              No. 31.)

24     Q    (By Ms. Jones) Well, let me show you 31.  I

25  think that is the staff analysis.

1      A    I'm not trying to be difficult.  I just --

2      Q    I actually copied the staff analysis, so I

3  will give it to you.  I want you to be able to answer

4  in an intelligent accurate way.

5      A    I do too.

6      Q    Is that --

7      A    Yes, that is the analysis.

8      Q    -- the staff analysis?  Would you, and you

9  listed the Kadampa Center as one of those instances

10  where the church requested that the applicant provide

11  the maximum capacity or occupancy of each room other

12  than the largest assembly room.

13      A    That's correct.

14      Q    And could you run through exactly how you

15  calculated the required parking for the Kadampa

16  Center.

17      A    The analysis on the Kadampa Center relates

18  to the fact that there are actually two uses in the

19  facility.  There is what we would consider the

20  religious facility and there is also what the staff

21  addresses under the zoning ordinance as a boarding

22  facility.  And those parking requirements are

23  separately calculated in here.  And that gave us a

24  total of 41 required spaces.  And that is what the

25  applicant provided and that was for both.  Of those

1    the place of worship required -- let's see.  There

2    were two separate calculations that were done.  One

3    was the requirements for the place of worship which

4    was a total of 25 spaces or one per three-and-a-half

5    fixed seats.  And then in addition, there was a

6    calculation of per one bedroom and five per 1,000

7    square feet of common area for the boarding house for

8    a total of 15 spaces which should total 41, but it

9    totaled 40.  But they provided 41.

10       Q    So you calculated that using Section 18.2.1

11   of the zoning ordinance that we are looking at here

12   as Plaintiff's Exhibit No. 28; is that correct?

13       A    That's correct.

14       Q    And you applied, to the church use you

15   applied, the churches and other places of worship

16   without fixed seating -- or is this a fixed --

17       A    This was the fixed.

18       Q    With fixed seating.  So you applied 1.356

19   seats in the largest assembly area for the church

20   use?

21       A    Yes.

22       Q    And then they had a separate use that was a

23   nonchurch use which was the boarding house or --

24       A    Well, it's a --

25       Q    -- dormitory use?

Page 166

1      A      -- it is a church-related use, but it is,

2      it is not a normal accessory use for a church.  And

3      so therefore, it was calculated as a separate use.

4      Q      And it actually has a separate calculation

5      in the zoning ordinance for this type of use; is that

6      correct?

7      A      That's correct.

8      Q      Where is that listed under, is that listed

9      under boarding houses?

10     A      You will have to let me go and look it up.

11     Dormitories and related, yes.

12     Q      And that would dormitories, fraternity

13     houses, sorority houses and boarding houses.  So if

14     you are using it as one of those things, then you

15     have to apply the one per bedroom plus five per 1,000

16     square feet of common area?

17     A      Common area, that's correct.

18     Q      Now, what other, are there any other

19     buildings besides the bedrooms and the sanctuary in

20     the Kadampa Center?

21     A      I don't have, I don't have the floor plan

22     here.  Without the floor plan, I, I couldn't answer

23     that for you.  I would expect that there would be

24     some area that people come, an, an entry area that

25     people come into that is over and beyond it, but I

1    don't know other than that.  And they may have a, an

2    office, some offices.

3        Q    How about in your staff report did you

4    notice or did you note any classrooms or offices or

5    other uses of the property besides the boarding house

6    and the largest assembly area?

7        A    I don't believe that we did.  And I,

8    without the floor plan before me, I can't tell you

9    what proportion of the area would have been bedrooms

10   and which proportion would be other uses.

11       Q    Well, I am looking at the front of your

12   staff report?

13       A    Yes.

14       Q    I am seeing bedrooms and fixed seats and

15   common area listed.

16       A    I understand.  And if the, if the remaining

17   space is relatively minor, it would be accessory and

18   wouldn't be separately calculated.  And this accounts

19   for the majority of the, the square footage of the

20   building.

21       Q    So this, so I just want to be clear that

22   you did not assign a parking requirement if, in fact,

23   there was office space in the Kadampa Center.

24       A    That's correct.

25       Q    And the same thing, if there were religious

1    classrooms, you did not assign a separate parking

2    requirement for any of those religious classrooms in

3    the Kadampa Center?

4         A    We would not, but I don't have the floor

5    plan before me and I can't even tell you that there

6    are those particular kinds of facilities in that

7    building without looking at it.

8         Q    But bottom line is you calculated the

9    Kadampa Center required parking using the Sandy

10   Springs Code Section 1821 requirements?

11        A    Yes.  But let me add that if the areas,

12   the, the accessory areas are relatively minor

13   relative to the total square footage that is covered

14   by the two uses that are parked, they would be

15   considered accessory and wouldn't be calculated.

16   When it's larger, when the, the accessory uses become

17   larger is when we would separately calculate them.

18        Q    Now, the Kadampa Center, the zoning of the

19   Kadampa Center had a condition that there shall be no

20   parking in surrounding neighborhoods or office

21   complex without an agreement; is that correct?

22        A    Yes.

23        Q    How did the City plan to enforce that

24   particular condition?

25        A    Well, I don't know that I can tell you

1   because it was added at council.  It wasn't a staff

2   condition.  I believe that the neighbors raised the

3   issue and were concerned about the parking in the

4   neighborhood.  And I can only assume that the council

5   expected that people would complain if the parking

6   occurred there.

7        Q    And that was discussed during the hearing?

8        A    I believe the, in the public hearing there

9   were comments made and I believe the motion to add

10  that item to the case was made.

11       Q    And that was adopted?

12       A    Yes.

13       Q    That was not your idea?

14       A    That was not a staff recommendation.

15       Q    All right.  That takes care of the Kadampa

16  Center.

17            MS. HENDERSON:  Let me ask you, as we

18            go through these, are you planning to ask all

19            your questions, you started going through the

20            interrogatories at Interrogatory No. 1 and we

21            referenced some of these same zonings on more

22            than one interrogatory.  Can we take all your

23            questions related to that center together to

24            orient, just to keep things oriented?  I don't

25            know that you will have any other questions

1          related to Kadampa Center.  That may have

2          answered all of them.

3                    MS. JONES:  It may have.  Let's see if

4          it did.

5                    MS. HENDERSON:  Okay.  I'm just trying

6          to keep it clear so --

7                    MS. JONES:  I understand.

8                    MS. HENDERSON:  -- we can all follow

9          it a little easier.

10     Q    (By Ms. Jones)  So the second question was

11   provide a list of any instances during the zoning

12   process when the City requested that an applicant for

13   a church or other place of worship provide the

14   maximum capacity or maximum occupancy of each

15   accessory use within the church or other place of

16   worship.  And you listed again the Kadampa Meditation

17   Center, but you did not, and let me be clear.  The

18   only accessory use that you requested required

19   parking for was the boarding house use?

20     A    And that would be, I believe, because that

21   was the only significant space that beyond the, the

22   assembly area that, that we were dealing with.

23     Q    So it wasn't necessarily each accessory

24   use, it was each significant accessory use?

25     A    Well, we would ask for the information, but

1    it, then the determination needs to be made on

2    whether the use is really accessory or is really a

3    concurrent use that is occurring along with a

4    religious facility.  And in this case, the, it is not

5    ordinary to have a residential use in a, of this sort

6    in a church facility.  And it was large enough so

7    that it was clearly going to generate additional

8    traffic and additional parking, and so it was

9    addressed as a separate use.

10       Q    Well, what do you consider in your mind

11   what an accessory use to a church is?  Or could you

12   list what you think the accessory uses are?

13       A    Well, I think that we would probably, and

14   it, and it may depend on size and not just on the

15   use.  Generally speaking, churches have some office

16   space.  They have some classrooms.  They may have a

17   library.  Those would be normal kinds of accessory

18   uses in a, in a church.

19       Q    They might have a kitchen?

20       A    They probably would have a kitchen.

21       Q    And maybe a fellowship hall?

22       A    Probably.  Although if the fellowship hall

23   was large, it might become the larger facility.  And

24   so that's, it depends.  Again, it is a scale and a

25   determination at the time that the application comes

Page 172

1    in.  Because the intent of the ordinance is obviously

2    to address the maximum occupancy of the building and

3    then to, the other things go hand in hand.  And if

4    things occur in conjunction with or if they occur at

5    off times, then they would be, they would be

6    considered accessory if they're relatively small.

7        Q    But unless it was an accessory use that had

8    a separate parking requirement on, in the zoning

9    ordinance, you would not list it as an accessory use;

10   is that correct?

11       A    I don't understand that question.

12       Q    Well, we will go through all of the zonings

13   that you have here and just kind of list out what the

14   accessory uses are.  In this case the accessory use

15   was as a boarding house which has its own parking

16   requirement under the zoning ordinance?

17       A    No, I don't believe I said that the, the

18   boarding house was an accessory use.  It is a

19   parallel use that is used by the church, but it

20   actually was approved for both uses.  And that's in

21   condition 1A.  And the parking is provided for either

22   of those uses because it is a separate use.

23       Q    So you don't consider the boarding house an

24   accessory use?

25       A    No.  It is, it is something which is being

1    done in conjunction with this church, but it is not,

2    it is significant enough so that it is, and it is not

3    what would be normally -- most churches don't have

4    this kind of facility.  And so the parking ordinance

5    really doesn't contemplate that kind of use at that

6    location.  And so it was separately addressed in

7    part.

8        Q    And you applied the zoning ordinance --

9        A    That's correct --

10       Q    -- to this requirement?

11       A    -- yes.

12       Q    How did you determine how many fixed seats

13   that church had?

14       A    They provided the information on the fixed

15   seating to us.

16       Q    There was no separate investigation to

17   determine whether the seating was fixed or not?

18       A    We assumed that they, they, that churches

19   present us truthful information.

20       Q    What is fixed seating anyway?

21       A    Fixed seating is seating that, that is

22   either affixed to the facility or is difficult to

23   move and where the permanent arrangement remains in

24   place.  And it's not where you move chairs in and

25   out.  For example, you wouldn't apply that if you had

1    a gym that doubled as an, an assembly area because

2    you would be moving chairs in and out and there might

3    be different arrangements at different times and that

4    would be a non-fixed seating kind of arrangement.

5         Q    Let me just make sure I don't have any more

6    questions about Kadampa since you've listed it

7    several times.

8                   MR. DILLARD:  What does Kadampa mean?

9                   MS. JONES:  It is a Hindu word for

10          meditation center.

11                  THE WITNESS:  Buddhist.

12                  MS. JONES:  Buddhist.

13                  MR. DILLARD:  Buddhist?

14        Q    (By Ms. Jones)  Please provide a list of

15    all instances in which, during the zoning process the

16    City requested the applicant for a church or other

17    place of worship to provide anticipated growth in

18    attendance or occupancy for a proposed church, and

19    you've listed Kadampa.

20               Could you find for me where you have even

21    considered anticipated growth of Kadampa?

22        A    Well, if we maximize the parking, if they

23    do not request that that be reduced for some reason,

24    then the anticipated growth can be accommodated in

25    the facility as being zoned.  If there is a reduction

1    in parking, then we would need additional

2    information.  But in order to know that we are

3    properly parking the facility, we need to know from

4    them their, their anticipated growth is going to be

5    something that they can accommodate in that space and

6    with that parking.

7         Q    And did Kadampa provide that information?

8         A    They discussed it with us and we felt

9    satisfied.  They were satisfied with the total amount

10   of parking.  Now, they did indicate as part of their

11   discussion that although they were, they had the

12   ability to take the 15 percent MARTA reduction, but

13   they were not asking for that to ensure that they had

14   enough parking on site.

15        Q    And is there any, is that anticipated

16   growth addressed in the staff report or in the

17   minutes?

18        A    Well, it's discussed in the sense that they

19   did not request the MARTA reduction and that is in

20   the staff report.

21        Q    So you took their not needing the MARTA

22   reduction to indicate to you that they did not

23   anticipate growing out of the 41 spaces they have

24   available?

25        A    That's correct.  The parking, the parking

1    requirements of the City are being met.  If they, if

2    they are willing to meet the full parking

3    requirements of the City, then we work with them on,

4    then we assume that their, that their, the growth can

5    be accommodated in that building.  And should they

6    need additional space, they would then have to rezone

7    and come back and provide additional parking for

8    anything additional.

9         Q    I think that takes care of Kadampa because

10   the rest of the interrogatories are about the

11   Lutheran Church of the Apostles.

12             MS. JONES:  That's an original, right?

13        But you want to keep those because we're going

14        to look at those some more.

15             MS. HENDERSON:  I was going to say you

16        probably want me to have those here.

17        Q    (By Ms. Jones)  And you know, what I want

18   to do is I am just going to jump right in to the

19   Lutheran Church of the Apostles while I am fresh

20   because it's a big fat one.  Thirty-one is my next

21   number.

22             (Documents were marked for

23             identification as Plaintiff's Exhibit

24             Nos. 32 and 33.)

25        Q    (By Ms. Jones)  I am going to show you

1    Exhibits 32 and 33 and see if you can identify those

2    exhibits.

3        A    Thirty-three is the staff report to the

4    planning commission.  Okay.  This is the case

5    submitted to the planning commission.

6        Q    And that's the site plan that was

7    considered?

8        A    Before planning commission.

9        Q    Do you know if that's the site plan that

10   was adopted?

11       A    No, I don't because I don't have the case

12   that went to the mayor and council.

13       Q    This is what was sent to us.  Let's see.

14            MS. HENDERSON:  I think we've got a

15       mixup on our questions and answers.  Nancy was

16       testifying that No. 33 is the staff report that

17       went to the planning commission and then you

18       asked her about the site plan, if that was the

19       one that went to council.  I think there's a

20       confusion as to between site plan and staff

21       report.

22       Q    (By Ms. Jones)  Were there recommended

23   conditions in the planning commission?

24       A    There were, but I don't know that they are

25   the same as what was recommended to mayor and council

1    without looking at the case that was submitted to the

2    mayor and council.

3       Q    This was what was made available to us.

4    And I really want to talk about Church of the

5    Apostles in a way that you can answer questions.

6             MS. HENDERSON:  Would it be helpful,

7        do you want to just have somebody pull the

8        report to the mayor and council?  I anticipate

9        that when you came to the city hall for review,

10       you flagged certain documents you wanted copies

11       of and that's what they copied.

12            MS. JONES:  Well, I thought I had

13       flagged the mayor and council stuff, and this

14       is, this was the whole package I got.

15            THE WITNESS:  I don't know, I mean

16       whatever you flagged, I'm sure, is what they

17       copied, but it may, they look alike except for

18       what is on the front.  So I have a copy.  If you

19       want to give me a minute to break, I will go and

20       see if we can't run some extra copies of it and

21       I will be glad to provide them.

22            MS. JONES:  Okay.

23            MS. HENDERSON:  They are not certified

24       or anything, but if you will trust me.

25            MS. JONES:  That's okay.

1          (Discussion ensued off the record.)

2          MS. JONES:  While you were gone, I

3      found a document that actually is a letter to

4      the property owner, I believe, that outlines the

5      conditions of zoning and --

6          THE WITNESS:  Well, I still probably

7      need, yeah, I need the whole case in front of me

8      if you don't mind.  I can be more intelligent

9      when responding with everything rather than some

10     of it.  And I will be happy to provide that in a

11     moment when the copy machine isn't down.  It's

12     the one that collates.

13          (Documents were marked for

14          identification as Plaintiff's Exhibit

15          Nos 34 and 35).

16     Q   (By Ms. Jones)  Okay.  Now, I think we have

17 it and I need to give you back --

18     A   The site plan is the same, so I checked

19 that.

20     Q   So it has been zoned to the site plan that

21 is Plaintiff's 32, condition on that site plan,

22 correct?

23     A   And to the conditions of zoning.

24     Q   Now, how was the parking calculated for

25 the, this is the Church of the Apostles on Hammond

1    Drive and Glenridge?

2        A    It was calculated one space per

3    three-and-a-half fixed seat in the largest assembly

4    area and it was also calculated separately for the

5    day-care.

6        Q    So what did, what was the largest, what was

7    the number of fixed seats in the largest assembly

8    area?

9        A    450.

10       Q    So what was the requirement for parking for

11   450 fixed seats?

12       A    129.

13       Q    And what was the required parking for the

14   church?

15       A    That's the church.

16       Q    What is the required parking for the

17   day-care?

18       A    I would have to go back and, and check

19   that.  I don't have that in the, it isn't in the

20   analysis.

21       Q    How many site, how many parking spaces are

22   provided on site?

23       A    Without checking the site plan, I can't

24   tell you.  129.

25       Q    So 129 spaces were required for this

1      sanctuary, the largest area of assembly?

2          A     Yes.

3          Q     And 129 are provided on site?

4          A     That's correct.

5          Q     So no additional spaces were required for

6      the day-care?

7          A     I would have to go back and do the

8      calculation for the day-care because 50 percent of

9      the parking spaces of the church may be shared with

10     the day-care.  And the calculation for the day-care

11     if it's either 50 percent of that 129 or less would

12     be included in the 129.

13         Q     And I am looking and I'm not finding a,

14     this does not appear to have all the information that

15     was in -- okay.  Turn to Page 20 of 359.

16         A     Okay.  The letter of intent?

17         Q     Yes.

18         A     Okay.

19         Q     And that letter of intent was received from

20     Ashford Engineers who were representing the church;

21     is that correct?  Or they were --

22         A     Yes.

23         Q     -- writing on behalf of the church?

24         A     Yes.

25         Q     Now, look at the second paragraph of the

1    letter of intent.  If you would read that, read it

2    into the record and then let's talk about it.

3         A    I'm sorry, which one did you ask for?

4         Q    Second paragraph of the letter of intent --

5         A    Okay.

6         Q    -- starting the existing building.

7         A    Has an approximate footprint of 20,000

8    square feet.  The existing sanctuary will house a

9    congregation of approximately 175 members.  The

10   proposed 8,770-foot facility -- foot family life

11   center will serve various functions and can

12   accommodate 450 removable seats for regular services

13   and special events.  The main assembly room can also

14   house athletic, theatric, music and social functions.

15        Q    And they propose, the next paragraph they

16   proposed 450 fixed eats?

17        A    Yes.

18        Q    And that was the number used to calculate

19   the required parking for the property?

20        A    For the church.

21        Q    For the church.  450 fixed seats at 3.5?

22        A    Yes.

23        Q    How were these seats fixed?  He says in the

24   letter they are removable.

25        A    They are removable, but they are fixed in

1    place almost all of the time and there's only one

2    configuration that works for the 450.  And so they

3    maxed out the number of, the number of seats that can

4    go into the room.  And even if they took some chairs

5    out, there would still be parking for 450.

6        Q    If they took all the chairs out, then the

7    seats would not be fixed, would they?

8        A    That's true.  But that's, the intent is for

9    this to be a, a facility that, that is in place for

10   that use almost all of the time.

11       Q    He says it can house athletic, theatric,

12   musical and social functions.  They would have to

13   take the seats out to do that, wouldn't they?

14       A    Not completely, no.  They would, they would

15   leave some of the seating in.  They might reduce the

16   seating.  They would never exceed it.

17       Q    So how does this calculation, so fixed does

18   not necessarily mean fixed, is that what you are

19   telling me?

20       A    Fixed does not mean it's affixed to the

21   ground and can't be moved.  I think I said that in

22   the beginning.

23       Q    So fixed does not contemplate moving the

24   seats out, correct?

25       A    Fixed contemplates that that's the maximum

1    number that you will have in there at any time and it

2    can be calculated.

3       Q    That's the maximum number of seats?

4       A    Yes.

5       Q    Correct?

6       A    Yes.

7       Q    But fixed does not take it, fixed used as

8    to the Church of the Apostles does not take into

9    account that some sort of a function would occur that

10   would, the Church of the Apostles would decide to

11   take the seats out to allow for a big ballroom type

12   function?

13      A    They could do that.

14      Q    They could do that.  Did you have that

15   discussion with them?

16      A    The most people that would be in the room

17   would, we anticipated would be those which would be

18   seated when they had the 450 seats in the room.  So

19   that is the largest parking requirement.

20      Q    Well, now, did you, did you count the

21   other, what other accessory uses are on the site?

22      A    Accessory or parallel?

23      Q    Okay.  We are going to have the day-care

24   center?

25      A    The day-care was separately calculated and

1    that is in, those parking spaces are shared spaces

2    with the church.

3        Q    So what other uses are in that church?

4        A    They would have some classrooms and they

5    would have some offices.

6        Q    How many classrooms?

7        A    I don't have that with, I don't have the

8    floor plan here.

9        Q    Did you calculate for purposes of required

10   parking the number of classrooms and spaces in the

11   classrooms?

12       A    The assembly area is approximately

13   30 percent of the total square footage of the total

14   facility including, which goes, which includes the

15   day-care which is, is separately calculated in part.

16       Q    How about, so you don't have a calculation

17   available of how many classrooms there are, religious

18   classrooms?

19       A    Not without getting the site plan -- not

20   without getting the building plan, no.

21       Q    How about the number of offices they have?

22       A    No.

23       Q    How about any other accessory uses?

24       A    I would assume but don't know for sure that

25   they probably have a library and they probably got a

1   kitchen in the normal things that they would do as

2   part of their, their, as a church facility.  The

3   day-care is not a normal part of the church facility.

4   It's really a separate operation that they run it

5   parallel.

6       Q   They currently have a 20,000-square foot

7   building that will house a congregation of 175

8   members.  That's their current, or it's not current

9   now because I believe they have opened their new

10  facility, but it was at the time of this zoning?

11      A   That's correct.

12      Q   So did they tear that down?

13      A   I believe they added on to the front.

14      Q   So is that sanctuary still there that can

15  house 175 members?

16      A   I don't know how they have reconfigured the

17  area, but when they added the, the new, the new area

18  on.  I don't have the floor plan before me.

19      Q   So it's possible that you could during

20  church services have your main sanctuary,

21  8,770 square foot sanctuary with 450 fixed seats in

22  it at capacity.  And you could also have in the other

23  existing sanctuary ever how many seats it would allow

24  for 175 people, correct?

25              MS. HENDERSON:  Object to form.

1              THE WITNESS:  I don't know.

2      Q    (By Ms. Jones)  You don't know whether that

3   is possible or not?

4      A    I don't know the configuration of the space

5   at this time because I don't know whether they did

6   any renovation of the space that they, they

7   previously used for the sanctuary, so I don't know.

8      Q    Wouldn't that, you didn't ask that question

9   when you were trying to calculate what the necessary

10  parking would be?

11     A    I don't have it here and it's not before

12  me, so I can't answer the question.

13     Q    It didn't come up as a consideration in

14  your staff report?

15     A    It is not mentioned in the staff report and

16  the answer is I don't know.

17     Q    So if we were to provide that information

18  from the Church of the Apostles, do you think you

19  could answer that question?

20              MS. HENDERSON:  I am going to object

21       to form.

22              THE WITNESS:  I would look at it.  I

23       don't know.

24     Q    (By Ms. Jones)  But it is done now, right?

25  What would you do?

1      A    I would answer your question if I could.

2      Q    So the City applied, the City assumed that

3  the seating in the 8,770-square foot sanctuary was

4  going to be 450 fixed seats and applied the zoning

5  ordinance requirement to that sanctuary, correct?

6      A    That's correct.

7      Q    And there may or may not be a separate

8  calculation for the day-care center?

9      A    There was a separate calculation.  It's not

10  in the staff analysis, but there was a separate

11  calculation.

12      Q    But whatever that calculation is would not

13  require more than a total of 129 parking spaces for

14  the entire site; is that correct?

15      A    That's correct.

16      Q    Do you know what the maximum number of

17  people able to use any particular room in the church

18  building at any one time is?

19      A    No.  I don't have a copy of the floor plan,

20  so I don't even know how it's laid out.

21      Q    Does the City have a floor plan?

22      A    The answer is I don't know.

23      Q    I don't believe that there was a floor plan

24  provided to us.

25              MS. HENDERSON:  To the extent that the

1       building was standing before the creation of

2       Sandy Springs, I don't know that the City would

3       ever have one if it wasn't -- to the extent that

4       the building added on to, there would have been

5       plans for that addition, but those plans would

6       not have necessarily included the older part of

7       the building that was not modified.  And the

8       plans for building would not be a zoning issue

9       because they are a building issue.

10              THE WITNESS:  Well, it, it probably

11      also goes beyond that.  There would be, could be

12      modifications made that wouldn't require a

13      building permit at all.  So there wouldn't be

14      any way that I could know without that

15      information.

16      Q    (By Ms. Jones)  So to your knowledge, you

17      don't know where the floor plan of the building for

18      the Church of the Apostles is?

19      A    No.

20      Q    Now, how about the fire code people, would

21      they have a floor plan?

22      A    I don't know.

23      Q    Should they?  I mean is that something that

24      they keep in their files for each building in the

25      city?

1      A    No.   The building permits that were issued

2   in Fulton County are still with Fulton County.   This

3   fire department would not have building plans for

4   anything that should be Fulton County.

5      Q    So it is possible that Fulton County may

6   have a copy of the building permit?   I mean if it

7   exists, would it be in Fulton County?

8      A    Can I answer truthfully?   The answer --

9      Q    You ought to know.

10          MS. HENDERSON:   You are supposed to

11          answer truthfully.

12          THE WITNESS:   I can answer truthfully.

13          The answer is first of all, this is a relatively

14          old building.   So I doubt very much that Fulton

15          County has any floor plans for it.   But should

16          they have them, they probably are unable to find

17          them because they just moved all of the records

18          to Fulton Industrial Boulevard and it's my

19          understanding that nobody can find anything in

20          those boxes because they are not properly

21          labeled.   So that's my answer.   And it's

22          truthful.

23      Q    (By Ms. Jones)   I don't doubt the truth of

24   your answer.

25          Okay.   With respect to the entire site,

1    does the City have any capacity limits on how many

2    people can be on the site at any one time?

3        A    The fire code controls specific areas of

4    the buildings, but I, in terms of the total number of

5    people in a building, we wouldn't have any way of, of

6    monitoring that.

7        Q    So is the answer to that then no?

8        A    It's, it's neither yes nor no.  It is what

9    it is.

10       Q    Let me ask you, do you know the maximum

11   number of people that can be in the buildings on that

12   site at any one time?

13       A    I do not.

14       Q    Do you know anyone who does know that?

15       A    You would, the, the capacity of rooms is

16   controlled under the fire code, and the fire marshal

17   would have such information for those rooms to which

18   it applies.

19       Q    When you say for those rooms to which it

20   applies, does it apply to some rooms and not others?

21   How does that work?

22       A    Well, generally the enforcement is for

23   places of public assembly.  So I don't know that

24   every room in the building would be monitored and

25   have a separate occupancy.

1     Q    So you could have, your enforcement would

2    be the main place of assembly, the sanctuary, how

3    many people are in the sanctuary?

4     A    You are, you're really better off asking

5    the fire marshal these questions because you're

6    dealing outside my area of knowledge.

7     Q    I feel like I have been there before.

8          Are you aware that the Church of the

9    Apostles owns the building next door on Glenridge?

10    A    Yes.

11    Q    Have they proposed any plans for use of

12   that building?

13    A    Not to my knowledge.

14    Q    To your knowledge, there's no pending

15   application to use that building for any church

16   purposes?

17    A    Not to my knowledge.

18    Q    Other than the conditions of zoning that

19   are in the Exhibit 35 --

20    A    Let me give you a better response to the

21   prior answer.

22    Q    Okay.

23    A    And that is the only page that, that I have

24   information on is the piece under the case.  And that

25   property adjacent is under a separate legal and it's

1    not included in the legal on this.  So there would be

2    no, there is no provision under our current case for

3    this.

4        Q    If the City had not considered the seating

5    fixed in that sanctuary, the 8,770-foot sanctuary, if

6    it were not fixed seating but it were the other type

7    of seating under the ordinance without the seating,

8    what would be the parking requirement?

9        A    It would be one per 35 feet in the largest

10   assembly room.

11       Q    Can you calculate that?

12       A    Do we have the square footage in the

13   assembly room?

14       Q    8,000 --

15       A    Just a minute.  If you will read me the

16   total.

17       Q    8,770 square feet.

18       A    Just a minute.  I'm not doing this right.

19       Q    It's on the other page, isn't it?

20       A    It may be.

21       Q    It's on the second page, I believe.

22       A    I know.  I --

23       Q    Churches and other places of worship.

24       A    It's one per 30.  Let me try this one more

25   time.

1    Q    It's absolutely counterintuitive how you do

2    that.

3    A    I know.

4    Q    I was messing with it the other day and

5    Doug had to come in and fix my math for me.

6         MR. DILLARD:  It doesn't make any

7    sense.

8    Q    (By Ms. Jones)  To figure it out.

9    A    I'm not sure I've calculated this right.

10   I'm going to, I'm not going to take responsibility

11   for it until I have got it --

12   Q    So for every thousand of square feet --

13   A    Right.

14   Q    -- it's, it's --

15   A    Thirty.

16   Q    -- 30.  So if there's 8,000 square feet,

17   you would multiply eight times 30, right?

18   A    That's, that's correct.  And it's 240.

19   Q    And that's 240?

20   A    Yeah.

21   Q    And then what extra over that for the 770

22   square feet?

23   A    So I had it right.

24   Q    So you would need at least 240 seats if

25   they were not fixed, correct?

1      A    That's correct.

2            MS. DANOS:   240 parking places.

3            MS. JONES:   240 parking places if the

4      seats are not fixed.   Thank you, Deb.

5      Q    (By Ms. Jones) I think that's all I have

6      with the Church of the Apostles.   I have got this

7      marked 34.   Let's just identify it so we don't have a

8      gap.

9            Is that a letter from the City verifying

10     the zoning?

11     A    Yes.

12     Q    And here's the second page.

13     A    Oh, I'm sorry.

14     Q    So the next one we are going to talk about

15     is Congregation Beth Tefillah?

16     A    Uh-huh (affirmative).

17     Q    And that was also part of your

18     interrogatory answer as to requesting an applicant to

19     provide the maximum capacity or maximum occupancy of

20     each accessory use within the proposed church or

21     other place of worship.   And you said that a use

22     permit to allow for the addition of 7,576 square foot

23     preschool at the existing synagogue with concurrent

24     variance was one instance with Beth Tefillah.   And at

25     the same time I believe there was a use permit issued

1    for a mikvah synagogue?

2         A    Yes.

3              Documents were marked for

4              identification as Plaintiff's Exhibit

5              No. 36.)

6         Q    (By Ms. Jones)   How did the City calculate

7    the required parking for Beth Tefillah?

8         A    One, one parking space per three-and-a-half

9    fixed seats in the largest assembly area, and then we

10   separately calculated the child care area.

11        Q    So how many fixed seats were in the largest

12   assembly area?

13        A    Seven --

14        Q    Well, that was seventy-six spaces.

15        A    I meant, I would have to go back and

16   calculate.

17        Q    Do the backward math?

18        A    Uh-huh (affirmative).

19        Q    How many spaces were required for the

20   day-care center?

21        A    Twenty-nine.

22        Q    So what was the total number of spaces

23   required?

24        A    Let's see.  Seventy-six plus 29.

25        Q    Well, you have done the math inside the

1    paragraph.  At a minimum, the site is required to

2    have a total of 105?

3        A    Yes.

4        Q    And did the site have 105 spaces?

5        A    I believe it was short some spaces.

6        Q    How many spaces?  That paragraph says that

7    also.

8        A    It does, but it doesn't completely deal

9    with the issues.  So it -- let's see.  They have 71.

10   So they would be short, under that calculation they

11   would be short the difference.  However, this

12   doesn't, it doesn't take into account the shared

13   parking arrangement under Article 18.

14       Q    I will get to that.

15       A    Yeah.

16       Q    So they were short 34 spaces; is that

17   correct?

18       A    Well, no, it's not.

19       Q    71 --

20       A    It's, it's not --

21       Q    105 to 71?

22       A    It's not correct because the statement by

23   the shared parking spaces is not in, in the

24   calculation.

25       Q    Without the shared parking spaces, they are

1    short 34 spaces?

2         A    That's correct.

3         Q    So they were required to provide 34 spaces

4    somehow and they did it through a shared parking

5    arrangement?

6         A    Yes.

7         Q    And that was with Greenfield Academy?

8         A    No.  I, I, I need to correct, and that's

9    why I was trying to get the record corrected.  A

10   church is, during the week does not, you, you can

11   share 50 percent of your spaces.  So you can take, of

12   the church's parking, you can take 50 percent of what

13   is required for the church and assign it to the

14   day-care center.

15        Q    So the sentence that says the applicant has

16   provided documentation of a shared parking agreement

17   with the Greenfield Academy which has 100 spaces

18   available is incorrect?

19        A    No.  They have provided that information.

20   However, their only short, if you take -- let me see

21   if I can --

22             MS. HENDERSON:  Start at the

23        beginning.

24             THE WITNESS:  Yeah.

25             MS. HENDERSON:  Start at the

1      beginning.

2              THE WITNESS:  The, the church is

3      required to have 76 spaces.  Can I write this

4      down so I can remember this?

5      Q    (By Ms. Jones)  Sure.  Do you want some

6   paper?

7      A    Yeah.  The church is required to have 76

8   spaces.  The day-care requires 29 spaces.  The church

9   can share 50 percent of its spaces with the day-care

10  during the week.  That would make 38 additional

11  spaces that are available to the day-care.  So you

12  can subtract that from the 105 and that means that

13  there are 77 spaces required.  And they have provided

14  71.  And so the agreement with Greenfield Hebrew

15  Academy really only requires that they provide the

16  additional six spaces that the site would be short

17  under that calculation.

18     Q    So they got their six spaces from

19  Greenfield Hebrew Academy?

20     A    Yes.

21     Q    And how far is Greenfield Hebrew Academy

22  from the congregation of Beth Tefillah?

23     A    It is just up the road a little bit.  But

24  it's more than, it's more than 300 feet.

25     Q    That was not mentioned in the staff report,

1   was it?

2       A    It was not and it should have been.  This,

3   there, there was no administrative permit issued for

4   that either and that was incorrect as well.

5       Q    And how about for the zoning district, what

6   zoning district is the synagogue in?

7       A    R2.

8       Q    Is shared parking under 19.3.6 allowed in

9   the R2 district?

10      A    There, there is a, an approved school and

11  church on that site.  And so the shared parking may,

12  may occur from the church.

13      Q    Well, would you look at the zoning, that

14  particular provision which, I think, is on 28.  It's

15  on the other exhibit.

16              MS. HENDERSON:  27?

17              MS. JONES:  It's on the one-pager,

18      yeah.

19      Q    (By Ms. Jones)  Does that control shared

20  parking for the zoning ordinance?

21      A    It does.  And I was incorrect.  It would

22  require a variance.  However, the shared parking is

23  allowed for churches and that's what I was trying to

24  deal with under 18.2.2.  And I will acknowledge to

25  you that this one was not handled correctly.

1    However, no variance was applied for.  Even though

2    the facility requires people walk to the services.

3        Q    So Section 19.3.6 which sets out the zoning

4    districts that shared parking is allowed in is, does

5    not apply to Section 18.2.2?  That trumps that

6    zoning?

7        A    That's, that's correct.  They would, they

8    really would, they need a variance for the six

9    spaces.

10                   (Documents were marked for

11                   identification as Plaintiff's Exhibit

12                   No. 37.)

13        Q    (By Ms. Jones) And now, I'm looking at the

14    site plan for Beth Tefillah which is here on 37 and

15    I'm afraid I don't have a legible small one.  But I

16    believe you can reference the actual zoning site plan

17    dated January 16th, 2007.  That should be this one.

18    I think I saw that date.

19        A    Yes, uh-huh (affirmative).

20        Q    So that would be the site plan that was

21    approved for Beth Tefillah?

22        A    Yes.

23        Q    And besides the synagogue and -- where are

24    those fixed seats that need 76 spaces?

25        A    I don't have the, the floor plan for the

1   synagogue, so I can't tell you.

2        Q    So the 76 fixed seats were just based on

3   what they submitted?  That was the number of fixed

4   seats?

5        A    I can't tell you what the staff analysis

6   would have been in terms of, they may have gone out

7   and looked at it or they may have something that I

8   don't know.

9        Q    Did you do a staff analysis on the case?

10       A    The staff analysis was done.  I didn't see

11  anything in there about that.  The answer is I don't

12  know what information was provided to the staff.

13       Q    Who did the staff analysis?

14       A    That would have been Patrice Ruffin.

15       Q    I was under the impression, I guess, from

16  last time that you reviewed all of the staff analysis

17  before they were submitted.

18       A    I do, but I might not necessarily see what

19  she had seen.  If she went to the site to look at it,

20  for example, and that was the information she was

21  using, I wouldn't have any way of knowing that.

22       Q    Would she have gone to the site?  Is that a

23  standard part of a staff analysis?

24       A    Yes.

25       Q    Now, was the building permit issued in

1    Sandy Springs for the Beth Tefillah?

2        A    For the synagogue?

3        Q    Yes.

4        A    No.

5        Q    That is Fulton County also?

6        A    Yes.

7        Q    And are you saying that there is no

8    building plan for Beth Tefillah on file with the City

9    of Sandy Springs?

10       A    Not that I am aware of.

11       Q    I am just curious how the City would not

12   have a building plan on file for every public place

13   of assembly in the city.  I mean it is just hard for

14   me to understand that the City would not think that

15   was a, a public safety issue --

16       A    I don't think --

17       Q    -- that would require --

18       A    -- the City disagrees with you.  I don't

19   think that's the question.  There's nothing under the

20   law that allows me to go back and get those from

21   people that previously permitted their properties.

22   And I, if I can't get them from Fulton County, I

23   don't have a way of doing it.  Certainly it would be

24   helpful, but we don't have them.

25       Q    So if I'm understanding you correctly, then

1   you have no way of knowing what the individual spaces

2   are for, in the 19,036-square foot building that is

3   called the existing synagogue other than it's the

4   existing synagogue?

5        A    That's correct?

6        Q    And when the staff did their report, they

7   did not count any spaces except in the largest place

8   of assembly to calculate the number of parking spaces

9   that would be necessary for the religious use?

10       A    All of it is a religious use.  That is not

11  correct.  Both the day-care and the synagogue are

12  religious uses, but they are different religious

13  uses.

14       Q    And when you say all of it's a religious

15  use, the offices are also considered a religious use,

16  correct?

17       A    That's correct.

18       Q    And the various classrooms and areas of

19  fellowship, the whole --

20       A    We are not aware that they are renting any

21  space out to anyone else.

22       Q    So if it is being used by the church for

23  church purposes even if it's admin purposes, it is

24  considered a religious use?

25       A    I don't question the fact that it's all a

Page 205

1   religious issue.  The, the issue for us is not

2   whether it is a religious use but whether the parking

3   is appropriately calculated.

4       Q    Does the Sandy Springs zoning ordinance

5   other than Section 18 that we have been looking at

6   have any other calculations for required parking for

7   churches and places of worship?  Other than what is

8   in that Section 18.

9       A    The answer is I'm not sure that I can say

10  for a certainty that there's nothing else in the

11  ordinance that applies to sizes or, or definitions of

12  parking spaces or anything else.  So I, I'm not going

13  to answer that I know.

14      Q    As to the Beth Tefillah, the City applied

15  the parking requirements obtained in Section 18.2,

16  correct?

17      A    For both uses, yes.

18      Q    For both uses, okay.  Would the tax

19  commissioner have the information about the floor

20  plan of the properties?

21      A    Certainly the tax commissioner wouldn't.

22  He just sends the bills.

23              MR. DILLARD:  Assessor's office would,

24      though.

25              MS. JONES:  Would they?

1                    THE WITNESS:  They might, yeah.

2                    MR. DILLARD:  Tax.

3                    MS. JONES:  So that would be Fulton

4        County essentially?

5                    THE WITNESS:  Well, except that the,

6        this is exempt, so I don't know.  I don't know

7        how that is handled.  And you would have to talk

8        to the assessor to get that information.

9        Q    (By Ms. Jones)  St. Andrews Presbyterian

10   Church.  This is 38.

11                   (Documents were marked for

12                   identification as Plaintiff's Exhibit

13                   No. 38.)

14       Q    (By Ms. Jones)  Let me show you what is

15   marked as Exhibit 38.  I believe in your

16   interrogatory responses you have, Interrogatory No. 1

17   you have listed St. Andrews Church U007005.  I think

18   it is down at the bottom of the page and then

19   continued to the next page.

20       A    Yes.

21       Q    Is this the staff report for St. Andrews?

22       A    Yes.

23       Q    And you say that they approved a

24   10,000-square foot to be of, of the church to be used

25   as a special foreign language school.  That's the

1    topic of your interrogatory response.

2         A    Yes.

3         Q    Did they use the requirements of the zoning

4    ordinance that is in Plaintiff's 28 for churches and

5    day-care or for schools?

6         A    Eighteen?  Eighteen?

7         Q    Oh, Section 18 but Plaintiff's Exhibit No.

8    28.

9         A    Oh, I'm sorry.  I'm sorry.

10        Q    I understand.

11        A    I apologize.  I'm looking, and this doesn't

12   seem to be -- okay.  I've got -- yes, they would have

13   used Article 18 which is Exhibit 28.

14        Q    Do they apply anything other than

15   Article 18?

16        A    Not to my knowledge.

17        Q    And I believe they came back again in 2009.

18   And I am going to give you No. 39.

19                  (Documents were marked for

20                  identification as Plaintiff's Exhibit

21                  No. 39.)

22        Q    (By Ms. Jones)  You might have two

23   St. Andrews somewhere.  You do, under use permits on

24   Page 9, well -- Page 9 of your interrogatories.

25        A    It's on, I, I think, in several.

1     Q     Down there somewhere?

2     A     Yeah.  It's in, I think, several.

3     Q     And they came back and they wanted an

4  additional 2,000 square feet and a use permit to

5  expand their enrollment?

6     A     That's correct.

7     Q     Was that analyzed under zoning ordinance

8  Section 18, Article 18?

9     A     Yes.

10    Q     Was any other section of the Sandy Springs

11 zoning ordinance calculated to the required amount of

12 parking?

13    A     Not to my knowledge.

14    Q     Was there any kind of limits placed on the

15 number of children who could be on site?

16              MS. HENDERSON:  Which application are

17         you talking about?

18              MS. JONES:  On either application.

19              MS. HENDERSON:  Do you have a copy of

20         39?

21              MS. JONES:  Sorry.

22              THE WITNESS:  Yes.

23    Q     (By Ms. Jones)  What were those limits?

24    A     Which case would you like to --

25    Q     Start with the earlier case.

1       A    The first approval in '07 was for 60

2    students, hours of operation limited to 9:00 to 5:00

3    p.m.

4       Q    How did the City plan to enforce that

5    limit?

6       A    The, generally we ask the applicant to

7    provide the information to us on their enrollment

8    before school starts.

9       Q    So that's what you did, you just took the

10   information from the, from the school?  There's no

11   separate count?

12      A    No.  The, the City doesn't go in and count

13   them.

14      Q    Let me show you --

15      A    Do you want to now know from the second

16   case?

17      Q    Yes.  I'm sorry.

18      A    The second case was much more complicated

19   because they were dealing with a larger range of

20   grades.  And so the private elementary school has a

21   total enrollment of 70 students Monday through Friday

22   from 8:00 to 3:00, a day-care facility with a total

23   enrollment number of no more than 150 between 8:00

24   and 6:00 Monday through Friday, and a day-care

25   facility with a total enrollment of 50 limited to

1    Saturdays between 9:00 and 3:00.

2        Q    In looking at the 2009, was that zoned to a

3    site plan?

4        A    Yes.

5        Q    Was it April 8th, 2009, site plan?

6        A    That's correct.

7        Q    Let me just get you to look at Exhibit

8    No. 40.  Would that be the site plan?

9                    (Documents were marked for

10                   identification as Plaintiff's Exhibit

11                   No. 40.)

12                   THE WITNESS:  Yes.

13       Q    (By Ms. Jones)  And just going back to the

14   2005, was it zoned to a site plan?

15       A    2007?

16       Q    2007.

17       A    Yes.

18       Q    And was that site plan dated April 3rd,

19   2007?

20       A    It was.

21       Q    Let me get you to look at No. 41.

22            Is that the site plan that it was zoned to

23   in 2007?

24

25

1          (Documents were marked for

2          identification as Plaintiff's Exhibit

3          No. 41.)

4          THE WITNESS:  Yes.

5     Q    (By Ms. Jones)  Generally speaking, other

6   than the conditions of zoning as set out in the, in

7   the motion and the approval, are there any other

8   conditions of zoning applied to a property?

9     A    I don't understand the question.

10    Q    I mean if there are conditions of zoning,

11  they are going to be listed, correct?  When the

12  property is approved, it's going to say these are the

13  conditions of zoning, correct?

14    A    Yes.

15    Q    So other than meeting the requirements of

16  the zoning ordinance and the conditions of zoning as

17  specifically set out in the minutes, there are no

18  other conditions of zoning in Sandy Springs?

19    A    There are other ordinances that may apply

20  to the development of the property, but they are not

21  under the zoning ordinance.  They may be separate

22  ordinances.

23    Q    Like building ordinances and electrical

24  ordinances and that sort of thing?

25    A    Erosion control, tributary buffer, land

1   development, all of the, the standard ordinances of

2   the City that apply to development.

3       Q    And that's another step, once you get your

4   zoning, then you have to comply with these various

5   ordinances?

6       A    Yes.

7       Q    Is that how it works?

8       A    Uh-huh (affirmative).

9       Q    You don't comply first with your erosion

10  control and then get your zoning?

11      A    It wouldn't make a whole lot of sense to do

12  it that way.

13           MS. HENDERSON:  Can we take a short

14      break?

15           MS. JONES:  Yes, we can.

16           (A brief recess was taken.

17           (Documents were marked for

18           identification as Plaintiff's Exhibit

19           No. 42.)

20      Q    (By Ms. Jones)  Looking at Plaintiff's

21  Exhibit No. 42, it appears to be the latest and

22  greatest church or places of worship use permit; is

23  that correct?

24      A    It is a day-care, an after school program,

25  yes.

1    Q    And that is, I was unable to really figure

2    it out.  Is that for the Hinson Center across the

3    street from the Sandy Springs Methodist Church --

4    A    Yes.

5    Q    -- or is it for the actual church area?

6    A    I believe it's in the Hinson Center.  Well,

7    let me look.  Maybe not.

8    Q    It's just, it was hard for me to tell.

9    A    Let me read, let me read from it.  It's on

10   the Hinson Center because it's south of Mount Vernon

11   and the church is on the north.

12   Q    If you'll look at, tell me how the required

13   parking was calculated for this particular use

14   permit.

15   A    I have to go back and --

16   Q    It's on your Page 2102.

17   A    Thank you.

18   Q    And I did those two sided in order to

19   conserve paper, so --

20        MS. HENDERSON:  It looks like we may

21        be missing some pages.  Because I have got 2095,

22        then I have got 209 and 209.  I wonder if my

23        secretary did that.

24        MS. JONES:  Oh, I think the page

25        number --

1          MS. HENDERSON:  Oh, it's cut off.

2      It's just cut off.  Okay.  Never mind.  Okay.

3      Never mind.

4          THE WITNESS:  Now ask your question

5      again.

6      Q    (By Ms. Jones)  Just go through how

7  required parking for this use permit was calculated.

8      A    Well, there are two, it, it's calculated

9  under Article 18 and it is, there are two separate

10  calculations, one for the assembly auditorium at one

11  space for 30 square feet.  And then for the day-care

12  center, 1.7 spaces per thousand square feet plus one

13  space for every four employees.

14      Q    I am just, and so the total parking

15  required is 239.  I'm just going back to where you

16  were explaining to me about how the day-care center,

17  that you subtract out some portion?

18      A    We can.  In this case they don't need to

19  because they have got more parking than is required

20  for the two uses they have at the facility.  But if

21  they, if you had a church here, which you do not, I

22  believe that this is an auditorium and not a church.

23  The church facility is actually on the north side of

24  Mount Vernon, then you could have a shared, shared

25  space.  But I don't believe they conduct their

1   services in this building.  I believe this is a, a

2   facility that they have other uses for.

3        Q    Do you know if there's a separate parking

4   requirement for the church across the street?

5        A    The church across the street is under a, is

6   on a separate property.  It's not even before us on

7   this.

8        Q    That would be a totally separate --

9        A    Yes.

10       Q    -- calculation?

11       A    Yes.

12       Q    I went there not long ago and heard the

13   singers that don't use notes and they sing acapella.

14                 MS. HENDERSON:  The shape singers.

15                 MS. JONES:  The shape singers, yeah.

16       That's a nice little facility over there.

17       Q    (By Ms. Jones)  Let me show you Exhibit No.

18   43.

19                 (Documents were marked for

20                 identification as Plaintiff's Exhibit

21                 No. 43.)

22       Q    (By Ms. Jones)  Now, what is, do you

23   recognize this particular use permit?

24       A    I will look.

25       Q    Or modification to use permit?

1       A    Okay.  I recognize it.

2       Q    How was the parking calculated for this

3    application?

4       A    I don't believe there's any difference in

5    the -- just a minute.  Let me look at this a minute.

6       Q    Was this application just a reconfiguration

7    of the site?

8       A    Yes.

9       Q    So there was no additional density added?

10      A    That's correct.  Because if it were, it

11   would require a new use permit.

12                (Documents were marked for

13                identification as Plaintiff's Exhibit

14                No. 44.)

15      Q    (By Ms. Jones)  This is the same Mount

16   Vernon Presbyterian School but at a different

17   location; is that correct?

18      A    Yes.

19      Q    And there was parking calculated for this

20   particular application, correct?  I'm on Page 142 of

21   --

22      A    Thank you.

23      Q    -- 335.

24      A    Thank you.

25      Q    Was it calculated under Section 18.2.1 of

1    the zoning ordinance?

2         A    Yes.

3         Q    Were there any additional parking

4    requirements?

5                   MS. HENDERSON:  Object to form.

6                   THE WITNESS:  Actually that, can I

7              just give a more generic answer because it may

8              be more helpful.  You may recollect when I said

9              that churches can share 50 percent of their

10             parking during the week.  These modular

11             facilities are located on another church and

12             50 percent of the spaces that are allocated to

13             that church can actually be, be given to this,

14             these modular facilities.  So there was no

15             additional parking required.

16        Q    (By Ms. Jones)  When you say these modular

17   facilities, now, this church is on the corner of

18   Mount Vernon and Glenridge; is that right?

19        A    Yes.

20        Q    And it sort of faces Glenridge?

21        A    Yes.

22        Q    Then are the modular facilities that big

23   gray concrete building behind the actual church

24   building?

25        A    No.  These are, well, these are temporary

1    classrooms.

2         Q    Are they shown, if you go to Page 155.

3         A    Well, let me, let me go back and check

4    again.

5              MS. HENDERSON:  Can I get my copy of

6         that, Andrea?

7              MS. JONES:  I'm sorry.

8              THE WITNESS:  I'm sorry.  It's in the,

9         the existing building on the back, yes.

10        Q    (By Ms. Jones)  What page are you looking

11   on?

12        A    I am actually looking at 155 of 355.

13        Q    What does, go to the page that says 179 of

14   Page 335.

15             Do you know what that represents?

16        A    That represents both the subject property

17   and the school property.

18        Q    And are those modular buildings shown on

19   that Page 179?

20        A    They are not modulars.  I was incorrect.

21   They are not modular.  They are the use of those

22   existing structures at the back of the property.

23        Q    And as I described --

24        A    Yeah.

25        Q    -- as being those --

1    A    Yes.

2    Q    -- concrete block buildings?

3    A    Yes, that's correct.

4    Q    And so this other part over here is all new

5  development for Mount Vernon Church?  Is that what is

6  happening, the school is expanding?

7    A    Well, it's a school that began

8  construction, I guess, in the late '90s when this

9  property was acquired and it has been developing over

10  time.  It's in operation now, the main school is.

11    Q    But is it part of the other Mount Vernon

12  Presbyterian school, are they the same group?

13    A    It's the same church, they are under

14  separate zoning cases.  And one is an upper school

15  and one is a lower school.

16    Q    So the lower school is the one that is in

17  between Mount Vernon and Johnson Ferry?

18    A    Yes.

19    Q    We are getting to the home stretch here.

20  So this is going to be 45.

21              (Documents were marked for

22              identification as Plaintiff's Exhibit

23              Nos. 45 and 46.)

24    Q    (By Ms. Jones)  I am going to show you

25  Exhibit No. 45.  Now, is that the variance petition

1    for the Zainabia Islamic Center?

2         A    Yes.

3         Q    Now, do you also review the Board of

4    Appeals reports also?

5         A    Yes.

6         Q    Have you seen this one?

7         A    Yes.

8         Q    How was the, and Zainabia, what does,

9    Zainabia wanted to increase the size of its

10   buildings; is that correct?

11        A    I believe they are modifying and adding to.

12        Q    It says new 50 by 54 building there.

13        A    Yeah.

14        Q    Is that what they were doing?  They needed

15   a variance to do that on their parking?

16        A    Yes.

17        Q    And what they wanted to do was reduce the

18   number of parking spaces required from the 57

19   required to 42 spaces?

20        A    That's the request, yes.

21        Q    And that request was granted?

22        A    Yes.

23        Q    Do you know what percentage decrease in

24   parking that was?

25        A    Not without calculating it.

1      Q    Was that request analyzed under Section

2   18.2 or the variance to reduce the required parking?

3      A    Yes.

4      Q    Under 18.2.1 --

5      A    Yes.

6      Q    -- that was applied?  Okay.  Oh, go to Page

7   7 of 8 section of the analysis.  It starts out

8   standards for consideration up at the top?

9      A    Okay.

10     Q    I am looking at the comment about whether

11  the relief would be in harmony with the general

12  purpose of the zoning ordinance.  And the staff,

13  whoever wrote the staff report commented that the

14  church has been located on the site for 12 years with

15  20 parking spaces without a parking problem.

16          Is that, is that a criteria for determining

17  the amount of parking?

18     A    If the place of public assembly is not

19  increasing, in this case I believe they were adding

20  some other things but not that, and this particular

21  facility has been operating for a lengthy period of

22  time with fewer parking spaces, then the additional

23  parking spaces that didn't reach the number seemed to

24  be an appropriate recommendation and met the standard

25  for the surrounding area.  This was a building which

1   existed with significantly less parking previously.

2       Q    And they are adding another building?

3       A    They are adding another building which is

4   an accessory structure, but the existing

5   congregational hall was not increasing, I believe.

6            (Reporter interruption.)

7               MS. JONES:   The existing

8           congregational hall.

9       Q    (By Ms. Jones)   So the parking was based on

10  the largest meeting area?

11      A    Yes.   They, they expanded the number of

12  parking spaces that they were providing on site which

13  was the reason for a number of the other variances

14  onto this particular application.

15      Q    So before they got this variance, they were

16  short the required number of spaces?

17      A    Yes.

18      Q    And they are still short the required

19  number of spaces, but they got a variance?

20      A    They are less short of spaces now than they

21  were before.   They have provided additional spaces,

22  but there was not room to get the full number on the

23  site.

24      Q    And my understanding is that one of the

25  reasons why the staff looked favorably on this

1    variance request was they had been operating just

2    fine with fewer spaces than required.

3        A    The staff tried to get the maximum number

4    of spaces that they could get on the site knowing

5    that they had never had a parking problem with

6    significantly few spaces, but we tried to bring them

7    as close to the standard of the ordinance as we could

8    given that this was a legal nonconforming use under

9    the, under their previous arrangement.

10       Q    They came in under Fulton County?

11       A    Well, I suspect that they, and I don't know

12   this for a fact, that they developed at a point where

13   the parking -- well, then I will finish my sentence

14   which is that I don't know given the, the age of the

15   facility, it could have come under other parking

16   requirements than what we currently have.

17       Q    I happen to have building plans for Mount

18   Vernon Baptist Church.  And I would just like to look

19   at them briefly with you.  Now, you should have them

20   facing your way, I think.

21            Now, were these building plans that were

22   approved by Sandy Springs?

23       A    Yes.  On February 9, 2007.

24       Q    Is there any calculation for parking on

25   these plans that you can see?

1        A    I don't believe there would be, but since

2    it's not a building requirement, I don't know that it

3    would be on here.

4        Q    Let's just look through and see.  It has

5    occupancy numbers on here.

6        A    Well, this is a building permit and it

7    doesn't --

8        Q    It doesn't address --

9        A    I am looking to see if we, we did a

10   separate land side permit.  Because if this is a

11   building permit, we wouldn't have done that part of

12   the building.

13       Q    Do you know, this church has been here for

14   a while, hasn't it?

15       A    Yes.

16       Q    It came from Fulton County?

17       A    Well, the, the renovation was.

18       Q    Okay.  Was with the City?

19       A    With Fulton, was with the City, but the

20   place where you would see the parking requirements

21   calculated would be on the land development side

22   because the, the parking spaces are done on the

23   property and not in the building.  And this is a

24   building permit.  So unless there is, unless they did

25   a concurrent land development permit with it that I'm

1    not seeing on here, it wouldn't be here.

2        Q    Well, how would I find out what the parking

3    requirement is as applied to Mount Vernon Baptist

4    Church?  Oh, maybe it has a sanctuary in here?

5        A    Well, the problem is that if it's a

6    preexisting church, the, we wouldn't repark it if

7    they were doing small renovations.

8        Q    Would you say this is a small renovation?

9        A    I mean I am looking at the, the renovation

10   area is 36,000 square feet.  The addition is 441

11   square feet.  So the renovation wouldn't, would not

12   generate the need for a change in parking.  The only

13   thing that would be 441 which is relatively small.

14   So there may not have been a land development side

15   permit since it is such a small addition.

16       Q    Is there someplace I would find that

17   information about what the required parking is at

18   Mount Vernon Baptist Church?

19       A    Well, if this was constructed prior to us,

20   I don't know what would have applied at the time that

21   they got their permits.  They would not be required

22   to provide additional parking on their existing

23   building because that was parked at the time of the

24   original permit.  The only thing that would

25   potentially add parking would be the 441 square feet.

1    And if that was accessory, it wouldn't have generated

2    any additional parking.  So the answer is I can't, I

3    can't answer for you what the parking requirements

4    would be at the time it was permitted.

5        Q    Well, let me ask you as a hypothetical

6    would the City, I mean if this church were coming in

7    new, which it were not, and the City needed to

8    calculate required parking for it, how would it go

9    about doing so?

10       A    We would use Article 18.

11            (Discussion ensued off the record.)

12       Q    (By Ms. Jones)  Just going back to the

13   Baptist church we were talking about before, Mount

14   Vernon Baptist Church, is that it?  In approving a

15   building permit, and I don't know even if this is

16   your area, but would the City permitting department

17   require any kind of parking analysis before approving

18   the building permit for an existing church?

19       A    If the permit changed the uses in the

20   building and increased the area of public assembly,

21   then the City would as part of that review address

22   parking issues.  If it was just a, a, a

23   reconfiguration or a renovation interior and the, the

24   standards that applied to, out of the Article 18

25   wouldn't change that, we would not, there wouldn't be

1    any analysis to present.  Generally speaking, these

2    existing buildings are allowed to remain as they were

3    permitted even though the, the codes may have changed

4    in the interim.

5        Q    So they would have, they would have just,

6    if there was no increase in the largest assembly

7    area, then there would be no --

8        A    Or some other provision that would generate

9    additional parking, yes.

10       Q    Such as putting a boarding house in the

11   church?

12       A    Right.

13              (Documents were marked for

14              identification as Plaintiff's Exhibit

15              No. 47.)

16       Q    (By Ms. Jones)  Let me show you Exhibit

17   No. 47 which is going back to, we have already talked

18   about -- this is double-sided copies.  It's fat.

19   Yours is fat.  These other ones are skinny.

20              Looking at Exhibit No. 47, this is going

21   back to the 2009 St. Andrews approval, there's a

22   discussion that I wanted to ask you if you remember

23   this discussion.  It's on page Bates Stamp No. 1922.

24   There's some discussion about what the penalty would

25   be if the school is operating at an enrollment

1   capacity level outside of what is conditioned.

2          That's where Council Member Jenkins asked

3   the city attorney?

4      A    Yes.

5      Q    And Mr. Wendell Willard, who is the city

6   attorney, had an answer to that, that the City could

7   cite them for violation of their use permit and fine

8   them?

9      A    Yes.

10     Q    So that, that is an enforcement, a way to

11  enforce a violation of a capacity limit, correct?

12             MS. HENDERSON:  Object to form.

13             THE WITNESS:  Let me -- ask that

14     question again.  I kind of got lost in it.

15     Q    (By Ms. Jones)  I guess the question is if

16  the City were to put capacity limits on a property or

17  a use and that property owner exceeded those limits,

18  according to this discussion and according, one

19  option the City would have would be to issue a

20  citation?

21     A    Yes.

22     Q    As a violation of the use permit.  And a

23  fine?

24     A    Assuming they were convicted.  The City, I

25  mean the staff issues the citation, but there has to

1    actually be a conviction.

2        Q    Well, there's always a conviction because

3    when you go to code enforcement court, you are

4    presumed guilty.

5                    MS. HENDERSON:  Objection.

6                    MS. JONES:  I have been to code

7            enforcement court before.  I know how that place

8            works.  Okay.  I'm through with that one.

9                    (Documents were marked for

10                   identification as Plaintiff's Exhibit

11                   No. 48.)

12       Q    (By Ms. Jones)  And I believe this is the

13   last one I have.  I don't think I made copies of

14   this.  We are going to call it 48.  And I only really

15   have one question for you on this one which is the

16   Carpenter Drive Second Church of Christ Scientist.

17                   Did the staff analyze parking requirements

18   under Article 18 of the code?  And I believe that

19   green sticky is the place --

20       A    Thank you.

21       Q    -- that you can look.

22       A    Yes.

23       Q    Do you know of any instance in which the

24   staff in analyzing parking did not apply Article 18?

25       A    No.

1        Q    Now, I'm at the end of my line.  I have one

2   or two questions written down somewhere that I have

3   got to find now.  So two minutes out.

4             (A brief recess was taken.)

5        Q    (By Ms. Jones)  Did you attend the CZIM

6   meeting for the Church of Scientology?

7        A    Yes.

8        Q    And did, was any kind of presentation made

9   regarding the, whether or not the church complied

10  with the parking requirement of the City?

11       A    I don't remember.

12       Q    So you don't remember Linda Aberay telling

13  the people at the public hearing that the church was

14  in compliance with the requirements under the Sandy

15  Springs code?

16       A    I just don't remember.

17       Q    You don't remember that part either?

18       A    I don't.  But I know I was there.

19       Q    Was there ever any report issued which

20  opined that the City required, complied with the

21  requirements of the Sandy Springs code?

22       A    I don't know.

23       Q    Well, it wouldn't have been issued by you,

24  correct?

25       A    I, not to my recollection certainly, but I

1   don't, I am saying I don't remember.

2        Q    Let me just fumble with my papers for a

3   minute --

4        A    Uh-huh (affirmative).

5        Q    -- and then we will be done.

6             (Discussion ensued off the record.)

7                  MS. JONES:  I guess that's all the

8        questions I have, what I thought were the extra

9        questions.  So we will just tie these things up

10       and be done.  Thank you, Nancy.

11                 THE WITNESS:  Okay.

12            (DEPOSITION CONCLUDED.)

13

14            _____

15                    NANCY LEATHERS

16

17
    Sworn to and subscribed before me,
18  this the _____ day of _____, 2010.

19  _____
    Notary Public
20  My commission expires:

21

22

23

24

25

Page 232

1              E R R A T A   S H E E T

2    I, NANCY LEATHERS, do hereby certify that I have read

3    the foregoing deposition and that to the best of my

4    knowledge said deposition is true and correct (with the

5    exception of the following corrections listed below).

6

7    Page/ line /  correction          reason

8    ____/ ____/ _____  _____

9    ____/ ____/ _____  _____

10   ____/ ____/ _____  _____

11   ____/ ____/ _____  _____

12   ____/ ____/ _____  _____

13   ____/ ____/ _____  _____

14   ____/ ____/ _____  _____

15   ____/ ____/ _____  _____

16   ____/ ____/ _____  _____

17   ____/ ____/ _____  _____

18   ____/ ____/ _____  _____

19   ____/ ____/ _____  _____

20   ____/ ____/ _____  _____

21   ____/ ____/ _____  _____

22   ____/ ____/ _____  _____

23   ____/ ____/ _____  _____

24

25

Page 233

1                    C E R T I F I C A T E

2    G E O R G I A:

3    FULTON COUNTY:

4            I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    questions and answers thereto were reduced to

7    typewriting under my direction; that the foregoing

8    pages 1 through 78 represent a true, complete and

9    correct transcript of the evidence given upon said

10   hearing; am in compliance with O.C.G.A. Section

11   9-11-28(d) and Section 15-14-37(a) and (b); and I

12   further certify that I am not of kin or counsel to the

13   parties in the case; not in the regular employ of

14   counsel for any of said parties; nor am I in anywise

15   interested in the result of said case.

16           This the 8th day of November, 2010.

17

18        _____
          Debera J. Puckett, B-1188

19

20

21

22

23

24

25

Page 234

1                    AMENDED CERTIFICATE

2   STATE OF GEORGIA

3   COUNTY OF FULTON

4

5        I hereby certify that in addition to the

6   certification made on Page 79 of the transcript, more

7   than thirty (30) days provided the deponent to read and

8   sign the original transcript has expired.  Therefore,

9   the original is being filed without signature of the

10  witness.

11        This the 13th day of December 2010.

12

13

14                              Debera J. Puckett
                                Certified Court Reporter
15

16

17

18

19

20

21

22

23

24

25