

## CERTIFICATE

I, Michael D. Casey, City Clerk and Custodian of Records for the City of Sandy Springs, Georgia, hereby certify that the twenty-two (22) pages of photocopied matter attached hereto is a true and correct copy of the Meeting Minutes of the **Regular Meeting of the City of Sandy Springs City Council** held on February 16, 2010.

This 16th day of July, 2010.

Michael D. Casey
Michael D. Casey
City Clerk



(Seal)

**PLAINTIFF'S EXHIBIT**
**30**

R002014

Regular Meeting of the Sandy Springs City Council was held on Tuesday, February 16, 2010, at 6:00 p.m., Mayor Eva Galambos presiding.

## INVOCATION

Rabbi Josh Heller with B'Nai Torah offered the invocation.

## CALL TO ORDER

Mayor Eva Galambos called the meeting to order at 6:00 p.m.

## ROLL CALL AND GENERAL ANNOUNCEMENTS

City Clerk Michael Casey reminded everyone to silence cell phones and pagers at this time. Additionally, those wishing to provide public comments, either during a public hearing or during the Public Comment section of the meeting, are required to complete a public comment card. The cards are located at the back counter and need to be turned in to the Clerk.

City Clerk Casey called the roll.

Mayor: Mayor Eva Galambos present.

Councilmembers: Councilmember John Paulson, Councilmember Dianne Fries, Councilmember Chip Collins, Councilmember Ashley Jenkins, Councilmember Tibby DeJulio, and Councilmember Karen Meinzen McEnerny present.

## PLEDGE OF ALLEGIANCE

Mayor Galambos led the Pledge of Allegiance.

**(Agenda Item No. 10-028)**
## APPROVAL OF MEETING AGENDA

Motion and Vote: Councilmember Fries moved to approve the Meeting Agenda. Councilmember Jenkins seconded the motion. The motion carried unanimously.

## CONSENT AGENDA

**(Agenda Item No. 10-029)**
1. Settlement Agreement – City Walk Towers, LLC
   *(City Attorney, Wendell Willard)*

**(Agenda Item No. 10-030)**
2. Resolution to Amend the City of Sandy Springs Community Development Fee Schedule
   *(Community Development Director, Nancy Leathers)*
   Resolution No. 2010-02-10

**(Agenda Item No. 10-031)**
3. Resolution to Reduce Fees Collected by the Department of Community Development for Economic Development Purposes
   *(Community Development Director, Nancy Leathers)*

R002015

### Resolution No. 2010-02-11

**Motion and Vote:** Councilmember Fries moved to approve the Consent Agenda. Councilmember Jenkins seconded the motion. The motion carried unanimously.

## PRESENTATIONS

1. Cardiac Arrest Save Award

**City Manager John McDonough** presented the Save Award to Sandy Springs Fire Rescue personnel for responding to a cardiac arrest call that resulted in saving a woman's life. On October 5, 2009, Sandy Springs personnel received a call concerning a possible cardiac arrest. The quick thinking of Captain Adams to redirect a closer unit to the scene than had been initially dispatched resulted in the crew arriving within five minutes of receiving the call. The crew arrived to find the patient in full cardiac arrest, without a pulse, and not breathing. Sandy Springs personnel and the arriving Rural Metro Ambulance crews immediately began working together in an attempt to restore circulation in the patient. CPR was continued and advanced life support measures were initiated. The patient's heart was stabilized, and she regained a pulse. The combination of the patient getting early CPR, Captain Adams reassigning a closer crew, and the overall quality of care given by the crews, produced a positive outcome. The patient was released by St. Joseph's Hospital several days later and is now enjoying full quality of life.

The Rescue Personnel receiving the award were:

Crew Chief - Phil Adams
Paramedic - Nim Pavlovic
Daniel Fullmore
Michael Nation
Matthew Cook
Darian Gripper
Paramedic Frazier
EMT Angela Wall

2. Proclamation for Georgia Arbor Day

**Mayor Eva Galambos** read the Proclamation for Georgia Arbor Day ending with the Mayor and City Council of the City of Sandy Springs do hereby proclaim Friday, February 19, 2010, as Georgia Arbor Day in the City of Sandy Springs and urge all citizens to celebrate and support the efforts to protect trees. Michael Barnett City Arborist accepted the award on behalf of the Big Tree Foundation.

**City Arborist Michael Barnett** stated that the work of the Big Tree Foundation would not have been possible without the commitment of the Mayor and City Council making trees and tree preservation a priority of the City of Sandy Springs. On behalf of the Arbor Day Foundation and in cooperation with the USDA Forest Service and the National Association of State Foresters, a plaque was presented naming the City of Sandy Springs as a "Tree City USA". This honor is national recognition that the City of Sandy Springs values trees and is committed to protecting trees.

City Arborist Barnett announced there will be a tree planting Friday, February 19th, at 11:30 a.m. and everybody is invited.

**Councilmember Karen Meinzen McEnerny** stated that the tree the City is planting is in honor of her husband, and she hopes to see everyone there on Friday the 19th at 11:30 a.m.

R002016

3.   Proclamation for FBLA Week

**Mayor Eva Galambos** stated the Future Business Leaders of America, Phi Beta Lambda, is a nonprofit educational organization established in Johnson City, Tennessee, in 1942. This organization is known to encompass over 250,000 members nationwide in high schools, colleges, universities, career and technical schools, and private business schools. Future Business Leaders of America is a professional business organization dedicated to bringing business and education together in a positive working relationship through innovative leadership and career development programs.

Mayor Galambos proclaimed February 15th through the 19th as National Future Business Leaders of America Week in the City of Sandy Springs. Students from North Springs High School presented Mayor Galambos with a small token of their appreciation for her support of Future Business Leaders in our community.

4.   Recognition of Yardian Angels and Thea Lloyd

**Councilmember Tibby DeJulio** explained the purpose of the Yardian Angels and their leader Thea Lloyd, who work together on neighborhood projects to improve the appearance of the community. The Yardian Angels told Councilmember Dejulio, there are some problems here and we're not going to be part of the problem. We're going to be part of the solution. The Yardian Angels show the true meaning of neighbors helping neighbors in Sandy Springs. On behalf of the Mayor and Council, the Angels were presented a Certificate of Appreciation.

5.   Photo-History Book Images of America: Sandy Springs

**Kimberly Brigance, Director of Historic Resources at Heritage Sandy Springs,** along with the President, Lori Evers, Executive Director Carol Thompson, and Chair of the Historic Preservation Committee Morris Moore, presented the City of Sandy Springs with a new photo history book about Sandy Springs. This book shares the history of Sandy Springs through photos that date back to the 1860's and all the way up to December 2005, when the City became incorporated. Heritage Sandy Springs is celebrating twenty five years of working to preserve and promote the City's history. This photo history book is on sale to the public at Heritage Sandy Springs.

**Mayor Eva Galambos** thanked Heritage Sandy Springs on behalf of the City for the beautiful book.

## PUBLIC HEARINGS

**City Clerk Michael Casey** read the Zoning Rules.

**Alcoholic Beverage License**

### (Agenda Item No. 10-032)
1.   11469 - Approval of Alcoholic Beverage License Application for Royal Package Store at 5325 Roswell Rd Sandy Springs, GA 30342. Applicant is Arunchandra Desai for Retail Package Wine, Malt Beverage and Distilled Spirits.

**Director of Operations Wayne Wright** stated this application is for a new location for the package sale of beer, wine and liquor. All administrative requirements have been met. The public hearing for tonight has also been advertised appropriately. Staff recommends approval.

**Mayor Eva Galambos** called for public comments in support of or opposition to the application. There were no comments from the public.

**Councilmember Karen Meinzen McEnerny** asked about the exact location of this store.

Director of Operations Wright stated it is the building on the southeast corner of Green Hill and Roswell Road.

Mayor Galambos asked what was in the building before.

Director of Operations Wright stated the building is vacant now and he is not sure what was in that location before.

Councilmember Fries stated she thinks it is by the Waffle House and the applicant came to Council with zoning concerns about the use of the location.

Councilmember Meinzen McEnerny asked if this building has gone through Community Development to determine if the zoning is appropriate.

Director of Operations Wright answered yes.

Councilmember Meinzen McEnerny asked if new package stores are allowed in the current Overlay.

**Director of Community Development Nancy Leathers** stated it would be considered retail use. When the application was reviewed the existing zoning permits retail use.

**Councilmember Tibby DeJulio** asked if there was something in the law about liquor stores being within so many feet of the strip clubs on Roswell Road.

**City Attorney Cecil McLendon** stated there is a distance requirement, but it is applicable to the adult entertainment establishment as opposed to the liquor stores.

**Motion and Vote:** Councilmember Fries moved to approve Agenda Item 10-032 for the Alcoholic Beverage License Application for Royal Package Store at 5325 Roswell Rd. Councilmember Jenkins seconded the motion. The motion carried 5-1 with Councilmember Meinzen McEnerny voting in opposition.

**(Agenda Item No. 10-033)**
2.  10880 - Approval of Alcoholic Beverage License Application for Figo Pasta at 1140 Hammond Dr, Bldg K, Suite G, Sandy Springs, GA 30328. Applicant is Sandro Romagnoli for Consumption on Premises of Wine, Malt Beverage & Distilled Spirits.

**Director of Operations Wayne Wright** stated this application is for a new location allowing for consumption on the premises of beer and wine. All administrative requirements have been met and the public hearing has also been appropriately advertised for tonight. Staff recommends approval.

**Mayor Eva Galambos** called for public comments either for or against this application. There were no comments from the public.

**Councilmember Dianne Fries** asked if the restaurant is located in City Walk.

Director of Operations Wright stated it is in Perimeter Town Center at Peachtree Dunwoody and Hammond.

**Motion and Vote:** Councilmember Fries moved for approval of Agenda Item No. 10-033 for an Alcoholic Beverage License Application for Figo Pasta at 1140 Hammond Dr. Councilmember Jenkins seconded the motion. The motion carried unanimously.

**Rezonings**

**(Agenda Item No. 10-034)**

3. RZ09-008/U09-008/CV09-017 - 1105 Mount Vernon Highway, *Applicant: Dunwoody Storage LLC.* To rezone the subject property from C-1 conditional to C-1 to allow retail and service commercial uses in the existing building, with concurrent variances and a use permit to maintain the existing self storage facility.

**Assistant Director Planning and Zoning Patrice Ruffin** stated this is a rezoning petition to allow for additional uses within the existing self-storage building to include retail and service commercial uses, such as sale of boxes, packing materials, and mailboxes for customers to purchase. The applicant is requesting three concurrent variances. Staff is recommending approval of the rezoning and concurrent variances. The Planning Commission heard this petition on January 21st and recommended approval, subject to staff conditions amended to prohibit the uses outlined in the staff report. Staff is also requesting that condition 1(a) be modified to state 218,459 sq. ft. storage facility and associated accessory uses with no more than 5,000 sq. ft. of retail and service commercial uses within a single structure, developed at a total density as listed in the staff report. The condition currently does not have the language and associated accessories. Staff is asking for that to be added to the conditions.

**Pete Hendricks, 6085 Lake Forest Drive,** stated he was representing the applicant. The application concerns the existing self storage facility located at the southwest corner of Mount Vernon and Peachtree Dunwoody. The purpose for the rezoning is to be able to add a UPS type component that includes mailboxes, packaging, shipping, and a modest amount of printing work. The applicant has come through rezoning to give clarity to those uses. Provision 1(a) is in order to override any confusion of the prohibitions that appear under 1(b), prohibiting office use and printing use. The office use under 1(b) would be anything from an insurance agency that would want to come in and have a stand-alone office operation or a blueprint company like Kinko's. The applicant requests Council's approval and authorization for staff to include the necessary language in condition 1(a). Staff's requirements are in conformity with the Steinberg requirements and with the special use requirements. The three concurrent variances are within the harmony and intent of the zoning ordinance and cause no foul to the general public at large. Mr. Tom Linder, owner and operator of the facility, is present any for questions.

**Mayor Eva Galambos** called for public comments in support of this application.

**Trisha Thompson, Chairman of the Zoning Committee for the Sandy Springs Council of Neighborhoods,** stated it isn't often she gets to speak on behalf of a zoning request. Tom Linder is a wonderful individual. This plan, this use, this area, everything is correct about it. It is wonderful to have been involved from the very beginning on this project and having spoken at the beginning in support of this through all the years that he has been coming forward with this plan. She is delighted to fully endorse this project, and hopes that council will too.

Mayor Galambos called for public comments against this application. There were no comments. The public hearing was closed.

**Motion and Second:** Councilmember DeJulio moved to approve agenda item no. 10-034, RZ09-008/U09-008/CV09-017 - 1105Mount Vernon Highway, *Applicant: Dunwoody Storage LLC*, To rezone the subject property from C1 conditional to C-1 to allow retail and service commercial uses in the existing building, with concurrent variances, with staff recommendations and a use permit to maintain the existing self storage facility. Councilmember Fries seconded the motion.

**Councilmember Karen Meinzen McEnerny** asked if there is enough parking for retail use above the storage use.

**Assistant Director Planning and Zoning Patrice Ruffin** answered yes, as an accessory to the self storage there is enough parking.

**Vote on the Motion:** The motion carried unanimously.

    **(Agenda Item No. 10-035)**
4.  RZ09-009/CV09-018 - 6860 Peachtree Dunwoody Road, *Applicant: Kadampa Meditation Center New York*, To rezone the subject property from O-I conditional to O-I to allow for a place of worship and a boarding house in the existing structure with concurrent variances.

**Assistant Director Planning and Zoning Patrice Ruffin** stated the current conditions on this property limit the development to a bed and breakfast. Therefore, the applicant is requesting to rezone to O-I to allow for a place of worship with accessory uses and to allow for a boarding house in the existing structure. The applicant is also requesting nine concurrent variances which are for current and proposed site conditions. Staff is recommending approval conditional of the rezoning and concurrent variances. This case was heard at the January 21st Planning Commission hearing, and the Commission recommended approval subject to staff conditions as amended and included in the conditions recommended by staff in the staff report.

**Steve Rothman, Wilson Brock & Irby LLC,** stated he represents the applicant Rameshori. Eric Kronberg, the architect, is also available to answer any questions. He asked for a show of hands of those in the audience in support of Rameshori and then another show of hands of those that are residents of Sandy Springs. The proposal is to change a condition of zoning for the property which currently is zoned O-IC, limiting the use to a bed and breakfast. The change is to O-I to allow a place of worship and also a space for practitioners and monks to reside. The goal is to preserve this old bed and breakfast structure and to preserve the wooded lot that it's located on. The petitioner has been working with the adjoining neighbors before filing the zoning application, and has made changes to the application. Councilmember McEnerny talked to the petitioner about the apartment dwelling space ordinance, and since then the petitioner has reduced it to a total of eight rooms, one of which would only have four beds in it, and the others are for individuals. They would not have more than four guests now, because that's what they are required to do. The applicant has reviewed and agrees with all of staff's recommendations.

**Mayor Eva Galambos** called for public comments in support of this application.

**Mary Jo Marks, 7050 Hunters Branch Drive,** stated she represented the homeowner's association in the Peachtree -Dunwoody corridor including the Branches, Drayton Hall, Glen Meadows, Hunters Hall, Rembley's Hall, and Westfair I and II. The neighborhoods support the use of the location with the following conditions:

- No on-street parking on Peachtree-Dunwoody Court. There are no parking signs posted. This is to ensure emergency vehicles will have free access in the event of such an emergency.

- Before a special event permit is issued, the applicant should be required to provide a letter from MARTA agreeing to parking on the special event date in the North Springs station. MARTA only approves outside parking on a case-by-case basis.
- Traffic management plan situations, non special events, should there be a Sunday Service where parking needs exceed 41 vehicles; where are they going to park?
- A maximum of eight residents, whether they be permanent residents or visitors at any time. Visitors are undefined as to length and/or frequency of stay and represent a situation that cannot be monitored by the City of Sandy Springs. That's also in line with the current conditions of zoning provided to the bed and breakfast allowing four bedrooms to be rented out.
- Assuming double occupancy, a maximum of eight guests.
- Appropriate tree protection with the addition of the new graveled parking areas.
- Appropriate identification of designated parking spaces via striping or some similar method to ensure the sight will be able to accommodate the required number of parking spaces. Without such designation on proposed gravel parking areas, there is no assurance visitors will park to accommodate the maximum of 41 vehicles.
- Sewer hookup. The property is currently on a septic tank. The applicant anticipates the county will require an additional drain field and expansion of the current septic tank. It would seem if improvements such as these are required for intended use, it would be most appropriate to require sewer hookup.
- Signage should be put across the existing driveway at the corner of Peachtree-Dunwoody Road and Peachtree-Dunwoody Court, which City of Sandy Springs Engineer's will close per the engineer's requirements.
- The parking in the apron of that driveway, there is sufficient space. There's a curb cut. That curb cut should be removed to reduce the likelihood that anybody might be tempted to park in that very dangerous location.
- No street parking in local neighborhoods and/or parking in office parks, such as Glen Meadows, the office site that's directly across Peachtree-Dunwoody Apartment Complexes, et cetera.
- In the case of neighborhoods such as Glen Meadows, on-street parking by the members and visitors of Rameshori will violate the intention of protected neighborhoods. And the use of office parks, such as the office site, will create a very dangerous situation for pedestrians in vehicle traffic.
- We ask that Rameshori maintain the current footprint of the existing structure as provided in the Planning Commission packet dated January 1, 2010.
- No retail transactions should be allowed on the property. This area is designated in the Comprehensive Land Use Plan, and retail is specifically prohibited in this area. Sale of any religious related items can be easily accommodated at the temple's commercial center at World Peace Café in City Walk or by the internet. This is not a condition of zoning but a key point of order.

Mayor Galambos called for public comments in opposition to this application.

**Trisha Thompson, Chairman of the Zoning Committee for the Sandy Springs Council of Neighborhoods,** stated she is speaking in opposition to the requested concurrent variances, rather than to the use. The use is appropriate for this site. The home was built in 1937 and is on septic. They are paying taxes on 3,700 square feet, although 7,500 square feet is the proposed use space. Due to excessive cost, the applicant does not want to spend any money on the streetscape, closing down the eastern most roadway access going into the property, or upgrading the septic system hook up. It is wrong to go from eight adults living there to twelve adults using the bathroom, laundry and kitchen on a single family septic tank. On top of that, there are 63 spaces in their worship center, which is a lot of stress on a septic tank. The Council of Neighborhoods asks the Council to require the applicant to close off the eastern portion of

the driveway, so it will never be mistaken as an entrance, adhere to the streetscape standards in the area, and limit the occupancy to eight people.

**Ken Kuatt, 415 Ottercreek Court,** stated he is the President of the Glen Meadow Homeowner's Association. He is concerned about the petitioners taking a 50-foot buffer and 10-foot improvement setback to two feet. They are trying to make a current illegal setup conform using a zoning variance. What they have now is a gravel driveway or parking area by the garage that extends well into the buffer that shouldn't ordinarily be there. He does not understand how anyone could conclude that it is in harmony with the intentions of the zoning regulations. Mr. Clap believes the general sentiments of the associations in the area are that this is a generally nice use of the property. He does not oppose the proposition, but would like to see the proper conditions put on it.

**Councilmember Ashley Jenkins** asked Mr. Kuatt if he wanted to address the streetscape issue concerning the Perimeter CID streetscape at that location.

Mr. Kautt answered the problem with the streetscape is the topography, which would require eating into the existing hillside if a full streetscape is put in. He has always wondered if there was an agreement that could be reached where it is not entirely compatible with the streetscape requirements, but not just left as is. Right now the sidewalk is not terribly big and has a significant visibility constricted space.

Mrs. Thompson stated the corner has very bad visibility and that any removal of that hillside or digging into that hillside would pull it back, allowing a greater line of sight.

**Melvin Silver, 6850 Peachtree Dunwoody,** stated that he lives in the Peachtree-Dunwoody Apartments whose entrance is directly across from this particular property. There are about 400 apartments on that corner and the traffic that comes off of that side street onto Peachtree Dunwoody is already a problem. If that entrance, closest to their property, is not closed off, it will be an absolute nightmare. He also has a concern about parking and the frequency with which the applicant would have large events needing additional parking. Larger events would also add to the sewer problem.

**Sharon Griswold, 240 Glen Meadow Court,** stated she supports the application but is concerned about parking. They need to provide an agreement from MARTA before they get a special event permit showing that they have parking. The school bus stop on this corner also compounds the importance of no parking zones on Peachtree-Dunwoody Court.

Mr. Rothman stated in response to the concerns about parking, the parking will be gravel on the site behind the hills that are adjacent to the street. Parking will be all on-site with 41 spaces, which is not taking the MARTA reduction benefit that the applicant is entitled to. The petitioner is in agreement to submit a traffic management plan for the special events permit that has to be provided on a case-by-case basis and an agreement with MARTA for parking. The petitioner has no objections to not having on-street parking. On the issue of placing trees within the parking area, since the two parking areas are graveled, more grading would need to be completed and more trees would need to be removed from the outside. The petitioners request to plant trees outside of the parking area to disturb less areas for the provision of trees.

With regard to the maximum of eight residents requested, the staff has said eight rooms and not a number of residents. The petitioner does not believe they should be limited to the number of guests that are allowed to stay. What they would like to do is to have a guestroom with four beds in it. Then there will be seven other rooms, with a maximum of eight permanent residents.

R002022

With regard to the request for a sewer hookup, the petitioner had this discussion with a lot of individual Councilmembers. The issue with the sewer hookup is that in order to hook up the sewer, the petitioner would have to go on the apartment's property, because that is where the sewer hookup is located. There are two ways to do it. One is to go across the street and through their entrance gate, and behind the entrance gate is where the manhole is. That would become, even if there was enough money to pay for that, operationally impossible for the apartment complex. It would mean tearing up their entrance gate and going right through the middle of it. The other would require going due west on the neighbor's property with a sewer line that's elevated, because of a stream there; going across their property, into the apartment's property beyond that, and tying in there. Both of those options are not only extremely expensive, they're very impractical and probably impossible. The applicant is going to enlarge the septic system and follow all of the Fulton County Health Department requirements. The applicant is willing to spend and will spend the money to upgrade the septic system.

Concerning the request for the variances, almost all of these variances are asking them to preserve the status quo, except for two. One is for the apportion of three parking spaces that they are tucking behind the hill, so that they can exceed the minimum required and provide parking to satisfy everyone. The other change, besides putting a handicap ramp in front, is to allow the applicant to build retaining walls and make the walkway more level to meet ADA specifications, so that people can use the existing patio. Other than those changes, the applicant's goal is to leave the exact same footprint of the house. It's an adaptive reuse of the house.

There was an allegation that the reduction of the buffer on the west side from 50 feet to 2 feet is an illegal condition. The Fulton County Commission, for better or for worse, approved a site plan that showed this gravel area here in 1996 for the bed and breakfast. It's attached to their ordinance and they had a condition that said all setbacks, all buffers, everything is reduced to allow the existing on-site situation as reflected in the site plan. The applicant is asking for 50 to 2, but only where it's existing gravel. They are not asking to take something that's 50 feet back and build a huge addition. It's not as if there's an illegal situation that they're trying to sanitize. It was approved by Fulton County in 1996, and the applicant is asking that allowance to continue.

The applicant has removed their request to have retail as a principle committed use here because of the Perimeter CID regulation. They are requesting an accessory retail to include a couple of shelves to allow people that are meditating or worshipping to pay for a book or a bottle of water. They have heard that the neighborhood is very concerned about retail starting to be the tail that wags the dog. They're talking about something very minor here. It would never take up more than 50 to 100 square feet. The applicant has agreed to close the eastern most driveway entrance and put grass down, so cars won't think that they can go up there.

Mayor Galambos closed the public hearing.

**Councilmember Ashley Jenkins** stated the applicant will contact MARTA prior to setting any event date to determine if it is a good date for MARTA.

**Councilmember Dianne Fries** stated that does not need to be included in the motion, because the Special Events Permit requires them to have a parking plan and if they don't have a proper parking plan off street, they won't get the permit.

Councilmember Jenkins asked if it is definite that it is not needed in the motion, because the neighbors are extremely concerned about the parking.

R002023

Assistant Director of Planning and Zoning Ruffin stated the Special Events Permit covers all parking requirements.

Councilmember Jenkins stated she wanted to remove the number five, which states no more than five special event permits, because she wants it for any event that goes over 41 parking spaces.

Councilmember Fries asked if she was making it unlimited.

Councilmember Jenkins stated she did not know how many people attend Sunday classes.

Assistant Director of Planning and Zoning Ruffin stated the applicant indicated that they would exceed the 41 parking spaces only five times a year.

Councilmember Jenkins asked if she needed to include anything in the motion stating the applicant needs to contact MARTA prior to an event.

Assistant Director of Planning and Zoning Ruffin answered no.

Councilmember Jenkins asked if she could include a condition that states they cannot park in any neighborhood or office complex.

Assistant Director of Planning and Zoning Ruffin answered yes.

**Director of Community Development Nancy Leathers** stated the conditions indicate the applicant has to have a special events permit if they exceed the 41 parking spaces. If they are parking in the neighborhood, they have immediately violated that condition of zoning and the City would serve them for the violation, so it is not necessary to include in the motion.

Councilmember Jenkins asked if that is enforceable.

Director of Community Development Leathers answered yes.

**City Attorney Cecil McLendon** stated the condition is appropriate in the motion just in case someone decided to park on the street before reaching the limit of 41 spaces.

Councilmember Fries stated her issue with office complex is that in the Special Event Permit they may choose not to park at MARTA and have an agreement with an office complex.

Councilmember Jenkins stated everyone agrees with putting up no parking signs on Peachtree Dunwoody Court. Does that need to be a condition of zoning or is it something the City can do?

Director of Community Development Leathers stated it is something that the City can do, because it is a request of the Fire Department.

Councilmember Fries asked if condition 3(j) includes replacement with curb and gutter.

**Transportation Planner Mark Moore** stated it is not written in the conditions. The original staff conditions were written with the intent of cutting off that driveway, and only allowing driveway access onto Peachtree Dunwoody Court. They will have to get an LDP to do the proposed site work and they will install 24 inch city standard curb and gutter and sidewalk along any frontage that does not have it per the development. That is already in the development ordinance. If the sidewalk and the frontage are not

compliant with the City standard of five feet with a two foot grass strip or is not ADA compliant with ramps, they will have to correct the issue to comply with ADA.

Councilmember Jenkins stated the sign is to be at that location. She asked if that needed to be in the conditions.

Transportation Planner Moore stated it does not have to be in the conditions as long as it meets the sign ordinance conditions.

Councilmember Jenkins stated condition 3.n. should be an accessory retail use limited to 50 square feet.

**Motion and Second:** Councilmember Jenkins moved to approve RZ09-009/CV09-018 - 6860 Peachtree Dunwoody Road, *Applicant: Kadampa Meditation Center New York*, To rezone the subject property from O-I conditional to O-I to allow for a place of worship and a boarding house in the existing structure, with concurrent variances, with staff conditions and with the following conditions: 1(d) There shall be no parking in surrounding neighborhoods or office complex without an agreement. 3(n) Accessory retail space shall be limited to fifty square feet. Councilmember Fries Seconded the motion.

Councilmember Fries stated she has an issue with the gravel parking lot, because it cannot be marked.

Mr. Rothman stated the applicant is willing to do whatever is required by the City to mark the spaces.

Director of Community Development Leathers stated she would prefer that a condition is included in the motion stating that the applicant has to delineate the parking spaces.

**Addition to the Motion:** Councilmember Jenkins added condition 3(o); spaces will be delineated in the gravel parking area. Councilmember Fries seconded the addition to the motion.

**Councilmember Tibby DeJulio** stated he is concerned about having a potential of 70 people in the home and 8 living there on one septic tank. He had a situation in his neighborhood where a Rabbi was living in a home with several kids and people coming in and the septic system leaked into the yard and the foundation of the next door neighbor's home. He is concerned with having a facility this large on a septic system. With 41 parking spaces there is a potential of having 80 people in the facility at one time, since most people worship together. The septic system is going to be over burdened.

Mr. Rothman stated the current septic system is designed for a bed and breakfast, but it was an event facility that hosted weddings. It has kitchens and bathrooms designed for larger groups.

**Eric Kronberg, 1359 La France Street,** stated he was the architect. Regarding the septic tank, the applicant has to comply with the Fulton County health requirements. In addition, the applicant has to be fully transparent with Fulton County concerning the number of occupants, the assembly use, the number of bedrooms, washer and dryer, kitchens, and everything else in the facility. The Health Department has already completed an initial analysis and the applicant is coordinating with the Health Department to verify what needs to happen. The current septic tank is within 30-40 gallons of the capacity required by Fulton County. After initial analysis, it appears the drain lines on the septic tank are undersized. The drain lines will have to be expanded to meet the Fulton County Health requirements. In addition, Fulton County stated there has to be room for a completely separate septic system, should that field ever reach capacity. If there is not room for the second system, the applicant will not receive a permit. The applicant has to show there is adequate septic as the building stands now and there has to be capacity for a separate septic system. The applicant would love to have a City sewer system that could be tied into in the public right-of-way. Unfortunately, that is not the case, because this sight was developed years ago.

Mayor Galambos asked if the Health Department would inform the Sandy Springs staff of the applicant meeting all heath requirements before the City of Sandy Springs would allow them to receive their permit.

Assistant Director of Planning and Zoning Ruffin answered yes.

Councilmember Fries added a friendly amendment to the motion. Item 1(b) should state 7,430 square foot building having no more than 12 people overnight instead of 8 dormitory bedrooms.

Councilmember Meinzen McEnerny stated the dormitory is already being changed from eight beds to four beds.

Councilmember Fries stated to remove dormitory completely and list it as a maximum of 12 overnight guests.

Councilmember Jenkins asked if the amendment was ok with staff.

Assistant Director of Planning and Zoning Ruffin answered yes.

Councilmember Jenkins stated she accepted the friendly amendment to 1(b) having not more than 12 overnight guests at any one time.

**Councilmember Chip Collins** asked if they were differentiating between permanent residents and overnight guests.

Councilmember Jenkins stated no.

Councilmember Collins stated he asked Assistant Director of Planning and Zoning Ruffin, under the proposed zoning, even with the conditions, how many people could sleep at that location. At the time it was a bed and breakfast it slept 32 people, but currently it would have 16 rooms with beds.

Assistant Director of Planning and Zoning Ruffin stated those numbers were based on the description in the letter of intent. Based on what is being represented tonight, it is no more than twelve people. It is staff's recommendation that the conditions be changed to a limitation on the amount of people that can stay overnight versus eight bedrooms.

Councilmember Collins asked if that stipulation included whether they are a permanent resident or not.

Assistant Director of Planning and Zoning Ruffin answered yes.

Councilmember Meinzen McEnerny stated a nine foot plus sidewalk that is required by Perimeter Center Overlay District is over kill for this area. It would be reasonable to agree to the Sandy Springs Building Code requirements for 5 feet and 2 feet.

Transportation Planner Moore answered yes, the City standard outside the Overlay District.

**Restatement of Motion with Additions and Amendments:** Councilmember Jenkins moved to approve RZ09-009/CV09-018 - 6860 Peachtree Dunwoody Road, *Applicant: Kadampa Meditation Center New York*, To rezone the subject property from O-1 conditional to O-1 to allow for a place of worship and a boarding house in the existing structure, with concurrent variances, with staff conditions and with the following conditions:

1. To the owner's agreement to restrict the use of the subject property as follows:

   a. To a Place of Worship having accessory uses and to a Boarding House.

   b. To a 7,430 square foot building developed at a density of 3,696.52 square feet per acre. There shall be no more than twelve (12) overnight occupants at any time.

   c. The owner shall obtain a Special Event Permit from the City on occasions where the necessary parking will or is expected to exceed the required 41 parking spaces, and no more than five Special Event Permits shall be issued to the owner per calendar year.

   d. There shall be no parking in surrounding neighborhoods and office developments without written agreement(s).

2. To the owner's agreement to abide by the following:

   a. To the site plan received by the Department of Community Development on January 11, 2010. Said site plan is conceptual only and must meet or exceed the requirements of the Zoning Ordinance, the Development Standards contained therein, and these conditions prior to the approval of a Land Disturbance Permit. The applicant shall be required to complete the concept review procedure prior to application for a Land Disturbance Permit. Unless otherwise noted herein, compliance with all conditions shall be in place prior to the issuance of a Certificate of Occupancy.

   b. To limit any monument/free standing sign to no more than a total of 32 square feet and limit the lighting to external.

3. To the owner's agreement to provide the following site development standards:

   a. Variance from the Tree Conservation Ordinance, Administrative Standards, & Best Management Practices - Landscape Strips, Buffers, and Parking (F.1) to relieve the requirement of planting a large shade tree every 6 parking spaces for all new parking lots (CV09-018).

   b. Variance from Section 4.23.2 of the Zoning Ordinance to eliminate the requirement to provide minimum ten (10) foot wide landscape islands at the end of each parking bay, and a ten (10) foot wide landscape island every sixth (6th) space for all new parking lots (CV09-018).

   c. Variance from Section 4.23.1.B of the Zoning Ordinance to reduce the required twenty-five (25) foot zoning buffer and ten (10) foot improvement setback to a minimum of seven (7) feet from the east side property lines to allow for existing building, gravel drive, walkways, and porch (CV09-018).

   d. Variance from Section 4.23.1.B of the Zoning Ordinance to reduce the required fifty (50) foot zoning buffer and ten (10) foot improvement setback to a minimum of two (2) feet from the western rear property line to allow for existing building, rear patio, gravel drive & parking spaces, and wall. And to allow for proposed retaining walls & a proposed ADA accessible/compliant path (CV09-018).

R002027

e.  Variance from Section 12B(1) of the Zoning Ordinance to reduce the required PCID streetscape improvements for rights-of-way designated as a "Street" (Peachtree Dunwoody Court) and as an "Avenue" (Peachtree Dunwoody Road) (CV09-018).

f.  Variance from Section 18.3.1.E of the Zoning Ordinance to reduce the required twenty-five (25) foot spacing of parking (new) from any property of a single-family use to two (2) feet from the western rear property line (CV09-018).

g.  Variance from Section 18.3.1.E of the Zoning Ordinance to allow parking (new) located within a required setback for the side corner yard (CV09-018).

h.  Variance from the Zoning Ordinance to reduce the minimum yards and landscape strips (adjacent to Peachtree Dunwoody Court) to the extent necessary for the existing structures and proposed parking areas, as shown on the recommended Site Plan, to comply (CV09-018).

i.  No access or curb cut on Peachtree Dunwoody Road will be allowed.

j.  The existing eastern curbcut on Peachtree Dunwoody Court (adjacent to Peachtree Dunwoody Road) shall be blocked in a manor to eliminate vehicular ingress/egress as determined by the Director of Public Works. The existing driveway serving the aforementioned curbcut shall be converted for pedestrian use/connectivity in accordance with the site plan received by the Department of Community Development on January 11, 2010 and as determined by the Director of Community Development.

k.  The owner/developer shall dedicate thirty (30) feet of right-of-way from centerline of Peachtree Dunwoody Court along the entire property frontage or ten and one-half (10.5) feet from back of curb, whichever is greater, to the City of Sandy Springs.

l.  The owner/developer shall dedicate forty-five (45) feet of right-of-way from centerline of Peachtree Dunwoody Road along the entire property frontage or ten and one-half (10.5) feet from back of curb, whichever is greater, to the City of Sandy Springs.

m.  Reserve for the City of Sandy Springs along the necessary property frontage of the following roadways, prior to the approval of a Land Disturbance permit, sufficient land as necessary to provide for compliance with the Comprehensive Plan. All building setback lines shall be measured from the dedication but at no time shall a building be allowed inside the area of reservation. All required landscape strips and buffers shall straddle the reservation line so that the reservation line bisects the required landscape strip or buffer. At a minimum, 10 feet of the required landscape strip or buffer shall be located outside the area of reservation. All required tree plantings per Article 4.23 shall be placed within the portion of the landscape strip or buffer that lies outside the area of reservation.

Fifty-five (55) feet from centerline of Peachtree Dunwoody Road.

n.  The accessory retail use within the Place of Worship shall not exceed fifty (50) square feet.

o.  The proposed on-site parking spaces shall be delineated subject to the approval of the Director of Community Development.

**Second and Vote:** Councilmember Fries seconded the motion. The motion carried unanimously.
**Ordinance No. 2010-02-05**

**(Agenda Item No. 10-036)**

5. Adopting a Water Conservation Ordinance that will allow City officials to enforce a state law requiring new irrigation systems to have rain sensor shut-off switches, and to enforce State drought watering restrictions.

**Environmental Compliance Officer David Schmid** stated Staff and the Community Development Department recommends that City Council adopt a Water Conservation Ordinance that would enable City officials to enforce the state requirement of installing rain sensor shutoff switches on all new residential and commercial irrigation systems. If adopted, the ordinance would also enable the City to enforce State-mandated water restrictions associated with the different drought stages.

**Mayor Eva Galambos** called for public comments either for or against this application. There were no comments from the public.

**Motion and Second:** Councilmember Jenkins moved to approve agenda item no. 10-036, Adopting a Water Conservation Ordinance that will allow City officials to enforce a state law requiring new irrigation systems to have rain sensor shut-off switches, and to enforce State drought watering restrictions. Councilmember Meinzen McEnerny seconded the motion.

**Councilmember John Paulson** asked the City's policy regarding these types of things. If somebody's sprinkler runs over, do they get a ticket or a warning?

Environmental Compliance Office Schmid stated Section 110-8 in the ordinance states that any violation of this chapter from time to time shall constitute a violation of this ordinance as set forth in Chapter 103, Article 3, Section 103-10, which states that there is a compliance period that will be issued to the offenders, so that the City will give them a notice of violation, and if they continue to violate, then the City will proceed with further enforcement.

Mayor Galambos asked if this is the first Water Conservation Ordinance that Sandy Springs will have enforcement authority.

Environmental Compliance Office Schmid answered yes.

**Vote on the Motion:** The motion carried unanimously.
**Ordinance No. 2010-02-03**

**(Agenda Item No. 10-037)**

6. An Ordinance to amend Chapters 109-222(c) (8) of the Code of the City of Sandy Springs to define and standardize exemptions to the City of Sandy Springs Stream Buffer Protection Ordinance related to Minor Land Disturbing Activities.

**Assistant Director Building and Development Blake Dettwiler** stated this item proposes to adopt an amendment to the City Stream Buffer Protection ordinance, specifically to adopt criteria that have been developed by the State Department of Natural Resources Environmental Protection Division to allow certain minor land disturbing activities in stream buffers.

**Mayor Eva Galambos** called for public comments either for or against this application.

**Patty Berkovitz, 800 Crest Valley Drive,** stated she represents the Watershed Alliance of Sandy Springs. The attached memo from DNR is a guidance document to help local issuing authorities to decide on how to proceed on some applications. She does not think it was designed to be incorporated into the ordinances or regulations. The first is a minimum buffer requirement that restricts activities within the buffer. Each issuing authority has the right and the power to do more than the minimum. By adding this minor land disturbance activity letter, we are further expanding the list of things that may be done in this protected buffer. Included in water conservation are water protection, and that means enforcing stream buffer protection. She commended the City for all of the activities with water conservation. Included in water conservation is water protection. That means enforcing stream buffer protection as strongly as can be done. They are pleased that the staff has added the entire letter to the ordinance. It is important to include for clarity things that you can do as well as things you cannot. They also asked that Council consider adding the word pervious to item 1(a). There are many different building materials and it is important that the community, builders, and the City be on the same page. Decks can now be built out of many different materials. For Structures within the 25 and 75 foot buffer, water needs to get to the ground, so it can infiltrate the soil so it can be filtered before it reaches the City's streams. It also helps slow it down. Roofs on gazebos are an issue, because it adds velocity and strength to the water that helps increase erosion. She asked Council to add the word pervious to item 1(a).

Mayor Galambos asked for clarification on where the word would occur.

Mrs. Berkovitz stated it is under (a) next to the number one which says elevated structure. Further down the page it directs that, but this one list does not. The clearer you are, the less trouble you will have.

**Councilmember Karen Meinzen McEnerny** suggested the statement read "elevated pervious".

**Councilmember Chip Collins** stated where the word pervious is placed makes a difference. The concern is mainly with the word gazebo. If the document states elevated pervious structure, that implies that gazebos are pervious, but gazebos by definition usually have roofs on them and are not pervious. The word pervious needs to be put in a different location.

Councilmember Meinzen McEnerny suggested the statement read pervious flooring.

**Councilmember Ashley Jenkins** asked if it was necessary to change this because item 1(f) covers the issue. It states no concrete and/or asphalt slabs, pads or foundations constructed or placed as a part of the site's preparation, construction or subsequent development.

**City Attorney Cecil McLendon** stated it depends on what Council would like to do. If water is supposed to pass through all structures, then it is appropriate in the location originally suggested, but that is what will be passed.

**City Attorney Wendell Willard** stated the footprint means the base of it, which may be a concrete pad for something like a gazebo.

Councilmember Jenkins stated it can't be; the ordinance says no concrete.

City Attorney McLendon stated section (f) is referring to the foundation structures that it is sitting on and it depends on what the Mayor and Council would like to do. Council needs to determine whether water needs to pass through all portions of the structure.

**Councilmember Dianne Fries** stated her understanding is the roof is the concern. Does Council want to have the roof solid or have openings so water can come through the roof?

Councilmember Meinzen McEnerny stated she thinks that a gazebo roof has to be waterproof. The flooring structure underneath the gazebo and elevated walkways need to be pervious. She suggested the language state the flooring in the area be pervious.

Councilmember Jenkins reiterated that is presented in 1(f).

Councilmember Meinzen McEnerny stated 1(f) refers to being on grade. She would like to add 1(g) stating all elevated flooring structures shall be pervious.

Councilmember Collins asked if roof structures would be included. Mrs. Berkovitz's concern is if you have a roofed gazebo that is filtering off water, which defeats the purpose of this.

Mrs. Berkovitz stated the term gazebo was used for lack of a better term, such as a seating area with some sort of latus with vines, which would have been a pervious surface in a natural setting, but there is no word for that, so gazebo was used. She feels it was language, when written, that was not intended to be part of the ordinance and regulation.

Councilmember Collins asked if Council was going to allow someone to build a roofed structure. He asked Mrs. Berkovitz what was the position of the Watershed Alliance of Sandy Springs.

Mrs. Berkovitz stated the next step would be a screened in patio or other items.

Councilmember Fries asked if there was a way to take gazebo out of section 1.

Councilmember Meinzen McEnerny suggested taking gazebo out and replacing it with elevated pervious structures such as decks, patios, and walkways.

Mayor Galambos stated there was a consensus to take gazebo out and add pervious to the other items.

Councilmember Meinzen McEnerny stated paragraph one would read elevated pervious structures such as decks, patios, walkways, viewing platforms and/or open picnic shelters.
Councilmember Fries stated the word gazebo has to be included somewhere.

Mayor Galambos stated this item has become too complicated. She referred the item back to staff to include all suggestions from Council.

**Motion and Vote:** Councilmember DeJulio moved to defer to the March 2, 2010, City Council meeting, Agenda Item No. 10-037, An Ordinance to amend Chapters 109-222(c)(8) of the Code of the City of Sandy Springs to define and standardize exemptions to the City of Sandy Springs Stream Buffer Protection Ordinance related to Minor Land Disturbing Activities. Councilmember Fries seconded the motion. The motion carried unanimously.

**City Manager John McDonough** asked that the Mayor suspend the regular order of business to allow the guests from Roswell to make their presentation from the Work Session agenda.

At this time Council recessed from the Regular Meeting to hear a presentation from City of Roswell Director of Transportation Steve Acenbrack. Council then discussed the Work Session agenda item Chattahoochee River Bridge on Roswell Road. Following this discussion Council took a ten minute break before ending the recess and returning to the Regular Meeting agenda.

## UNFINISHED BUSINESS

There was no Unfinished Business.

R002031

## NEW BUSINESS

### (Agenda Item No. 10-038)

1. Resolution by the Planning Commission of the City of Sandy Springs to request that the Mayor and City Council initiate a Rezoning Petition

**Assistant Director Planning and Zoning Patrice Ruffin** stated that the Planning Commission, at their January meeting, adopted a resolution requesting that the City Council initiate a rezoning for five lots located on Tanacrest Drive in District 3 of the City. Ms. Ruffin introduced Roger Rupnow.

**Roger Rupnow, 490 Tanacrest Drive,** stated that he and his wife had decided to do some renovating of their house. When the architect applied for the building permit, staff informed him he was in a R2 zoning district and they had to have a larger side yard then they had planned. That wasn't a problem and the deck was built within the R-2 sidelines. When looking at the zoning map, it seems that when their development was built, about 5 houses were built where the zoning line crosses. The zoning line does not follow the property lines. Some houses were built in zone R2, some in R3 and some have a mixture of the two zones. Mr. Rupnow is petitioning to change the 5 lots from a R2 zoning to R3.

**Motion and Vote:** Councilmember Collins moved to approve Agenda Item No. 10-038, a Resolution by the Planning Commission of the City of Sandy Springs to request that the Mayor and City Council initiate a Rezoning Petition. Councilmember Fries seconded the motion. The motion carried unanimously. **Resolution No. 2010-02-12**

### (Agenda Item No. 10-039)

2. Consideration of Approval of a Contract to Construct the Lake Forest Elementary School Sidewalks Project Subject to Validation and Approval by the Legal and Finance Departments

**Capital Program Director Marty Martin** stated there were twelve bids received for this project. The lowest bid was received from Urey Construction in the amount of $529,813.00. Mr. Martin recommends that Urey Construction be awarded the contract. He also suggested that the City procure the services of a geo-technical inspection services consultant with this contract, because of the complexity of the construction involved.

**Councilmember Ashley Jenkins** asked if the geo-tech consultant was included in the $529,813.

Capital Program Director Martin answered no, it would be an additional cost.

**Mayor Eva Galambos** asked if it was still included in the budget.

Capital Program Director Martin answered yes.

**Councilmember Karen Meinzen McEnerny** stated the project was under budget as the budget was $750,000.

Capital Program Director Martin answered yes.

**Councilmember Dianne Fries** asked if geo-tech consultant could be covered under the next agenda item.

**City Manager John McDonough** stated that was a possibility.

R002032

Capital Program Director Martin stated in this case it is a separate issue. This is inspection and testing services which includes testing labs, compaction inspections, and those types of services that specialty engineer consultants do.

Councilmember Fries asked how much it would be.

Capital Program Director Martin stated the cost is not to exceed $50,000 and it should be about half of that based on the initial research.

**Councilmember John Paulson** asked if in the original contract the retaining wall is vendor designed.

Capital Program Director Martin stated the retaining walls are concrete and there was a design provided by the City's design consultant to validate that the construction complies with the GDOT standard specifications.

Councilmember Paulson asked if there is a geo-tech report that accompanied the design.

Capital Program Director Martin stated there was a preliminary boring inspection that was preformed. As the excavation is opened up, there will be more detailed geo-tech compaction tests.

Councilmember Paulson asked if it is common practice for the City to hire geo-tech engineers for a project such as this.

Capital Program Director Martin responded by saying that this is an uncommon project for the kinds of work that the City has done thus far. In the last project where the City had retaining wall compaction, a consultant was hired through the construction contractor.

**Motion and Second:** Councilmember Fries moved to approve Agenda Item No. 10-039, Approval of a Contract to Construct the Lake Forest Elementary School Sidewalks Project Subject to Validation and Approval by the Legal and Finance Departments and a separately procured Geo-Technical Inspection Services (primarily soils) contract not to exceed $50,000. Councilmember Paulson seconded the motion.

City Manager McDonough stated this is more of a material testing issue rather than a field inspection which would be done under the field inspection program. This is a technical sampling and sending off to the lab. His recommendation is to proceed per Capital Program Director Martin's recommendations.

**Vote on the Motion:** The motion carried unanimously.
**Resolution No. 2010-02-13**

  **(Agenda Item No. 10-040)**
3. Contract for Project Management & Construction Management

**City Attorney Wendell Willard** stated an RFP went out as a proposal for a work change order which is outside of the scope of the current CH2M HILL contract for operations of the City. It came about as a result of there being recognized under the contract that this called for an increase of work, therefore an increase of cost. There were proposals from CH2M HILL, but there were no measureable values of the costs involved with the work. A committee set up by Mayor Galambos, consisting of three council members, the City Manager, John McDonough, the Assistant City Attorney, Cecil McClendon, and himself was set up to review the contract. In reviewing, the contract, a decision was made to have an RFP submitted to have a measurable standard to go by to see what the cost would be. It is also prudent to review change orders in this manner if future things come up.

**Assistant City Manager Noah Reiter** stated that Procurement went out with an RFQ for a project in construction management with those proposals due February 2, 2010. They received twenty written proposals and an administrative review disqualified three of the twenty. One was disqualified because the cost proposal was not sealed. The other two were disqualified due to missing signed certification documents. The seventeen remaining proposals were reviewed by a committee set up by City Manager John McDonough consisting of Noah Reiter, Assistant City Manager, Eden Freeman, Grants Administrator, Tyra Little, Contracts Administrator, and a Professional Engineer from a neighboring jurisdiction. The applicants were graded on a point system out of 50: 15 points for the firms' experience; 10 points for the government experience of the firm; and 25 points for the qualifications of the proposed staff that would be assigned to the project. The four scores of the committee members where then averaged and ranked. The top three scoring companies were invited to give a 30 minute in-person presentation and a 15 minute session of Q & A. For consistency, the three meetings were all attended by the same four committee members and they had a standard list of questions for the firms. The three companies were again graded on a scoring system out of 50. Twenty-five points were awarded for the understanding of the scope of the project; 10 points for the firm's construction knowledge; 10 points for the experience of their staff; and 5 points for how quickly they could start work. Again, those scores were averaged and ranked. Once all three applicants had been heard, the sealed bids were opened. The RFQ specified that 50% of the total score would be for cost and 100 points was awarded to the least expensive firm. The committee then took a proportion of the other two firms cost versus the proposed cost of the least expensive firm and awarded a point value out of 100 proportional to that difference. The scores of the earlier two phases were then combined with the cost points. The result was Moreland Altobelli Associates, Inc. was the least expensive firm and scored highest in all three phases: written presentation; oral presentation; and the least expensive. Staff is seeking authorization from the Council for the City Manager to execute a contract with Moreland Altobelli Associates, Inc. for a project in construction management services.

**Mayor Eva Galambos** thanked Assistant City Manager Noah Reiter for such a clear explanation of the process.

**Motion and Second:** Councilmember Jenkins moved to approve Agenda Item No. 10-040, awarding the Contract for Project Management & Construction Management to Moreland Altobelli Associates. Councilmember DeJulio seconded the motion.

**Councilmember Dianne Fries** stated she has an issue with the whole process. This was a change order that was on the table 18 months ago. She brought it up at the last retreat that this needed to be handled. There is a clause in the contract for mediation if there is a conflict. She was told then it would be resolved. It is the same change order and 12 months later there is still no resolution on it. She stated that the RFP was put out prematurely, and not all of the staff got to see it. She stated that there are areas in the process that need to be tweaked. The last two RFP's that have come up have had issues. She stated that she cannot support this motion because the change order was not handled correctly 18 months ago and it should have never become an RFP, had the City gone through mediation as the contract allows.

**Vote on the Motion:** The motion carried 5-1, with Councilmember Fries voting in opposition.

**Mayor Eva Galambos** stated that we keep learning and that some of the comments by Councilmember Fries have merit and they will be taken into account.

Councilmember Fries responded saying let's learn and get better.

## REPORTS AND PRESENTATIONS

a) Mayor and Council Reports

b) Staff Reports

## PUBLIC COMMENT

**Joe Seconder, 2023 Woodland Way,** stated he is on the Board of Directors of the Georgia Bike Alliance. It is a statewide network of bicycle advocacy organization. Two years ago, he had the opportunity to periodically meet with City staff and Councilmembers regarding planning for and implementing bicycle accommodations throughout the City. He submitted a petition to the Clerk with 308 signatures. Sixty-five percent are Sandy Springs residents with 82 petitioners willing to volunteer to help work toward bicycle advocacy and start a bicycle task force. On March 23, 2010, there will be several hundred bicyclists riding along Roswell Road in the fifth annual "Georgia Rides to the Capital" sponsored by the Metro Atlanta Mayor's Association. They are riding partly to support House Bill 998, which includes a 3 foot safe passing lane for bicycles. Mr. Seconder has been working towards Sandy Springs becoming more "bicycle friendly". He showed that other cities are working toward being "bicycle friendly". Mr. Seconder submitted to the Clerk a document of a previous presentation he had given in 2008 titled "City of Sandy Springs Goal: Bicycle Friendlier". It contains relevant sources, goals and potential action items. In closing he asked the Council to form a task force to help the young City of Sandy Springs to become a bicycle friendly city.

**Bruce Dickman, 200 Lakeview Ridge East,** stated he lives in Roswell, Georgia. He has been riding different types of bicycles for over 20 years. He would love to see a new bike trail put in, if there is going to be new pavement put in. Mr. Dickman would also like to see a Mountain Bike trail put in. He stated that it would be worthwhile for the City of Sandy Springs to have that in their recreational department. He thanked the Council for their time.

**Mayor Eva Galambos** thanked Mr. Dickman for staying to speak.

## PUBLIC COMMENT – Did not Wish to Speak

**Richard Ellin, 8140 Jett Ferry Road,** supports the provision of funds to construct a multiuse bridge over the Chattahoochee River connecting Sandy Springs to Roswell.

**Ron Rosen, 455 Ferry Landing,** supports a pedestrian and cyclist friendly bridge at Morgan Falls.

**Cindy Corui, 7635 Blandford Place,** stated she supports a bike friendly community.

**Dan Ellithorp, 4931 Rebel Trail,** stated he supports the Chattahoochee River Bridge project.

**Stephen Thomas, 4397 Windsor Oaks Circle,** stated although he lives in Marietta, he works in Sandy Springs and regularly rides his bicycle to work. Because his commute crosses the river he must ride either on Johnsons Ferry or Roswell Road. Neither road is conducive to cyclists, especially during rush hour. He would like to urge the Council to support the proposed multi-use bridge across the river next to Roswell Road in conjunction with the City of Roswell and its federal grant.

**Curtis Herline** stated he supports a more "bicycle friendly" neighborhood.

**(Agenda Item No. 10-041)**
**EXECUTIVE SESSION – Litigation**

R002035

Regular Meeting of the City of Sandy Springs City Council
Tuesday, February 16, 2010
Page 22 of 22

**Motion and Vote:** Councilmember DeJulio moved to enter into Executive Session to discuss litigation. Councilmember Jenkins seconded the motion. The motion carried unanimously, with Councilmember Paulson, Councilmember Fries, Councilmember Collins, Councilmember Jenkins, Councilmember DeJulio, and Councilmember Meinzen McEnerny voting in favor of the motion.   Executive Session began at 8:38 p.m.

**Motion and Vote:** Councilmember DeJulio moved to adjourn Executive Session. Councilmember Fries seconded the motion. The motion carried unanimously, with Councilmember Paulson, Councilmember Fries, Councilmember Collins, Councilmember Jenkins, Councilmember DeJulio, and Councilmember Meinzen McEnerny voting in favor of the motion. Executive session adjourned at 9:03 p.m.

**(Agenda Item No. 10-042)**
**ADJOURNMENT**

**Motion and Vote:** Councilmember Fries moved to adjourn the meeting. Councilmember Jenkins seconded the motion. The motion carried unanimously. The meeting adjourned at 9:05 p.m.

Date Approved: July 13, 2010

_____                    _____
Eva Galambos, Mayor                         Michael Casey, City Clerk