# SANDY SPRINGS

GEORGIA

## CERTIFICATE

I, Michael D. Casey, City Clerk and Custodian of Records for the City of Sandy Springs, Georgia, hereby certify that the thirty-five (35) pages of photocopied matter attached hereto is a true and correct copy of the Meeting Minutes of the **Regular Meeting of the City of Sandy Springs City Council** held on July 21, 2009, and approved on March 2, 2010.

This 30th day of June, 2010.

Michael D. Casey
City Clerk

(Seal) 



R001911

**Regular Meeting of the Sandy Springs City Council was held Tuesday, July 21, 2009, 6:00 p.m., Mayor Eva Gal ambos presiding.**

## INVOCATION

Rev. Bruce Donnelly, Sandy Springs United Methodist Church, offered the invocation.

## CALL TO ORDER

Mayor Galambos called the meeting to order at 6:02 p.m.

## ROLL CALL and GENERAL ANNOUNCEMENTS

**City Clerk Michael Casey** reminded everyone to silence their cell phones and pagers at this time. Additionally, those wishing to provide public comments, either during a public hearing or before the conclusion of the meeting under the Public Comment section, are required to complete a public comment card. The cards are located at the back counter and need to be turned in to the Clerk.

City Clerk Casey called the roll.

**Mayor:** Mayor Eva Galambos

**Councilmembers:** Councilmember Doug MacGinnitie, Councilmember Dianne Fries, Councilmember Rusty Paul, Councilmember Ashley Jenkins, Councilmember Tibby DeJulio, and Councilmember Karen Meinzen McEnerny

## PLEDGE OF ALLEGIANCE

Mayor Galambos led the Pledge of Allegiance

(Agenda Item No. 09-167)
## APPROVAL OF MEETING AGENDA

**Motion and Vote:** Councilmember Paul moved to approve the meeting agenda. Councilmember Jenkins seconded the motion.

**Amendment to Motion:** Councilmember Meinzen McEnerny moved to amend the agenda to add an item entitled Archeological Assessment of the William Power Cabin Site and Chimneys.

**Mayor Galambos** stated we are all aware of this request and the motion does not need a second based on instructions from the City Attorney. The City has a long standing policy for Council deliberations when issues are brought up in Work Sessions. She did not think any Councilmember had ever asked to have an item added on the Work Session that was not put on the agenda. Council has deliberations and discussion about items with the idea of vetting proposals to determine whether or not they should move forward to the formal agenda. This has been Council's procedure in the past. The process of vetting something and the reason we have been doing this is to facilitate the meetings so the public is not here until 10:00 p.m. hearing proposals that have already been discussed in a Work Session. This procedure has been nullified and we may have longer meetings from now on. You have heard the agenda item and must vote on whether or not to add it to the Agenda.

**Vote on Amendment to Motion:** The amendment to the motion carried unanimously.

**Vote on Main Motion as Amended:** There was no Council discussion. The motion carried unanimously.

Regular Meeting of the City of Sandy Springs City Council
Tuesday, July 21, 2009
Page 2 of 35

**Mayor Galambos** stated the item will be added to the agenda and placed under "unfinished business", since City Council previously had discussion on this item.

## CONSENT AGENDA

**(Agenda Item No. 09-168)**
1. Meeting Minutes:
   a. February 17, 2009 Regular Meeting
   *(Michael Casey, City Clerk)*

**Motion and Vote:** Councilmember Jenkins moved to approve the consent agenda. Councilmember Fries seconded the motion. There was no Council discussion. The motion carried unanimously.

## PRESENTATIONS

### P.C.I.D. Project Progress Update

**Yvonne Williams, President/CEO, Perimeter Community Improvement Districts** extended congratulations to Mayor and Council on their great first term of leadership. She then gave a presentation and updates on the following projects:
- Intersection Improvements
- Branding of Perimeter
- Flagship/Partnership Project the City joined PCID with in 2007 Perimeter Center Parkway Bridge.
- Perimeter Parkway Streetscape
- Perimeter Center West/Abernathy Road Streetscape
- Perimeter Center West
- Automated Transportation Management System (ATMS)
- Peachtree Dunwoody Medical Center Streetscape
- Phase II - Peachtree Dunwoody Medical Center
- Peachtree Dunwoody Medical Center Streetscape & Sidewalk Activity,

Since the inception of the CID thru 2011, Sandy Springs alone has made $1,600,000 in median investment, for medians and maintenance to support the program from year to year; $1,400,000 for Traffic Officers, and $11,000,000 for total infrastructure for all of the cumulative activities, which is the streetscape, intersections and signals. We have $14,000,000 invested in our young history together to help address all of the CID activities. Our job is to work with the City on the 20% matches and be the facilitator to advance engineering and design.

A few bigger projects are the Hammond Half Diamond Interchange and the Regional project for Rapid Transit or Light Rail. The Hammond Interchange contract was signed in November and email updates were sent out this week. The utility inspection work should be completed and the dirt is being moved in September/October. The Hammond Interchange gives us a two year project and major opportunity to advance the Hammond interchange as another gateway to Sandy Springs perimeter. A significant future project is the Regional Project to help support transit at either I-285 or Hammond to have a connection from Cumberland to Doraville. We have joined with an analysis and engineering project to look at bus rapid transit or light rail.

The economic outlook for Sandy Springs is very positive. Sandy Springs is performing better than any region in Atlanta in residential and commercial growth. For 2009 planned development, a lot of projects have been through the Regional Permitting process. These projects include a great deal of mixed use development, high end office,

R001913

residential, and retail development that includes some new hotel rooms. Sandy Springs is a very prime area to be successful as the markets turn.

The economic development impact so far is $43.6 million in City/County tax revenues by the base of the Perimeter Center. Eight ($8) million in sales tax revenue and $1.2 million in additional CID revenues have been brought in just by being a very aggressive organization to seek federal funds and then have the implication of developmental interest come into the area. These are just projects under construction and planned that will allow us to continue to build that economic platform.

PCID is proud to be a partner and is already working very hard to secure the next grants that will allow this region to be on top of every opportunity for infrastructure.

**Mayor Galambos** thanked Ms. Williams and PCID for being a tremendous benefit to the Sandy Springs community. PCID is recognized as the premier leverager in the Atlanta area in terms of being able to access state and federal money. The City wants to continue partnering with PCID to do this for the Sandy Springs community.

## Save Award - Newborn Delivery - Sandy Springs Fire Department

**City Manager, John McDonough** presented the Save Award to Sandy Springs Fire Rescue personnel for the rescue of a woman in labor. The Sandy Springs personnel arrived within 11 minutes of receiving the call. Upon arrival, they found that the woman had delivered the baby. The family had assisted in the delivery of the newborn and had attempted to cut the umbilical cord. However, in the stress of the moment, they had not clamped either end of the then bleeding cord. As a result, the mother and the child, only a few minutes old, were continuing to hemorrhage. The mother was already exhibiting signs of shock, and the newborn had stopped breathing. Sandy Springs personnel were quick to act recognizing that both patients were critically ill. Paramedic Pavlovic began directing the care of the bleeding mother, while he actively resuscitated the newborn. His quick action stabilized the mother and prevented further severe hemorrhage. Rural Metro arrived shortly thereafter, and through a coordinated effort, continued to resuscitate the mother and child and prepared them for transport to a hospital. As of the last follow-up, mother and child were doing well.

The Rescue Personnel receiving the award were:
**Sandy Springs Fire Rescue Crew**
Fire Rescue Technician II/ Paramedic - Nem Pavlovic
Fire Rescue Technician I – Adam Daniele

## Save Award - Cardiac Arrest - Sandy Springs Fire Department

**City Manager, John McDonough** presented the Save Award to Sandy Springs Fire Rescue personnel for the rescue of a patient in cardiac arrest. The Sandy Springs personnel arrived within 3 minutes of receiving the call. The crew found the patient in full cardiac arrest, without a pulse or respiratory efforts. The Sandy Springs personnel and the arriving Rural Metro Ambulance crews immediately began working together in an attempt to restore circulation in the patient. CPR was initiated and advanced life support measures were began including the use of a defibrillator and cardiac medications. Because of these efforts the patient was successfully resuscitated and regained a pulse. Despite the return of spontaneous circulation, the patient remained comatose. The crew recognized this and for the first time in the City, initiated the Hypothermia Program. They began infusing two liters of iced saline to cool the patient's body and offer protection to the injured brain from when he had been starved of oxygen during the cardiac arrest. They continued their efforts in route to the hospital assisting Rural Metro in monitoring and stabilizing the patient.

The Rescue Personnel receiving the award were:
**Sandy Springs Fire Rescue Crew**

Regular Meeting of the City of Sandy Springs City Council
Tuesday, July 21, 2009
Page 4 of 35

---

Fire Rescue Technician II/ Paramedic - Nem Pavlovic
Fire Rescue Technician I – Josh Mohler

**Rural Metro Ambulance Crew**
Erika Harmon
Marcela Kneblik

**PUBLIC HEARINGS:**

**Alcoholic Beverage**

> **(Agenda Item No. 09-169)**
> 1. Approval of Alcohol Beverage License Application for Fuego Mundo at 5970 Roswell Rd, Ste 120, Sandy Springs, GA 30328. Applicant is Marsha Hleap for Consumption on Premise Wine and Malt Beverage

**Accounting Manager, Tarsha Patterson** stated the application for Fuego Mundo is for a new business. The staff has reviewed the application and found all the administrative requirements have been met and it has been properly advertised for the public hearing tonight. The staff recommends approval.

(Invitation for Public Comment)

**Motion and Vote:** Councilmember Meinzen McEnerny moved to approve Agenda Item No. 09-169, an Alcoholic Beverage License Application for Fuego Mundo at 5970 Roswell Rd, Ste 120, Sandy Springs, GA 30328. Councilmember Fries seconded the motion. The motion carried unanimously.

> **(Agenda Item No. 09-170)**
> 2. Approval of Alcoholic Beverage License Application for GA OIL #177 8763 Roswell Rd, Sandy Springs, GA 30350. Applicant is Kiley Cox for Retail Package Wine and Malt Beverage.

**Accounting Manager, Tarsha Patterson** stated the application for GA Oil #177 reflects a change of ownership. The staff has reviewed the application and found all the administrative requirements have been met and it has been properly advertised for the public hearing tonight. The staff recommends approval.

(Invitation for Public Comment)

**Motion and Vote:** Councilmember Fries moved to approve Agenda Item No. 09-170, an Alcoholic Beverage License Application for GA OIL #177 8763 Roswell Rd, Sandy Springs, GA 30350. Councilmember DeJulio seconded the motion. There was no Council discussion. The motion carried unanimously.

**City Clerk Michael Casey** read the Zoning Rules.

**Use Permits - Deferred**

> **(Agenda Item No. 09-171)**
> 3. **U09-001/U09-002/U09-007** - 5855 Riverside Drive, *Applicant: St. Andrew's Presbyterian Church* - A use permit to allow for a day care, a use permit to expand the existing school, and a use permit to expand the existing church

R001915

**Assistant Director of Planning and Zoning, Patrice Ruffin** stated the applicant is requesting three use permits: to expand the existing church building; to expand the enrollment at the existing Private School; and to establish a daycare. The petition was heard at the June 18, 2009, Planning Commission hearing. The Commission recommended approval subject to staff conditions as amended. Staff is recommending conditional approval of all three use permits including the conditions amended by the Planning Commission as outlined in the staff report.

**Ellen Smith, 100 Galleria Parkway, Atlanta, Holt Ney Zatcoff & Wasserman, LLP,** representative for St. Andrews Presbyterian Church and Tabula Rasa Language Academy, stated the Planning Staff and the Planning Commission have recommended approval of this application and the applicant respectfully requests Council approval.

Permit U09-001 pertains to the Church Building. This permit is to expand the L-shape portion of property for relocation of the church offices and library. The existing offices and library would be renovated for classroom space. Even with this proposed addition to the church building, approximately 68% of the churches 10.08 acre tract will remain undeveloped.

Permit U09-002 and U09-007 relate to the Tabula Rasa Language Academy. The Planning Department has been diligently struggling to figure out the zoning code and to make sure that there is a correlation between state requirements for private schools and daycare facilities and what the City's Zoning Ordinance requires. The existing use permit received in 2007 is for a private school, with accessory daycare use. The City has also determined that our proposed use of the property qualifies as both a daycare facility and as a private school as defined by your Zoning Ordinance.

The academy seeks to increase its enrollment to a maximum of 270 students; 220 of these students will be enrolled Monday through Friday, and 50 of these students would be enrolled on Saturday. These are projected numbers with the hope to grow. Last academic year the Academy offered full time enrollment, which means 180 days a year for Pre-K and Kindergarten Programs. The existing use permit is not limited to those grades. By submitting this application, the applicant is subjecting itself to the City's ability to add conditions to the existing private school with the intent to respond to the concerns raised by the Sandy Springs Council of Neighborhoods and others that a private school is not desirable at this location. At the same time, the application gives the Academy the opportunity to see if an elementary school is viable, if there is interest in the school, along with giving the applicant time to look for an alternative location. The three proposed conditions to limit the private school use are not conditions that are currently applicable to the existing private school property. The applicant proposes to have no more than one grade per academic year for the next three academic years, limiting the Academy to the third grade. Currently, there is no grade limit. Lastly, the private school use permit would expire in December 2013, meaning no more private schools at that location.

At the applicant's request, the staff has imposed a restriction that no more than 60 students are allowed in a private school. Because of the determination the City has made that a private school can not include students who are four years and younger, the applicant requests permission to establish a daycare facility on the property. The staff has recommended the maximum enrollment of the daycare be 50. The applicant respectfully requests the number up to 220, but then reduced by however many kids are in the private school. The staff will receive a head count and know how many kids are there. Currently, our daycare program requires kids come Monday and Wednesday or Tuesday and Thursday. Maximum enrollment, meaning the number of kids that can come to the school, would be 220 that could come to the daycare facility. This alleviates some of the confusion that has been going on for the past year.

The applicant respectfully requests that the City review the application based on the factors set forth in Zoning Ordinance Section 19.2.4, and approve the application with the conditions set forth by the staff, modified by our request. The applicant complies in every respect with all setbacks, density, buffering and other land use requirements. Even at proposed maximum capacity, there is still onsite parking and sufficient staging room for

carpools. The church and the associated proposed uses are consistent with your future land use map. In fact, Table 6.1 of the Comprehensive Land Use Plan confirms that it is appropriate to have institutional uses in protected neighborhoods. With respect to the conditions that are proposed on these uses, the applicant believes they are compatible.

With respect to traffic, the applicant appreciates that the I-285 Riverside Drive intersection is heavy with traffic. Nobody can disagree with that. The applicant has staff reports that say the increased enrollment is not going to adversely impact that traffic. The school staggers the time for drop off and pick up. The applicant has enforced rules for parents who pick up late.

There are a number of church members and school members here tonight who support this application. There have been a lot of negative things brought forth about the school. The people here tonight, the petition that was signed and submitted to Staff and the letters of support show that a number of people in the Sandy Springs community are in full support. The applicant respectfully requests Council's consideration and approval of this application.

**Mayor Galambos** called for public comment in support of application.

**Public Comment Cards – did not wish to speak, comments for the record**

**Sonya Matchan, 110 E. Blackland Ct.** – I have been a member of the church of St. Andrew since May 1972. I have been deeply involved in Christian education. I whole-heartedly support our mission with Tabula Rasa.

**Susan Stevens, 3959 N. Stratford** – My children have been enrolled for several years, the school is such an asset to our community.

**Benay Grumby, 4971 Willeo Ridge** – I have been a member of the church of St. Andrew's for 25+yrs, in total support of the school as a mission of our church.

**Joy Thacher – 6925 Castleton Dr.** – I have been a long time member of the church and consider the school a very important mission for our church.

**Melissa Prewitt – 1772 Millside Dr.** – I support Tabula Rasa in its application for licensing, extended hours, increased students, etc.

**R.E. Thacher, 6925 Castleton Dr.**–I totally approve of your involvement in educating our young people in dual languages.

**Ed Nay, 280 Riverhill Dr.** – I am a 30yr member of St. Andrews, fully support the expansion program for the church and school.

**Deborah A. Map, 280 Riverhill Dr.** - Excellent needed care for young children

**Cece Webster, 6270 Black Water Trl** – Fully support application. Tabula Rasa is an asset to the Sandy Springs community.

**Robert N. Larkin – 155 Belmont Trace** –No significant traffic issues due to the church or school, no excessive noise or disturbances.

**Lynne A. Schlosberg, 50 Cameron Glen Dr., NW** –As treasurer of the church, it is financially sound. Tabula Rosa is a mission, not a fundraiser.

**Jody S. Watts, 790 Overhill Court, NW** – As a long-time member of the church, I am strongly in favor of our mission, Tabula Rasa

**Bonnie Wisdom, 5145 Middlebury Lane** – A member for 27 yrs and support Tabula Rasa School

**End of Public Comment Cards**

**Mayor Galambos** called for public comment in opposition to the application.

**Robert Crewdson, 135 Foxridge Dr,** spoke on behalf of a number of neighbors in opposition to both the private school and the daycare applications. The neighbors that are directly adjacent to St. Andrews do oppose both the daycare and the private school permit applications. The big thing to understand when looking at the issue is that the Council can exercise discretion because of the use permit. There are a number of factors that the Council can look at. This is not something that has to be approved because it is automatically allowed like a normal zoning application might be. This permit is one that has major criteria that the Council and the City need to really look at and in the end the application should be denied. Long term there will be a K-12 type school. Starting in 2013 it will be a for profit daycare facility of substantial size. This started out as a for profit enterprise a daycare and now it has one or two grades with a few students, which is inappropriate use for an R-1 location according to the Comp Plan. Profit and non-profit businesses should be separate from residential areas particularly in the R-1 location in the City of Sandy Springs. This is one of the criteria the Council should look at applying to this particular permit. The use permit should not be approved if these uses are not allowed under the use permit ordinance. In order to ask that discretion be exercised, the school that's being proposed has to be a private school. The definition of a private school is a curriculum that is the same as Fulton County Schools or equivalent. Is this school's curriculum equivalent? Tabula Rasa is based on the International Baccalaureate, which probably has some significant difference. The only accreditation they have received is a GAC which is not a curriculum based decision. Therefore, it is highly questionable whether this constitutes a private school. According to the use permit ordinance, the daycare application can only be approved if it is in connection with a school or church. There is no private school there now to have a daycare facility as an accessory. At the neighborhood meeting the church was asked if the daycare facility or the school was a mission of the church. The answer was no, but the letters that were submitted to Council stated it is connected to the church. Another issue is having the daycare open on Saturdays, because the use permit ordinance 19.4.15 only allows daycare facility use Monday through Friday. The daycare facility is three times the size of the proposed private school. Looking at the long term, in 2013 there will be a for profit daycare facility.

The history of this location is important to the decision on the current application. There was not a use permit for the school before 2007. In 2007 Tabula Rasa asked for approval for sixty students daily, but as soon as the permit was approved, they increased the student population within a year to more than a hundred students. It was not until 2009 that information was obtained that there were 157 students. In April, the state visited the school to learn that the school was not in compliance with a daycare that cared for students for four hours a day. There is a great concern that Tabula Rasa does not deserve the trust from the Council to keep the student count to 220 students or comply with the requirements. The City should take into account that the applicant has not complied with the requirements already imposed.

It is the job of the City to determine the traffic issues. Should traffic be worse at 5:00 p.m. or 6:00 p.m. on a week day? Is it appropriate for the kids that are in those cars to deal with the folks turning around and fighting for position at that intersection? That is part of the discretion tonight, deciding whether this is a good place for this particular school of this particular size. The big question is where is the appropriate location for this very large school and daycare to thrive? In the interest of the neighborhood, the Council should suggest that in 2013 Tabula Rasa move to a commercial location. The neighborhood does not want to see this area become a commercial location in 2013 when the use permit expires.

**Barbara Malone, 240 Coles Way, Representative of Sandy Springs Council of Neighborhoods,** stated the question of a commercial entity in a residential neighborhood has been raised several times. The issue should have been addressed at the original special use hearing. A second issued raised is the accurate number of students being enrolled. The school and their attorney have addressed many of the issues that the Sandy Springs Council of Neighborhoods has raised. The 60 student enrollment has ballooned to 157 students. The 200 represents significant growth from the original Council approval of 60 students. While reviewing the application, several threats have been found in the special use permits that are not clearly defined.

Sandy Springs Council of Neighborhoods would like to request that the Mayor and City Council establish clear guidelines and rulings that will serve to clarify and shorten future proceedings. This should also ensure that planning decisions are made in a uniform manner with the best interest of the community.

**Ellen Smith, Holt Ney Zatcoff & Wasserman, LLP, Representative for St. Andrews Presbyterian Church and Tabula Rasa Language Academy,** stated she would like to comment on some of the issues that were raised. With respect to the Monday through Friday limitations at the daycare facility, the Community Development Staff recommended that the Saturday classes be classified as a daycare facility, because the definition of private school is limited to that which is offered by Fulton County. Since Fulton County doesn't have school on Saturday, they classified it as a daycare facility even though there is going to be foreign language classes. The intent is to offer language classes that were originally offered only in the afternoon.

Council's discretion is to apply the facts that have been presented to the criteria that are set forth in the City's Zoning Ordinance. The Comprehensive Plan and Zoning Ordinance make a distinction between institutional uses and commercial uses. Mr. Crewdson is perfectly right, this is currently a for profit corporation that is running the school. The use, however, is not to garner a lot of money into a bank account. It is to teach children foreign languages. It is an institutional use, both for our daycare facility and for our private school, because it is called that under the City's Zoning Ordinance.

The state does look at our curriculum for one, two, three year olds and up. Our curriculum meets the state requirements that are equal to that being offered by Fulton County. The state is the one that determines whether or not we have a license based on our curriculum.

The curriculum issue is not necessarily before City Council. The issue is whether or not this is appropriate land use. The City's Comprehensive Plan and the Zoning Ordinance specifically states that institutional uses are appropriate and that quality, public and private schools are an important component of the fabric and attributes of a successful community. In addition to their role and education of young people, their location integration into the community can position them as important resources, not only for their individual neighborhood, but for the community at large. There are more children who attend Tabula Rasa that are citizens of the City of Sandy Springs than those who have opposed this application in the last three months. City Council's approval of this application is requested for those citizens of Sandy Springs.

**Mayor Galambos** closed the public hearing and called for City Council's comments or questions.

**Councilmember DeJulio** asked if it was true that Tabula Rasa is using FTE's rather than number of students and if they were licensed for 60 students and went up to 157.

**Ms. Smith** replied it was true.

**Councilmember DeJulio** stated he would like to understand how they went to 157 students.

**Ms. Smith** stated Tabula Rasa was licensed for 60 students in 2007 with a use permit for a foreign language school with a component for pre-school and kindergarten at a maximum of 60 students. In early 2008, before an

R001919

application to increase enrollment was filed, there was a complaint filed against the school and there was a question of how many kids were enrolled. The school has to supply its enrollment every year. The response received from City staff in writing was "60 means 60 at any given time". The staff did not ask for a formal determination by the City Attorney. The staff didn't ask for anything else from the people that filed the initial application.

**Councilmember DeJulio** asked if this school had any connection with the church other than being a tenant on a commercial lease. Is it sponsored by the church? Do any of the profits go to the church? Is the church involved in the curriculum, or is this just a church that is renting out part of its space?

**Ms. Smith** replied Tabula Rasa is associated with the church. She intended to file a letter from the pastor stating that the school does fulfill a mission of the church. The church has also been working with the school to set up a chapel service for the children to attend and there are a number of students and families that have become members of St. Andrews. The church sees this as an opportunity, not only to have people in their space during the week, but as a mission of their church to help educate young people.

**Councilmember DeJulio** asked if the daycare facility would have the full 220 children at one time.

**Ms. Smith** answered yes and no. The proposal in the staff recommendation is to limit it to 150 children. The daycare facility does not anticipate that the private school will have seventy children in the next four years. To avoid having to come back before Council and go through four more months of this, the school has heard from the Sandy Springs Council of Neighbors that they would not oppose a daycare facility that had 200 students. The reason I say it could or could not is because we offer kids to come on a Monday – Wednesday or Tuesday – Thursday. Most parents for foreign language immersion are going to pick those alternative days as opposed to a full time daycare. The short answer is it could be 220 children. There is also a limitation that is imposed by the Fulton County Septic Sewer Department. Fulton County staff has recommended there be a limit of 117 children and staff until Fulton County reviewed their three septic tanks on the property.

**Councilmember Fries** asked for the number of students in the school and daycare right now.

**Ms. Smith** stated there are 32 kids total in the summer school and last year in the fall there were 157 children. The school did not differentiate between daycare and school. Last year there were eight kids in kindergarten.

**Councilmember Fries** asked, in the fall there were 157 daycare children?

**Besa Tarabu, 494 Colewood Way, School Administrator**, stated there are around 100 children who are planning to register at the school.

**Councilmember Fries** stated she wanted to distinguish how many are daycare children and how many are private school age children.

**Ms. Tarabu** stated this is the first year for first graders. At this time there are three kids registered for first grade and four registered for Kindergarten.

**Councilmember Fries** asked how many children are anticipated between the daycare and the school in 2010.

**Ms. Tarabu** stated for the daycare 120 children are anticipated for total enrollment. The numbers for the private school enrollment are unknown since this will be the first time second grade is offered. It is unknown at this time how many kids are going to go from the first grade to the second grade or from kindergarten to the first grade. If all the kids currently enrolled from pre-kindergarten to first grade advance to the next level, there will be a maximum of 15 children.

**Councilmember Fries** stated the information shows a limit of 150 children in one place and then it shows a limit of 50 children in another place, which is assumed to be on Saturday.

**Community Development Director, Nancy Leathers** stated the Council has two different applications. One application is what the staff is recommending and the other is what the attorney is recommending and they are not the same. The staff is recommending 150 children in daycare during the week, 50 children in daycare on Saturday, and 70 total school children. However, this recommendation cannot take effect until the septic situation has been alleviated and the City has received certification from Fulton County that the applicant has addressed the issue. Until then, there can only be 117 total children enrolled.

**Councilmember Meinzen McEnerny** wanted to clarify that the applicant was asking for more flexibility on the numbers, 70 students for private school, 50 students for daycare on Saturdays and 150 during the week. The applicant is asking for flexibility to increase the number in the daycare by the number enrollment for the private school is less than 70.

**Ms. Tarabu** stated yes.

**Councilmember Meinzen McEnerny** stated she did not read in the staff recommendations whether or not the project is in compliance with the Comprehensive Land Use Plan and was struggling with the statement that it is compatible with residential. She was also concerned with commercial use in a residential area and wanted the staff's view point on why a commercial use in a residential area is compatible with the Comprehensive Land Use Plan.

**Community Development Director, Nancy Leathers** stated the Comprehensive Plan does not address the issue of whether something is "for profit" or "not for profit." It addresses only uses, and these particular kinds of institutional uses are found in the Zoning Ordinance and addressed in the Comprehensive Plan as being compatible with residential areas. That is what staff is reporting back to you. It is not a question of whether they are "for profit" or "not for profit."

**Councilmember Meinzen McEnerny** stated that there are a lot of "for profit" daycare facilities in commercial locations such as Crème de la Crème and the Chastain School. She asked why it is referred to as institutional instead of calling it commercial.

**City Attorney, Wendell Willard** stated the City cannot differentiate between what is a for-profit or not-for-profit operation, or a public school versus a private school. The City has to recognize schools being schools in a bulk classification. The fact that one is being operated as a business for profit does not change that it is still a school as a type of use for the facility.

**Councilmember Meinzen McEnerny** stated in the City's Zoning Ordinance or in the Use Ordinance it states that the daycare is to be an accessory to a private school. If, as the applicant has offered, the private school component goes away in 2013, would the daycare be allowed as a standalone operation?

**Community Development Director Nancy Leathers** stated in this case it is also the church's institutional use which is associated and that the staff would deem the daycare as appropriate if the school left the site. All three are institutional uses, but this daycare is associated with the church.

**Councilmember Meinzen McEnerny** stated none of the private schools in Sandy Springs have regular classes or curriculum for daycare uses on Saturday. Her concern is the use as a commercial institution. If the other schools in residential areas, such as Holy Innocence, are not operating a regular business for daycare on Saturday, why would it be appropriate for Tabula Rasa.

R001921

**Councilmember Fries** stated the schools usually do not have their daycare "Mothers Morning Out" on the weekends, but a lot of churches do.

**Councilmember Paul** asked Ms. Malone if the Council of Neighborhoods is opposed to this application.

**Ms. Malone** stated the Council of Neighborhoods was not opposed to the application in its entirety.

**Councilmember Paul** asked Ms. Malone if she would define what the Council of Neighborhoods supports and what they oppose.

**Ms. Malone** stated that the Council of Neighborhoods believes there should be a maximum of 200 students at this location. They also felt that an elementary school would be better served on the Roswell Road Corridor, not at this location, because it is residential.

**Councilmember Paul** asked Ms. Malone if she had any other objections to the staff recommendations other than the elementary school.

**Ms. Malone** stated no, staff has been very diligent in the way they have handled this application.

**Councilmember Jenkins** asked if Tabula Rasa is currently licensed by the State for both the daycare program and private school.

**Ms. Smith** stated they are licensed. The State makes periodic checks and has come out after complaints were filed. The State had recommendations and the applicant has complied with those recommendations. At no time did the State tell Tabula Rasa not to continue operating. In fact, the State told Tabula Rasa to continue operating and said they had a good program. Nancy Leathers has spoken with the State as well and the State understands the request that is before City Council. The applicant has made application for the full daycare facility, and it is pending based on City Council's decision this evening.

**Councilmember Jenkins** asked the City Attorney what the penalty would be if Sandy Springs Code Enforcement goes to Tabula Rasa and finds that they are not operating at the enrollment capacity level.

**City Attorney, Wendell Willard** stated in granting the use permit, they have a property interest. The only thing the City can do is cite them for violation their use permit. They would then come before the court based upon the fact they had limitations that they violated.

**Councilmember Jenkins** asked if the violation would be $1,000 per kid over the capacity.

**Director of Community Development, Nancy Leathers** stated she was not sure if the violation would be per child, but it certainly could be every day.

**Councilmember Jenkins** asked if there is a way to pull a business license.

**City Attorney, Wendell Willard** stated they have a vested property interest and we would have to go through a court proceeding based on the fact that there is something being done that is detrimental to the health, safety and welfare; therefore they should not be allowed to continue using it.

**Councilmember Jenkins** asked if the Zoning Ordinance defines daycare and private school as an institutional use which is allowed in residential.

R001922

**Director of Community Development Nancy Leathers** stated it is allowed in association with churches. A school is allowed as an institutional use in residential areas and a daycare either associated with the church or with the school in residential areas.

**Councilmember MacGinnitie** stated that the Ordinance states that daycare should be limited to Monday through Friday. Does the City Council have the authority to issue a use permit for Saturday daycare?

**Director of Community Development Nancy Leathers** stated that she believes City Council can as an exception to this condition.

**Councilmember MacGinnitie** stated if City Council approves this application as staff has recommended, which is 150 in the day care and 70 in the private school, then in 2013 the 70 go somewhere else, which leaves 150 in the daycare. He asked if the 150 left in the daycare is basically the same size as the daycare is today.

**Director of Community Development, Nancy Leathers** stated that is correct.

**Councilmember MacGinnitie** clarified most kids don't go to daycare every single day, but you could choose to make it 150, if all chose to go every day, as opposed to now, where it is 60 at any one time.

**Ms Smith** replied yes, this number is total enrollment.

**Councilmember MacGinnitie** stated going forward total enrollment of the daycare would be 150, which means you could have anywhere up to 150 four year olds and under on the campus.

**Ms. Smith** replied that is correct.

**Councilmember MacGinnitie** stated that most kids don't go, as the school is currently set up, every day to daycare. It's most likely it will be less than 150 everyday.

**Ms. Smith** replied that is correct.

**Mayor Galambos** stated the part she was confused about was the sunset provision in the year 2013, in that the school is supposed to go away. She asked if at that time the total number of children in the daycare went to 220.

**Ms. Smith** stated she did not ask that at the Planning Commission hearing because she ran out of time. If Council elects to go with staff's recommendations, the applicant will greatly appreciate it as well.

**Director of Community Development, Nancy Leathers** stated she would like a fixed number for the daycare and a fixed number for the school. The staff cannot combine these numbers because we do not have a way to distinguish between them.

**City Attorney, Wendell Willard** stated the staff has looked at the fact that there is an existing permitted license use on the premises now. Whatever City Council does will replace this. They have within the school permit on the property now this ancillary use of daycare. City Council has to act on both uses (daycare and private school) the same way by granting both or denying both. City Council cannot take one over the other because of the fact they have both uses currently on the property.

**Councilmember Jenkins** asked if this would limit the Council from striking the provision for Saturday school.

**City Attorney, Wendell Willard** answered that it did not limit the Council from striking the Saturday provision.

**Mayor Galambos** asked if, in 2013, this is a definite sunset provision with it going away without further reauthorization.

**City Attorney, Wendell Willard** stated yes, it would be a part of the conditions.

**Councilmember DeJulio** asked if the Saturday daycare would be like his son taking a karate class on Saturday, or is this daycare where someone would take their child and leave them for the entire day.

**Ms. Tarabu** stated they have kids who have finished the four year old class and moved on to Heards Ferry. Those families that would like to continue with their Spanish or French come once a week on Wednesday from 3:30 to 5:00 p.m. The families who feel the one and one half hour class is not enough, after their child spent four hours every day learning Spanish in the four year old class, can then come on Saturday for another one and half hours.

**Ms. Smith** explained that the reason it is called a daycare on Saturday is because Fulton County doesn't offer school on Saturday. It does not fall under the private school definition.

**Motion and Vote:** Councilmember Meinzen McEnerny moved to approve Agenda Item No. 09-171, U09-001/U09-002/U09-007 - 5855 Riverside Drive, *Applicant: St. Andrew's Presbyterian Church* - A use permit to allow for a day care, a use permit to expand the existing school, and a use permit to expand the existing church subject to staff's recommendations and with the exception of the daycare component on Saturday. Councilmember Jenkins seconded the motion.

**Councilmember Meinzen McEnerny** stated the reason she excluded the Saturday component is because this is a very busy intersection and on Saturday in a residential area it adds more traffic activity. It isn't related directly to bible studies or church. It is a school activity that is not generally offered at the other schools in the neighborhood. She stated she is also worried about the commercial institutional use.

**Substitute Motion and Second:** Councilmember Fries moved to approve Agenda Item No. 09-171, U09-001/U09-002/U09-007 - 5855 Riverside Drive, *Applicant: St. Andrew's Presbyterian Church* – with staff's recommendations and conditions the 50 and 70 with Saturdays for a use permit to allow for a day care, a use permit to expand the existing school, and a use permit to expand the existing church and subject to the (following) staff conditions. Councilmember Paul seconded the motion.

1. To the owner's agreement to restrict the use of the subject property as follows:

   a) A church at a maximum density of 2,614.19 square feet per acre or a total of 26,351 square feet, whichever is less (U09-001). The subject Private School (U09-002) and Day Care Facility (U09-007) may occupy the aforementioned space.

   b) A Private Elementary School (grades K through 3) with a total enrollment of no more than 70 students limited to operating Monday through Friday between the hours of 8:00 a.m. to 3:00 p.m.

   c) A Day Care Facility with a total enrollment of no more than 150 children limited to operating Monday through Friday between the hours of 8:00 a.m. to 6:00 p.m.

   d) A Day Care Facility with a total enrollment of no more than 50 children limited to operating Saturdays between the hours of 9:00 a.m. to 3:00 p.m.

   e) The Private School and Day Care(s) shall provide copies of all state licenses and exemptions to the Director of Community Development by July 1st of each calendar year.

R001924

Regular Meeting of the City of Sandy Springs City Council
Tuesday, July 21, 2009
Page 14 of 35

f) By August 21, 2009 and July 1st of each calendar year thereafter, the Private School and Day Care(s) shall provide an annual report detailing total enrollment by the uses (exemptions and/or licenses) detailed in conditions 1.b, 1.c, and 1.d, subject to the approval of the Director of Community Development.

g) No more than a total of 17 staff and 118 children shall be enrolled during weekdays and Saturdays until such time review and approval for more occupancy has been obtained from Fulton County Health & Wellness, then a total enrollment of up to the quantity specified in conditions 1.b, 1.c, and 1.d. may be utilized.

2. To the owner's agreement to abide by the following:

a) To the site plan received by the Department of Community Development dated April 8, 2009. Said site plan is conceptual only and must meet or exceed the requirements of the Zoning Ordinance and these conditions prior to the approval of a Land Disturbance Permit. Unless otherwise noted herein, compliance with all conditions shall be in place prior to the issuance of a Certificate of Occupancy.

b) The owner/developer shall dedicate thirty (30) feet of right-of-way from centerline of Riverside Drive along the entire property frontage or ten and one-half (10.5) feet from back of curb, whichever is greater, to the City of Sandy Springs.

c) The light source of all external lighting in the development shall be screened and shall not be directly visible from adjoining residential properties.

d) To bring the existing structure into compliance with building codes pursuant to Chapter 105, Buildings and Building Regulations, the Code of the City of Sandy Springs.

e) To bring the existing structure into compliance with fire codes, pursuant to Chapter 22, Fire Prevention and Protection, of the Code of the City of Sandy Springs.

f) The school shall provide a 24-hour contact person available to address on-site management issues for surrounding property owners. The school shall provide this information in the annual report referenced in condition 1.f. Compliance with this condition shall be in place by July 1st of each calendar year.

g) The school shall submit a schedule of events to the Sandy Springs Communications Department detailing the date and time of each special event. Said schedule shall be submitted annually, by July 1st of each calendar year, and monthly on the first day of each month.

h) Use of such recreational fields and play areas shall not be permitted after sunset.

i) To prohibit any fixed/permanent outdoor loudspeakers, horns, or amplified sound systems. Operation and use of any portable sound system shall be subject to the City of Sandy Springs Noise Ordinance.

j) Parking lot lighting shall be no taller than 20 feet and shall not be installed within 50 feet of any residentially-zoned property. The light source of all external lighting on the Property shall be screened and shall not be directly visible from adjoining residential properties. Outdoor lighting of all play areas and recreational fields is prohibited.

k) Delivery hours and days shall be limited to the following: 7:30 AM to 7:30 PM on Monday through Friday; 8:00 AM to 5:00 PM on Saturdays; no deliveries are permitted on Sundays.

l) No additional instruction and programs shall be permitted for any person beyond the staff recommended conditions for the number of enrollment during weekdays and Saturdays as specified in conditions 1.b, 1.c, and 1.d.

m) The existing trailers, shown on the site plan received by the Department of Community Development dated February 25, 2009, shall be removed from the subject property no later than December 31, 2013.

n) The subject Private School Use Permit shall expire on December 31, 2013.

o) The instruction at the Private School shall be limited as follows: only offer grades K though 1 for the 2009-2010 academic year, only offer grades K through 2 for the 2010-2011 academic year, only offer grades K through 3 for the academic year 2011-2012.

**Councilmember Fries** commented that Tabula Rasa has heard from several Planning Commission members and Council with the questions about all the things that went on about whether the school had its accreditation or not. She advised the applicant to run the daycare and school properly by the conditions of the permit.

**Vote on the Substitute Motion:** The motion carried 4-2 with Councilmember DeJulio and Councilmember Meinzen McEnerny voting in opposition.
**Ordinance No. 2009-07-35**

**Rezoning**

**(Agenda Item No. 09-172)**
4. RZ09-002/CV09-004 - 5545- 5565 New North Side Drive & parcel 17-0205-LL-070-1, *Applicant: Fog Capital, Inc.* - To rezone the subject property from C-1 and A-O conditional to C-1 for the development of 6,500 square foot veterinary clinic and 5,800 square feet of retail/office space with concurrent variances

**Assistant Director of Planning and Zoning, Patrice Ruffin** stated that the applicant is requesting to rezone the subject property from C-1 and A-O Conditional to C-1 for the development of a two story retail/office/ restaurant and veterinary clinic building. The applicant is also requesting four concurrent variances. Staff is recommending approval conditional of the rezoning and the concurrent variances. The petition was heard at the June 18, 2009 Planning Commission hearing. The Commission recommended approval of this application, subject to staff conditions, with the concurrent variances, and amended to prohibit massage parlors and adult establishments.

**Carl Westmoreland, 1545 Peachtree Street,** stated that he was representing the applicant. This application is for the one and one half acres at the top part of the site that is bounded by Interstate 285, Powers Ferry and New Northside Drive. The frontage on Powers Ferry is improved with the Chevron Station and Wachovia Bank which has recently been built in the center of the site. The top portion, which is the triangular shape portion of the property, was originally Chevy's. Part of it is on A-O, an old classification from Fulton County and the other part is C-1. The applicant is asking to go to C-1 for a clinic which would be Andy Smith's Powers Ferry Animal Hospital which would relocate on the site. The other uses would be a combination of office and retail.

The reason for the variance is to reduce the landscape strip on the western side of the site that is adjacent to the 285 right-of-way, just south of the bridge going over Interstate 285. The reason for this is to move all the improvements as far as possible where the site narrows away from the stream buffer. What would be left in those areas are simply part of a retaining wall and a very small bit of parking. There is a dramatic reduction in impervious surface from both the 25 foot impervious area and the stream buffer area. The applicant has asked for an additional monument sign. Staff recommended approval of the freestanding 40 foot monument sign.

R001926

The stream buffer encroachments, if granted as requested would take 222 square feet out of the 50 foot stream buffer and would take 2,348 square feet out of the impervious area. It is a dramatic reduction of what is there now. The applicant has asked for three changes to the conditions. The first is condition 3.a., which requires a 55 foot dedication of right-of-way from the centerline of New Northside Drive and 10.5 feet from the back of curb. The applicant would like to change it to 40 feet. The reason for this is it is adjacent to the GDOT right-of-way. It is extremely unlikely that any more right-of-way will be needed because the bridge cannot be widened. The applicant has tried to push the development to that side of the site in order to stay as far as possible out of the stream buffer. The second condition 3.b. requires a dedication of right-of-way along Powers Ferry. The applicant is fine with this but would like a clarifying statement that it would only be required at the time of redevelopment of that portion abutting Powers Ferry. The last is to insert a new condition that would provide interparcel access among the three uses. This is because the only access to Powers Ferry is through the Wachovia and Chevron property. Conversely, they have access to New Northside Drive through this property.

**Mayor Galambos** called for public comments in support of the application.

**John Gillin, 4645 Harris Trail,** came forward to speak in favor of application.

**Mayor Galambos** called for public comments in opposition to the application. There were no comments from the public.

**Motion and Second:** Councilmember Meinzen McEnerny moved to approve Agenda Item No. 09-172, RZ09-002/CV09-004 - 5545- 5565 New North Side Drive & parcel 17-0205-LL-070-1, *Applicant: Fog Capital, Inc.* - To rezone the subject property from C-1 and A-O conditional to C-1 for the development of 6,500 square foot veterinary clinic and 5,800 square feet of retail/office space with concurrent variances as recommended by the Planning Commission and staff. Councilmember Paul seconded the motion.

**Councilmember Meinzen McEnerny** stated she was amazed when she went to site and saw how much of the existing footprint was in the buffers. She wants to applaud the applicant for working with the Sandy Springs Council of Neighborhoods. They pulled every bit of that blue area out of the buffer. There was an existing retaining wall that they need to leave. This is a great benefit to our community.

**Councilmember MacGinnitie** asked Mark Moore to respond to the applicant's request of changes in the staff conditions.

**Transportation Planner, Mark Moore** stated that the second condition is about Powers Ferry Road at time of redevelopment. It is how it would operate anyway. Although this property is zoned as one piece and never split by plat, it is split by deed. There are three distinct owners and three distinct uses on the property. Effectively, this is how we would typically take this with three different owners; as the individual pieces come in for developments, we would require the right-of-way deeds at the time of Land Disturbance Permit. Staff has no problem placing this in the conditions. Condition 3.g., interparcel access is good. The reduction to 40 feet of right-of-way would be far enough back to put all of the sidewalk improvements into right-of-way going up until it hits the GDOT right-of-way on the tangent, it is less than called for in our plan for the New Northside area. The 55 feet from centerline would be enough, given both the functional classification, the lanes that are there and for any future expansion. Ultimately, that would be staff's recommendation. The problem with the plan as shown is at 55 feet the leading edge of the first five or six parking spaces would end up in the right-of-way, which is something that can be dealt with, but would effectively reduce the front landscape setback as we measure a landscape setback outside of the right-of-way to effectively zero. The exact plan that they are showing in the site plan can be built, but it would have some other ramifications on how the setbacks are measured.

**Councilmember Fries** asked for clarification on condition one.

**Transportation Planner, Mark Moore** stated the applicant is asking for an introductory clause so that at the time of redevelopment the portion of property abutting Powers Ferry Road shall have dedicated 40 feet of right-of-way from the center line of Powers Ferry Road. The gas station on the corner of Powers Ferry would not be required to dedicate right-of-way until they or a future owner, zoning goes with the land, were to redevelop this site or to pull a Land Disturbance Permit. As long as it stays in the current building that it is in, they would not be required to deed us the property. The requirement for them to deed us the right-of-way is triggered at the time they apply for the Land Disturbance Permit or Development Permit.

**Withdrawal of Motion and Second:** Councilmember Meinzen McEnerny withdrew her motion. Councilmember Paul withdrew his second.

**New Motion and Vote:** Councilmember Meinzen McEnerny moved to approve Agenda Item No. 09-172, RZ09-002/CV09-004 - 5545- 5565 New North Side Drive & parcel 17-0205-LL-070-1, *Applicant: Fog Capital, Inc.* - To rezone the subject property from C-1 and A-O conditional to C-1 for the development of 6,500 square foot veterinary clinic and 5,800 square feet of retail/office space as recommended by staff and the Planning Commission, with concurrent variances, and add the conditions requested by applicant; 3a. , 3b and 3g, and subject to the following staff conditions:

1. To the owner's agreement to restrict the use of the subject property as follows:

    a) Retail and service commercial, office and including a veterinary clinic (non-outside animal facility), a restaurant, and financial institution, at a maximum density of 4,943 gross square feet per acre or 17,303 gross square feet, whichever is less. Massage Parlors, Adult Establishments/Businesses, Laundry/Dry Cleaning Plants, Garden Shops/Centers, and Tobacco Shops are prohibited.

2. To the owner's agreement to abide by the following:

    a) To the site plan received by the Department of Community Development dated June 3, 2009. Said site plan is conceptual only and must meet or exceed the requirements of the Zoning Ordinance and these conditions prior to the approval of a Land Disturbance Permit. Unless otherwise noted herein, compliance with all conditions shall be in place prior to the issuance of a Certificate of Occupancy.

3. To the owner's agreement to provide the following site development standards:

    a) The owner/developer shall dedicate forty (40) feet of right-of-way from centerline of New Northside Drive along the entire property frontage or ten and one-half (10.5) feet from back of curb, whichever is greater, to the City of Sandy Springs.

    b) At the time of redevelopment of that portion of the property abutting Powers Ferry Road, the owner/developer shall dedicate forty (40) feet of right-of-way from centerline of Powers Ferry Road along the entire property frontage or ten and one-half (10.5) feet from back of curb, whichever is greater, to the City of Sandy Springs.

    c) Reserve for the City of Sandy Springs along the necessary property frontage of the following roadways, prior to the approval of a Land Disturbance permit, sufficient land as necessary to provide for compliance with the Comprehensive Plan. All building setback lines shall be measured from the dedication but at no time shall a building be allowed inside the area of

R001928

reservation. All required landscape strips and buffers shall straddle the reservation line so that the reservation line bisects the required landscape strip or buffer. At a minimum, 10 feet of the required landscape strip or buffer shall be located outside the area of reservation. All required tree plantings per Article 4.23 shall be placed within the portion of the landscape strip or buffer that lies outside the area of reservation.

Fifty-five (55) feet from centerline of Powers Ferry Road.

d) To reduce the seventy-five (75) foot buffer and setback requirements (50 foot undisturbed natural buffer and 25 foot impervious surface setback) to a minimum of a fifty (50) foot undisturbed natural buffer plus a seven (7) foot impervious surface setback to allow for the proposed retaining walls and to allow for the existing and other proposed impervious surfaces to be within the required seventy-five (75) foot stream buffer and setback as shown on the site plan received by the Department of Community Development dated June 3, 2009. (CV09-004).

e) To install an additional freestanding monument sign along New Northside Drive where one (1) is permitted. The sign shall be located as shown on the site plan received by the Department of Community Development dated June 3, 2009 and the sign area shall be limited to no more than 40 sq. ft. and the overall height shall be limited to no more than 5 feet (CV09-004).

f) To allow a permanent structure (parking lot) completely within a landscape strip (CV09-004).

g) To provide interparcel access among the three uses on the subject property (proposed retail, Wachovia Bank property and Chevron property) to and from Powers Ferry Road and New Northside Drive.

Councilmember Fries seconded the motion. The motion carried unanimously.
**Ordinance No. 2009-07-36**

**Zoning Modifications**

**(Agenda Item No. 09-173)**
5.  ZM09-003/CV09-006 - 15 Glen Oaks Drive, Applicant: John and Gerri Lewis - To modify condition of 3. of 1978Z- 0036 to allow a five (5) foot high brick fence to encroach into the twenty-five (25) foot natural buffer on the north property lines with a concurrent variance.

**Assistant Director of Planning and Zoning Patrice Ruffin** stated that the applicant is requesting a modification of the conditions of Fulton County zoning case Z78-0036 to allow for a five foot brick wall to encroach into the twenty-five foot natural buffer on the northeast property line, and to allow the brick wall to encroach 10.4 feet into the public right-of-way on Mt. Vernon Highway. Staff is recommending approval conditional of the modification and concurrent variance.

**Shea Roberts, Roberts & Daughdrill, P.C., 15 Lenox Pointe, NE,** stated she was representing the applicant. The property is located at the corner of Mt. Vernon Highway and Glenn Oaks Drive. Other property owners along this street having frontage on this highway have the same idea as John and Gerri Lewis. They have installed fences and walls along the frontage of their property on Mt. Vernon to provide privacy and protection from the highway.

R001929

They have a permitted wrought-iron fence with brick pillars, and a gate going across the driveway on Glenn Oaks Drive. They would like to connect a five (5) foot brick wall that would basically curve around the corner and go up in front of Mt. Vernon Highway. What the applicant needs for this is a modification. In 1978, when this property was subdivided, the developer was required to impose a 25 foot natural buffer in a 60 foot setback. The intention of that was to prevent driveways on Mt. Vernon Highway. The applicant is not putting in a driveway and is not violating the original intention of the 1978 zoning conditions. The variance is because there are lots of existing trees and landscaping on the corner and along Mt. Vernon and the wall is at that location to preserve that landscaping. The Public Works Department has no opposition to the location of the wall. It is consistent with where a lot of other walls are located. The applicant requests City Council's approval.

**Mayor Galambos** called for public comments. There were no comments from the public.

**Motion and Second:** Councilmember Paul moved to approve Agenda Item No. 09-173, ZM09-003/CV09-006 - 15 Glen Oaks Drive, *Applicant: John and Gerri Lewis* - To modify condition of 3. of 1978Z-0036 to allow a five (5) foot high brick fence to encroach into the twenty-five (25) foot natural buffer on the north property lines with a concurrent variance subject to (the following) staff conditions:

1. The petitioner's original Letter of Intent received by Zoning Department May 17, 1978 and signed by David Winitt and Craig Wrigley in which they indicate that the property would be developed into a subdivision consisting of 23 lots which meet the R-2A (Residential) zoning restrictions.

2. To the petitioner's addendum to the original letter of Intent received by the Zoning Department June 14, 1978 signed by Craig Wrigley and David Winitt in which they agreed to submit a detailed grading plan prior to defoliation; to conform to minimum house size now required in the adjoining Idlewood Valley Subdivision; to provide reverse frontage lots with 60 foot setbacks from Mt. Vernon of which the first 25 be left natural as a buffer with no direct access to these lots; except for 15 Glen Oaks Drive (17-0165-0324-42) which shall be permitted to have a five (5) foot high brick wall encroaching into the twenty-five (25) foot natural buffer as shown on the site plan submitted to the Department of Community Development dated May 5, 2009. Also, to allow no exposed concrete block exterior building material; to pay the pro-rated share of sewage extension and tap-on fees; to allow an archeological survey of property; to provide studies required by the Subdivision Regulations and the Public Works specifications; and that no recreational amenities are planned for the subdivision. No lots are planned to front on Mount Vernon, however, if it should be necessary to do so, the lots will be a minimum of 1 acre and adhere to R-1 restrictions regarding frontage and setbacks.

3. To the petitioner's agreement to dedicate at no cost to Sandy Springs 40 feet of right-of-way from existing centerline of Mt. Vernon Highway as well as to allow construction easement for future improvement of those right-of-way.

4. To the petitioner's agreement to work with the Public Works Department in the improvement of Mt. Vernon Highway if lots front directly on Mt. Vernon Highway

5. To allow for a five (5) foot high brick wall encroaching ten feet four inches (10.4) into the right-of-way as shown on the site plan submitted to the Department of Community Development dated May 5, 2009. A signed and approved indemnification agreement with the City is required prior to approval of a wall/wall permit. (CV09-006)

Councilmember Meinzen McEnerny seconded the motion.
**Ordinance No. 2009-07-37**

**Councilmember MacGinnitie** asked if this would affect our ability to put sidewalks in on Mt. Vernon.

R001930

**City Attorney, Wendell Willard** suggested with this type of permitted use of the right-of-way a condition be attached to the right-of-way use. If ever a need arises in which the City is requiring the use of this area for other public improvements, there would not be a concurrent damage cost to the City for taking down the wall. **Transportation Planner, Mark Moore** stated that the standard staff condition is an indemnification agreement that includes this clause or states that any structure be removed at the owner's expense.

**Vote on Motion:** The motion carried unanimously.

  (Agenda Item No. 09-174)
  6. ZM09-004/CV09-008 - 960 Fenimore Circle, Applicant: Bill Grant - To modify condition of 3.a. of 2003Z- 0153 to reduce the setback from forty (40) feet to twenty-one (21) feet to allow for a pool, pool deck and equipment in the rear

**Assistant Director of Planning and Zoning, Patrice Ruffin** stated that the applicant is requesting a modification to the conditions of Fulton County Zoning Case Z03-0153 to modify condition 3.a. to reduce the 40 foot building setback along the rear property line to 21 feet, and to allow for a pool, pool deck and equipment to encroach into the perimeter setback. Staff is recommending approval conditional of the zoning modification and concurrent variance.

**Den Webb, Smith, Gambrell & Russell, 1230 Peachtree Street, Atlanta,** stated he was representing the applicant. The property is on 7/10ths of an acre. It is at the northwest quadrant of the intersection of Dunwoody Club Drive and Fenimore Circle. The lot contains a new two-story home; it's actually part of a smaller five unit subdivision called Fenimore. The subdivision is zoned neighborhood unit plan (NUP). The applicant has been trying to sell this house for awhile. He received an offer from Bill & Pat Segal to buy the home, but with the condition that the builder adds a pool to the property. The builder drew up a plan, took the plan to the City, discussed it and was told "no problem." The Ordinance says "pools are generally allowed within 10 feet of rear and side yards." Later the applicant applied for a building permit and was denied because of the zoning condition that Ms. Ruffin referred to that was imposed in 2003. This condition requires a 40 foot perimeter setback around the periphery of the subject property. The applicant has neighborhood support and has submitted eight letters from residents that live around this property, including the person who lives next door to the north and will be the most affected. This property is going to be obscured from all angles for a variety of reasons including landscaping and topography. The applicant requests that City Council follow staff's recommendation of approval and approve this application subject to the staff conditions.

**Mayor Galambos** called for public comments. There were no comments from the public.

**Councilmember Meinzen McEnerny** asked the City Attorney if it would be a precedent setting if Council were to relieve this particular applicant of the NUP zoning subdivision rear setback.

**City Attorney Wendell Willard** stated it would not be precedent setting for Council. What the Council would be doing is a quasi legislative function, and Council can way each one of these applications, based upon the merits of what is provided.

**Councilmember Meinzen McEnerny** asked staff to explain why this particular application came to the City Council rather than going to the Board of Appeals to grant a variance.

**Assistant Director of Planning and Zoning, Patrice Ruffin** stated for the NUP Zoning classification the setbacks are typically part of the conditions of zoning. Because of that they have to be modified rather than just a standalone variance.

R001931

**Mayor Galambos** asked if the adjacent property owner supported the applicant's modification petition.

**Mr. Webb** replied the applicant notified everybody within 300 feet of this property, and received eight letters in support from the folks that surround it. The property owner to the north did submit a letter.

**Motion and Second:** Councilmember MacGinnitie moved to approve Agenda Item No. 09-174, ZM09-004/CV09-008 - 960 Fenimore Circle, *Applicant: Bill Grant* - To modify condition of 3.a. of 2003Z- 0153 to reduce the setback from forty (40) feet to twenty-one (21) feet to allow for a pool, pool deck and equipment in the rear subject to (the following) staff conditions.  Councilmember DeJulio seconded the motion.

1. To the owner's agreement to restrict the use of the subject property as follows:

   a) Single family detached dwellings and accessory uses and structures.

   b) No more than 5 total dwellings units at a maximum density or 1.09 units per acre based on the total acreage zoned, whichever is less.

   c) The minimum heated floor area per dwelling unit shall be 3,500 square feet.

2. To the owner's agreement to abide by the following:

   a) To  the revised Site Plan received by the Department of Community Development on November 10, 2003 and to submit to the Director of Community Development for approval, prior to the approval of a Land Disturbance Permit, a revised Site Plan based on a certified boundary survey of the entire property zoned, incorporating the stipulations of these conditions of zoning approval and meeting or exceeding requirements of Zoning Resolution

   b) To comply with the Subdivision Regulations of Sandy Springs, Georgia.

3. To the owner's agreement to the following site development considerations:

   a) The minimum design standards are:

   | | |
   |---|---|
   | Lot Frontage: | 35 Feet |
   | Front Yard: | 35 Feet |
   | Side Yard: | 10 Feet |
   | Rear Yard: | 40 Feet |
   | Lot Width: | 100 Feet |
   | Perimeter Setback: | 40 Feet, with 50 feet on Side Yard, Corner along Dunwoody Club Drive |

   Except, lot 2 which shall have a perimeter setback of twenty-one (21) feet to allow for a pool, pool deck and equipment shown on the site plan submitted to the Department of Community Development dated May 11, 2009.

   b) No more than one (1) exit / entrance on Dunwoody Club Drive. Curb cut must align with Mill Trace Drive or be offset a minimum of 300 feet from Mill Trace Drive, or as may be approved by the Sandy Springs Traffic Engineer.

   c) No lot shall have direct access to Dunwoody Club Drive.

4. To the owner's agreement to abide by the following requirements, dedications and improvements:

    a) Dedicate at no cost to the City of Sandy Springs along the entire property frontage, prior to the approval of a Land Disturbance Permit, sufficient land as necessary to provide the following right-of-way, and dedicate at no cost to the City of Sandy Springs such additional right-of-way as may be required to provide at least 10.5 feet of right-of-way from the back of curb of all abutting road improvements, as well as allow the necessary construction easements while the right-of-way are being improved.

       30 – feet from the centerline of Dunwoody Club Drive.

    b) Improve roadway along the entire property frontage with curb and gutter per Sandy Springs Standards or as may be required by the Georgia Department of Transportation.

    c) Provide a deceleration lane for each project entrance or as may be required by the Sandy Springs Traffic Engineer.

    d) Provide a left turn lane for each project entrance or as may be required by the Sandy Springs Traffic Engineer.

    e) All recreational and other areas which may be held in common shall be maintained by a mandatory homeowners association, who's proposed documents of incorporation shall be submitted to the Director of the Department of Community Development for review and approval prior to the recording of the first final plat.

5. To the owner's agreement to abide by the following:

    a) Prior to submitting the application for a Land Disturbance Permit (LDP) with the Department of Community Development, Development Review Division, arrange to meet with the Sandy Springs Traffic Engineer. A signed copy of the results of these meetings will be required to be submitted along with the application for a Land Disturbance Permit.

    b) Prior to submitting the application for an LDP, arrange an on-site evaluation of existing specimen trees/stands, buffers, and tree protection zones within the property boundaries with City of Sandy Springs Arborist. A signed copy of the results of these meetings will be required to be submitted along with the applicant for LDP.

    c) Prior to submitting the application for an LDP, the developer/engineer shall contact the Public Works Department, Water Services Division, and arrange to meet on-site with an engineer from the Surface Water Management Program (SWMP), who is responsible for review of the Storm Water Concept Plan submittals.

    d) Prior to submitting the application for an LDP, the developer and/ or engineer shall submit to the SWMP, through the Development Review Division, a project Storm Water Concept Plan. This concept plan shall indicate the preliminary location of the storm water management facilities intended to manage the quality and quantity of storm water. The concept plan shall specifically address the existing downstream of-site drainage conveyance system(s) that the proposed development surface runoff will impact, and the discharge path(s) from the outlet of the outlet of the storm water management facilities to the off-site system(s) and/or appropriate receiving waters. As part of the Storm Water Concept Plan submittal, a preliminary capacity analysis shall be performed by the engineer on the off-site drainage system(s) points of constraint. The capacity analysis shall determine the capacity of all existing constraint points, such as pipes, culverts, etc., the point in the stream channel where the 25 year storm

peak flow is the greatest percentage of the channel capacity, and the hydraulic grade elevation at these points. The critical capacity points shall be selected based upon the engineer's field observation, professional judgment and limited field survey data.

e) Where storm water currently drains by sheet flow and it is proposed to be collected to and/or discharged at a point, the discharge from the storm water management facility outlet shall mimic pre-development sheet flow conditions. A description of the method proposed to achieve post-development sheet flow conditions shall be provided as part of the Storm Water Concept Plan.

f) A draft of the Inspection and Maintenance Agreement required by OCGA Section 26-278 shall be submitted to the Department of Public Works with the Storm Water Concept Plan.

g) The Inspection maintenance Agreement shall provide that all storm water management/detention facility outlet control structures shall be inspected, photographed and cleaned on a monthly basis, by the owner. The Inspection and Maintenance Agreement shall require that an annual operation and maintenance report for all storm water management/detention facilities be prepared by a licensed design professional and submitted to the SWMP. The annual report shall include monthly inspections, photographs and documentation of the cleaning of storm water management/detention facilities outlet control structure(s) as well as an operational assessment of the facilities indicating that they do, or do not, function as intended/designed, and if they do not, a description of the specific actions to be taken to allow the facilities to function as intended/ designed.

h) The required Inspection and Maintenance Agreement shall be recorded with the Clerk of Superior Court prior to the issuance of an LDP, Grading Permit or Building Permit associated with the development.

i) The engineer/ developer is required to submit, along with the application for an LDP, signed documentation verifying approval of the Storm Concept Plan.

j) Where paved parking areas (including access aisles are proposed to exceed 5,000 square feet, the storm water management facilities shall be designed to remove pollutants such as oil, grease and other automobile fluid that may leak from vehicles. A description of the storm water management facilities proposed to achieve the removal of such pollutants shall be submitted with the Storm Water Concept Plan.

k) With the application for a LDP, provide documentation (such as channel cross-sections, centerline profiles, etc.) describing the geometry of all existing natural streams, creeks and draws within the proposed development boundary and provide details on the Storm water Management Plan of the post-development channel bank protection measures.

l) The developer/engineer shall demonstrate to the City by engineering analysis submitted with the LDP application, that the discharge rate and velocity of the storm water runoff leaving the site is restricted to seventy-five percent (75%) of the pre-development conditions for the 1-year frequency storm event, up to and including the ten (10)-year frequency storm event.

m) To allow a pool, pool deck, and equipment on lot 2, 960 Fenimore Circle (06-0383-LL-087), to encroach into the perimeter setback of a NUP (Neighborhood Unit Plan District) zoned district as shown on the site plan submitted to the Department of Community Development dated May 11, 2009. (CV09-008)

**Vote on Motion:** The motion carried unanimously.

R 0 0 1 9 3 4

---

**Ordinance No. 2009-07-38**

**UNFINISHED BUSINESS**

    **(Agenda Item No. 09-184)**
1. Archeological Assessment of the William Power Cabin Site and its Chimneys

**Motion and Vote:** Councilmember Meinzen McEnerny moved to conduct an archeological assessment of the William Power cabin site and Council authorize, at its expense, a third party survey by professionals with the expertise in historical assessment of 19th century construction methods, materials and archeology such that a determination can be made in a written report as to the age, footprint, ownership and conclusion of historical relevance of this cabin site.

**Councilmember Meinzen McEnerny** asked Mayor Galambos if public comments from the community could be considered before there was a second to the motion.

**Mayor Galambos** stated that in order to abide by the City Charter in changing our procedures in terms of accommodating the addition of this item to the agenda. The City is going by the rules. The rules say that when the City has a public hearing, it must be advertised.

**Councilmember Meinzen McEnerny** withdrew her motion in order to make another motion.

**New Motion and Vote:** Councilmember Paul moved to authorize the Sandy Springs Conservancy to have access to the site in question where the chimney is located, to hire a consultant of their choosing, at their expense, to produce an archeological analysis as to the age, footprint, ownership and conclusion of the historic relevance of the cabin site and its chimney and report to City staff on or no later than August 15, 2009 for determination and review. Councilmember Fries seconded the motion.

**Councilmember Meinzen McEnerny** raised point of order. Resolution No. 2007-04-22, Section 19(b) Public Participation on Agenda Items, it states "By a majority vote, the city council may allow public comment on an agenda item at the time the item is being considered by the city council." This item has been duly added to the agenda and that is why I respectfully asked the Mayor if she would allow public comment at this time. Mayor Galambos said that she would not allow comments. She then asked Councilmember Paul to temporarily withdraw his motion so that the public can comment.

**Councilmember Paul** stated the public cannot comment unless there is a motion made.

**Mayor Galambos** stated that Council will accommodate all public comment in due time.

**Councilmember Meinzen McEnerny** stated she read into the record a question and it needs to have a vote.

**Councilmember Paul** added to his motion that there be ten minutes of public comment with each speaker limited to a one minute presentation. This is not to cut anybody off, but to make sure that in that ten (10) minute public hearing period we accommodate as many people as we can. Simply be courteous to others, and maybe hold it to 30 seconds.

**Mayor Galambos** asked Councilmember Paul to repeat his motion.

**Motion and Second:** Councilmember Paul moved to authorize the Sandy Springs Conservancy to hire a consultant of their choosing, at their expense, to produce a report on the historical relevance, the age, footprint, ownership and conclusion of the historical relevance of the cabin site's chimney and report to the City staff no later than August

R001935

Regular Meeting of the City of Sandy Springs City Council
Tuesday, July 21, 2009
Page 25 of 35

15, 2009. Also, Council set aside ten minutes of public hearing not for pro or con, but ten minutes of public hearing based upon the cards received by the City Clerk prior to this meeting and that it be limited to ten minutes and no one speaker be allowed more than one minute to talk in the interest of allowing everyone the opportunity to speak. Councilmember Fries seconded the motion.

**Councilmember Meinzen McEnerny stated** she did not hear the word archeological assessment used in his motion. The Sandy Springs Conservancy is currently doing an archival survey that will tie in all the historical written records.

**Councilmember Paul** responded that his motion gives the Sandy Springs Conservancy permission to go to the particular site and make a report on the findings. Councilmember Paul stated whoever has access to the site needs to sign a waiver of liability stating that the City is not held liable for any injuries obtained on the site.

Councilmember Paul stated the reason his motion was proposed at the Conservancy's expense was based on conversation with them where they stated they could raise the funding for the assessment. If the Conservancy is willing to raise the money, Council needs to allow them, so there isn't a reason to reallocate funds. If funds have to be reallocated, it may trigger budget hearings, which will slow the process further.

Councilmember Meinzen McEnerny commented that it is within the discretion of the City Manger, should the Council give him that authority, and he can spend up to fifty thousand dollars. She stated she would like to see in the motion a definition stating the report is brought back to the Council and at that time the Council can make a decision as to whether or not the results merit saving the site.

Councilmember Paul stated the reason he asked that the findings be brought back to staff by August 15, 2009 is because that is the appropriate place to start. When the staff brings a recommendation back to Council, we can act on it at that time.

After much discussion on the motion, Councilmember Paul removed the public comment from the motion and asked for unanimous consent for a public hearing period of ten minutes to allow everyone a maximum of one minute. There was no objection from Council. There was unanimous consent for a ten minute public hearing and then the Council would vote on the motion.

**Mayor Galambos** called for public comments.

**Stan Jones, 225 Cliff Overlook,** stated he was representing the Sandy Springs Council of Neighborhoods and 60 of his neighbors in Huntcliff. There were 60 or so neighbors who signed the petition presented to Councilmember Fries last night. Mr. Jones read a letter and asked Council to please reconsider their position.

**Joseph Mayson, 6615 Glenridge Drive, Chairman of the Sandy Springs Conservancy** stated they have already invested $3,600 in a study of the historic significance of this site. The study which Council is asking for has estimates as high as $40,000. The most the Conservancy could possibly commit tonight is $10,000. This is not the mission of the Sandy Springs Conservancy. We are primarily interested in green space. Some concerns are that we do not know where the contract is on the current plan to develop this site, and if the bulldozers are going in there before August 15th. Another thing is the assurances from the City that if the report says that the chimney is well worth preserving in situ, where it is, that the City will do that.

**Mayor Galambos** stated it is abundantly clear that the chimney will be preserved where it is right now. If necessary it will be stabilized.

**Mayor Galambos** stated that she wants everybody to be very clear that we have all loved the chimney from the time it was uncovered from all the bamboo. It was like a revelation and we love it there.

R001936

**Councilmember Paul** stated that the City's goal is to protect and preserve the chimney and its historical significance to the extent that we can in balancing that with public safety. The City will work to do everything that is reasonably possible to maintain the historic significance of that structure and site, consistent with the public safety and the public use and vision for that site.

**Mr. Mayson** asked if it included the chimney's architectural integrity.

**Councilmember Paul** replied to Mr. Mayson by stating that his question could not be answered at this time because the chimney's structural integrity is unknown. The Council has one additional requirement, and that is public safety on that site.

**Mr. Mayson** asked what the City is going to do about the water hazard (river). There is liability there as well.

**Councilmember DeJulio** stated that there is a difference between somebody intentionally going in the water and some child seeing the chimney as a climbing device and it collapsing on him. The City is trying to make sure that somebody does not get hurt and the City doesn't get sued for having a piece of property out there that's not protected.

**Mr. Mayson** asked if it can be preserved in situ with being stabilized as it is.

**Councilmember Paul** replied until assessments are completed that question cannot be answered.

**Morning Washburn, 681 Hyde Road, Cobb Landmarks and Historical Society,** stated she lives in the home of Winiford Copland who came from the Sandy Springs area in the 1840's. The cabin has two stacked stone chimneys and is still in its original condition. She invited Sandy Springs Council members, Mayor, staff and anyone involved in working to assess and preserve this chimney and the site to come to this cabin to see if it can in anyway help you in your process of gathering information.

**Lisa Banov, 8350 Valley Tarn, Long Island Creek Watershed Preservation Association, Inc.** read the following into the record. We at the Long Island Creek Watershed Preservation Association are perplexed as to why the City of Sandy Springs is not leading the effort to investigate and possibly preserve the architectural artifacts found on the Powers Ferry site of the new Morgan Falls Park.

**Lori Evers, 1040 Lancaster Walk, President of the Heritage Sandy Springs,** thanked Mayor and City Council for the work they are doing to create this park. Heritage is excited that there is going to be more green space in Sandy Springs and what the City is doing at the Morgan Falls Overlook site. Heritage appreciates the City's willingness to consider the historic value of the site and recognize the research done to learn more, ensuring a more informed decision on how to proceed. Because of their interest in preserving Sandy Springs history for the present and future economic and social well being of the residents of Sandy Springs, Heritage Sandy Springs would like to encourage Council to undertake a professional historic archeological assessment of the Powers family cabin site at Morgan Falls Overlook Park. Heritage Sandy Springs offered its services to the City during this process.

**Helen Taft, 300 Mountain Creek Trace,** stated she thinks this is a unique opportunity for the City to demonstrate with this one small resource, that's very manageable, the City's commitment to its heritage and celebrating all the opportunities that it brings together; green space, connectivity, heritage, outdoor experience, education.

**Public Comment Cards – did not wish to speak, comments for the record**

**Shelia Champion, 6166 Ferry Drive, Sandy Springs:** Here in Sandy Springs we have so little structural history that I believe that it is really important to preserve what little there is. I am of the opinion that it doesn't really

matter whose chimneys they are. What matters is that they are extremely old structures that should be preserved on their original site as part of Sandy Springs history.

**Charles Maddrey, 5605 Whitner Drive, Sandy Springs:** I strongly urge the City Council to have a proper assessment of the historical relevance of the Overlook Park property before proceeding with the development of this site.

**Ann Moller, 8990 River Run, Sandy Springs (Huntcliff):** I support investigating the chimney at Morgan Falls and if authentic, pursuing same professionally.

**Beverly Sauer, 9865 Trace Valley, (Huntcliff):** I support investigating the chimney at Morgan Falls and if authentic, preserving same as is without dismantling or removing. I feel this is important to Sandy Springs and its park. People enjoy all historical projects and the preservation of these authentic artifacts. It is necessary to keep the chimney intact as is. There are many of these artifacts in Buckhead and Roswell, but not many in our community. This chimney is beautiful as it stands and if cordoned off and made safe, we should preserve it at all cost.

**Elizabeth Hunger, 9835 Trace Valley, Sandy Springs (Huntcliff):** To secure professional personnel to determine how to execute the stabilization of Power Chimney in situ, so as to preserve its historical significance. To secure contractors familiar with historical preservation and to perform preservation. To secure professionals to excavate and determine the total parameters of remains of the house at this same site.

**Kathleen Zamer, 9845 Trace Valley, Sandy Springs (Huntcliff):** I support preservation of the chimney with proper archeological site investigation before the immediate area is disturbed. Further, I do not support a fire pit at the new Overlook Park. After speaking with our neighbors, I would like to report that without exception each person was in support of preserving the chimney and exploring the site. I have presented our Council Person, Dianne Fries, with approximately 50 signatures demonstrating this support.

**Teresa Proctor, 475 Huntcliff Green, Sandy Springs (Huntcliff):** Resident of Sandy Springs 20 plus years. I support preservation of the chimney at the new park at Morgan Falls with proper archaeological investigation and preservation tactics involved. I would like the National Parks Service involved in the efforts as I believe it would benefit us to bridge the history of our area east of the Chattahoochee with the history west of it. I believe this would benefit the community as a whole as we show how our individual cities in the area are truly tied together. In fact, the current plan attempts to unite these areas physically. I believe the historic recognition will help capitalize on these attempts. Thank you for your consideration.

**Albert Sauer, 9865 Trace Valley, Sandy Springs (Huntcliff):** Ask for time to do archeological study of Powers site.

**Katherine Feeman, 840 Jett Ferry Manor, Sandy Springs, Jett Ferry Homeowners Association:** We support an archaeological study regarding the chimney at Overlook Park and subsequent recommendations.

<u>**End of Public Comment Cards**</u>

**Mayor Galambos** stated there was a motion on the floor by Councilmember Paul. It was seconded by Councilmember Fries. She asked if there was any further discussion.

**Councilmember Meinzen McEnerny** stated she would like to add a friendly amendment based on the concerns shared here that a requirement is added to the motion that it come back for public comment for Council discussion and disposition, one way or the other.

**Councilmember Paul** reiterated that he was sure staff would evaluate this and then bring it back to Council.

**Vote:** The motion carried unanimously.

## NEW BUSINESS

(Agenda Item No. 09-175)
1. Updates to Development Ordinance Section 10.3 concerning Final Plat Specifications

**Building and Land Development Engineer, Bennett White** stated this update to the Development Ordinance is simply a measure to reduce the chances that when the City approves a plat, it's in the form in which the boundary lines represented on the plat are not easily inserted into a geographic information system.

**Councilmember Meinzen McEnerny** asked what the definition is of a Minor Plat.

**Building and Land Development Engineer, Bennett White** stated a Minor Plat is a type of plat that does not require a Land Disturbance Permit in order to provide infrastructure improvements; to create lots. It could be a situation such as having frontage and infrastructure already there and the desire is to take two lots and subdivide it into four lots of a smaller size, but you don't need new streets and new sewer to accommodate that.

**Motion and Vote:** Councilmember Paul moved to approve Agenda Item No. 09-175, updates to Development Ordinance Section 10.3 concerning Final Plat Specifications as proposed by Staff. Councilmember MacGinnitie seconded the motion. The motion carried unanimously.
**Ordinance No. 2009-07-39**

**Public Works**

(Agenda Item No. 09-176)
2. Consideration of Approval of the Acceptance of Driveway and Temporary Construction Easement Rights for the Windsor Parkway (Roswell to High Point) Sidewalk Project (T-0020)

**Public Works Manager, Garrin Coleman** stated this item is for four temporary construction easements and/or driveway easements for the Windsor Parkway sidewalk project. The total cost is $7,200.

**Motion and Vote:** Councilmember DeJulio moved to approve Agenda Item No. 09-176, the Acceptance of Driveway and Temporary Construction Easement Rights for the Windsor Parkway (Roswell to High Point) Sidewalk Project (T-0020). Councilmember Meinzen McEnerny seconded the motion. The motion carried unanimously.
**Resolution No. 2009-07-41**

(Agenda Item No. 09-177)
3. Consideration of Approval of the City of Sandy Springs Partnering with the Georgia Department of Transportation on the Roswell Road Phase One Streetscape Project (from Meadowbrook Drive to Long Island Drive) (T-0019)

**Public Works Manager, Garrin Coleman** stated this item is the Project Framework Agreement from GDOT. The staff notified GDOT today that there are a couple of errors that need to be corrected.

Page 4, Item 5, *Department* should be replaced with *Local Government*.

Page 6, Item 9, *Department* should be replaced with *Local Government*.

R001939

Page 9, there are several references to *County* that should be replaced with *Local Government*.

The staff talked to the GDOT Project Manager and agreed if the PFA is approved by City Council, we could go ahead and sign it, line out the items for the corrections, and send it down to the department. GDOT would send the corrected version with the signature pages back to us, and at staff level we could get a concurrence that it was correct and send it back down to GDOT to be expedited.

**Councilmember Jenkins** asked what was included in utility relocation for this project.

**Public Works Manager, Garrin Coleman** answered he was unsure at this time what was included, but at a minimum there should be some power relocation.

**Councilmember Jenkins** asked if that means to move them or to bury them.

**Public Works Manager, Garrin Coleman** answered that they would just move them because of the cost.

**Councilmember Fries** asked what the cost difference was between moving them and burying them.

**Public Works Manager, Garrin Coleman** answered the cost to move a wooden pole is $10,000 and it would be around $740,000 for the Abernathy part underground.

**Councilmember Jenkins** stated the Council should be considering before we approve any more of the streetscapes along Roswell Road. She feels if the poles are just being moved to the back of the streetscape it is not fixing the problem and the streetscape is still unattractive. The City needs to consider burying them verses just moving them to the back of the streetscape.

**Mayor Galambos** asked if the staff could not move the poles to the back of the buildings instead.

**Director of Community Development, Nancy Leathers** stated if it is existing development, then moving them to the back of the property line works. She stated for redevelopment she would recommend burying the lines versus moving them to the back of the sites.

**Councilmember Jenkins** suggested that going forward the cost to bury the lines should be added into the recommendations, so the streetscapes are attractive.

**Public Works Manager, Garrin Coleman** stated Georgia Power does not want to undertake a lot of design cost.

**Mayor Galambos** suggested tabling this item.

**Councilmember Paul** asked if there are alternative contractors, other than Georgia Power, that the City could contract with.

**Public Works Manager, Garrin Coleman** stated that could be an option.

**Motion and Vote: Councilmember Paul** moved to defer Agenda Item No. 09-177, the City of Sandy Springs Partnering with the Georgia Department of Transportation on the Roswell Road Phase One Streetscape Project (from Meadowbrook Drive to Long Island Drive) (T-0019) to the August 18, 2009 Regular Meeting; to give staff the opportunity to investigate this option as an alternative. Councilmember Fries seconded the motion. The motion carried unanimously.

(Agenda Item No. 09-178)

4. Consideration of the Approval of a Consulting Engineering Contract with Mulkey Engineers and Consultants for the Design of the Community Development Block Grant Sidewalk Project on Roswell Road from Dalrymple to Roberts Drive

**Capital Program Director, Marty Martin** stated this agenda item details the selection process used by the committee to recommend Mulkey Engineers and Consultants and the recommendation to award the contract to Mulkey Engineers and Consultants for the Design of the Community Development Block Grant Sidewalk Project.

**Mayor Galambos** asked if the sidewalks will be built with the same standards as the other sidewalks.

**Capital Program Director, Marty Martin** answered yes, based on the district standards and the location of the sidewalks.

**Mayor Galambos** asked if existing sidewalks would be completely torn out or would the new sidewalks just be providing connectivity.

**Capital Program Director, Marty Martin** stated the sidewalks would be connected, but the staff did ask the consultant to make sure all the sidewalks are in compliance with the Americans with Disability Act Standards.

**Councilmember Fries** asked if the streetscapes for that area include the lights and the trees.

**Director of Community Development, Nancy Leathers** stated it does include the lights. It can include trees. If not, the City can use the Treebank for the trees.

**Motion and Vote:** Councilmember Fries moved to approve Agenda Item No. 09-178, a Consulting Engineering Contract with Mulkey Engineers and Consultants for the Design of the Community Development Block Grant Sidewalk Project on Roswell Road from Dalrymple to Roberts Drive. Councilmember MacGinnitie seconded the motion. The motion carried unanimously.
**Resolution No. 2009-07-42**

(Agenda Item No. 09-179)
5. Request for Mayor to Nominate Members to the North Fulton Comprehensive Transportation Plan Stakeholder Committee

**Mayor Galambos** stated this is the Fulton County Comprehensive plan that was discussed a year ago. When the City found out they were going to do connectivity east and west and not just north and south, the City decided to participate in the plan. They are now asking for names the City would like to submit for Stakeholders. She recommended Sandy Abrams, Marguerite Wilson, J. Scott Leonard, Gabriel Sterling, Chris Miller and Jon Drysdale.

**Motion and Vote:** Councilmember Jenkins moved to approve Agenda Item No. 09-179, the Mayor's Nominations of Members to the North Fulton Comprehensive Transportation Plan Stakeholder Committee: Sandy Abrams, Marguerite Wilson, J. Scott Leonard, Gabriel Sterling, Chris Miller and Jon Drysdale. Councilmember Fries seconded the motion. The motion carried unanimously.
**Resolution No. 2009-07-43**

(Agenda Item No. 09-180)
6. Motion that the City Council Approve the List of Streets for the FY 2010 Capital Paving Program following a presentation by Stephen Smith, P.E., President of Infrastructure Management Services (IMS)
**Field Services Manager, Ron Adderley** stated this item is to approve the 2010 Capital Paving Program List of Streets. He then introduced Steven Smith, President of IMS, to give a presentation about the IMS study and how the rating of the City street system has been improved.

**Mr. Steven Smith, President of IMS,** gave a presentation on the IMS study. He reported that Sandy Springs has 317 miles of road and 4 million square yards of pavement, which is over three hundred million dollars worth of assets. He stated for the four years he has worked with Sandy Springs each year is better, which makes the City of Sandy Springs above average. Mr. Smith explained the purpose of pavement management is to be sure the City is using the tax money to the best benefit possible and then he went over the different pavement management techniques. Analysis techniques will be used to be sure that all the roads are in good shape and money is being used the best way possible. Currently, Sandy Springs major roads are in good shape. For the future, the priorities are arterials, collectors, and then locals. Priority number one is maintaining the integrity of the roadway network. Second is proactive preventative maintenance. Third priority is attacking backlogs and setting aside money for reconstruction. Local roads will be patched and paved.

**Fields Services Manager, Ron Adderley** stated the list does include the collectors and arterials as well as the reconstruction phase per Council's instruction.

**Motion and Vote:** Councilmember Jenkins moved to approve Agenda Item No. 09-180, the List of Streets for the FY 2010 Capital Paving Program. Councilmember Meinzen McEnerny seconded the motion. The motion carried unanimously.

**Fields Services Manager, Ron Adderley** stated word was received from GDOT that they are accepting LARP projects for 2010 and the staff will submit a list of roads to GDOT.

**City Attorney**

      **(Agenda Item No. 09-181)**
   7.  Employment Solicitation Ordinance

**City Attorney, Wendell Willard** stated the Ordinance is to control the solicitation of workers along the right-of-way.

**Motion and Vote:** Councilmember Paul moved to approve Agenda Item No. 09-181, the Employment Solicitation Ordinance. Councilmember Jenkins seconded the motion. The motion carried unanimously. **Ordinance No. 2009-07-40**

      **(Agenda Item No. 09-182)**
   8.  Solid Waste Ordinance

**City Attorney, Wendell Willard** stated an appeals process has been added to the Solid Waste Ordinance to bring items before the Board of Appeals if a variance needs to be granted.

**Councilmember Meinzen McEnerny** asked why the public would not have the opportunity to comment on a request for a variance.

**City Attorney, Wendell Willard** answered the variance request would be posted on the property and there would be a public hearing on that basis.

**Director of Community Development, Nancy Leathers** stated the current ordinance allows a waste hauler to apply for a variance. Only for public safety can it be approved. This makes it a simple process for the staff to review and if the application is denied, the applicant can go to the Board of Appeals. This limits the amount we have to do on all the cases.

R001942

**Councilmember Meinzen McEnerny** asked if applicant asks for a variance, is it handled in house, and if so, does this limit the access for the public to complain.

**Director of Community Development, Nancy Leathers** stated there is currently no procedure in the ordinance other than the manager reviews to determine if there is a public safety issue.

**City Attorney, Wendell Willard** stated there will be ability for the public to be aware due to advertising and notice.

**Councilmember Meinzen McEnerny** asked how the public can go before the Board of Appeals for a variance that is unacceptable to them.

**City Attorney, Wendell Willard** stated a variance would be granted before 7am only if there was a public safety hazard.

**Motion and Vote:** Councilmember Meinzen McEnerny moved to approve Agenda Item No. 09-182, the Solid Waste Ordinance. Councilmember Paul seconded the motion. The motion carried unanimously.
**Ordinance No. 2009-07-41**

(Agenda Item No. 09-183)
9.   Request for Authorization to Apply for Broadband Infrastructure Funding

**City Manager, John McDonough** stated the deadline to submit the application is August 14, 2009 and in order to submit the application there has to be a resolution endorsed by the City Council. The application has not been prepared, but the staff wanted Council to know that there was money available to improve our infrastructure in the area of broadband offerings. The Council does not have to accept the funding.

**Councilmember MacGinnitie** stated there are several reasons he does not like the broadband infrastructure item: it is not in budget; there is no picture of the total cost; there are several municipalities that have failed when putting this infrastructure in; it provides free service for some, but not all; there are other ways to spend the money; and it's not free money, it is still our tax dollars.

**Councilmember Paul** stated if the City has the opportunity to add broadband infrastructure to the community, it should be considered, because it is the communications highway for the 21st century. If the City does not consider the opportunity for financial assistance now, then we are doing our tax payers a disservice, because they will have to use their tax dollars in the future to pay for this.

Councilmember Jenkins read the purpose of the broadband infrastructure funding. The primary purpose is to award competitive grants to accelerate broadband deployment in unserved and underserved communities. City management is seeking Council approval for the development and submittal of a federal application to provide free wireless broadband access to underserved populations within Sandy Springs. The service areas will include high density housing easements and social and community service organizations. She stated her goal is not to provide free wireless access to some portions of the City.

**Councilmember Meinzen McEnerny** stated the City did not budget for the broadband infrastructure. The city should prioritize the $200,000 worth of tax money using it for things like sidewalks or underground utilities.

**City Manager, John McDonough** stated the staff received word on this opportunity this afternoon. It was brought before Council in an effort to make the City competitive in this process. It does not mean the Council has to act on this now. There are a lot of high tech businesses in Sandy Springs. The City has

R001943

been talking with the Chamber of Commerce about trying to expand international commerce in our city. He encouraged Council to at least allow the staff to provide better information at a later time. Council needs to look into initiatives like this to follow through on for the City to remain competitive.

**Councilmember Fries** stated for the last four years Council has been good with thinking outside the box and being on the cutting edge. The City is doing some wonderful things with our 911 system and the fiber optics used for the transportation. Soon the 911 system and the fiber optics will all start to merge together and help each other and the broadband infrastructure is just one more layer of all the new technology that's coming out. This is the same grant process we all agreed on in 2005.

**Councilmember DeJulio** stated this was not a new idea. It was discussed four years ago to make Sandy Springs a business friendly, commuter friendly, and customer friendly area by providing broadband. This was never completed because so many other projects came up. A million dollars is a lot of money, but it is unacceptable for the City to not even look at what is out there in the way of sharing the expense.

**Motion and Vote:** Councilmember Paul moved to approve Agenda Item No. 09-183, to authorize the City Manager to explore and apply for the Broadband Infrastructure Funding. Councilmember Fries seconded the motion. The motion carried 4-3, Councilmember Fries, Councilmember Paul and Councilmember DeJulio voting in favor and Councilmember MacGinnitie, Councilmember Jenkins and Councilmember Meinzen McEnerny voting in opposition. Mayor Galambos broke the tie voting in favor of the motion.
**Resolution No. 2009-07-44**

## REPORTS and PRESENTATIONS

    a)   Mayor and Council Reports

**Councilmember Paul** acknowledged and thanked Angela Parham, former Director of Public Works, for her service to the community and all that she has done.

    b)   Staff Reports

        i.   Storm Water Outfall Screening – Public Works

**Manager of Storm Water Services, David Chastant** gave an update on the City's negotiations with EPD on the Storm Water Outfall permit. EPD has requested that the City change its procedure in inspecting outfalls. Outfalls are where the City's system ends and discharges into state waters. The City is required by permit to go out to these locations and look for pollution. EPD has requested the City increase the number of locations and we have agreed. There are over 2000 locations and the City has to do 20% a year. Most of the outfalls are dry and do not require sampling, so the cost increase is around $4000. The City does have the staff to cover the increase by shifting staff from inventory to inspections.

**Councilmember Jenkins** asked if this is being asked of all the cities.

**City Attorney, Wendell Willard** stated it is a statewide mandate, not just the City of Sandy Springs. EPD has been granted rule making authority that cannot be legislatively changed.

        ii.   Green Print – Community Information

**Community Service Manager, Dan Coffer** gave a presentation on Green Print Sandy Springs. Mr. Joseph Mayson with Sandy Springs Conservancy and Helen Taft with the Trust for Public Land gave comments in support of this item.

R001944

---

     iii.  G.C.I.C. Fee Increase - Tarsha Patterson

**Accounting Manager, Tarsha Patterson** stated the federal and state agencies have implemented an increase in their fees to the City and the City would like to increase our fees to cover the costs passed along to the City.

**Motion and Vote:** Councilmember DeJulio moved to approve the G.C.I.C. fee increase pass through. Councilmember Meinzen McEnerny seconded the motion.  The motion carried unanimously

     iv.  Solid Waste Fee Schedule - Nancy Leathers

**Director of Community Development Nancy Leathers** stated this is the last of the solid waste fee increases.  The staff is requesting a $50 fee per site.

**Motion and Vote:** Councilmember Fries moved to approve the $50.00 Solid Waste fee to file an appeal. Councilmember Meinzen McEnerny seconded the motion.  The motion carried unanimously.

## PUBLIC COMMENT

**Joseph Mayson, 6615 Glenridge Drive, Chairman of the Sandy Springs Conservancy** read a statement into the record regarding the Morgan Falls Overlook Park and the chimney.

**Terrell Davis, 4585 Mystic Drive,** stated the back of his lot backs up to Chastain Apartments.  On his lot there is a creek that comes onto his property from Chastain.  The residents from Chastain Apartments are using that creek bank as a garbage dump.  He has contacted land development and contacted the management at Chastain but nothing has happened to rectify the situation.  He had pictures showing the conditions.

**Stan Jones, 225 Cliff Overlook, Sandy Springs, Sandy Springs Council of Neighborhoods** stated he is an engineer and stability is a very important term in respect to the chimney and it is affecting the chimney in four areas.  First is the gravitation of the geotechnical stability.  Second is the basic structural ability of the structure itself, the material that binds the stones together to help it distribute the load through its system.  One of the things they are looking for in the Conservancy Study is an analysis of the mortar.  Something should be able to be done about that.  Third is the lateral stability, wind and seismic.  Fourth is the esthetic protection of the chimney itself.  With a relatively fragile iconic element, it deserves protection from people itself.  In the past it was suggested to surround the chimney with a wrought iron fence that would allow everyone to view the workmanship and the quality of the chimney, but yet protect the chimney itself from people wanting to climb on it.

**Councilmember DeJulio** asked what is holding this chimney together.

**Mr. Jones** stated the chimney is mud, some sand, and natural additives like burnt lime, which is used as a binder. Not only do you have the rigidity of something that hardens and has more weather durability than mud, but it actually does have some adhesion itself.  Part of an analysis of a masonry structure is the mortar itself and the dating.  Looking at the masonry elements is best way to find out how old something is.  The chemical content of the mortar not only gives you an idea of the structural integrity of the mortar, but allows you to date the construction of that portion of the wall.  That is one reason it is being suggested, not only by the Archeological subcontractor, but also Lord, Aeck & Sergeant, who is doing an analysis.  They both want to look at that mortar because it will tell us so much about the structure.  I believe burnt lime was used as an additive on this chimney.  Burnt lime gives additional strength.

R001945

Regular Meeting of the City of Sandy Springs City Council
Tuesday, July 21, 2009
Page 35 of 35

**(Agenda Item No. 09-185)**
**ADJOURNMENT**

**Motion and Vote:** Councilmember Paul moved to adjourn the Regular Meeting and convene into the Work Session. Councilmember Jenkins seconded the motion. The meeting adjourned at 10:11 p.m.

Date Approved: March 2, 2010


_____                    _____
Eva Galambos, Mayor                                Michael Casey, City Clerk