IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCH OF SCIENTOLOGY OF )
GEORGIA, INC., a Georgia )
Corp., )
                      )
      Plaintiff,   )
                      )  CIVIL ACTION
    vs.           )
                      )  FILE NO. 1:10-CV0082CAP
CITY OF SANDY SPRINGS, )
GEORGIA, ET AL., )
                      )
      Defendants.   )

- - -

Deposition of NANCY J. LEATHERS, AICP,

taken on behalf of the Plaintiff, pursuant to

agreement of counsel, in accordance with the Federal

Rules of Civil Procedure, before Cathey H. Sutton,

Certified Court Reporter, at 7840 Roswell Road,

Building 500, Sandy Springs, Georgia on the 2nd day

of June, 2010, commencing at the hour of 10:03 a.m.

- - -

Deb Puckett & Associates

636 Old Ivy Road

Atlanta, Georgia   30342

(404) 365-9015

1          DISCLOSURE

2    STATE OF GEORGIA

3    COUNTY OF FULTON

4

5    DEPONENT:  Nancy J. Leathers, AICP

6    Date of Deposition:  June 2, 2010

7         Pursuant to Article 10.B of the Rules and
     Regulations of the Board of Court Reporting of the
8    Judicial Council of Georgia, I make the following
     disclosure:
9
          I am a Georgia Certified Court Reporter.
10
          I am not disqualified for a relationship of
11   interest under the provisions of O.C.G.A.
     9-11-28(c).
12
          I am a representative of Deb Puckett &
13   Associates.

14        Deb Puckett & Associates was contacted by
     Andrea Cantrell Jones, Esq. to provide court
15   reporting services for this proceeding.

16        Deb Puckett & Associates will not be taking
     this proceeding under any contract that is
17   prohibited by Georgia law.

18

19

20

21

22

23   Cathey H. Sutton, CCR B1354
     Certified Court Reporter
24   Date:  June 2, 2010

25

1          INDEX TO EXHIBITS

2    Plaintiff's

3    Exhibit No.    Description                          Page

4       15          Resume                               6

5       16          Portion of ordinance                 56

6       17          Diagram                              58

7       18          Zoning ordinance excerpt             75

8       19          Zoning ordinance excerpt             98

9       20          6-16-09 staff report                115

10      21          7-16-09 staff report                118

11      22          8-18-09 staff report                123

12      23          9-17-09 staff report                132

13      24          10-20-09 staff report               136

14      25          Report for planning commission  139

15

16

17

18

19

20

21

22

23

24

25

DEB PUCKETT & ASSOCIATES

```
 1   APPEARANCES OF COUNSEL:

 2   On behalf of the
     Plaintiff:                G. DOUGLAS DILLARD, Esq.
 3                             ANDREA CANTRELL JONES, Esq.
                               Dillard & Galloway, LLC
 4                             3500 Lenox Road, NE
                               Suite 760
 5                             Atlanta, Georgia  30326

 6   On behalf of the
     Defendants:               LAUREL E. HENDERSON, Esq.
 7                             Henderson & Hundley, PC
                               160 Clairemont Avenue
 8                             Suite 430
                               Decatur, Georgia  30030
 9                                    - - -

10           NANCY J. LEATHERS, AICP,

11   having been duly sworn, was examined and deposed as

12   follows:

13           MS. JONES:  This will be the deposition of

14      Ms. Nancy Leathers in the case of Church of

15      Scientology versus City of Sandy Springs.

16      Ms. Leathers, you have the right to read and

17      sign your deposition.  Do you wish to reserve

18      that right?

19           THE WITNESS:  I do.

20           (Whereupon, the reading and signing of the

21      deposition by the witness was reserved.)

22           MS. JONES:  Will Counsel agree to reserve

23      all objections except those to the form of the

24      question and responsiveness of the answer until

25      such time as the deposition is to be used --
```

DEB PUCKETT & ASSOCIATES

1          MS. HENDERSON:  Yes.

2          MS. JONES:  -- at trial?  This deposition

3     is taken under the Federal Rules of Civil

4     Procedure and shall be used for all purposes

5     allowed thereunder.

6          EXAMINATION

7  BY MS. JONES:

8     Q    Ms. Leathers, I assume you have had your

9  deposition taken --

10    A    Yes.

11    Q    -- at least once before?

12    A    I have.

13    Q    So I'm not even going to go through the

14  instructions.  I'm sure you are a seasoned

15  testifier, given your position.  Here comes

16  Mr. Dillard.

17    A    Actually, while he's coming in, I was

18  going to bring you my resume, which I left on my

19  desk.

20         MS. JONES:  Okay.  Good.

21         (A recess was taken from 10:05 a.m. to

22     10:09 a.m., and Mr. Dillard joined the

23     proceedings.)

24         MS. JONES:  What was the, I can't remember

25     what the last number we used.  Was it 12?

1          MS. HENDERSON:  I don't remember, but if

2     we've got a gap it won't hurt anything.  Why

3     don't we just start at 15.

4          MS. JONES:  Let's start at 15.

5          (Document was marked for identification as

6     Plaintiff's Exhibit No. 15.)

7     Q    (BY MS. JONES) I'm going to show you what

8  I've marked as Plaintiff's 15, and it is the resume

9  that you just handed me; is that correct?

10     A    Yes, it is.

11     Q    And that is your resume?

12     A    Yes.

13     Q    And it contains your address and your

14  educational background?

15     A    Yes, ma'am.

16     Q    And your work history?

17     A    Yes.

18     Q    Is it pretty much a complete description

19  of all of those categories?

20     A    It is, including my professional

21  affiliations.

22     Q    Your professional affiliations, you are a

23  certified planner; is that correct?

24     A    That's correct.

25     Q    And Master of Arts, what kind of arts did

1  you get a master's in?

2       A    I actually got it in urban geography from

3  the University of Chicago.

4       Q    Is that where you're from?

5       A    No.  I'm from Minnesota.

6       Q    Minnesota, okay.  You have been the

7  director of community development since the

8  inception of the city of Sandy Springs?

9       A    That's correct.

10      Q    And immediately before that, who was The

11 Collaborative Firm?

12      A    The Collaborative Firm is a consulting

13 firm, and I was part of that for a couple of years,

14 mostly on a part-time basis.

15      Q    And who were your other collaborators?

16      A    Michael Hightower.

17      Q    And did you provide consulting services to

18 private property owners?

19      A    Some to private property owners.  Our

20 largest contracts were actually governmental

21 contracts.

22      Q    What governments did you --

23      A    Newton County I spent about a year.

24      MR. DILLARD:  I had forgotten that.  You

25      did that through Michael's group?

1      THE WITNESS:  No.  We actually did the
2   restudy of the reformulation of the planning
3   department.  They did, they had all paper
4   records, and they, we reassessed how it should
5   be organized and what staffing they should have
6   and what kinds of computer systems they should
7   have.
8      MR. DILLARD:  Did you work with Robert?
9      THE WITNESS:  I'm sorry?
10     MR. DILLARD:  Did you work for Robert?
11  Paulson, isn't that his name?
12     THE WITNESS:  No, huh-uh.
13     MR. DILLARD:  Sorry to interrupt.
14     THE WITNESS:  It's been a while.
15   Q    (BY MS. JONES) So from October 5th to the
16  present and you are presently the director of
17  community development for Sandy Springs?
18   A    That's correct.
19   Q    And what are your duties as the director
20  of development?
21   A    The community development department
22  comprises three major areas, planning and zoning,
23  land and building development, and code enforcement.
24   Q    And do you oversee all three of those
25  areas?

1      A     I do.

2      Q     Who do you have working immediately under

3   you in planning and zoning?

4      A     That would be Patrice Ruffin.

5      Q     How about in the land and building

6   development?

7      A     Blake Dettwiler.

8      Q     Blake, okay.

9      A     D-e-t-t-w-i-l-e-r.

10      Q     Former green shirt?

11      A     Yes.  Yes.

12      Q     Blake and I have our history --

13      A     Okay.

14      Q     -- from Fulton County.

15      A     Yes.

16      Q     And then code enforcement?

17      A     Marcus Kellum.

18      Q     In terms of hands-on work in the planning

19   and zoning area, what would, describe what your

20   involvement is.

21      A     On a zoning case I do the final review.

22   All recommendations that come from the department

23   are signed off on by the director because it's a

24   departmental recommendation.  Generally through the

25   process we have initial review of the cases, and we

1  discuss how they're going to be handled.  And then
2  there are several reviews that involve multiple
3  levels within the department as the case processing
4  goes through.

5      Q   Do you meet with the applicant at the
6  beginning of the case?

7      A   I may or may not, depending on, on the
8  circumstances.  Sometimes they'll meet with me;
9  sometimes they'll meet with Patrice; sometimes
10  they'll meet with both of us.

11      Q   You say you do the final review.  Are you
12  active in developing the staff report as the review
13  progresses?

14      A   I am active in ensuring that the, all of
15  the issues that must be addressed in the case are
16  addressed.  And it is my final determination on
17  whether or not the request meets the policies of the
18  City because that's the guidance that we have in
19  terms of our final recommendation.

20      Q   Is there a place in the code that states
21  what your authority is in terms of meeting of
22  recommendations and how your recommendations are to
23  be considered by the council?

24      A   In the sense that there are separate
25  recommendations coming from the planning commission

1  and from the staff, I believe that's in the zoning

2  ordinance.  The, in terms of how we internally

3  prepare those reports, that would be, that's a

4  management issue and not a code issue.

5      Q    So you are the one who decides how the

6  report gets prepared and presented to the planning

7  commission; is that correct?

8      A    I am the, I, I make the final decisions on

9  it.  I may not make all of the decisions on it

10 because if someone comes up with a great idea

11 they're, obviously I'm going to be listening to my

12 staff because they're doing the reviews.

13     Q    What specifically are Patrice Ruffin's

14 duties?

15     A    She manages the preparation of all zoning

16 cases, all variances, all modifications, any

17 amendments to the zoning ordinance, and she oversees

18 the comprehensive plan.

19     Q    And what is your involvement with the land

20 and building development area?

21     A    It's really the same as it is in the

22 other, which is that I'm ultimately responsible for

23 all decisions made.  And I work with each of my

24 assistant directors in consultation on issues, but

25 the final decisions on issues are mine.  And I am

1   the, actually the building officer for the City.  So
2   I sign all certificates of occupancy.
3       Q    Would that department encompass land
4   disturbance permits and other types of permits?
5       A    It, it includes both land disturbance
6   permits and the inspections of those.  And it
7   includes building permits and the inspections of
8   those because those are two very different
9   functions.  And all of the permitting process.
10      Q    Now, would variances fall under this
11  category, or do they fall under the planning and
12  zoning?
13      A    Zoning variances fall under planning and
14  zoning.  There are variances to other ordinances,
15  and in Sandy Springs' code all variances related to
16  development-related issues are handled by what is
17  called the board of appeals.  And so they not only
18  oversee zoning issues, they oversee the tributary
19  buffer ordinance, the tree ordinance, the land
20  development regulations, the international property
21  maintenance code.
22          All of the, the codes that, that this
23  department is responsible for are actually, any
24  appeals to those are heard by the board of appeals.
25  And so the resident experts in each of those areas

1    would be within the divisions, but the paperwork is
2    actually processed through the planning and zoning
3    division.

4        Q    And how about code enforcement, what is
5    your involvement in the activities of the code
6    enforcement department?

7        A    Well, very similar to the others.  And
8    that is that I'm, I'm ultimately responsible, but
9    all of the, the day-to-day administration is handled
10   by Marcus Kellum.

11       Q    In the code enforcement area, how is that
12   divided up in terms of policing and actual
13   enforcement about violations?  What are the areas
14   that code enforcement involves itself in?

15       A    Well, code enforcement is responsible for
16   the enforcement of the international property
17   maintenance code.  It is responsible for a couple of
18   other codes that probably you're not interested in,
19   such as the solid waste management code and the
20   hours of collection and so on and the zoning
21   ordinance.  And they would be responsible for the
22   enforcement of zoning ordinance in the field,
23   whether it is the sign regulations within the zoning
24   ordinance or whether it is use provisions in the
25   zoning ordinance or whether it is other provisions

1    of the zoning ordinance.

2              The enforcement of construction-related

3    issues, if there is a permit on a piece of property,

4    then that enforcement is done in the land

5    development division.  They, either the land

6    development inspectors, the arborists, or the

7    building inspectors would do the enforcement in

8    those areas when there is a permit.  Code

9    enforcement deals essentially with property,

10   unpermitted properties, existing uses and the issues

11   that are related to those.

12              Now, they may be involved in construction

13   noise issues, which is, which are permitted sites,

14   but other than that they're generally not involved

15   with construction sites.

16        Q    Going back to the planning and zoning, I

17   want to talk about the process in Sandy Springs.

18   When some, an applicant comes to Sandy Springs to

19   get a rezoning, who wants a rezoning and submits an

20   application, what does the City do with that

21   application at the onset?

22        A    Can I give you the overall process and

23   then go back to what we --

24        Q    Sure.

25        A    -- do at the beginning?  It might put it

1    into context.

2        Q    Okay.

3        A    We have what is called 120-day process

4    from filing deadline till a case goes before the

5    mayor and city council.  There is a requirement that

6    an applicant have a preapplication conference with a

7    planner to ensure that the application is

8    essentially complete before it is filed.

9            And there is a sign-off sheet that they

10   have to bring in when they bring their application

11   in, which shows that they've had a preapplication

12   conference.  In part that is because in Sandy

13   Springs most properties are existing buildings and

14   existing properties, and so we need to make sure

15   that all the necessary concurrent variances come

16   hand in hand with the zoning application.  And so

17   we, that process is in place.

18           Then begins the 120-day process.  The

19   filing deadline is the first Tuesday of each month.

20   There is then a subsequent community zoning

21   information meeting which is handled, is held once a

22   month for all applications that were filed.  And

23   that, at that time the applicant and the planner are

24   present, and anybody from the community that wants

25   to come can learn about the application and ask

1    initial questions and identify themselves as being

2    interested in the case.

3         Subsequent to that the staff comes back

4    and circulates the information regarding the case to

5    all of the appropriate departments within the city

6    and outside the city that require comments.  And

7    that would be everything from Fulton County Health

8    and Fulton County Public Works, City of Atlanta

9    Water, board of education, and then city agencies

10   and Georgia DOT.  There are just a whole multitude

11   of those, and they go, go to all of those at one

12   time, including the city departments.

13        Internally we then have what is called the

14   focus meeting.  And at that time the staffs from the

15   various city departments that are assigned to make

16   comments to us come together, review the plans with

17   our staff, and then they go back and prepare their

18   written report and send that to us.  That, those are

19   the formal comments on the case.

20        Once we have that information plus the

21   information from the applicant and any other

22   research that the planner would have done based on

23   the review of the case and the determination of what

24   information we would need in the case, we then start

25   putting together a preliminary report.  And that

1  preliminary report is done so that we can begin to

2  outline the issues and make sure that we're

3  complete, and we also prepare a preliminary set of

4  conditions of zoning.

5       Because whether the staff recommends

6  approval or denial, we must put forward a set of

7  conditions that should the mayor and council choose

8  to approve they will have available to them.  So we

9  always do a preliminary set of conditions.  Once we

10 have those preliminary conditions, we go to what is

11 called the community developer resolution meeting.

12      And, again, those folks that came to the

13 community zoning information meeting and anyone else

14 who is interested can come.  The applicant's

15 required to be there; anybody else that has an

16 interest is there, and we talk about issues related

17 to the case and any suggested changes to the

18 conditions that we have prepared preliminarily.

19 Following that meeting we come back, assess all of

20 the information we have up to that point, and put

21 together our report and go through the review

22 process to get that report to the planning

23 commission.

24      I'm not going to go into the advertising

25 because the advertising is what advertising always

1   is on zoning cases under state law.  But that report

2   then goes to the planning commission, and the

3   planning commission holds its public hearing and

4   makes its recommendation on the case.  And that goes

5   forward to the mayor and council.  The staff's

6   report goes separately to the mayor and council, and

7   both recommendations are before them.

8           If the case is located in the city's,

9   Sandy Springs overlay district, then it will have

10  also been going to the design review board during

11  the period prior to the community developer

12  resolution meetings so that they can make any

13  comments on the overlay district requirements so

14  that they will go to the planning commission and on

15  to the council.  All of that is then transmitted to

16  the mayor and council.

17      Q    And we know --

18      A    And they will do their --

19      Q    -- what happens then.

20      A    And then they have the opportunity to do

21  whatever they think is appropriate with the case.

22      Q    At what point in this process does the

23  staff do an analysis of the code requirements for

24  the rezoning application?

25      A    It would be in, in those, between the

1  filing deadline and the time that it goes to

2  planning commission, we should have completed our

3  review of everything that we're aware of.  I'm not

4  suggesting that there couldn't be issues that arise

5  after the fact, but we, to the best of our ability

6  we try to analyze the information that we have and

7  the codes that, that address it.

8      Q    And who is responsible for that analysis?

9      A    Well, it's really the total staff.  I mean

10  it is, this is a team effort.  There is a planner

11  who is responsible for preparing the case.  There is

12  a zoning administrator who assists in working

13  through the code requirements.  There is an

14  assistant director who is involved.  And depending

15  on where the codes are located, people from other

16  divisions or other departments are involved in the

17  assessment of the code.  All of that occurs

18  concurrently.  And when it comes to me, I can also

19  raise issues about it.  It's, this is an ongoing

20  conversation until it's done.

21      Q    Who in particular would make a

22  determination about how much parking a project would

23  need?

24      A    That would be done in the planning

25  division.  I don't know that I would say it's an

1    individual decision.  It is an analysis that would

2    be done as part of review.

3        Q    What are the names of the people who would

4    do that analysis?

5        A    The analysis would be done by the assigned

6    planner and the assistant director.  The zoning

7    administrator may be involved, and they would

8    certainly discuss it with me if there were issues.

9        Q    So that pretty much involves the entire

10   department in terms of doing the parking analysis?

11       A    The parking analysis would be initially

12   looked up by the planner, discussed with the

13   assistant director and the zoning administrator, and

14   reviewed by me.

15       Q    The assistant director is?

16       A    Patrice Ruffin.

17       Q    And the zoning administrator is?

18       A    Asay Sarkaraldo.

19       Q    And then the assigned planner, how many

20   assigned planners do you have?

21       A    On this case I believe there was one, and

22   that was Linda Aberay.

23       Q    Now, you signed a set of interrogatory

24   responses on behalf of the City.  We sent

25   interrogatories to the City, and they were answered

1  in a written form; and you were the person who

2  verified the interrogatory responses.  Did you

3  actually review and supply the information for the

4  interrogatory responses?

5       A    Well, the department provided the, the

6  information, and I believe probably both Patrice and

7  I reviewed it.

8       Q    You don't remember specifically reviewing

9  your interrogatory, the City's interrogatory

10 responses?

11      A    Oh, I'm, I know that I did.  I don't, I

12 don't remember precisely now.

13      Q    Well, you said probably.  I thought

14 well --

15      A    No.  Probably was I thought that Patrice

16 had reviewed it as well.

17      Q    In your interrogatory responses you, in

18 the interrogatories you were asked to state with

19 specificity the compelling governmental interest you

20 contend justifies denial of the Church of

21 Scientology application as requested.  And the

22 denial being that less density --

23      A    I, I --

24      Q    -- was recommended.

25      A    -- I wouldn't view it as a denial.  I,

1   this is an approval with conditions.

2       Q    Okay.  But it was denied as requested

3   because they requested forty-three thousand some odd

4   square feet, and they only got thirty-two.

5       A    Well, I don't, that's not a denial.  A

6   denial would be to recommend denial of the case,

7   and, and this was not that.  This was a

8   recommendation to approve it at a density we thought

9   was appropriate for the site.

10      Q    I'm not going to quibble with you about

11  the semantics of this, but basically I'm asking you

12  what the compelling governmental interest, what

13  compelling governmental interest was served by

14  recommending 32,053 square feet as opposed to the

15  square feet requested by the Church of Scientology?

16          MS. HENDERSON:  I'm going to object, but

17      you can answer.

18          THE WITNESS:  Okay.  The, the issue that I

19      was unable to, to address was the issue of

20      sufficient parking for the larger square

21      footage.  We worked very hard to find a

22      solution to that, and I was unable to do that.

23      Q    (BY MS. JONES) Let me give you the

24  question again.  I'm asking you what compelling

25  governmental interest was served by the

1  recommendation for 32,000 square feet.

2      A    Insufficient parking creates a public

3  safety issue related to the site, and that is the

4  public interest that, that was involved.

5      Q    Do you understand what the term compelling

6  governmental interest means as a matter of law?

7          MS. HENDERSON:  Objection.

8          THE WITNESS:  No.  I'm not a lawyer.

9      Q    (BY MS. JONES) Did your lawyer explain to

10 you what a compelling governmental interest is?

11     A    I don't know that I know what a compelling

12 governmental interest is.

13     Q    Do you believe parking constitutes a

14 compelling governmental interest?

15         MS. HENDERSON:  I'm going to object.  You

16     can answer.

17         THE WITNESS:  Okay.  I believe that the

18     inability of people to park on the site and to

19     back up traffic on the road because they could

20     not get in and out of the site because there is

21     insufficient parking is a public safety issue.

22     Q    (BY MS. JONES) And I don't mean to belabor

23 this, but is it "compelling"?

24     A    If the --

25         MS. HENDERSON:  Objection.

24

1          THE WITNESS:  -- traffic is backing up

2     onto Roswell Road and backing up one lane of

3     traffic, I believe that is a compelling public

4     interest.

5          Q     (BY MS. JONES) Does the Scientology

6     property have an entrance from Roswell Road onto the

7     property?

8          A     Yes, it does.

9          Q     And does it go to the parking?

10         A     Yes, it does.

11         Q     Behind the building?  Would it be possible

12    to alleviate that problem by putting someone at the

13    entrance that would prohibit cars from going in once

14    the lot was full?

15         A     That would be another option.  I don't

16    know that, that anyone volunteered to provide that

17    kind of service.

18         Q     Do you ever park down at Fulton County?

19    When you worked down at Fulton County, did you ever

20    park in that building across the street from the

21    Fulton County governmental administrative building?

22         A     On both, in both of the parking decks,

23    yes.

24         Q     And did you ever experience a sign out

25    front that said lot full?

1       A     I did indeed.

2       Q     And did you move on when the lot -- well,

3   you probably didn't have to.  You probably had a

4   monthly parking pass.

5       A     I did.

6       Q     But that is one way it could have been

7   handled to keep cars from backing up on MLK?

8           MS. HENDERSON:  Objection.

9           THE WITNESS:  Well, it's, it's a possible

10          way to do it if someone is willing to do that

11          during the periods of operation of the

12          facility.

13      Q     (BY MS. JONES) Did the City suggest that

14   as a possibility?

15      A     I didn't know that it was my

16   responsibility to suggest to the applicant how they

17   address the issue.  I addressed the issue in terms

18   of the ability to park on the site.  I addressed the

19   issue of what the problem was.  It is not the City's

20   obligation, in my view, to prepare the plan for the

21   applicant in order to suggest something which

22   clearly had a significant expense to it.  The

23   applicant came forward with another alternative and

24   discussed that with us, and we were perfectly

25   willing to discuss it with them; but it, it would

not be our obligation to prepare an application for
an applicant.

    Q    Nor would it be your obligation to come up
with a lesser restrictive means to achieve your
compelling government interest?

        MS. HENDERSON:  Objection.

        THE WITNESS:  If the applicant had
        suggested it, I would have evaluated it to see
        whether it was something that could be done.
        It was never suggested to us during the, the
        four deferrals that we had from the mayor, or
        the four hearings that we had with the mayor
        and city council, that never arose as an issue.

    Q    (BY MS. JONES) And I don't want to belabor
this either, but I just want to make sure that I'm
understanding what you're saying, and that is that
the City never suggested that some sort of signage
or, or gate or, or monitoring of the entrance off of
Roswell Road be instituted by the Church of
Scientology to control the flow of traffic on
Roswell Road?

    A    Well, it's not to control the flow of
traffic on Roswell Road.  It's to ensure that the
traffic going into the facility does not slow down
the traffic on Roswell Road and impede it in the

1  outside and, and turning lanes.  And as you know,

2  that is an intersection where we have a variety of

3  turning lines so there's several lanes that would be

4  impacted by that.

5       Q    So phrased that way, the City never

6  suggested an alternate, the idea of gating or

7  blocking or monitoring the entrance?

8       A    I'm not aware that anyone on either,

9  either the applicant nor the City suggested that

10  alternative.

11      Q    Were there any other issues regarding

12  ingress and egress to the Church of Scientology

13  property other than perhaps blocking traffic on

14  Roswell Road?

15      A    The, the City's policy is that parking

16  should be provided on site and if the parking is not

17  capable of being located on site, that there is an

18  appropriate arrangement for off-site parking for

19  required parking.  We were never presented with an

20  alternative that met the requirements of the

21  ordinance other than the existing off-site parking,

22  which is located on the post office property, which

23  we showed as continuing forward.

24           But we, there was never, there were

25  alternatives discussed, but there were, there, there

1  was nothing presented which we could then

2  incorporate as part of the case.

3      Q     Now, No. 9 of the interrogatories asks the

4  City to identify every church or place of worship

5  for which the City has issued a permit, granted a

6  variance, or approved a zoning application from

7  December 31, 2005 to the present, along with the

8  zoning variance or building permit number

9  associated.  And the City did provide a list of, in

10  their responses of churches on an Exhibit D.

11         MS. JONES:  I hate the way these exhibits

12      are attachments instead of in the

13      interrogatories.

14         MS. HENDERSON:  We provided you so much

15      information that it seemed a systematic way to

16      organize it.

17         MS. JONES:  I guess I'm just not used to

18      that much of a system.

19      Q     (BY MS. JONES) Well, within the body of

20  the interrogatories the City listed a number of, a

21  number of places of worship.  And I'm going to go

22  through those places of worship and ask you to tell

23  me how the parking, required parking, was calculated

24  for each one of these locations in the ones that you

25  have named.  Sandy Springs Christian Church, and it

1   was approved on April 15th, 2009.  What method of

2   calculating the required parking was used for

3   approval of the Sandy Springs Christian Church

4   variance?

5       A    I would have to go back and look at the

6   case in order to tell you that.  I can't tell you

7   from memory.

8       Q    Has the City ever used any method of

9   calculating required parking for a church or place

10  of worship other than applying Zoning Ordinance

11  18.1?

12      A    For the main church, no.  For related

13  uses, yes.

14      Q    When you say for the related church --

15      A    Related uses.

16      Q    Related uses.

17      A    There are schools and day-care facilities

18  and a number of other things that are sometimes

19  associated with churches, and those are calculated

20  separately.

21      Q    Let's look at the recently approved

22  Lutheran church on the corner of Hammond and

23  Glenridge.  That's where it is, across from Hammond

24  Park.

25      A    Uh-huh.  Yes, it is.

1      Q    I rode by there this morning.  It is --

2      A    A very large facade.

3      Q    It's up and at 'em.  Now, how was the

4 required parking calculated for that expansion of

5 the Lutheran church?

6      A    It was a, based on the place of largest

7 public assembly.

8      Q    Does that church have a day care?

9      A    It does.

10     Q    Does that church have a school?

11     A    I don't believe so.  I think it's just a

12 day care, but I'm not absolutely certain.

13     Q    Does it have offices?

14     A    Yes.

15     Q    Does it have a church library?

16     A    I'm sure it does.

17     Q    Does it have a church bookstore?

18     A    I don't know.

19     Q    Was any investigation done as to the

20 separate uses within that church property as it

21 relates to required parking?

22     A    I don't believe it was done at the time of

23 zoning, no.

24     Q    Has it been done since?

25     A    I believe there was some assessment when

1  the certificate of occupancy for the day care, I

2  believe it was the day care was issued.

3  　　　Q　　And who did that assessment?

4  　　　A　　That would have been done in planning.  I

5  don't know that I can tell you which individual did

6  it.

7  　　　Q　　How was that assessment done?

8  　　　A　　I believe it was based on each of the

9  uses, but I'd have to go back and check.  I know

10  that there were separate calculations on it.  I

11  don't have the details.

12  　　　Q　　Where is that information kept?

13  　　　A　　It would be in either the zoning file or

14  it would be in the building permit file.  I'm not

15  sure which.

16  　　　Q　　So at the time of zoning you simply looked

17  at the square footage of the main assembly area and

18  applied 18.1 to that?

19  　　　A　　Generally that would be the way it would

20  be done, yes.

21  　　　Q　　That was what was done in the case of the

22  Lutheran church?

23  　　　A　　Unless, unless it has fixed seating, in

24  which case we would deal with the, the fixed seating

25  provision of the ordinance as opposed to the square

1   footage.  Square footage is when there is no fixed

2   seating.  And if there are pews, then there's a

3   separate, different calculation.

4        Q    Both of those calculations are addressed

5   in 18.1?

6        A    Yes.

7        Q    For churches or places of worship?

8        A    That's correct.

9        Q    Is there any other place in the zoning

10  ordinance which sets forth parking requirements for

11  churches and places of worship?

12       A    Not that I'm aware of.

13       Q    When you say that you would look at

14  related uses such as schools or day care to make the

15  calculation, let's just talk about day care.

16  Looking at day care, are you talking about, not,

17  you're not talking about your nursery during church

18  services, are you?

19       A    No.  That, a, a nursery during church

20  services is an accessory use to the church.  A day

21  care which is operated with a state license is a

22  different issue.  And they, when it is being

23  operated as a day care with a dropoff and so on,

24  then it would be handled as a separate but related

25  use.

1    Q    Is it the state license that triggers the,

2  the requirement to look at, look at the day care?

3    A    No.  It's actually spelled out in the

4  zoning ordinance.  However, when we do the review

5  in, under the zoning ordinance provisions we then

6  assure ourselves that if it requires state licensing

7  that they do that as well because they deal with a

8  portion of the day care that we don't deal with.

9  Because ours is strictly a land use decision but

10  from a public safety point of view.  When we do the

11  conditions of the approval of, say, a day care or a

12  private school, we put a condition in that requires

13  the state license prior to the issuance of the CO.

14    Q    When you're talking about private school,

15  you're not talking about, say, Sunday School

16  classrooms or classrooms used by the church as part

17  of their programs?

18    A    That's correct.  The, a private school

19  under the definition zoning ordinance is spelled out

20  as a school which has a, a, a curriculum which is

21  equivalent to a public school, the Fulton County

22  Public School System.

23    Q    I can't remember whether I asked this or

24  not, but I'm going to ask it again.  And church

25  offices are not calculated separately, are they?

```
 1        A      No.   Because they're really accessory to
 2   the, the main use.  And the church is defined as an
 3   assembly use, and so that would be the related
 4   accessory use, just as in an office building you
 5   have accessory uses in the building that may not be
 6   offices but which are considered accessory to the
 7   main office use of the building.
 8            Would this be an appropriate time to take
 9   a break?
10        Q      Anytime you want to take a break, Nancy --
11        A      If you don't mind.
12        Q      -- you go right ahead.
13            (A recess was taken from 10:47 a.m. until
14        10:57 a.m.)
15        Q      (BY MS. JONES) In order to jostle your
16   memory some, I'm going to show you a copy that I
17   made --
18        A      Uh-huh.
19        Q      -- of Defendants' Response to Plaintiff's
20   Interrogatories, which I believe contains your
21   verification at the end on Page 22.  You're in the
22   appendix now.
23        A      I'm, I'm seeing all the stuff at the end
24   that we gave you, yes.  I see the signature.
25        Q      And that is your signature?
```

1      A     It is.

2      Q     And if you would, go to Page 8, which,

3  well, I guess the question actually is Question

4  No. 9, which is on Page 7, in which I ask you to

5  identify churches and places of worship that the

6  City has issued a permit, granted a variance, or

7  approved a zoning application from December 31st,

8  2005 to the present along with the zoning variance

9  or building permit number associated therewith.

10     A     Yes.

11     Q     Now, I'm just hoping this will help you

12 remember these individual applications so that you

13 can answer a few questions about them.  And the

14 first one is the Sandy Springs Christian Church.  It

15 does not appear to involve parking; is that correct?

16     A     That's correct.  It's a signage request.

17     Q     And the second one is the Zainabia

18 Non-Profit, Inc., 1100 Hope Road?

19     A     Yes.

20     Q     Where is Hope Road?

21     A     Hope Road is in the vicinity of Dunwoody.

22 I can show you on a map.  It's easier for me to do

23 that.  It's, this is Dunwoody Place, and Hope Road

24 is, is in, in this general area here.  North of

25 Northridge and --

1         MR. DILLARD:  Wasn't that a Medfirst on

2   there?

3         THE WITNESS:  Yes, I think so.  Yeah,

4   you're right.

5         MR. DILLARD:  I have to make some kind of

6   contribution.

7     Q   (BY MS. JONES) Was the Zainabia -- I hope

8   I'm saying that right -- Zainabia, Z-a-i-n-a-b-i-a,

9   Non-Profit, Inc., a church or a place of worship?

10    A   Yes, it's a place of worship.

11    Q   How was the required parking calculated on

12  this property?

13    A   The largest place of public assembly.

14    Q   Were the variances granted that they

15  requested for no required parking islands and a

16  reduction of required parking spaces?

17    A   Yes.

18    Q   And was that calculation done under

19  Section 18.1 at sec of the zoning ordinance?

20    A   Yes.

21    Q   How about the Second Church of Christ

22  Scientist on Carpenter Drive, how was the parking

23  calculated for the, for that church?

24    A   That would have been in the place of,

25  largest place of public assembly.  Although that's

1  just a, well, it's, it's a church, but it's, it's

2  actually the, a reading library for the church.

3       Q    So in that case --

4       A    Christ Scientist.

5       Q    -- was the reading room considered the

6  largest place of assembly?

7       A    Yes.

8       Q    Was any other, other code section or

9  requirement attached to that analysis?

10      A    No.

11      Q    Now, we know about the Church of

12 Scientology so we'll talk about that in more detail

13 in a little while.  The Kadampa Meditation Center

14 New York, is that next to Kaiser?  Is that where

15 that is?

16      A    No.  It's up on Peachtree Dunwoody next to

17 the MARTA station.

18      Q    And how was the parking, required parking,

19 calculated for that site?

20      A    In the largest public assembly.

21      Q    Was any other requirement placed on it --

22      A    There weren't --

23      Q    -- for parking?

24      A    -- there weren't any other uses on the

25 site.

1    Q    It was to allow for a place of worship and
2    a boarding house.  What kind of boarding house did
3    they allow?

4    A    They actually have resident monks.  And so
5    they, there would have been a separate calculation
6    for the, for the residents, but that's a separate
7    use.  There were two uses calculated on that site.
8    But in terms of the, the meditation facility, it was
9    based on the place of public assembly.

10   Q    The Congregation Beth --

11   A    Tefillah.

12   Q    -- Tefillah, how was that calculated?

13   A    Well, the preschool was, was calculated
14   based on, it, it's on a separate parcel, and the
15   preschool was calculated as a preschool.

16   Q    That wasn't an expansion of the place of
17   worship.  It was the addition of a preschool; is
18   that correct?

19   A    That's right.  They had actually approved
20   the use permit for the adjacent house some time ago,
21   and they came in and, and got, had this done so that
22   they could complete that.

23   Q    And this seems to be the use 07003 was
24   approved on the same date for a 2,000 square foot
25   mikvah?

1          A      Yes.

2          Q      What is a mikvah?

3          A      That is, I'm, I'm not sure that I can tell

4    you precisely what it does, but it's just a separate

5    bathing area, I believe.  And it is at the back of

6    the site near Georgia 400.

7          Q      Was some parking calculation done to

8    analyze the addition of a mikvah at the synagogue?

9          A      I don't believe so because in this case it

10   is such a minor use and it's really accessory to the

11   actual church itself.  It required, because it was

12   an additional structure it required the additional

13   use permit, but there wasn't any required additional

14   parking.  That facility actually had additional

15   parking over and beyond the required.

16         Q      Would a certificate of occupancy be

17   required for this additional structure?

18         A      I'm not sure of its size and so I'm not

19   sure whether it would or not.  If it is less than a

20   hundred square feet, it would not.  If it's more

21   than a hundred square feet, we would.

22         Q      It says here that it was the addition of a

23   2,000 square foot mikvah?

24         A      Then it probably would have had a CO.

25         Q      Is there a CO file cabinet or a CO room?

1    Where do you keep the COs?

2       A     The COs are issued by, individually, and

3    we have, we have a listing of those that we have

4    issued; and you can certainly get a copy of all of

5    them.

6       Q     You say that with some --

7       A     There are many.

8       Q     -- some pleasure there.

9       A     If you want just some, it's more

10   difficult.  If you want them all, I'm happy to just

11   do it up.  It's because I've signed them I know how

12   many there are.

13      Q     The St. Andrews Presbyterian Church --

14      A     Yes.

15      Q     -- was a use permit to allow for 10,000

16   square feet of the existing 25,000 square foot

17   church to be used for a special foreign language

18   school with a preschool kindergarten component.  Did

19   you apply the, did you recalculate the parking

20   required for St. Andrews when you issued this use

21   permit?

22      A     There was actually so much additional

23   parking at the church over and beyond what is

24   required for the church that we did the calculation

25   and no additional parking was required.

1    Q    But you --

2    A    Yeah, we did the calculation.  We did the

3 calculation on the school because it was separate

4 from the church.

5    Q    And there's a separate calculation for a

6 school than there is for a church?

7    A    Yes.

8    Q    We'll skip the cell tower.

9    A    Extensive parking.

10   Q    And then Mount Vernon Highway, Mount

11 Vernon Presbyterian School, any calculation you did

12 on that would have been done under the school

13 calculation?

14   A    That's correct.

15   Q    Now, Holy Spirit Preparatory School, what

16 calculation did you do for the parking at Holy

17 Spirit's?

18   A    It related to the offices and to the

19 fields because there was no place of public assembly

20 church at that location.  That, the main building is

21 located elsewhere.

22   Q    And so how did you calculate these uses

23 for purposes of parking?

24   A    Well, there are, parking, the parking

25 requirements in 18.1 spell out the, the, the parking

```
 1   for athletic fields and also for offices.
 2       Q    So you applied 18.1 to that?
 3       A    Yes.
 4       Q    Did you apply any other, any other
 5   calculation in the zoning ordinance from --
 6       A    No.
 7       Q    Were there conditions of zoning placed on
 8   this Holy Spirit project?
 9       A    Yes.
10       Q    Did they include any special conditions
11   for parking?
12       A    I'm not sure I'm, I'm understanding what
13   you're asking.
14       Q    Well, you calculated the, the, under 18.1
15   you calculated parking required for the athletic
16   fields?
17       A    Yes.
18       Q    Then in the conditions of zoning, were
19   there any other conditions relating to parking
20   contained in the conditions of zoning?
21       A    There were restrictions in the hours of
22   use of the parking.
23       Q    Any other restrictions?
24       A    I, without looking at the case I can't
25   remember.  It was fairly complicated, and I believe
```

1  we, there were issues about how the parking was

2  configured and so on; but I would have to go back

3  and, and read that case again to remember exactly.

4  But there were, the parking issues that related to

5  it related not only to the amount of parking but

6  also where it was located, how it came in and out of

7  the site, and where the lighting was located, how

8  high the lighting was, the noise that would impact

9  the neighbors, et cetera.

10      Q    The Holy Spirit application for these

11  athletic fields and accessory uses did not fall

12  within the provisions for, or were not considered a

13  church or a place of worship in any form, were they?

14      A    No.

15      Q    They were a separate secular use?

16      A    Well, it was, well, it was a use related

17  to a school.  The school happened to be a private

18  school which happened to be a religious school, but

19  it was, it, it just comes under the provisions of

20  the, the use in the ordinance.

21      Q    Then we come to the Lutheran Church of

22  Apostles, which we talked about a little bit before.

23  Let me just confirm that the analysis for required

24  parking was based entirely on the size of the main

25  assembly area of the church; is that correct?

1      A     As far as I can recollect, that was true.

2      Q     Now we're at St. Andrews Presbyterian

3  Church.

4      A     You actually saw it, you saw the first

5  case, and then you saw the second case.  It has come

6  through twice.  It was, there was one addition, and

7  then there was a second case.  The first one was in

8  '07.  The second one was in '09 when they expanded

9  the use.

10     Q     And they increased the size of the church

11  by 2,000 square feet?

12     A     Yes.

13     Q     And was the calculation for parking done

14  under 18.1 for a church and place of worship?

15     A     And for the school.

16     Q     So the 2,000 square foot addition to the

17  existing church, was that separate from the use

18  permit to expand enrollment at the existing school?

19     A     Let me explain.  These were concurrent

20  filings.  And the reason they were concurrent is

21  because the expansion was actually to expand the

22  church so that the school could take an additional

23  2,000 square feet of the existing church.  So the

24  church did not expand except in the sense that the

25  building is one building and the use was actually

1    the expansion of the school use.

2        Q    So you calculated this as the expansion of

3    a school as opposed to the expansion of a church?

4        A    We did.

5        Q    That took some explaining.

6        A    Well, that was a very complicated case.   I

7    can actually remember it fairly well because I spent

8    a lot of time on it.

9        Q    Now we have the Holy Innocents Episcopal

10   Church and School.  It says use permits to revise

11   the existing church, private school, and day-care

12   facility uses and property with concurrent

13   variances.  That happened just last December, it

14   appears?

15       A    Yes.

16       Q    Took it a long time.  No.  I guess '09 to

17   '05 to '09.  What revision did they make to the

18   existing church?

19       A    They did a minor addition to the existing

20   church, a minor expansion to the church, and they

21   also added a cemetery addition.  And then they

22   reconfigured the site plan.  They did not add

23   students to the school, but they reconfigured the

24   site plan to make it a more usable campus.

25       Q    Was the parking requirement for the minor

1   expansion, or was there an increased parking

2   requirement for the minor expansion to the church?

3       A    I don't believe it, it really required any

4   additional because of the shared parking provisions

5   of the school and the church.

6       Q    And if I'm understanding how it's all

7   done, the school and the day-care facilities got

8   their own analysis for the parking?

9       A    They did.

10      Q    Now Mount Vernon Presbyterian is wanting

11  to modify again.  That was for the classrooms only?

12      A    It appears.  And I, I don't remember the

13  details of this, but it appears that it modifies the

14  site plan for the, the school with concurrent

15  variances, but it's not an addition of anything.

16      Q    Okay.  Good.

17           MS. HENDERSON:  Better?

18           MS. JONES:  Much better.

19      Q    (BY MS. JONES) It always helps, I guess,

20  to have your memory tickled a little bit.

21      A    There are a lot of cases.  It's hard to

22  remember.  You might want that back.

23           MS. JONES:  Here, Doug.  You can put that

24      back in your book.

25      Q    (BY MS. JONES) Oh, just a question.  We

1  asked for the identity of every church or place of

2  worship within the city limits of Sandy Springs.

3  And I just was curious; the list starts with nine.

4  And I was just -- you can look on there; that's

5  Exhibit A to the list -- if there were one through

6  nine someplace and one through eight someplace else,

7  or was that just a typo?

8      A    I don't know.  I'd have to go ask.

9          MS. HENDERSON:  That's a good question.

10         THE WITNESS:  Well, we can check while

11     you're here.

12         MS. HENDERSON:  It could be that a page

13     stuck together in copying.  We can --

14         MS. JONES:  Okay.

15         MS. HENDERSON:  This came from the City so

16     we can, we'll check on a break.  How about

17     that?

18         MS. JONES:  That's fine.  You know, it

19     could be any reason why it started with nine,

20     you know.  Maybe just the numbering system was

21     off, but, okay.

22     Q    (BY MS. JONES) Okay.  I guess we can let

23  you look back on, on the responses again just

24  because this is kind of a complicated response.  I

25  asked on Interrogatory No. 11 for the City to

1   identify each harm or detriment to the public

2   health, safety, morals, and welfare that you contend

3   would result from plaintiff's proposed use of the

4   property and that is, and all evidence you contend

5   supports the alleged harm or detriment to the public

6   health, safety, morals, and welfare.

7         And you responded by referring me to your

8   interrogatory response to, to number, to No. 8 and

9   13.  So, and it appears that No. 13 is a, is an

10  expanded response to that particular interrogatory,

11  and we've already talked about that the, that you

12  found a harm to the public safety as a result of the

13  inadequate parking proposed.  But I'm curious about

14  the response that says, quote, disallowing

15  conversion of the underground parking deck is a

16  mitigating measure for proposed church use.  Could

17  you explain what that means?

18        A    It means that if the conversion of the

19  underground parking is not allowed, then that

20  mitigates the impact of not having enough parking on

21  the site and it becomes inadequate.

22        Q    You're not saying that it mitigates the

23  impact to the Church of Scientology as a result of

24  not having the requested square footage?

25        A    I didn't understand that that was the

DEB PUCKETT & ASSOCIATES

1  question.  It was my understanding that the, that

2  this would mitigate the effect that it would have on

3  adjoining properties which was the question.

4      Q    Well, actually the question was --

5      A    It says to any perceived harmful effect

6  that the proposed church would have on adjoining

7  properties or on the City.

8      Q    That was Question No. 13.

9      A    Right.

10     Q    And you're answering, Question No. 11

11  refers to your answer to No. 13.

12     A    Okay.  And so what, so what I have to do

13  is look at Question 11.  I'm --

14     Q    See what I'm talking about?

15     A    So let me see what No. 11 says.  Okay.

16  Well, the public health, safety, morals, and welfare

17  would be the same as -- just a minute, let me

18  finish -- the public health, safety, and morals and

19  welfare is also, is the impact on the neighbors and

20  on the right-of-way.

21     Q    It's asking for the evidence that, that

22  the City relied on to come to the conclusion that

23  there would be a negative impact on the neighbors.

24     A    Well --

25          MS. HENDERSON:  I'm going to object to the

1    question.  You can answer to the extent you

2    can.

3         THE WITNESS:  The evidence is that the

4    parking is insufficient to accommodate the use

5    proposed on the site according to our

6    calculations.  And based on that, the potential

7    is that it will impact the neighbors because

8    folks will be parking in other locations, which

9    would potentially impact the neighbors.  They

10   may be parking in the neighborhoods.

11        Q    (BY MS. JONES) But they wouldn't be

12   parking on Roswell Road?

13        A    They certainly would not.

14        Q    Well --

15        A    Not if they had any common sense.

16        Q    They could potentially be parking in the

17   post office?

18        A    They could.

19        Q    And, in fact, they have an easement at the

20   post office?

21        A    For a portion of the post office parking

22   but not all of the post office parking.

23        Q    What neighborhoods do you think that they

24   could potentially be parking in?

25        A    Well, they could be parking in residential

1   areas around there.  They could be parking in the

2   office next door.  There are other properties in the

3   vicinity that have parking.  And so to the extent

4   that they're there, they have an impact on, on those

5   uses as well.  And those are parking areas that are

6   spelled out for their use.

7       Q    Well, the office next door could boot

8   them, correct?

9       A    They could, but they would have to go

10  through the effort to do that.  And that's the, the,

11  the difficulty is that they, it has to occur before

12  you can address the issue unless you go to the

13  additional expense of controlling the access to

14  your, your site with a gate.

15      Q    Or unless it might not occur?

16      A    If it didn't occur, it wouldn't be a

17  problem.  But I, you're asking what could

18  potentially happen if there is not enough parking on

19  site and people are coming looking for a place to

20  park.  And my comment is that they'll look for

21  another place to park and they'll look for something

22  that is available in the vicinity so they can come

23  back to the site.  If I were coming north on Roswell

24  Road and I couldn't get into that site, I would

25  probably go to the next driveway, which is the

1   office building.

2       Q    Can you point to a situation or an

3   instance in which that happened where there was

4   insufficient parking at a church or place of worship

5   and the people coming parked in neighborhoods or on

6   streets?

7       A    Yes.  I have a wonderful example.  It is

8   at Belle Isle and Roswell Road, and it is no longer

9   there.  And I cannot remember the name of the

10  church, but it was --

11      Q    Buckhead?

12      A    Yeah.  Yes.  And it was a huge problem.

13  And there was insufficient parking on the site, and

14  parking was on the street and in the neighborhoods.

15  And there were continuing complaints about it over

16  an extended period of time until the church moved.

17      Q    And in that case the overcrowding and the

18  parking and traffic issues occurred during Sunday

19  church services, correct?

20      A    Yes.

21      Q    It wasn't constant.  It was just when they

22  filled up that church on Sunday morning with all

23  those young people?

24      A    It was a place of public assembly, and

25  that was their main time of assembly, I agree.

1      Q      And they all came like at the same time?

2      A      That's correct.

3      Q      I myself experienced the Buckhead Church

4   going to that Kroger.  No. 13, which we've already

5   talked about the response to No. 13, the

6   interrogatory was asking the City to identify every

7   measure considered or suggested by the City to

8   mitigate any perceived harmful effect the proposed

9   church would have on the adjoining properties or on

10  the City.  The response --

11         MS. JONES:  Can I have the thing back,

12     Doug?

13     Q      (BY MS. JONES) I just want to ask you some

14  questions about the response as sort of down toward

15  the middle of the response you say "Parking

16  requirements are a separate, nonreligious use apart

17  from the church itself."  What does that mean, a

18  separate, nonreligious use apart from the church

19  itself?

20     A      The parking is looked at as related to a

21  place of public assembly, whether it is a church or

22  some other use.  And so the parking is viewed as

23  being related to the place of public assembly.

24     Q      Well, isn't it true though that the

25  parking ordinance, the 18.1 sec specifically,

1    identifies churches and places of worship and

2    assigns a parking calculation specifically for

3    churches and places of worship?

4         A    It does.  And --

5              MS. HENDERSON:  Objection.

6              THE WITNESS:  -- indeed it spells out in

7         that provision and the ordinance calls a church

8         a place of assembly.  And so that is the basis

9         on which we, I'm saying that.

10        Q    (BY MS. JONES) So the City does not

11   distinguish between one place of, between a place of

12   assembly and a church or place or worship; is that

13   what you're saying?

14        A    No.  What I'm saying is that a church is

15   one type of assembly.

16        Q    Church parking is considered a

17   nonreligious use; is that what you're saying?

18        A    What I'm saying is that it would be

19   required of any assembly, whether it is a church or

20   some other form of assembly.

21        Q    Is the parking requirement for an

22   assembly the same as for a church or place of

23   worship?

24        A    I'm going to have to check it to make

25   absolutely sure.

1       Q     Well, let me give you the zoning

2   ordinance.

3       A     Well, I have it here.

4       Q     Yeah.  Let me just mark it and I'll let

5   you look at it.  You can look at it in your book

6   too.

7       A     It's easier to --

8            MS. HENDERSON:  I mean I'll be happy to

9        have you mark a portion of the zoning ordinance

10        and allow her to use it, but I'm going to

11        object to three pages being characterized as a

12        zoning ordinance when it's something like three

13        hundred and seventy pages.

14            MS. JONES:  I'm not characterizing it as a

15        zoning ordinance.  It is the portion of the

16        zoning ordinance pertaining to off-street

17        parking and loading.

18            MS. HENDERSON:  And I object as it being

19        complete when there are other interrelated

20        sections of the zoning ordinance that impact

21        use of that provision.

22            MS. JONES:  Well, you can object.  And

23        Ms. Leathers --

24            MS. HENDERSON:  And all I'm doing is

25        preserving it.

1    Q    (BY MS. JONES) -- Ms. Leathers can look

2    through the book, but I'm going to just show for

3    purposes of identification Plaintiff's Exhibit

4    No. 16.

5        (Document was marked for identification as

6        Plaintiff's Exhibit No. 16.)

7    Q    (BY MS. JONES) Which I would note has the

8    Bates Stamp Nos. 731 through 736 which were placed

9    on there by the City or its counsel.

10       THE WITNESS:  They're similar but not

11       precisely the same.

12    Q    (BY MS. JONES) Assembly places with fixed

13   seating refers to stadiums, auditoriums, theaters,

14   and amphitheaters, correct?

15    A    With fixed seating.  And assembly places

16   without fixed seating would be malls, libraries, et

17   cetera.

18    Q    Church is not one of those types of

19   uses --

20    A    No.

21    Q    -- under assembly places with fixed

22   seating?

23    A    No.

24    Q    And then, of course, we talked about

25   churches, cathedrals, and temples which fit under

1    churches and other places of worship?

2        A    Yes.

3        Q    So the applicable criteria to be placed on

4    a church or place or worship is the criteria

5    contained under that section as opposed to assembly

6    places with fixed seating?

7        A    Well, I guess what I was trying to say in

8    my answer is there are several types of assembly.

9    And one is in the general assembly discussion, and

10   the other is under churches, which are also an

11   assembly type but they're calculated separately.

12   Just as there is office general and there's office

13   medical, which are different.

14            (Discussion ensued off the record.)

15       Q    (BY MS. JONES) And it says, then you go on

16   to say in your answer to No. 13 down toward the

17   bottom of Page 13, allowing use of the post office

18   parking easement, although it would be practically

19   unavailable for much of the business day, is another

20   mitigating measure.

21       A    Yes.

22       Q    What evidence do you have that the post

23   office parking easement would be practically

24   unavailable for much of the business day?

25       A    The, at least the times that I have been

1    there, the post office parking area has been quite

2    full, but that's an observation.

3        Q    Did the City do any study of the

4    availability of the post office parking easement?

5        A    No.  And, of course, that varies,

6    depending on season and on day of the week and time

7    of day.

8        Q    Let me show you what's marked as

9    Plaintiff's No. 17.

10            (Document was marked for identification as

11       Plaintiff's Exhibit No. 17.)

12       Q    (BY MS. JONES) And this is produced by the

13   City, and it appears to represent the post office

14   parking with an area marked out on the left side of

15   the page.

16       A    Yes.

17       Q    Is that where you believe to be the post

18   office parking easement for the Church of

19   Scientology is?

20       A    That's my understanding.

21       Q    Is that a landscape island that's shown

22   between those parking spaces and the post office

23   parking lot?

24       A    Yes.

25       Q    Now, have you observed people during the

1   day using that area within that easement area for
2   post office parking?
3       A    I view that as an overflow area.  I don't
4   know when, if I see cars in there I don't know who
5   they belong to.
6       Q    It could be local people just using the
7   Church of Scientology's --
8       A    It --
9       Q    -- yard to park?
10      A    -- it could.  I'm, I mean I'm not, because
11  I would never know who belongs to any of the
12  vehicles in the lot.
13      Q    So when you say it would be practically
14  unavailable for much of the business day, you want
15  to limit that somewhat, that statement?
16      A    Well, I'm, I guess what I'm saying is the
17  business day would be the time period when it has
18  the potential to be unavailable.  Certainly after
19  hours when the post office is not open, that would
20  certainly be an available space.
21      Q    What does practically unavailable mean?
22      A    If it's not, if it's in use by someone
23  else it wouldn't be available totally or
24  partially.
25      Q    So practically means in practice --

1    A    Yeah.

2    Q    -- it would be unavailable?  And have you

3   noticed that practice?

4    A    I have seen cars in there.  I do not know

5   who they belong to.

6    Q    How many cars have you seen in that

7   particular area at any one time?

8    A    I don't recollect.  I've been past a

9   number of times, but I don't know that I could tell

10  you how many were in there.

11   Q    And the City made no effort to determine

12  whether post office patrons were using this easement

13  area?

14   A    The reality is that, that this was

15  calculated as part of the required parking for the

16  building.

17   Q    The post office, what time does the post

18  office close?  5:00?  6:00?

19   A    I believe it's 5:00, but I'm not

20  absolutely certain.  And I believe they open at

21  9:00.

22   Q    So they are closed in the evening.  They

23  don't stay open in the evenings, correct?

24   A    No.  I don't believe this one is open in

25  the evening.

1      Q      They close a half a day on Saturday?

2      A      I believe they're open in the morning on

3   Saturday but not in the afternoon.

4      Q      And they're not open on Sunday?

5      A      No.

6      Q      So during all those times there would not

7   be a conflict with the post office patrons in using

8   the easement area --

9      A      That's correct.

10     Q      -- for the church?  Now, you further say,

11  in addition, the City held a community zoning

12  information meeting on March 24th, '09 and a

13  community developer resolution meeting on

14  April 23rd, '09.  During these meetings mitigating

15  measures are discussed between all parties involved.

16  Who are you referring to?

17     A      Both the applicant and any interested

18  parties.  If we go back to my discussion about the

19  community zoning information meeting, the community

20  developer resolution meeting at the very beginning,

21  I discussed the fact that those, what we have before

22  the audience at the time that we're talking and who,

23  who was there and who was discussing and what issues

24  are discussed.

25     Q      And what were the mitigating measures

1  discussed?

2      A    The, I would have to go back and pull the

3  neighbors' comments from the summary that we did of

4  that meeting to see whether they raised any.  I

5  believe that in terms of mitigating the parking, I

6  don't recollect that either the applicant or the

7  neighbors presented any mitigating proposals.  At, I

8  was not at the community zoning information meeting,

9  but I was at the community developer resolution

10  meeting.  I don't recollect that either party raised

11  any mitigating proposals in that meeting for

12  parking.

13     Q    Let me clarify that last sentence of your

14  response to No. 13 where you say during these

15  meetings mitigating measures are discussed between

16  all parties involved.  And am I understanding you

17  correctly that that would generally be what would

18  happen, but you don't recollect whether that

19  happened or not?

20     A    No, I don't, I, I was, I can't tell you

21  what was discussed at the community zoning

22  information meeting because I was not there.  But I

23  was at the community developer resolution meeting,

24  and it is not my recollection from that meeting,

25  without going and checking the detailed notes, that

1    anyone on either side raised any mitigating measures

2    regarding parking.  The issue was raised, and the

3    issue was discussed; but no one mentioned any

4    mitigating measures in that meeting.

5         Q    So in what context was mitigating measures

6    discussed?

7         A    Well, there are all kinds of mitigating

8    measures that can occur in a zoning case.  As you

9    know, the impact of the use needs to be assessed

10   against the, the, the, against the surrounding uses.

11   And so there were discussions of traffic issues.

12   There were discussions of the, there was discussion,

13   significant discussion of parking issue.  There were

14   discussions about the maintenance of the building.

15   There were discussions about the landscaping on the

16   site.  Those off the top of my head I can remember,

17   and I, if I had the report I, there probably are

18   others.

19        Q    At some point the City and the church

20   negotiated alternate conditions to, to address the

21   parking on the site; is that correct?

22             MS. HENDERSON:  Object to form.  I'm going

23        to ask you to rephrase the question.  I don't

24        think that's a correct statement of what

25        occurred.

1      Q    (BY MS. JONES) Did the City and the Church

2   of Scientology or its representatives develop a set

3   of negotiated alternate conditions to address

4   parking on the site?

5           MS. HENDERSON:  I still object to the form

6        of the question.

7           MS. JONES:  What do you object to about

8        that form?

9           MS. HENDERSON:  The City, in order for the

10       City to take action in terms of agreeing to any

11       negotiation, the city council would be the

12       agency who would have to do that.  If you

13       rephrase it as city staff I'll have no

14       objection.

15      Q    (BY MS. JONES) Did the city staff and the

16   city attorney discuss negotiated alternate

17   conditions to the parking issue on the property?

18      A    Yes.

19      Q    I'm going to show you what's previously

20   been marked as Plaintiff's Exhibit No. 7.  And I

21   think I gave you this at the last deposition.

22          MS. HENDERSON:  I, I kept what you gave me

23       and didn't bring them back so I'll look on,

24       over Nancy's shoulder.

25          MS. JONES:  All right.

1        Q     (BY MS. JONES) Now, did you receive this

2   memorandum?  Or have you seen this memorandum

3   before?

4        A     Yes.  I signed it.

5        Q     That's your, that is your initials?

6        A     That is my initials, yes.

7        Q     I didn't even notice the initials.  And

8   what do you believe this memorandum to involve?

9        A     If I could reread it since it's been a

10  while.

11       Q     Sure.  Take your time.

12       A     Yeah.  This is the memo to the city

13  manager indicating that the city attorney and I were

14  forwarding a set of alternate possible conditions

15  for this property.  And since it was very late in

16  the process of the mayor and council taking this

17  case separate question and deferral, so that it

18  could go back to planning commission for their

19  consideration and counsel.

20       Q     Are the alternate conditions contained or

21  attached to the memo?

22       A     They are.

23       Q     And were these the alternate conditions

24  that the staff and the Church of Scientology crafted

25  in order to address the parking issues on the

1    property?

2        A    Yes.

3        Q    Now, did the staff accept these alternate

4    conditions as, did the staff accept these alternate

5    conditions as part of its recommendation?

6        A    The staff indicated these were alternate

7    conditions that would be acceptable to the staff,

8    but the staff did not change its recommendation.

9        Q    Did the staff recommend either the

10   recommended conditions that the planning staff

11   recommended or the alternate conditions --

12       A    Yes.

13       Q    -- for the approval of the rezoning?

14       A    Yes.

15       Q    So the staff was satisfied that either the

16   recommended, the planning staff recommended

17   conditions would be acceptable or the alternate

18   conditions would be acceptable?

19       A    Yes.

20       Q    Now, in Interrogatory No. 14, I'm going to

21   give you this back to look at your interrogatory

22   response.

23           MS. JONES:  You know, if you need to take

24       more aspirin, then just holler.

25           THE WITNESS:  I think it's --

1          MS. HENDERSON:  If we could go about

2      another 15 minutes and maybe take a lunch

3      break --

4          MS. JONES:  Lunch break, yeah.

5          MS. HENDERSON:  -- and let her rest her

6      head for a while.

7          THE WITNESS:  Yeah.

8          MS. HENDERSON:  That would be good.

9          MS. JONES:  Yeah.  I don't want you to be

10     sitting there miserable.

11         THE WITNESS:  No.  You'll just get the

12     answer that comes out when I have a headache.

13         MS. JONES:  Actually I was trying --

14         MS. HENDERSON:  I don't want the answer

15     that just comes out when her head hurts.

16         MS. JONES:  I was just trying to be nice

17     about that.  I don't want the answer that

18     comes out just because your head hurts

19     either.

20         THE WITNESS:  I'm sorry.  Okay.

21     Q    (BY MS. JONES) In your response to

22 Interrogatory No. 14 which asks you to identify

23 your, the question was to identify each harm or

24 detriment to the public health, safety, morals, and

25 welfare that the City contends would result from the

1   use of the property in accordance with the alternate

2   conditions as proposed by the staff.

3          The response was that the City, and I'm

4   looking at the fourth line, third line of the

5   response, the City of Sandy Springs has no effective

6   means of monitoring compliance with a condition that

7   limits occupancy to a level considerably less than

8   the building could comfortably hold.

9          I'm a little bit confused since based

10  on your testimony regarding these alternate

11  conditions you recommend, you could recommend

12  approval of the altered conditions.  There seems

13  to be in my mind a contradiction between this

14  response and the response of recommending approval

15  of the alternate conditions.  Could you explain

16  that?

17     A    Theoretically one can do what is in the

18  alternate conditions.  Practically speaking the

19  mayor and city council have indicated that they

20  don't have the resources to be able to do that

21  kind of monitoring.  It is extremely difficult to

22  monitor occupancy in any event.  Currently I have no

23  weekend code enforcement officers so it would be

24  very difficult if the activity occurred on the

25  weekend to be able to address the issue.

```
 1          In addition, it would be difficult for us

 2    to deal with this in the same way that we would deal

 3    with, say, a nightclub where we were asking that

 4    some of the people leave the room.  And this is a, a

 5    church.  And I'm not sure that that would be

 6    something that, that we would feel comfortable

 7    monitoring in that form.

 8        Q    Now, you approved the alternate, you

 9    recommended approval.  You didn't approve them

10    because you don't have that authority, but you

11    recommended approval of the alternate conditions

12    both with a occupancy cap of 283 persons and also

13    with an occupancy cap of 170 persons; is that

14    correct?

15        A    I know the 170.  I can't, I, the, the

16    issue about the two, 283 I can't exactly remember

17    those, the timing of those recommendations.  So

18    forgive me if I don't remember that.  However, I was

19    making my best effort to find a resolution to a

20    difficult case.  Because we did not have a problem

21    with the use of the facility as a church, it was

22    certainly my goal to find a, a solution that would

23    be mutually acceptable.

24          The difficulty is that in crafting those

25    conditions there are some implications that became
```

1    more apparent as we discussed the process.  And so

2    although one can do this, I don't have the resources

3    to do it at this time.  And that was where we ended

4    up on the case.

5        Q    You found it acceptable for the, for

6    the monitoring to be self-reporting; is that

7    correct?

8        A    Yes.

9        Q    Did you change your mind about that?

10       A    No.  The self-reporting is not an issue.

11   The difficulty here is if there is a matter of

12   noncompliance and a complaint, how it would be

13   handled.

14       Q    So if a neighbor complained --

15       A    Someone would have to go into the church,

16   count the people, and if the numbers were over --

17   and it's the total building; it's not just the

18   place of public assembly -- then we would have to

19   find a way to deal with that issue.  And I don't

20   believe that that is where the mayor and council

21   want to be.

22       Q    A citation could be issued, couldn't

23   it?

24       A    I would find it very difficult to issue a

25   citation to a church over an occupancy issue.  And I

1   think that it would be very difficult to determine

2   given that the, that this would be a 43,000 square

3   foot building with total occupancy in the total

4   building, it would require going through the total

5   building to determine whether or not that it was

6   overoccupied.

7        Q    You certainly would be able to

8   determine whether or not church members were parking

9   on the streets or in the neighborhoods; is that

10  correct?

11       A    If the parking, if, if the number of cars

12  exceeded the parking in the lot, that would

13  certainly be an indicator that there might be an

14  issue, but it doesn't deal with the issue of the

15  number who are in the building.  The only way to

16  determine the number in the building is to go and,

17  and actually figure out how many are there.  And

18  that would require that someone go through the total

19  building.

20            And then to figure out how we would

21  address the, the -- a citation could be issued, but

22  the reality is that if this is a, this kind of

23  issue, then normally one would try to have people

24  leave who go beyond that number.  But that's

25  something that would be pretty awkward and pretty

1    difficult, particularly in a church.  And I, I don't

2    think that that was where the mayor and council

3    wanted to be.

4        Q    Do you know of any instance in which the

5    City found that a church or place of worship was

6    overcapacity --

7        A    I'm not aware of any.

8        Q    -- at any one time?

9        A    I've never heard of it.

10       Q    How about the Buckhead Church?

11       A    I don't believe that -- by the time we

12   became a city and the issue arose, it pretty much

13   went away shortly afterwards.  So I, it never came

14   to us in that form.

15       Q    If a neighbor complained, the City would

16   send someone to check; is that correct?

17       A    Well, the difficulty is that the Buckhead

18   Church would have been a different situation because

19   the only limitation would be the certificate of

20   occupancy total numbers in the church.  If the

21   parking was just insufficient for the number in that

22   church assembly area, I wouldn't have any way of

23   dealing with that other than parking violations and

24   it be a police department issue.  And I don't know

25   because I, that was prior to the city, and I'm not,

1   not as familiar with it except for the complaints

2   about the parking.

3        Q    Does each church in Sandy Springs have a

4   certificate of occupancy?

5        A    Yes.  They would have received one at time

6   of completion of their building.  It might be old;

7   they might not have a copy of it anymore, but, yes,

8   they would have gotten one when they completed

9   construction.

10       Q    And does each certificate of occupancy

11  contain a capacity load?

12       A    It would because the fire -- on, on the

13  Sandy Springs certificates of occupancy, it goes

14  actually on the certificate because we have a common

15  CO which is signed by both the fire marshal and the

16  chief building officer.  And so it's a single CO,

17  and that is posted.

18            MS. HENDERSON:  And when you get through

19       the certificate of occupancy questions, then

20       can we take a break?

21            MS. JONES:  We can take a break right now,

22       and then I'm going to come back to certificate

23       of occupancy later anyway.

24            (A lunch recess was taken from 11:53 a.m.

25       to 1:09 p.m.)

1    Q    (BY MS. JONES) We were talking about COs

2    when we left off, and I had one more question about

3    COs.  What is the point of assigning a capacity load

4    for any establishment if the City cannot enforce it?

5    A    The capacity that is normally done is done

6    by the fire department, and the fire department

7    would, would handle the, the enforcement of that

8    provision under the fire code.

9    Q    How would they do that?

10   A    We would have to ask them.  They assign,

11   they do their own calculations, and, and that would

12   be the normal calculation that we would see.

13   Q    Who in the fire department would you turn

14   to for that sort of information?

15   A    It comes to us from either their inspector

16   or from the fire marshal.

17   Q    Who is the inspector?

18   A    Well, I'm not sure which one of them

19   actually turns the information in.  It could be

20   either Cheryl Walls or David Adams, or it could be

21   the fire marshal, and that would be Jeff

22   Scarborough.  But it is Jeff's signature that goes

23   on the CO.

24   Q    Let me show you an excerpt from the zoning

25   ordinance, and you can look at your own zoning