1    ordinance if you would like.

2         A    If you tell me where it is I'll --

3         Q    It's Article 28.  And I'm going to mark,

4    for purposes of reference I'm going to mark the

5    excerpt as 18.

6              (Document was marked for identification as

7         Plaintiff's Exhibit No. 18.)

8         Q    (BY MS. JONES) At some point the City

9    alleges that it could impose conditions of zoning

10   that would vary the required zoning set out in

11   Article 18.  Is that, is that this, is Article 28

12   what the City is using to, referring to?

13             MS. HENDERSON:  I'm going to object to

14        form.  I don't know what you mean by required

15        zoning.

16             MS. JONES:  Under Article 18 they

17        required, the required parking.

18             MS. HENDERSON:  Oh, you're talking about

19        parking, okay.  I heard required zoning.

20        That's why I --

21             MS. JONES:  I'm sorry.

22             MS. HENDERSON:  -- didn't understand the

23        question.

24             MS. JONES:  No.

25        Q    (BY MS. JONES) The required parking as, as

1    set out in Article 18, it is my understanding that

2    the City has alleged that they can use Article 28 to

3    vary those requirements set out --

4         A    No, I don't think --

5         Q    -- in Article 18.

6         A    -- I said vary.

7         Q    Okay.

8         A    I think I said impose conditions because

9    the, the quote that I read into the record at the

10   planning commission is "In approving any rezoning

11   petition and/or use permit request, the city council

12   shall impose conditions of approval as deemed

13   necessary and appropriate to mitigate potentially

14   adverse influences or otherwise promote the public

15   health, safety, or general welfare."

16        Q    And as it specifically refers to this

17   case, are you saying that the City can, cannot apply

18   Article 18's requirement for churches' parking and

19   instead impose its own conditions?

20        A    No.  I said, what I am saying is that if

21   the request causes impacts, then the City may impose

22   mitigating conditions.

23        Q    And those mitigating conditions may vary

24   the requirement of parking set out in section,

25   Article 18; is that correct?

1          MS. HENDERSON:  Let me object to the form.

2     You can answer to the extent you can.

3          THE WITNESS:  It meant that, that in

4     reviewing the application if the content of the

5     application leads us to believe that the

6     studies that, that underlie Article 18 are

7     inconsistent with the proposed use, then this,

8     then the City may impose additional conditions

9     to address the impacts of the proposed use.

10         Q    (BY MS. JONES) And would you please tell

11    me in what manner the proposed use of the Church of

12    Scientology building is in conflict with the use as

13    set out in Article 18?

14         MS. HENDERSON:  For what?

15         MS. JONES:  For parking.

16         Q    (BY MS. JONES) It's a church.  How is, how

17    is this church in conflict with Article 18's

18    examples of types of use and minimum requirements?

19         A    I'm not suggesting that it is in conflict.

20    I am suggesting that it does not fully reflect the,

21    the, what we were addressing.  So let me walk

22    through the logic of what, why I am suggesting this,

23    because it may be helpful.

24         The definition of a church in the zoning

25    ordinance is a facility in which persons regularly

1    assemble for religious ceremonies.  The studies that
2    have been done on churches and examining other
3    churches that have been before us, we find that the,
4    the place of public assembly is a, is a proportion
5    of the total square footage on the site, probably is
6    in the 30 to 40 percent range of the total because
7    there are a lot of accessory uses that go with
8    churches that are, that are part of what was
9    measured.

10           In this case the proposed place of public
11   assembly is 3 percent of the total square footage of
12   the facility.  And in examining that, it appears
13   that the predominant use is, in the building is not
14   assembly, and that was indicated by the applicant's
15   representative at the community developer resolution
16   meeting where he indicated that this facility does
17   not operate as many churches do.  And it is not to
18   suggest that this isn't a place, a, a religious
19   location but rather that the assembly portion of the
20   definition was not the major use on the property.

21           And, therefore, based on that, the staff
22   felt that there were, that there were, needed to be
23   an effort to mitigate the impact of a minimal
24   parking requirement on a building of 43,000 square
25   feet where the number of parking spaces was either

1  41 or 47 under the calculation.  I can't remember

2  which it is.

3      Q   Can you tell me where in the zoning

4  ordinance it uses the word predominant use for an

5  assembly?

6      A   It says assembly, place of assembly.  That

7  is the definition.  And in this building 3 percent

8  of the building is devoted to that place of

9  assembly.

10     Q   I'm not arguing with that.  What I want to

11  know is where can we point to in the zoning

12  ordinance that says the place of assembly has to be

13  any percentage?

14     A   If the zoning ordinance leaves to the

15  director the ability to interpret the ordinance and

16  predominant would be the, the key based on the

17  standards of most religious facilities, predominant

18  would then go to the, to the dictionary for, for

19  definition.

20     Q   But predominant is not in the zoning

21  ordinance.  Predominant is a word that you have

22  interposed into the analysis.

23     A   It is not --

24         MS. HENDERSON:  Objection to form.

25         THE WITNESS:  Predominant is, is an

1    indication that the largest use, single use on

2    most churches is the place of assembly.  And in

3    this case it is very minor.  And so by

4    measuring only the place of assembly, there is

5    a much larger portion of the building which is

6    unaccounted for which has activities that draw

7    people.

8        Q    (BY MS. JONES) Let me just make it real

9    plain so we have a simple sentence.  Do you find the

10   word predominant as applied to the minimum

11   requirements for churches and other places of

12   worship expressly mentioned in the zoning ordinance?

13       A    No.

14       Q    Do you find any place in the zoning

15   ordinance that fixes a percentage of usage in the

16   largest assembly area of a church facility?

17       A    No.

18       Q    Well, we're still on your City's

19   interrogatory response to Interrogatory No. 14 and

20   the statement is that the property is not served by

21   suitable transit.  Is the property on the MARTA

22   line?

23       A    It is.

24       Q    Where's the bus stop?

25       A    It's, I'm not sure if it's directly in

1   front of the building, but it's close.

2       Q     You say it is not anticipated that members

3   of the church will take the bus in significant

4   numbers based on traffic patterns at the existing

5   Dunwoody location.  Could you point me to the

6   traffic, the, where you got the information about

7   the traffic patterns at the existing Dunwoody

8   location?

9       A     The traffic patterns as opposed to the

10  parking patterns?

11      Q     Well, it just says based on traffic

12  patterns at the existing Dunwoody location.  So

13  traffic is the word.

14      A     Well, the, the, okay.  It probably should

15  have been parking patterns because the current

16  facility is, has significant parking issues with it

17  and, which is the reason there are, one of the

18  reasons that they were looking for an alternate

19  location obviously because they expect to expand the

20  facility, and we certainly encourage that.  But

21  that, the MARTA bus goes past only every 15 minutes

22  past this location, and there is no other transit

23  that serves it.

24      Q     But a MARTA bus does go every 15 minutes?

25      A     It does, uh-huh.

 1      Q     And who told you there were parking

 2   problems at Dunwoody?

 3      A     I believe we observed them and have some

 4   photographs of, of parking issues at the Dunwoody

 5   location.

 6      Q     Who made the photographs?

 7      A     I believe that one of our staff members

 8   did, but I'm not sure whether it was the planner or

 9   if we sent a, an officer over to do that.

10      Q     Do you know whether or not those

11   photographs have been provided to the church, or to

12   the plaintiff?

13      A     I'm not sure.

14      Q     Do you know the name of the staff member

15   who took the photos?

16      A     No, I don't.

17      Q     Where would the photos be kept?

18      A     Well, that's what I'll have to check.  I,

19   since I don't know who took them, I don't know where

20   they're kept.

21      Q     Were they placed in the zoning record?

22      A     It would have, I believe that it -- I

23   don't know.  I don't think so, but I'm not sure.

24   But we can check it.

25      Q     How many members of the Dunwoody church

1   take the bus?

2       A    That I don't know.

3       Q    How is the street location or the location

4   of the Dunwoody church similar to the location of

5   the Roswell Road church?  In terms of traffic flow.

6       A    I'm not sure that I know personally how

7   that, what the traffic flow is past the facility.

8       Q    Do you know what the traffic flow is past

9   the Dunwoody church?

10      A    That's what I'm saying, I don't know.

11      Q    Do you know what the traffic flow is past

12  the Roswell Road church?

13      A    I believe that the traffic engineer

14  indicated that we had something like 50,000 trips

15  per day, but I'm doing that from memory.

16      Q    Were you able to anticipate that members

17  of the Roswell Road church will take the bus in

18  significant numbers?

19      A    I don't believe there is any church in

20  Sandy Springs that currently has a predominant

21  membership, a membership which predominantly takes

22  the bus, even those which are located on bus lines,

23  which would include Roswell Road and also Peachtree

24  Dunwoody Road.

25      Q    How about the little Catholic church in

1   Campbell-Stone?

2        A    In where?

3        Q    Campbell-Stone Senior Living.

4        A    I'm unaware.  If there is a, a church

5   within Campbell-Stone it would be an, an accessory

6   use in effect to the facility.  And I would assume

7   that that serves the Campbell-Stone development.  If

8   you're talking about the mission on north,

9   Northland, I mean not north, but Northwoods Drive,

10  then that is the one place where I would expect we

11  have mostly walkers.  There's not, not a bus line

12  that reaches them because Northwood is, is, the, the

13  mission is close to Lake Forrest on Northwood Drive,

14  and that's a fairly long walk from Roswell Road.

15  But that, because there are apartments in the area,

16  that, that mission predominantly serves that walking

17  community around it.

18       Q    No, I was actually talking about the

19  Catholic church that they do a mass at

20  Campbell-Stone every Saturday afternoon.

21       A    Well, I assume that serves primarily the,

22  the residents of Campbell-Stone, and I don't believe

23  we have a, a use permit for that.  So I would view

24  that as an accessory use of Campbell-Stone.

25       Q    But you don't know whether it serves

1   Campbell-Stone residents primarily or if other

2   people are bused in or carpooled in?

3        A     No, I don't.

4        Q     In your response to No. 16, which asks for

5   each instance in which the City has denied a zoning

6   variance or building permit for a church, you list a

7   Lake Forrest Drive address, Mr. Hemsa Monfaird.  How

8   do you say his last name?

9        A     I don't recollect anymore.

10       Q     You know what I'm talking about?

11       A     I do remember the case, but I don't

12   remember his name.

13       Q     And why was that denied?

14       A     It was denied because he was not able to

15   bring that facility up to the standards of a place

16   of assembly.  It was, there were a whole series of

17   issues related to it.  It was on septic tank, and it

18   would have required sewer.  It would have required

19   placing parking on most of the, the residential

20   area.  He thought that he could keep a residence in

21   the building, but if he was using it as a place of

22   assembly it was going to be difficult if not

23   impossible to do it, and the cost was going to rise.

24   There were just a whole series of problems that

25   related to converting that to an assembly use that,

1    that he wasn't able to address.

2        Q    So once it was denied, that applicant went

3    away or didn't pursue anything else?

4        A    He, I have not seen anything, and I

5    believe the building is vacant right now.

6        Q    Want to just verify on your answer to No.

7    19, which was please identify each instance from the

8    beginning of Sandy Springs to the present in which

9    the City has been unable to enforce occupancy

10   restrictions placed on property within the city.

11   Are there any instances where the City has been

12   unable to enforce occupancy restrictions?

13       A    I'm not the person to ask on that because

14   the enforcer of most all of the occupancy

15   requirements is the fire department, and that would

16   have to come from them.

17       Q    You say to date the City has not received

18   a complaint of overcrowding due to zoning

19   restrictions --

20       A    That's correct.

21       Q    -- is that correct?

22       A    But fire code is a different issue, and

23   I'm not speaking to that.

24       Q    Interrogatory No. 20, I'm just not sure I

25   understand the response.  The question was please

1  identify each and every instance from December 31st,

2  2005 to the present in which the City has applied a

3  parking ratio other than one parking space for every

4  30 square feet or floor area or one, within the

5  largest assembly area within fixed seats or one

6  parking space for every 3.5 seats in the largest

7  assembly area, which is basically section, Article

8  18's requirement.

9       It's asking every church that the City has

10  not applied that requirement to.  And there are a

11  number of churches listed, but all except one is

12  requiring more spaces than the City requires, is

13  providing more spaces than the City requires.  So

14  what I want to --

15       MS. HENDERSON:  Why don't you let her look

16     at that.  And then if you can kind of simplify

17     that question, that would be helpful.

18     Q    (BY MS. JONES) You looked at it?

19     A    I looked at it.

20     Q    So basically what I'm understanding that,

21  that, the response to be is that all except one of

22  those churches provided more parking than was

23  actually required by the ordinance, Article 18?

24     A    Yes.

25       MS. HENDERSON:  I'm going to object.

1      Q    (BY MS. JONES) So the question I have is

2    are there any instances where the City, where the

3    City allowed less parking than required by the

4    ordinance?

5      A    Okay.

6      Q    And other than the congregation Beth --

7      A    Yeah.   Beth Tefillah.

8      Q    Tefillah.

9      A    The answer is that wasn't the question.

10   The question was where have we applied something

11   different than the standard.   And if the parking

12   that was proposed in the approved site plan for the

13   use provided more, then that was not one per 30 or

14   any, anything in the requirement.   It was more than

15   the requirement, and the City would have required it

16   because it was approved as a condition of zoning.

17     Q    So are you saying that 16 spaces provided

18   by -- who's your first one?

19     A    It, it doesn't list the, it just gives the

20   case number.

21     Q    But so it says required parking, 12

22   spaces, provided 16 spaces.   Are you saying for each

23   one of those that those, that larger number of

24   spaces was required as a condition of zoning?

25     A    What I am saying to you is that if a

1   proposal comes to the City in which they have a

2   proposed site plan showing how they're going to park

3   the site, which we need to review in order to ensure

4   that all the City standards are met, we, and there

5   is no, and they exceed the requirements of the

6   ordinance, we condition them to the site plan.  So

7   then they're required to meet, they're required to

8   do the site plan, and the site plan has the

9   additional parking in it.  And so, yes, it would be

10  required.

11      Q    Let's go back a step.  I understand that

12  if you condition a rezoning to a site plan and the

13  site plan shows 16 spaces, then they have accepted

14  that as a condition of zoning.

15      A    That's correct.

16      Q    What I'm curious about is any instances in

17  which the City has of its own conditioned the zoning

18  on parking to be provided in excess of Article 18

19  requirements.

20      A    The answer is that isn't what I researched

21  because that wasn't the question.  So I can't give

22  you an answer to that without researching that.

23      Q    Well, I will ask you to research that and

24  give me an answer because I, it must have been an

25  inaptly stated question.  It was plain to me, but.

1   That's why this is like reading the Bible.

2        A     It is.

3        Q     Also the City submitted initial

4   disclosures.  And in these initial disclosures the

5   City identified -- let's see.  I'll find it.  This

6   is why I can't set up my DVD player.

7             MS. HENDERSON:  Sounds like a personal

8        problem.

9             MS. JONES:  It is.  It is.

10            MS. HENDERSON:  I have similar personal

11       problems.

12       Q     (BY MS. JONES) In your initial

13  disclosures, No. 5, you were asked to provide the

14  name, address, and telephone number of each

15  individual likely to have discoverable information

16  that you may use to support your claims or defenses

17  unless solely for impeachment identifying the

18  subjects of the information.  I didn't make that

19  question up.  That's federal court.  The federal

20  court made that question up.

21            But anyway, you listed a number of people

22  that you believe have discoverable information that

23  the defendants may use to support their claims or

24  defenses.  First, you listed Deborah Danos of the

25  Church of Scientology.  I don't need to ask you

1  about what information she has.  And you list
2  yourself.  What information, and then you list all
3  these other people that I'm going to just ask you
4  about individually.  What information does Patrice
5  Ruffin have that you were unable to provide today in
6  response to any of the questions?
7       A    She might have more detailed responses in
8  some issues than I do because she would have been
9  closer to the preparation of the case.
10      Q    And what, which --
11      A    I don't know that I can tell you precisely
12 which items, but I listed her because she has, she
13 worked directly on the case and would have been
14 involved in its preparation and gathering of
15 information.  And so she may have information that,
16 that I didn't have personally.
17      Q    And one of the reasons why I'm asking this
18 is I'm trying to determine if I need to take these
19 various people's depositions.
20      A    I understand.
21      Q    So you can streamline the process if you
22 can.
23      A    Well, if you go through the names first I
24 may be able to go back then and help you.
25      Q    We have Chris Miller.

1    A    Chris is my deputy director.  I think it's

2  less likely he is going to have any information

3  that, that, that, that I don't have and that Patrice

4  doesn't have.

5    Q    Linda Aberay.

6    A    Linda was the case planner.  She certainly

7  might have information, detailed information on what

8  she did.

9    Q    Would Patrice or Linda have written

10  information that would not be in the zoning file?

11    A    No.

12    Q    Zasar Geraldo?

13    A    Zasar is the zoning administrator, and I

14  mentioned to you that he also reviews these items;

15  but I believe that either Patrice or Linda would

16  probably have most of the, any additional

17  information that I don't have in, in the zoning

18  division.

19    Q    Mark Moore?

20    A    Mark Moore you've already deposed, and

21  he's the traffic engineer.  So I think you probably

22  know which information he has.

23    Q    Did you have any discussions with Mark

24  Moore when you were working on the alternate

25  conditions regarding the feasibility of the

DEB PUCKETT & ASSOCIATES

1   alternate conditions?

2       A    I don't believe there were any traffic

3   issues that were involved so, no, I would not have.

4       Q    Terry Robinson?

5       A    Terry is the person who actually manages

6   the, the council meetings, but I don't believe he'll

7   have any specific information that, that you might

8   need.

9       Q    Joslyn Stevens?

10      A    Joslyn is the administrative coordinator,

11  and she also may have done some of the transcribing

12  of some minutes; but I don't believe she would have

13  any information over and beyond the first two.

14      Q    And Doug Tretton?

15      A    Doug Tretton is another planner, but Linda

16  would have been the point on this case.

17      Q    John McDonough.

18      A    John McDonough is the city manager.  I

19  doubt that he has any information beyond what we

20  have.

21      Q    You listed the planning commission

22  members.  Do the planning commission members possess

23  any information that you know of that was not

24  presented to them in the planning commission

25  hearings?

1      A     I don't believe they would have any

2  information that was not either presented them, to

3  them by us or is in the public record.

4      Q     Now, you listed public citizens that

5  expressed either support or opposition to the City

6  at the relevant planning commission meetings.  I

7  understand that these individuals may have some

8  knowledge that, or some that, that may lead to

9  discoverable information.  What I want to know is

10  specifically out of these people you listed do you

11  know of that knowledge, and I'll let you look at

12  that.

13      A     And let me look at that and I can, there

14  are one or two that may, may be.  I can't remember

15  the names.

16          MS. HENDERSON:  I will stipulate for you

17      that in putting that list together if we found

18      a name in the record, we put it on the page.

19          MS. JONES:  I figured that.  I just want

20      to make sure that there's not somebody sitting

21      out there with a treasure chest full of stuff

22      that I need to know about.

23          THE WITNESS:  What I cannot remember, so

24      I'm going to tell you that we'll get you the

25      name, I'm sure it's in here, is the architect

1      that lives, I believe, in Round Hill

2      Condominiums that commented on the, the

3      building plans and the square footage.  But I

4      don't remember his name, but I'm sure that I

5      can go back and we can figure that out.

6      Q    (BY MS. JONES) Was it Mr. Holland?

7           MS. HENDERSON:  I don't remember his name

8      either.

9           THE WITNESS:  I mean I, if you told it to

10     me I don't think I would recognize it, but I

11     can find out.

12     Q    (BY MS. JONES) Well, to what extent did

13     the City -- Hubbell, it was Mr. Hubbell.

14     A    It may be Mr. Hubbell.

15     Q    He had quite a bit of correspondence in

16     the, in the record that we received.  How does the

17     planning department or the staff use information

18     from citizens who either support or oppose a

19     rezoning?  What do you do with that information when

20     it comes in?

21     A    Well, most, I mean if, there are a couple

22     of things that happen.  If somebody raises a

23     question, then we determine whether it is relevant

24     to the case or not.  And if it is, then we try to

25     address it or to get information from the applicant

1   to address it.  If they have a technical review, and

2   I believe in this case Mr. Hubbell did and

3   questioned the square footage of the building that,

4   the information that was presented, then we try to

5   verify whether that is indeed true or not.

6        Generally we would go to the applicant and

7   ask them to verify for us whether what he is

8   alleging is, is true or not and get some information

9   to get a corrected piece of information.  He was

10  raising the issue because the square footage

11  contributes to the parking requirement so obviously

12  it was relevant to the discussion.  So the answer is

13  if they raise questions that seem appropriate to the

14  kinds of considerations that the City would take on

15  a rezoning case, then we would examine them and try

16  to get additional information on them and, and

17  address them as part of the case.

18        If it is something that, where we need

19  additional information from the applicant, we go

20  back to the applicant and request that they provide

21  us with that information.  And I believe both of

22  those happened in, in this case, depending on who

23  brought the, the issues forward.  But the piece that

24  I think is probably most relevant to your question

25  about information as opposed to questions would be

1   the architect who raised questions about the square

2   footage of the building.

3       Q    How about the questions raised by

4   Mr., Mr. Dogrell?

5       A    He, well, he raised technical questions as

6   well.  I mean I, he came in very late in the

7   process, and so I'm not sure.  The, most of the

8   discussion had occurred before he came into the,

9   into this so I guess I forgot about that.

10      Q    Oh, he's not on this list either, so.

11   Just --

12      A    You can add him to the list.

13      Q    But basically when these questions are

14   raised, you make an attempt to verify what the

15   answer is?

16      A    If it is relevant to the case.  I mean I,

17   you know, obviously issues get raised that aren't

18   related to the rezoning of the property.  And if

19   they don't relate to a relevant issue that we need

20   to address, then we may not deal with it.  But if it

21   is relevant to our review, then we would ask a

22   question and try to get an answer to it.

23      Q    Well, I remember I was at the hearing and,

24   and in reviewing all of this there was an issue

25   raised about -- where did it go?  It was in Article

1    19, off-site parking.

2         A    Yes.

3         Q    And here it is, Article 19.

4         A    Uh-huh.

5         Q    This is going to be --

6              MS. HENDERSON:  This will be 19.

7              MS. JONES:  Nineteen, how appropriate.

8              (Document was marked for identification as

9         Plaintiff's Exhibit No. 19.)

10        Q    (BY MS. JONES) Again, this is an excerpt

11   from the zoning ordinance.  And there was a

12   requirement on 19-3-6-1B --

13        A    Two.

14        Q    -- 2 that requires that no more than

15   20 percent of the total parking requirement may be

16   provided off site via an administrative permit that

17   is allowed under this article.  I believe that that

18   issue was raised by Mr. Dogrell at the hearing.

19        A    It was.

20        Q    And my recollection is that no one really

21   had an answer to that question.  And so I'm asking

22   you how, if it does, does this code section apply to

23   the instant application.

24        A    We evaluated this relative to the fact

25   that the, it had been previously approved as part of

1   the, this building and determined that in this case

2   it was a preexisting parking area that was approved.

3   And, therefore, we allowed it to go forward even

4   though it exceeded the 20 percent.

5       Q     And when you say it, you're talking about

6   the --

7       A     Yes.

8       Q     -- post office easement?

9       A     Yes, uh-huh, that's correct.

10      Q     Would you agree that if Article 18.1,

11  parking requirements for churches and places of

12  worship, were literally applied to the largest

13  assembly area of the Roswell Road building that they

14  have more than enough parking spaces --

15          MS. HENDERSON:  Objection.

16      Q     (BY MS. JONES) -- to meet that

17  requirement?

18          MR. DILLARD:  You can answer to the extent

19      you can.

20          THE WITNESS:  The, the, the parking would

21      be sufficient for the place of assembly and the

22      related accessory uses under that provision.

23      Q     (BY MS. JONES) Because you would multiply

24  3.5 times 12 or 1300?  I can't remember --

25      A     It varied, yeah.

1     Q    They kind of used it a little bit --

2     A    Interchangeably, yeah.

3     Q    -- interchangeably.  Okay.  That doesn't

4 mean I'm through.  That's just, okay.  And then

5 Crystal Williams, what kind of information might she

6 have that -- she just wrote an emergency services

7 letter; is that correct?

8     A    I believe so.  I think that's who that is.

9     Q    So would she have other information --

10    A    No.

11    Q    -- that would be discoverable?

12    A    No.  They're just, we provided you with

13 everyone we knew.

14    Q    So Doug Smith, who wrote the Bureau of

15 Drinking Waters comment, and James Buchan, who wrote

16 the DOT comment, and Monica Robinson, who wrote the

17 Fulton County Environmental Health Services comment,

18 all of their, all of their knowledge would be

19 contained in their comments that they submitted?

20    A    I believe so.

21    Q    Now, I think we've got one more leg of

22 this journey.

23        MS. HENDERSON:  You want to take a quick

24    break first?

25        MS. JONES:  Sure.

```
1              (A recess was taken from 1:51 p.m. until
2       1:57 p.m.)
3        Q     (BY MS. JONES) I'm going to show you, and
4    this is a quicky here, what's previously been marked
5    as Plaintiff's Exhibit 3 and ask you if you
6    identify, if you have seen these photographs before.
7              (Discussion ensued off the record, and
8       Mr. Dillard left the proceedings.)
9        Q     (BY MS. JONES) We're looking at --
10       A     Yeah.
11       Q     -- Plaintiff's 3.
12       A     Yeah.  I've, I've seen these before.
13       Q     Do you know who took these pictures?
14       A     I do not recollect who took them.  I had
15   someone go up, but I don't know who it was that took
16   them.
17       Q     But these pictures were taken by the City?
18       A     Yes.
19       Q     Or for the City.  And what was the purpose
20   of the pictures?
21       A     Just to make sure that we had appropriate
22   photographs of both the subject property and
23   surrounding properties.
24       Q     Did you give specific instructions of what
25   you wanted the photographs of?
```

1      A      Well, normally we, we photograph what, the

2   subject property and the surrounding properties so

3   that we have a record of that.  And so that appears

4   to be what, what was done.

5      Q      I see what appears to be several

6   photographs of the street.

7      A      Yes.

8      Q      Was there some specific item you were

9   looking to memorialize by photographing the street?

10     A      No.

11     Q      Do you generally make photographs of the

12  street in front of properties to be rezoned?

13     A      We would normally photograph the, the

14  property and the area around it, which may include

15  the roadways.  And I lean to the person in the field

16  to make a judgment on what they think is

17  appropriate.

18     Q      I am looking at the one that's marked

19  R000505.

20     A      Five oh five?

21     Q      The third one in.

22     A      Yes.

23     Q      Fourth one in.

24     A      Yes.

25     Q      Which way am I looking there, north or

1   south?

2       A    I have to orient myself to see here.  It

3   would appear -- I'm not sure.  I, I see the light.

4       Q    Do you think that's that light up there

5   where that horrible intersection is where you turn

6   onto Glenridge?  No, that wouldn't --

7       A    No, it's not.  It, that's, the turn lane

8   is incorrect for that and the building on the left

9   isn't clear.  This may be going -- I'm not sure.  I,

10  speculating isn't very helpful.

11      Q    So you don't know?

12      A    I'm not sure where, where that one is,

13  yeah.

14      Q    Although the first photograph --

15      A    Is on Glenridge.

16      Q    Is on Glenridge?

17      A    Uh-huh.  Yes.  That's the post office on

18  the left and the condos on the right.

19           (Mr. Dillard returned to the proceedings.)

20      Q    (BY MS. JONES) That's that.  Now, I've got

21  this series of staff reports.  So this is your opus

22  here that I want to ask you about.

23           MS. HENDERSON:  This is a Bible, isn't it?

24           MS. JONES:  Yeah.

25      Q    (BY MS. JONES) Well, I have to say I'm

1  impressed by the volume of staff documentation.

2  You actually change your staff report each time or

3  you --

4      A    Well, you make the change --

5      Q    -- date it and --

6      A    Yes.  If, if, if it's being deferred for a

7  reason and you don't respond to the reason, then you

8  haven't done your job, so.

9      Q    What I'm looking for is my notes to myself

10  about this.  Here we go.  Let me show you what has

11  already been marked as Plaintiff's Exhibit No. 2,

12  get you to identify that.

13          MS. JONES:  And I think that I gave my

14      third copy to you last time, Laurel.

15          MS. HENDERSON:  You did.

16      Q    (BY MS. JONES) You have identified it?

17      A    Oh, I'm sorry.  I'm sorry.

18      Q    You were waiting for me; I was waiting for

19  you.

20      A    I'm, I'm trying to identify it so let me,

21  give me just a moment here.

22      Q    No.  Go right ahead.  Take your time.

23      A    Yes.  I believe, well, this is one of the

24  versions of what we prepared.  And it would appear

25  that this was going to the mayor and city council

DEB PUCKETT & ASSOCIATES

1    hearing on June 16th.

2         Q    We're not looking at the same thing.

3         A    That's what I, I'm looking at the report

4    and the report says --

5         Q    Here is what I think it is, and let me

6    just ask you if that makes sense because as you get

7    past that first page that says prepared for the

8    planning commission hearing on September 18th, 2008,

9    at the bottom of Page 146, which is your --

10        A    Yes, uh-huh.

11        Q    The rest of the pages say prepared for the

12   planning commission on May 21, 2009.

13        A    They do and --

14        Q    And that would be the planning commission

15   date that's listed up here at the top.

16        A    Yes.  And that appears most likely, given

17   that I have the, the following council version and

18   it is not exactly the same, I agree.

19        Q    So we would agree that it was prepared for

20   the May 21st, 2009 planning commission hearing?

21        A    I agree.

22        Q    In that staff report, and I'm pointing you

23   to Page 153, or when I say page I mean that

24   reference 153.

25        A    Yes.

1    Q    Would you agree that the staff analyzed

2    the parking impact using the aggregate of the uses

3    in the building?

4    A    That's correct.

5    Q    The staff did not apply Article 18,

6    parking requirements, to this particular zoning

7    application --

8         MS. HENDERSON:  Objection.

9    Q    (BY MS. JONES) -- is that correct?

10   A    At this time.  At this time.

11   Q    And then you turn to the next page.  Did

12   the staff assume in using this aggregate of the uses

13   in the building 100 percent use of the entire

14   building at one time?

15   A    The staff assumed that the uses were

16   devoted as indicated in the table and applied the

17   parking standards to those uses.

18   Q    So the staff assumed that the sanctuary,

19   the classroom, and the offices would all be used at

20   the same time; is that correct?

21   A    The staff certainly assumed that the

22   classroom and the, classrooms and the offices might

23   be used at the same time.  It is the staff's

24   responsibility to prepare an analysis of the full

25   use of the building and not a partial use of the

DEB PUCKETT & ASSOCIATES

1   building and, therefore, the staff would assume full

2   use.  The sanctuary's a relatively small part of

3   that, and so it didn't have a significant impact on

4   the parking.

5        Q    But it was also assumed to be used at the

6   same time as the classrooms and the offices, right?

7        A    Based on the, the applicant's discussion

8   of the use of the building, that is what the staff

9   assumed.

10       Q    Now, when the staff did its analysis of

11  the Lutheran church at Hammond Drive and Glenridge,

12  did it use this same parking analysis as it has used

13  for the Church of Scientology building?

14       A    No, it did not.

15       Q    It did not break down the uses and add

16  them up?

17       A    That's correct.  And the representative of

18  the church didn't indicate that this was the way the

19  facility was going to be used.  The staff was

20  responding to the information from the applicant in

21  preparing this.

22            (Mr. Dillard left the proceedings.)

23       Q    (BY MS. JONES) Then on Page 156 it looks

24  like you got, on the top of 156, one, one, two,

25  three, four department comments are noted, and the

1   transportation department only commented on

2   right-of-way dedication and right-of-way

3   reservation; is that correct?

4       A    That's --

5       Q    Sandy Springs transportation.

6       A    That's correct.

7       Q    And there was no concern noted by the

8   transportation department about traffic flow in the

9   area of the building?

10      A    I'm not sure that I understand your

11  question.

12      Q    Mr. Moore is the Sandy Springs

13  transportation planner?

14      A    Yes.

15      Q    And his report, his departmental comment

16  did not include any concerns about the flow of

17  traffic on Roswell Road or Glenridge in terms, yeah,

18  in relation to the use of the Church of Scientology?

19      A    Can I recraft what I think you're asking

20  me so that I --

21      Q    Please.

22      A    Are you asking me whether he believed

23  there would be an impact of this use on the traffic

24  flow on those roads?  Because if you are asking me

25  what the, what, for him to comment on the traffic on

1    those main roads, that would not be a comment that

2    we would get on the case.

3         Q    All I'm asking you is he did not make any

4    comment?

5         A    He did not talk about the impact of this

6    use on the traffic on the traffic on the main line

7    because he indicated --

8              (Discussion ensued off the record.)

9              THE WITNESS:   -- because he, there was no

10             indication that there was, was, that there

11             would be any issue related to this use over

12             using the roadway where there would have to be

13             additional project improvements on the project

14             to serve this case.

15        Q    (BY MS. JONES) I'm looking at the comments

16   that were made by the public.  And on Page 156 the

17   public commented that the City is not able to

18   collect taxes on a church.

19             (Mr. Dillard returned to the proceedings.)

20        Q    (BY MS. JONES) And it, and then there's a,

21   like a little hyphen, and it's in italics, true.  Is

22   the true in italics the City's comment to the public

23   comment?

24        A    It is the staff's response to the public

25   comment.

1    Q    And to what extent does the ability to

2    collect taxes on a church use impact the City's

3    willingness to rezone a piece of property for use as

4    a church?

5    A    Well, I can't speak to the mayor and city

6    council, but it is not a standard that the staff

7    addresses.  However, if an issue is raised in a

8    community meeting, it is best to respond to it with

9    whether or not that is a, a true statement or not.

10   And so that's what we did.

11   Q    And then the amount of money raised for

12   the project, is that a relevant factor for the staff

13   to consider?

14   A    No.

15   Q    Then on Page 158 the staff concluded that,

16   at the end that the entire 43,246 square feet could

17   be recommended for approval by staff if applicant

18   can demonstrate that the on-site parking will be

19   sufficient to meet the full use of the proposed

20   building, including the expansion through either a

21   parking study or shared parking analysis.  Did the

22   applicant provide a parking study or a shared

23   parking analysis?

24   A    There was no shared parking analysis

25   because the, the proposed shared parking already

1    However, we did indicate that we wanted to make sure

2    that, that we were dealing, we were dealing with a

3    fully occupied building.  We wanted to understand

4    how others operated, and we wanted to see the

5    factors that might play into how they, they dealt

6    with the issue of people getting to the site.

7         Q    Did you have any, any concerns about the

8    choice of Kimley-Horn to do the traffic study for

9    the plaintiff?

10        A    No.  They're a, a well-respected firm.

11        Q    I think you might have said this, I'm not

12   sure, but is the use of the building consistent with

13   the future land use plan of Sandy Springs?

14        A    Yes.

15        Q    What kind of variance, and I'm looking at

16   Page 158 where you reference, reference a variance.

17   It's in the No. F.  It says staff recommends the

18   total building area be limited to 32,053 square feet

19   unless the applicant receives a variance from the

20   minimum parking requirements or can demonstrate a

21   reduction as warranted due to the operation of use

22   such that parking spaces could be shared.  What kind

23   of variance from parking requirements would be

24   available to the church that, that you're talking

25   about here?

1    A    It really, it would require a study that,

2  that show us that, that the, the parking could be

3  accommodated for the full use of the building.  And

4  the staff has to anticipate the full use of the

5  building.

6    Q    As it's laid out in this chart?

7    A    As the applicant desires to use the

8  building.  Our request was, our effort was to

9  understand what was being done in the building.

10       The applicant indicated in the community

11  developer resolution meeting that this didn't

12  operate like many other churches, that it was, that,

13  that the main function was not a place of assembly

14  on Sunday morning and that the largest accumulation

15  of people on the site might not occur during that

16  time period but rather that that was a smaller piece

17  and that the, the, the, the piece that, that

18  involved the, the studies and the rotations through

19  the rooms, et cetera and the counseling was a, a

20  very, very important part of this.

21       And the staff was making an effort to try

22  to address how this church operated in terms of the

23  numbers of people there.  It was not something we

24  understood to start with, and so our continuing

25  efforts were to better understand exactly how the

1  building functioned so that we could understand how

2  to deal with the question of whether or not there

3  was enough parking.

4      Q    If indeed you were satisfied with the use

5  of the building, what kind of variance would be

6  available to alter the requirement, to reduce the

7  requirement for parking?

8      A    It would be something that the director

9  could sign off on at least initially, and then if

10 the applicant was not satisfied with that, they

11 could carry it to the board of appeals.

12     Q    Is there a percentage limit on the

13 director's authority to sign off on a variance?

14     A    Well, in this case it would be, it would

15 be a condition of zoning.  So it would be an

16 interpretation of what would be required under a

17 condition, and then it would be an appeal of the

18 director's opinion to the board of appeals.

19     Q    If the church agreed with the director but

20 somebody else disagreed with the director, then --

21     A    Then my lawyers would have to tell me

22 whether the neighbors can appeal or not because I

23 don't know whether they have standing.

24     Q    Well, how about if the board of appeals

25 wanted to sue itself?

1    A    Well, they could do that.  Or we can sue

2  them, right?

3          MS. HENDERSON:  Apparently so.

4          MR. DILLARD:  Absolutely no question about

5      it.

6          (Discussion ensued off the record.)

7      Q    (BY MS. JONES) Let's look at Plaintiff's

8  Exhibit No. 20.

9          (Document was marked for identification as

10     Plaintiff's Exhibit No. 20.)

11     Q    (BY MS. JONES) Hand that to you.

12         MS. HENDERSON:  You want to keep the one

13     with your flags on it?

14         MS. JONES:  Oh.  Yeah.

15     Q    (BY MS. JONES) And is this the staff

16  report prepared for the city council meeting for

17  June 16th, 2009?

18     A    Yes, it is.

19     Q    And your comment on Page 177 was that

20  because the sanctuary is not proposed to be the

21  largest portion of the building, the lack of parking

22  could cause an excessive or burdensome use of the

23  existing infrastructure?

24     A    The --

25         MS. HENDERSON:  One seventy-seven.

1          THE WITNESS:  Oh, one seven -- I'm sorry.

2     I'm on 176.  That's why I can't.

3     Q     (BY MS. JONES) Bottom of 177.

4     A     Okay.  Yes.

5     Q     And the excessive or burdensome use you're

6     talking about is your concern that the attendants to

7     the church would park on private property or on the

8     streets?

9     A     No, it's not -- well, let me qualify that.

10    If they could park on other private property, I

11    don't believe that there is a public street, at

12    least not a major public street that they could park

13    on.  But if people were trying get into the parking

14    lot and they could not get in and the traffic backed

15    down onto Roswell Road, it could back up the traffic

16    there and cause accidents.

17    Q     And if the people parked on private

18    property, other private property other than the

19    church property, they would be trespassing, wouldn't

20    they?

21    A     I would consider it that.

22    Q     And they could be charged with

23    trespassing?

24    A     If the property were posted.

25    Q     Would that be something that the church

1    could do would be to offer to post nearby properties

2    so that --

3        A    I think they would have to have that

4    conversation with the property owners.  That

5    wouldn't be something that I would, would know

6    about.

7        Q    Was that discussed at all?

8        A    That was never raised by the applicant.

9        Q    Was it raised by the City?

10       A    No.  The, the, the City requires that the

11   parking on site be sufficient to meet the needs of

12   the facility.  So it was not the staff's position

13   that we needed to assist someone in parking, in

14   required parking on other properties.  And I'm not

15   aware of any facilities other than the post office

16   that have excess parking in the area, with the

17   exception of The Prado, which may not have any

18   excess parking for very long.

19       Q    They wish.

20       A    Well, we have an application in to --

21       Q    Oh, good.

22       A    -- address the back property.

23       Q    Good.  So on, in this June 16th, 2009

24   report the staff recommended approval of the

25   rezoning application limited to the 32,053 square

DEB PUCKETT & ASSOCIATES

1   feet density and other conditions that are on Page

2   179 and 180?

3        A    Yes.

4        Q    Show you 21.

5             (Document was marked for identification as

6        Plaintiff's Exhibit No. 21.)

7        Q    (BY MS. JONES) I'm going to show you

8   what's been marked as Plaintiff's 21.  Is this the

9   planning commission, was this the report prepared

10  for the planning commission meeting July 16th, 2009?

11       A    Yes, that's what it appears.

12       Q    At that point you had a parking study of

13  the Nashville facility and the Dunwoody facility; is

14  that correct?

15       A    Well, I'm looking to see.

16       Q    Okay.

17       A    Yes.

18       Q    And what conclusions did the staff reach,

19  having reviewed the parking study from Nashville and

20  Dunwoody?  I'm looking on Page 253.

21       A    Yes, I am too.

22       Q    Okay.

23       A    I think we continued to conclude that

24  there would not be enough parking for the 43,000

25  square foot facility but the 32,000 square foot

1   facility could be accommodated.

2       Q    How did you come to the conclusion based

3   on the Nashville study, how did you use that study

4   to come to your conclusion?

5       A    Well, the Nashville study was a little bit

6   difficult to deal with because the, the building had

7   only been in occupancy for six months.  It, we could

8   not tell how much of the building was actually

9   occupied.  The parking ration in Nashville was three

10  spaces per thousand square feet, which was

11  essentially consistent with what, what is currently

12  provided on the existing site with the 32,000 square

13  foot building.  And, but that wouldn't support the

14  43,000 square foot building.  That would support a

15  32,000 square foot building in our opinion.

16      Q    You said the parking ratio for Nashville

17  was three per thousand square feet?

18      A    Yes, ma'am.

19      Q    And was that derived by dividing the

20  number of square feet in the Nashville building by

21  114 spaces?

22      A    I believe it was.  And I, it may have been

23  in the report.  I can't remember because I read the

24  report a long time ago.

25      Q    Did the Nashville ordinance require that

DEB PUCKETT & ASSOCIATES

1   ratio, or was that just derived from the actual

2   number of spaces ratio to the square footage of the

3   building?

4       A    I don't believe that they gave us that

5   information.  I don't believe they told us whether

6   it was required in the ordinance or not.

7       Q    Were all of the 114 spaces being used when

8   the study was done?

9       A    I, they were not, but I don't know what

10  proportion of the building was occupied either.  So

11  I couldn't, it, it didn't tell me what I needed to

12  know.

13      Q    Did it have any kind of breakdown of

14  spaces used in the building for different

15  activities?

16      A    It didn't tell me how close to full

17  occupancy the building was.  And without knowing

18  what proportion of the full occupancy they were at,

19  I couldn't tell how close they were on the parking.

20  If half the parking were used and the building was

21  about at half of what would be expected, then I

22  would have something that I could deal with, but I

23  didn't have that information.

24          (Discussion ensued off the record.)

25      Q    (BY MS. JONES) So basically you said

DEB PUCKETT & ASSOCIATES

1   Nashville ratio was three spaces per thousand square

2   feet of building space, which would require, and

3   then if you applied that to Sandy Springs' three

4   spaces per thousand feet of building space, Sandy

5   Springs would need 130 spaces, is that?  That's the

6   middle of the second paragraph of parking and

7   traffic impact analysis.

8        A    Yes.  If, if you were going to the 43,000

9   square foot building, yes.

10       Q    So you would require 130 spaces.  If we

11  have 111 spaces, which you said the site currently

12  has 111 spaces?

13       A    Yes.

14       Q    That's the Sandy Springs site.  If you

15  divide the number of square feet of the building by

16  111 spaces, don't you get more than 32,053 square

17  feet?

18       A    It didn't seem to make a great deal of

19  sense to try to deal with enclosing only a portion

20  of the garage unless I had information that led me

21  to believe that could be done.  It would have

22  allowed some additional square footage, but I don't

23  know that I had enough information to know whether

24  we could do that or not.

25       Q    So you didn't exactly apply the Nashville

1  ratio to the building?

2      A    I didn't have enough information to, to do

3  that.  We would have been happy to do it had we

4  known it was possible, but I didn't believe that

5  enclosing a portion of the garage -- well, for one

6  thing because enclosing a portion of the garage, I

7  wasn't sure how many parking spaces I was going to

8  lose.

9          I hadn't at that point had an opportunity

10 to go in to see whether all of the basement was

11 actually parking garage or whether there was some

12 building and storage area in addition.  So I really

13 couldn't address exactly how to do that garage.  So

14 at that point we, we went between the existing and

15 the proposed, and we didn't try to find a middle

16 ground.  Had we had more information, we might have

17 been able to.

18     Q    Do you know what the planning commission

19 did with that night, July the 16th?

20     A    I'd have to go check their action.  I'm

21 sure it's going to say.

22     Q    One of these has it.

23     A    The planning commission recommended

24 approval subject to the staff's conditions, so the

25 32,000 square feet.

DEB PUCKETT & ASSOCIATES

1      Q     Let's look at No. 22.

2            (Document was marked for identification as

3      Plaintiff's Exhibit No. 22.)

4      Q     (BY MS. JONES) This is your punishment for

5   being so thorough.

6      A     I know.

7            MS. HENDERSON:  No good deed goes

8      unpunished, does it?

9            THE WITNESS:  That's right.

10     Q     (BY MS. JONES) And this appears to be --

11  wait a minute.  This goes on the back of that.  Now,

12  I want to say that Pages 19 to 22, I did not find

13  them attached to my Bates stamped copies, but they

14  were attached to the copy we had in our file.  So I

15  don't know if they just inadvertently did not get

16  stamped or got separated or --

17           MS. HENDERSON:  I don't know because

18     unfortunately when the stuff comes to my office

19     I get a big pile of unstapled papers, and I

20     make the best sense of it I can.  So I don't

21     know.

22           MS. JONES:  Well, I just want to say that

23     is why --

24           MS. HENDERSON:  Yeah.

25           MS. JONES:  -- 19 and 22 don't have your

DEB PUCKETT & ASSOCIATES

1        Bates stamp on them.

2              MS. HENDERSON:  Okay.

3              MS. JONES:  But I don't have any reason to

4        believe that those pages --

5              MS. HENDERSON:  I think you probably --

6              MS. JONES:  -- were not attached.

7              MS. HENDERSON:  -- have 19 through 22

8        Bates stamped somewhere else.

9              MS. JONES:  Somewhere.  That may be.

10             MS. HENDERSON:  Just not here.

11             MS. JONES:  And when I saw them, they came

12       without an index so all I had was the numbers.

13       Q    (BY MS. JONES) So would this be the staff

14   report presented to the planning commission on

15   August 18th, 2009?

16       A    No.  To the mayor and city council.

17       Q    To the mayor and council.  Oh.  Well --

18       A    You had the planning commission version

19   here.

20       Q    So on Page 2 where it says prepared for

21   the planning commission meeting, it really should

22   say city council meeting?

23       A    It should.

24       Q    All those succeeding ones should say city

25   council meeting, not --

DEB PUCKETT & ASSOCIATES

1        A    Yes.  Yes.

2        Q    Okay.  But this went to --

3        A    We were consistent.

4        Q    This went to the city council.  And at

5   this point were additional, was an additional

6   parking study presented?

7        A    I'd have to look --

8        Q    Okay.

9        A    -- to see.  Yes.  That is the time when we

10  received the parking study for Buffalo, New York.

11       Q    And I'm looking on Page 289, which is a

12  chart, Table 2.  Could you explain to me what the

13  function of this chart is.

14       A    Well, I can't read, I'm going to go to my

15  version of this because I can read the top header.

16       Q    Go right ahead.  I had to pull one out of

17  our version to be able to read it too, so.

18       A    This was a, an effort to take a look at

19  the, the, the proposed facility in Sandy Springs,

20  the three studies that were provided to the staff by

21  the applicant for the, the sites outside of, well,

22  outside of Sandy Springs that parking studies were

23  done on and then to look at the more recent, some of

24  the more recent case, church cases that the staff

25  had dealt with in terms of the, the square footage

1   of the building, the, the proportion of the building

2   that is the sanctuary and the parking that, that has

3   been provided and the parking provided per thousand

4   square feet so that we could take a look and see

5   what we were actually looking at in the building to

6   make sure that we were addressing it properly.

7        Q    Who created this chart?

8        A    That would have been the staff.

9        Q    Who instructed the staff what to put in

10  the chart?

11       A    The staff was instructed to prepare a

12  chart that showed the information provided plus the

13  information on the churches where issues had been

14  raised in the past or that had been recent actions

15  and those were under my instruction to do the

16  evaluation.

17       Q    Where is the Temple Sinai?

18       A    Temple Sinai is up in Council District 1,

19  I believe, off of, I forget which road it is.  I

20  believe I'm correct on that.

21       Q    The Temple Sinai has a 64,800 square foot

22  building; is that correct?  Am I reading that right?

23       A    Yes.

24       Q    And out of that building square footage,

25  3695 square feet are used for the sanctuary?

1       A       That's correct.

2       Q       Did the City apply Section 18, Article 18

3    for churches and places of worship to the Temple

4    Sinai to --

5       A       I don't --

6       Q       -- arrive at the parking?

7       A       -- I don't recollect that this came in

8    during the period when the city, when we were a

9    city.  However, the, the parking is, is consistent

10   with what we would, would expect under that

11   analysis, but I'm not, I don't recollect that, that

12   it was a city project.

13      Q       Why was it chosen to be on this chart?

14      A       I think because it had very large square

15   footage and the place of public assembly was

16   relatively small.  You'll notice that that's at 6

17   percent, and we wanted to show a range.  And this

18   was an example that could be used here in the city,

19   and then we looked at the parking that was provided

20   in addition.

21      Q       What is the other 61,000 square feet being

22   used for at the Temple Sinai?

23      A       I'm, I'm not sure.  They probably have

24   some educational facilities.  I'm really not sure,

25   but they clearly are, are providing a significant

1   amount of parking for it.

2       Q    Do you know if they have a Hebrew school

3   or something there?

4       A    They, they may very well.

5       Q    Where did you get this information about

6   the Temple Sinai?  Where is that kept?

7       A    I would assume it came out of a zoning

8   case.

9       Q    Do you know when that zoning case

10  occurred?

11      A    No, not without going back and getting the

12  case.

13      Q    You indicated to me that that may not have

14  been zoned during Sandy Springs' existence?

15      A    I don't recollect that it was.  I'm not

16  going to tell you that it wasn't, but I'm not going

17  to say -- I, I don't recollect that it, that it was.

18  And I think I probably would remember.

19      Q    Where is the Matthew Leighton Imerman

20  Chabad Center?

21      A    I am not sure which of, of two centers it

22  is.  It may be the chabad center that we looked at

23  before, I think it is, which is on Highpoint Road.

24  There is another similar facility on Mount Vernon,

25  but this, I believe, is the Highpoint Road facility.

1      Q    And it goes by some other name also?

2      A    Well, we called, I think we called it the

3  chabad center.

4      Q    Oh, okay.

5      A    Or Temple Beth, Beth Tefillah.  But I

6  think the chabad center and Beth Tefillah are the

7  same facility, but I'm not sure.

8      Q    Now, you looked at the Buffalo, you looked

9  at the Buffalo study.  Did the Buffalo study have no

10  information on its parking?

11      A    It does not have parking specifically for

12  that building.  It apparently is a, an in-town

13  facility.  And I haven't been in Buffalo recently,

14  but my recollection is in that area that, that

15  there's a lot of on-street parking, and they

16  probably use other parking.  But it, it's a large

17  facility, but it does, I don't believe that they've

18  got on-site parking for that.

19      Q    Do you know what the size of the assembly

20  area was in the Buffalo location?

21      A    I couldn't without going back to the

22  study.  I know what the building is, but I don't

23  know what the assembly area is.

24      Q    Now, attached to this staff report is a,

25  are the conditions, and then there's a, then there's

1    three pages of alternate conditions.  And they're at

2    the last, 19 to 22.

3        A    Yes.

4        Q    Did you present the alternate conditions

5    to the city council at that August 18th, '09

6    meeting?

7        A    They were presented to the council but

8    with the indication that because they had been

9    prepared very late that the, the director and the

10   city attorney were recommending a deferral in order

11   to give the opportunity for the planning commission

12   to review these alternate conditions, and also the

13   mayor and council.

14       Q    Were these alternate conditions conditions

15   that the staff and the city attorney and the

16   Scientology representative and attorneys had joint,

17   or had as a joint, jointly drafted?

18       A    Yes.

19       Q    Were they negotiated?  Was there some back

20   and forth?

21       A    I think that would probably be an accurate

22   statement.

23       Q    It references on No. B, it says "the total

24   occupancy for the building shall be limited to" --

25       A    If you could tell me B what number that's

1   under because I'm not sure.

2        Q    That's under 1 --

3        A    Okay.

4        Q    -- 1B.

5        A    Okay.   Thank you.

6        Q    Page 19 of 22.

7        A    Yes.

8        Q    It states that "the total occupancy for

9   the building shall be limited to a maximum of 283

10  persons based on a required parking ratio of one

11  space per every 3.5 persons within the building."

12  How did that, how did you arrive at that number of

13  283 persons?

14       A    I don't believe I arrived at it.   I

15  believe the applicant arrived at it based on a

16  figure of three-and-a-half people per vehicle.

17       Q    Where did that three-and-a-half people

18  come from?

19       A    I'm trying to remember what document that

20  came from.   Off the top of my head I can't remember,

21  but by the end of the deposition I may.   It's

22  rolling around up there.

23       Q    There was a logical reason for 3.5

24  persons?

25       A    There was, there was a reason for 3.5.   I,

DEB PUCKETT & ASSOCIATES

1   that was, and the applicant and we talked about

2   that, but I can't remember what it is right now.

3       Q    And these alternate conditions provide for

4   a self-reporting method of keeping up with the

5   occupancy of the building; is that correct?

6       A    Yes.

7       Q    That the director of or the president or

8   whoever is in charge of the church would send

9   information to the City on some schedule; is that

10  right?

11      A    That's correct.

12      Q    And did the city council actually defer

13  hearings so the planning commission could look at

14  it?

15      A    And because they hadn't had an opportunity

16  to really review this either.  And so they wanted to

17  have the planning commission input before they

18  considered it.

19      Q    Now we're at Plaintiff's Exhibit 23.

20          (Document was marked for identification as

21      Plaintiff's Exhibit No. 23.)

22      Q    (BY MS. JONES) I want to show you

23  Plaintiff's 23.  And is that the report submitted to

24  the planning commission meeting on September 17th,

25  2009?

```
 1      A     Yes.

 2      Q     This is another one of those situations

 3   where --

 4      A     The front page is not correct, but the --

 5      Q     The rest of it appears to be consistent --

 6      A     Yes.

 7      Q     -- with what was going on?

 8      A     Yes.

 9      Q     Actually the planning commission didn't

10   even get on the hearing and meeting date's schedule

11   up here at the top.

12      A     That's what I was missing up at the top

13   was, was the, that didn't get changed, but the, the

14   footer is correct.

15      Q     Now, if you will look at Page 323, the

16   conclusion to findings.  Well, let me go back to the

17   alternate conditions.  If you'll look at Page 326.

18      A     Three -- I'm sorry, what number was that?

19      Q     Three twenty-six.  That's Page 19 --

20            MS. HENDERSON:  My numbers are cut off.

21            MS. JONES:  -- of 22.

22            THE WITNESS:  Okay.

23            MS. JONES:  I'll accept blame for that.  I

24      copied these myself.

25            THE WITNESS:  Okay.  I've got it.
```

1    Q    (BY MS. JONES) And you're looking at 1B
2  again?
3    A    Yes.
4    Q    And that limits the total occupancy to a
5  maximum of 283 persons based on a required parking
6  ratio of one space per every 3.5 persons within the
7  building.  And that's the same alternate conditions
8  as were presented to the council on August 18th; is
9  that correct?
10   A    It appears to be.  I haven't checked this
11 to make sure there were no changes, but I, this
12 looks to be the same so I assume it is.
13   Q    So at that point on September 17th, '09
14 the alternate conditions were to cap the occupancy
15 at 283 persons.  And if you would look at page,
16 well, that's before the alternate conditions.  It's
17 going to be R323, which is Page 16 of 22, conclusion
18 to findings.
19   A    Yes.
20   Q    And in the conclusions the staff's opinion
21 that the, is that the proposed use and density when
22 applied with either the recommended conditions or
23 the alternate conditions are consistent with the
24 policies of the comprehensive plan.  Therefore, the
25 staff recommends approval conditional of the request

1    to rezone the subject property to OI, office and

2    institutional, District 2, OI, office and

3    institutional district conditional and the

4    associated concurrent variances.  The staff

5    recommends either the recommended conditions or the

6    alternate conditions for the approval of the

7    rezoning.

8            And that, is that what the staff's opinion

9    was as presented to the city council on

10   September 17th, 2009?

11       A    Well, this would have been what the

12   planning, what the staff recommended to the planning

13   commission on September 17th, 2009.

14       Q    Yes.

15       A    Not the city council.

16       Q    I'm sorry.  I thought I said planning

17   commission, but my mouth sometimes does things that

18   my brain doesn't hear.

19       A    That's what I thought I heard.

20       Q    You probably did.  So as of

21   September 17th, 2009 the staff was recommending the

22   recommended conditions, which limited the building

23   to 32,053 square feet or the alternate conditions

24   with the maximum capacity of 283 persons, correct?

25       A    Yes.

1      Q    To your knowledge did the staff present

2  any concern that the capacity could not be enforced

3  at, to the planning commission?

4      A    I can't, I believe that the question was

5  raised by the planning commission.  I don't

6  recollect exactly what was responded to in that

7  respect by, to the planning commission because the

8  planning commission actually raised the question of

9  enforceability.

10      Q    You don't remember whether you

11  represented --

12      A    I can't remember --

13      Q    -- to the planning --

14      A    -- I can't remember exactly what the

15  discussion was, and I'd rather go to the record than

16  to my memory.

17      Q    That would be in the minutes I guess.

18      A    Hand me that clip.

19      Q    We're getting there.

20          (Document was marked for identification as

21      Plaintiff's Exhibit No. 24.)

22          (Discussion ensued off the record.)

23      Q    (BY MS. JONES) Is this the report given to

24  the, who is this report, was submitted to the

25  October 20th, 2009 city council meeting?

DEB PUCKETT & ASSOCIATES

1    A    That's correct.

2    Q    And it repeated on Page 394 -- I hope you

3    got those references there.  It repeated the Table 1

4    that was previously in one of those staff reports?

5    A    Yes.

6    Q    And Table 2 on the next page --

7    A    Yes.

8    Q    -- that was in those staff reports.  On

9    page, look at Page 383.  At that point did the

10   applicant volunteer to reduce the occupancy count

11   from 283 to 170?  I think we're on a different page.

12   A    You said 383?

13   Q    Three eighty-four.

14   A    I don't know.

15   Q    I'm sorry.  I might have said 383.  I

16   don't know what's coming out of my mouth right now.

17       MS. HENDERSON:  Okay.  We couldn't find

18   it.  Okay.

19       THE WITNESS:  Yes.

20   Q    (BY MS. JONES) And what was the reasoning

21   behind the reduction from 283 to 170?

22   A    The applicant and the staff were

23   responding to issues that were raised particularly,

24   I believe, the planning commission about whether the

25   3.5 persons per vehicle was a reasonable figure to

DEB PUCKETT & ASSOCIATES

138

1    anticipate in terms of occupancy for any facility.

2    And after doing some research I believe that we

3    found a, a federal study done by the Federal Highway

4    Administration that supported one-and-a-half persons

5    per vehicle during the week and two people per

6    vehicle on the weekend.  And the applicant

7    voluntarily reduced the occupancy of the building

8    down to 170 to address that issue.

9        Q    And when you say we did the research, do

10   you mean the City did the research to come up with

11   that number?

12       A    Yes.  The City actually, we, our staff

13   actually researched.  I, I asked our staff to look

14   into the literature and see if there were any

15   studies that would give us some guidance on this

16   figure.  And the applicant indicated that they would

17   be interested in seeing that information as well,

18   and so we shared that with the applicant.

19       Q    Who on the staff obtained that

20   information?

21       A    It would have been either Patrice Ruffin

22   or Linda Aberay.

23       Q    I know Patrice.  Is Linda still with the

24   City?

25       A    Yes, uh-huh.

1    Q    And if you'll turn to Page 396, on the top

2  of the page that it, that the staff concluded that

3  the level of parking necessary to support the

4  proposed use in an occupancy of 170 would be

5  adequate?

6    A    Yes.

7    Q    And on Page 402 the staff finds either the

8  recommended conditions or the alternate conditions

9  are consistent and recommends either of them for the

10 approval of the rezoning?

11   A    Yes.

12   Q    And the alternate conditions attached are

13 essentially the same as what were attached to the

14 283 capacity cap except it was now reduced to 170?

15 Is that the change?

16   A    I believe so.  But without checking

17 everything in the case, I can't tell you if there

18 are no other changes.

19   Q    And we're now at Plaintiff's 25.

20        (Document was marked for identification as

21        Plaintiff's Exhibit No. 25.)

22   Q    (BY MS. JONES) Show you Plaintiff's 25.

23 It's got my stickies on it, but that's okay.

24 There's no notes, and it might just enable you to

25 turn to the page.  And if you turn to Page 420.

1          MS. HENDERSON:  Which page?  I'm sorry.

2          MS. JONES:  Four twenty.

3      Q    (BY MS. JONES) Traffic analysis.  It has

4   a, it has a traffic analysis with some red lines on

5   it.  They're not red, but some cross-throughs in the

6   traffic impact analysis.  Were those edits that the

7   staff made?

8      A    I can't recollect without going back and,

9   and checking.  It would appear so.

10     Q    It recommends the 283 occupancy count.  Is

11  that the recommendation?

12     A    Yes.

13     Q    That was the --

14     A    Oh, no.  This is --

15     Q    -- only condition?

16     A    No.  It's, it's to 170.

17     Q    To 170.  It has gone down to 170 from --

18     A    Yes.

19     Q    -- the 283?

20     A    Yes.

21     Q    Oh, I see it.  Applicant has proposed to

22  limit the occupancy from 283 to 170?

23     A    Right.

24     Q    And there's 81 spaces provided.  And those

25  81 spaces are 30 post office spaces and 51 on-site

1  spaces; is that how they're counted?

2      A    I would have to go look at the, I'm not

3  sure where it says it in here.  I'm sure it's

4  correct.  And if not, I'd have to check it.

5      Q    Then finally the granddaddy of grandaddies

6  here, what's previously been marked as Plaintiff's

7  10.  And is this the final staff report dated

8  December 15th for the December 15th, 2009 council

9  meeting?

10     A    Yes.

11     Q    And looking on Page 44, did the staff find

12 that the proposed request of 43,916 square feet

13 would meet the level of parking necessary to support

14 the proposed use at an adequacy, occupancy of 170

15 persons?

16     A    I'm reading.

17     Q    Okay.  It's in the, sort of the bottom of

18 the third paragraph right above concurrent review.

19     A    Yes, that's correct.

20     Q    Turn to Page 454.  And there's some

21 squares that have been circled there.  And I'm

22 looking at that particular paragraph with the

23 circled 130 spaces and 97 spaces.

24     A    Yes.

25     Q    And I'm not sure I understand the, what

1   the restriping was, or what was restriping and what

2   was, what was going to be accomplished by the

3   restriping of the parking lot.

4       A    Okay.

5       Q    Could you fill me in on that?

6       A    I think I can explain it without going

7   into counting all the spaces.  There were two things

8   that were going to happen.  There, the, there was

9   going to be an expansion of the number of spaces

10  provided in the parking lot.  And the way to do that

11  was in two ways.  Number one, there were some

12  parking spaces that could be achieved by some

13  additional paving and filling in of, of parking

14  spaces behind the, the wall around the, that goes

15  around the building, which would, and which required

16  a variance in order to park in the, the front yard

17  setback and take out the landscaping in that area,

18  but that was one area that could happen.

19          The second one was to restripe the

20  existing parking area.  There are a certain number

21  of spaces that can be compact spaces.  And by taking

22  advantage of the number of compact spaces, you can

23  then achieve an additional addition.  And that gave

24  us the total of a hundred, I believe it was 111

25  parking spaces was what we achieved with the

1    recommended conditions, which is that, the limited

2    to 32,053 square feet, or the alternate conditions

3    of the approval of the rezoning of the property?

4        A    Yes.

5        Q    And at that point you were satisfied that

6    those alternate conditions would address any

7    concerns that the City might have about parking on

8    the property at 43,916 square feet?

9            MS. HENDERSON:  Objection to form.

10            THE WITNESS:  I believed that that

11        addressed the, the ability to provide parking

12        commensurate with the amount of activity of the

13        site.

14        Q    (BY MS. JONES) And you were comfortable

15    with the enforceability of the alternate conditions

16    at that time?

17        A    I was not sure about the enforce, the, the

18    staff's ability to enforce it.  That's a commitment

19    made at a staffing level which is a funding issue by

20    the mayor and city council and not something that

21    the staff could make a determination on.

22        Q    Well, if in your opinion the conditions

23    were unenforceable, would you have refused to

24    recommend them?

25        A    I didn't know whether the mayor and

DEB PUCKETT & ASSOCIATES

1  council was willing to take on that responsibility

2  or not.  From a technical point of view, it can be

3  done.  From a practical point of view, they may

4  believe that that's not something that they want to

5  fund, which is the additional staffing that would be

6  necessary to do that kind of work.  That would be

7  beyond my capabilities.  That, that really is a

8  policy issue, and it's not an issue with the

9  comprehensive plan or the planning issues that I

10 deal with.

11     Q     How much additional staffing do you think

12 would be required to monitor the capacity limits on

13 the building?

14     A     Well, it would certainly require weekend

15 enforcement, and I currently have only four

16 officers, which does not allow me weekend

17 enforcement.  So it would be probably one or two

18 additional code enforcement officers to be able to

19 cover weekend activities, which is where, where I

20 would expect that those issues would arise.

21     Q     Do you know how many people are projected

22 to be in the building on the weekend?

23     A     According to what was presented to us by

24 the applicant, the assembly activities occur on the

25 weekend and the classes continue on the weekend.  So

1   I assumed based on that information that we might

2   well see more activity on the weekend than during

3   the week.  Particularly if you assume that the

4   people who attend classes work during the day, then

5   they may well be working during the day during the

6   week and going there in the evening, on the

7   weekends.

8           And so if you combine the combination of

9   the assembly portion of it with the, the study

10  portion and the counseling portion, it appeared to,

11  to us that the greatest level of activity was

12  probably going to be on the weekend.

13      Q    Are you aware of how many people currently

14  attend Sunday services at the Dunwoody center?

15      A    It is not my, I don't know how many

16  currently attend the Dunwoody center.  That wasn't

17  really the issue that we were looking at.  The issue

18  we were looking at was at full occupancy.  And I did

19  not assume that the current configuration and

20  membership was, was full occupancy of this building.

21  I assumed that this larger building was being

22  acquired because there was certainly a plan to be

23  able to expand into the rest of the building.

24          (Discussion ensued off the record.)

25      Q    (BY MS. JONES) Let me show you what's been

147

1   previously been marked as Exhibit 8 and ask if you

2   recognize Exhibit 8.  And it says Exhibit A on top

3   of it, but that's because it was attached to a

4   letter from Woody Galloway as an exhibit.  But if

5   you can just thumb through and see if it looks

6   familiar to you.  Are you familiar with Exhibit 8?

7        A    Yes.

8        Q    Is that the study of the Dunwoody and

9   Nashville sites?

10       A    Yes.

11       Q    Do you have any training in, in parking or

12  traffic studies?

13       A    Not in the actual studies, only in, in

14  reading them and using them.

15       Q    When this report was submitted, who was it

16  that analyzed the sufficiency of the report?

17       A    Well, I, we look for specific information

18  to be made available in the report.  It is, I'm not

19  questioning the validity of any information that's

20  provided but only on what was addressed.  And you

21  may recollect that I indicated that I wanted to

22  determine how we would deal with the building at

23  full occupancy.  And so any study that was done I

24  needed to see where the building was relative to

25  full occupancy so I could see how the parking

1    worked.   That was part of what we struggled with as

2    we went through these studies.

3        Q    Who in particular analyzed the report

4    besides yourself?

5        A    It would have, it would have been Patrice

6    Ruffin and, and Linda Aberay.

7        Q    Are Patrice or Linda traffic engineers?

8        A    No.   I wouldn't, the parking requirements

9    are not located, then are not a, something that the

10   traffic engineer does.

11       Q    Do you have any reason to doubt any of the

12   factual information contained in the reports?

13       A    No.

14       Q    Let me show you Exhibit 9, which has

15   previously been marked as 9.   Do you recognize that

16   as the Buffalo study that was presented by the

17   Church of Scientology?

18       A    Yes.

19       Q    Again, who analyzed this particular study?

20       A    It would have been the same two staff

21   members.

22       Q    Was there a written report generated that

23   critiqued either Plaintiff's 8 or 9 in terms of

24   taking the study apart and talking about each

25   element of it?

 1      A     No.  I, it is not the, it is not the

 2   responsibility of the staff to critique the report

 3   but to look for the information that we requested.

 4   And that was what we were doing when we reviewed

 5   these.  But in terms of critiquing the work that was

 6   done, no.  And that was, I, Kimley-Horn is perfectly

 7   capable of presenting quality professional

 8   information, and I have no question about that.

 9      Q     Well, critiquing might be a poor word.

10   Maybe just breaking the report down and parsing it.

11   Was there any kind of written, written process that

12   the staff used to digest the report?

13      A     The, as I indicated, the staff was looking

14   for particular information to come out of these

15   reports.  And if it was there, we used it.  And if

16   it was not there, we couldn't use it.  And so that's

17   what we went through and looked for.  I never asked

18   nor would I suggest that our staff critique a

19   professional firm that hands its work in.  We use

20   Kimley-Horn regularly on, on city work.  So I'm not,

21   I'm certainly not questioning their capability in

22   doing the work, and I don't question the quality of

23   their work.  In this case there were pieces that we

24   needed that weren't in the report.

25      Q     Did the City disagree with -- and I'm

150

1    looking on Page 3 of the Buffalo report -- with the

2    last, with the statement with 81 spaces being

3    provided at the proposed Sandy Springs location, a

4    surplus of 52 spaces will be provided based on the

5    Buffalo rate.  Do you disagree with that statement?

6        A    Since I don't know how much of the

7    Buffalo, how close to capacity the Buffalo building

8    is, I cannot tell.  That's the piece that's missing

9    that doesn't allow me to use that conclusion.  If I

10   should assume that the Sandy Springs building's

11   level of occupancy will remain at whatever the

12   building in Buffalo's current occupancy is in terms

13   of proportion of the area or the level of occupancy

14   in the building, then I could accept that

15   conclusion.  I don't know that.

16            (Discussion ensued off the record.)

17       Q    (BY MS. JONES) Just to finish up on the

18   Buffalo report, you do not in any way disagree with

19   any of the factual statements made in this Buffalo

20   report; is that correct?

21       A    I'm not, I, I wouldn't have a basis for

22   disagreeing with the facts presented.

23            MS. JONES:  I think we're very close to

24       being --

25            MS. HENDERSON:  You want us to take a

DEB PUCKETT & ASSOCIATES

```
1        break while you consult --

2             MS. JONES:  You can take a little break

3        while we consult.

4             (A recess was taken from 3:22 p.m. until

5    3:34 p.m.)

6             (Deposition concluded at 3:34 p.m.)

7             (Plaintiff's Exhibit Nos. 15 through 25

8        were retained by the reporter to be attached to

9        the deposition transcript.)

10

11                    _____

12                    Nancy J. Leathers, AICP

13

14

     Sworn to and subscribed before me,
15   this the _____ day of _____, 2010.

16   _____
     Notary Public
17   My commission expires:

18

19

20

21

22

23

24

25
```

1            E r r a t a    s h e e t

2

3        I, Nancy J. Leathers, AICP, the undersigned, do

4    hereby certify that I have read the foregoing

5    deposition and that to the best of my knowledge said

6    deposition is true and correct (with the exception

7    of the following corrections listed below).

8

9    Page/ line /   correction          reason

10   ____/ _____/ _____    _____

11   ____/ _____/ _____    _____

12   ____/ _____/ _____    _____

13   ____/ _____/ _____    _____

14   ____/ _____/ _____    _____

15   ____/ _____/ _____    _____

16   ____/ _____/ _____    _____

17   ____/ _____/ _____    _____

18   ____/ _____/ _____    _____

19   ____/ _____/ _____    _____

20   ____/ _____/ _____    _____

21   ____/ _____/ _____    _____

22   ____/ _____/ _____    _____

23   ____/ _____/ _____    _____

24   ____/ _____/ _____    _____

25   ____/ _____/ _____    _____

1          C E R T I F I C A T E

2     G E O R G I A:

3     FULTON COUNTY:

4              I hereby certify that the foregoing

5          transcript was taken down, as stated in the

6          caption, and the questions and answers thereto

7          were reduced to typewriting under my direction;

8          that the foregoing pages 1 through 152

9          represent a true, complete and correct

10         transcript of the evidence given upon said

11         hearing; am in compliance with O.C.G.A. Section

12         9-11-28(d) and Section 15-14-37(a) and (b); and

13         I further certify that I am not of kin or

14         counsel to the parties in the case; not in the

15         regular employ of counsel for any of said

16         parties; nor am I in anywise interested in the

17         result of said case.

18              This, the 28th day of June, 2010.

19

20

21              Cathey F. Sutton, B1354

22

23

24

25

DEB PUCKETT & ASSOCIATES

AMENDED CERTIFICATE


STATE OF GEORGIA

COUNTY OF FULTON


I hereby certify that in addition to the certification made on Page 153 of the transcript, more than the thirty (30) days provided the deponent to read and sign the original transcript has expired.  Therefore, the original is being filed without signature of the witness.

This the 3rd day of August, 2010.

Cathey F. Sutton
Certified Court Reporter


DEB PUCKETT & ASSOCIATES