IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCH OF SCIENTOLOGY OF GEORGIA, )
INC., a Georgia Corporation,       )
                                   )
      Plaintiff,                   )
                                   )
v.                                 )    CIVIL ACTION
                                   )    FILE NO. 1:10-CV0082 CAP
CITY OF SANDY SPRINGS, GEORGIA,    )
et al.,                            )
                                   )
      Defendants.                  )

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff CHURCH OF SCIENTOLOGY OF GEORGIA, INC. ("Plaintiff") and files its Response to Defendants' Motion for Summary Judgment as follows:

### FACTUAL BACKGROUND

Plaintiff relies upon and incorporates herein by reference its Response to Defendants' Statement of Material Facts Not in Dispute, Plaintiff's Statement of Undisputed Material Facts and Additional Undisputed Material Facts, Plaintiff's Reply to Defendants' Response to Plaintiff's Motion for Partial Summary Judgment and Defendants' Statement of Material Facts not in Dispute, and the depositions, exhibits, and affidavits of record.

## SUMMARY JUDGMENT STANDARD

On a motion for summary judgment "the moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Clark v. Coats & Clark, 929 F.2d 604 (11th Cir. 1991). Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment. Id. at 607. The court must "view the evidence and all factual inferences that flow from the evidence in the light most favorable to the party opposing the motion for summary judgment." Clark v. Union Mutual Life Insurance Co., 692 F.2d 1370, 1372 (11th Cir. 1982). "If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." Id.

## ARGUMENT AND CITATION OF AUTHORITY

I.   **PLAINTIFF'S RELIGIOUS FREEDOM CLAIMS:**

   A.   **Defendants Have Acted in Violation of the Anti-discrimination Provision of RLUIPA and the Religion Clauses of the First Amendment.**

The RLUIPA provides in pertinent part that "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of

religion or religious denomination." 42 U.S.C. §2000cc(2)(b)(2).
That section reflects and implements the core principle of the
Free Exercise and Establishment Clauses of the First Amendment as
applied to the states through the Fourteenth Amendment. Everson
v. Board of Education, 330 U.S. 1 (1947). "The clearest command
of the Establishment Clause is that one religious denomination
cannot be officially preferred over another." Larson v. Valente,
456 U.S. 228, 244 (1982). Accord, Allegheny County v. American
Civil Liberties Union, 492 U.S. 573,591 (1989)(quoting Everson,
330 U.S. at 15)("Neither a state nor the Federal Government can
... pass laws which aid one religion, aid all religions, or
prefer one religion over another"); Zorach v. Clauson, 334 U.S.
306, 314 (1952)("The government must be neutral when it comes to
competition between sects"); Lynch v. Donnelly, 465 U.S. 668, 692
(1984)(O'Connor, J., concurring)("What is crucial is that a
government practice not have the effect of communicating a
message of government endorsement or disapproval of religion").
As both the Supreme Court and the Eleventh Circuit have
emphasized, the Establishment Clause's prohibition upon
governmental imposition of denominational preferences is also
central to the Free Exercise Clause: "The two clauses are closely
related in their purposes. For instance, the Establishment Clause
"'prohibition of denominational preferences is inextricably

154006.5                              3

connected with the continuing vitality of the Free Exercise Clause.'" Church of Scientology Flag Service Org. v. City of Clearwater, 2 F.3d 1514, 1542 (11th Cir. 1993) (quoting Valente, 456 U.S. at 245). See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520 (1993).

Accordingly, government imposition of denominational preferences is subject to strict judicial scrutiny, and may be justified only in furtherance of a compelling government interest and only by means that are the least restrictive of religious exercise and equality. Valente, 456 U.S. at 246 ("In short, when we are presented with a state law granting a denominational preference, our precedents demand that we treat the law as suspect and that we apply strict scrutiny in adjudging its constitutionality"); Church of the Lukumi Babalu Aye, Inc., 508 U.S. at 531-32 ("Neutrality and general applicability are interrelated, and ... failure to satisfy one requirement is a likely indication that the other has not been satisfied. A law failing to satisfy these requirements must be justified by a compelling governmental interest and must be narrowly tailored to advance that interest"). This strict standard is applied whether the denominational preference is facially apparent from a statute, rule or regulation, or whether it arises from the government's preferential application of a facially neutral law.

Thus, in <u>Valente</u>, the Court applied strict scrutiny to strike down a Minnesota statute that on its face had a disparate impact upon different religious bodies depending on whether they solicited contributions primarily from the public or from their own membership. In <u>Fowler v. Rhode Island</u> the Court applied a similar test to a city's unequal application of a facially neutral ordinance to convict a Jehovah's Witness minister for conducting a religious service in a public park. 345 U.S. 67 (1953). The State conceded that the ordinance had not been applied to prohibit the public religious services of other faiths.  The Court stated:

> That broad concession ... is fatal to Rhode Island's case. For it plainly shows that a religious service of Jehovah's Witnesses is treated differently than a religious service of other sects. That amounts to the state preferring some religious groups over this one.

345 U.S. at 69.  More recently, the Court applied strict scrutiny to strike down the City of Hialeah's facially neutral ordinance restricting animal sacrifice because both the purpose and the effect of the law was to single out the local Santeria church for disparate treatment:

> Facial neutrality is not determinative.  The Free Exercise Clause, like the Establishment Clause, extends beyond facial discrimination.  The Clause "forbids subtle departures from neutrality" (citations omitted).  Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.

. . .

> The city claims that this ordinance is the epitome of a
> neutral prohibition .... The problem, however, is the
> interpretation given to the ordinance by the respondent
> [City] and the Florida attorney general.

Church of the Lukumi Babalu Aye, 508 U.S. at 534, 537.(emphasis
added).

RLUIPA creates a federal civil rights remedy for violations
of the core nondiscrimination principle, and requires the
application of the constitutionally mandated strict scrutiny
standard to any such case.

In the instant case, it is undisputed that the City's Zoning
Ordinance provides for a specific formula for parking regulations
for churches within the jurisdiction, and that the City refused
to apply that Ordinance and formula to the application of this
Church for a zoning variance.

In its motion for summary judgment, the City attempts to
justify its refusal to apply the Ordinance's formula for
calculating parking requirements for churches on two grounds: (1)
that the Ordinance does not apply to Plaintiff because Plaintiff,
although a church of a bona fide religion, does not meet the
Ordinance's definition of a "church;" and (2) that the manner in
which Scientologists typically participate in and practice their
religion is different from the manner of religious participation

in mainstream congregational religions, and that difference justifies the disparate treatment.

The City's effort to defend its action dramatically emphasizes and exacerbates the denominational preference and disparate treatment it has imposed.  The City argues that Plaintiff does not meet the Ordinance's definition of a "church," and, therefore, the City need not justify its refusal to apply that part of the Ordinance to Plaintiff. Its argument is patently contrary to the clear meaning of the words used in Section 3.3.1 of the Ordinance.

The Ordinance defines a "Church, Temple or Other Place of Worship" as "a facility in which persons regularly assemble for religious ceremonies."  According to Defendants, "This definition assumes an assembly-type use for large congregational worship services."  Defendants' Brief at 5 (emphasis added).  The City's attempt to re-write the Ordinance is improper.  Nowhere in the Ordinance's definition is the word "large," or "congregational," or "worship."  Only by its after-the-fact "gerrymandering" [1] of the Ordinance can the City argue that Plaintiff does not come within the definition written in section written in 3.3.1. of the Ordinance.

---

[1] See Valente, 456 U.S. at 255, condemning such "religious gerrymandering."

Plaintiff's primary use is as a church, fitting completely within the definition of the Zoning Ordinance. Plaintiff proposes to use the Property as a facility where parishioners regularly come together for daily and weekly services and other regularly scheduled assemblies and religious ceremonies, all of which fit easily within the actual definition in the Ordinance. First, Plaintiff conducts regular congregational Sunday services. Defendants contend that such congregational services are not "large," are not the "primary" religious practice of Scientology, and do not involve "worship" of a deity; but these requirements do not appear in the Ordinance. Second, Plaintiff conducts other regularly scheduled assemblies in the beliefs, conduct, practice and ceremonies of the Scientology religion, known as Training. Training is a central religious practice of Scientology, through which parishioners seek to achieve spiritual salvation. It is conducted regularly, in fact, daily and typically involves participation of parishioners and Church staff, who assemble to participate in Scientology religious education and ceremonies. It is true that Training ceremonies do not have to be "congregational" in nature; however, the Zoning Ordinance does not require "congregational" assemblies to constitute a church. Third, Plaintiff provides the central religious practice of Auditing to its parishioners. Auditing also is conducted every

154006.5                    8

day.  Such meetings are also not "congregational," but they are central to the practice of the Scientology religion.

The City, therefore, proposes to construe and apply an Ordinance that contains facially nondiscriminatory terms in a manner that would distinguish among churches and religions, based upon the beliefs and practices and the methods by which they conduct their ceremonies.  It is difficult to imagine a clearer, more dangerous type of denominational preference.  Indeed, this is even truer if one were to accept the City's after-the fact revision of the Ordinance as an accurate or binding construction of the Ordinance.  If, as the City now argues, the Ordinance defines a "church" to include only institutions whose religious practices involve large, congregational worship services, and if the Ordinance thus provides for separate and favorable treatment of such a "church" through the application of its parking regulations, as opposed to the treatment of other religious bodies or institutions, the Ordinance would constitute a facially discriminatory Ordinance of the type condemned in Larson v. Valente.  As the Court stated in Church of Lukumi Babalu Aye, "the problem ... is in the interpretation given to the Ordinance by the [City]." Id. at 537.

Defendants' contention that it "consistently applied the standards from Zoning Ordinance Section 18.2.1 to determine the

level of required parking" is incorrect.  If Defendants had
applied the standards from Section 18.2.1 to Plaintiff, 41
parking spaces would have been required for the 43,916 square
foot facility with the largest assembly area of 1,218 square
feet, not the arbitrary 130 parking spaces Defendants contend are
required.  Instead, Defendants invented new standards, applied
only to the Church of Scientology, to justify the City's refusal
to allow the Church full use of its Property.  Defendants'
application of its Zoning Ordinance creates a classic
denominational preference.

The City attempts to defend the denominational preference by
arguing that the parking ratios created by the Ordinance's
definition of a church should not be applied because Plaintiff's
use of the Property is non-traditional and different than the use
of property by many other churches.  The City points to
statements by Plaintiff that its use of the chapel is less
intensely congregational than that of other churches and that its
use of space requires creation of "classrooms" for the Training
courses, Auditing rooms and administrative offices.  The City
then claims that it applied the ratios set forth in the Ordinance
for classrooms and offices in determining the parking
requirements of the Property, and that it had a compelling

interest in doing so to ensure public safety and sufficient parking.

The problem is that, while Defendants claim to have relied on Plaintiff's own description of its needs as a basis for applying a different standard to Plaintiff than it does to other churches, the City clearly ignored the uncontradicted expert opinion of third party engineers and traffic consultants, as well as the full and complete description of Plaintiff's proposed use of the Property. Critically, Plaintiff uses "classrooms" for its Training, but in a more diffuse and less intense manner than the typical use of classrooms by schools. Scientology Training can utilize up to five (5) rooms at a time for a single class, with the "class" migrating from one room to another over the course of the day or days. Doc. 38-1, Cartwright Aff. ¶ 1. Thus, much more space is required for each class, and conversely the intensity of use (i.e., the number of parishioners per square feet of space) is much less than for a typical class in another institution. Plaintiff also explained that it operates on both a day and an evening basis, with different ministers and staff for each time period. Further, the day and evening staff necessarily use their own Auditing rooms and offices; therefore, at least half the Auditing rooms and offices would remain unoccupied at any time.

That the City has applied its Ordinance in a way that discriminates among and between religions, or alternatively that the Ordinance itself creates such a denominational preference, is not the end of the inquiry.

The City appears to attempt to defend the denominational preference, whether facial or de facto, as the least restrictive means to further a compelling interest. If there exists a compelling interest (in the form of public safety and adequate parking requirements) for the City to depart from the standards that normally apply to a church, then the least restrictive means to pursue that interest must take into account how Plaintiff will utilize the rooms for Training, Auditing, and administrative offices, rather than for the City to craft an unsupported and irrational formula to calculate the parking needs for Plaintiff.[2]

This the City has failed to do by its own admission. It claims that it carefully analyzed the question of the Church's parking requirements by taking into account that Plaintiff's primary use is not large congregational services, but then it

---

[2]     Even if Defendants' calculation is valid, which the Church vigorously disputes, it is questionable whether the 19 space difference between 130 spaces that the City claimed were required and 111 spaces that the property will have after re-striping would rise to the "compelling interest" standard, given the contrary opinion of the traffic engineers and the Church's actual manner of operation.

blatantly concedes that in determining Plaintiff's parking needs it merely applied a numerical formula to the terms "course rooms" and "offices," ignoring the actual manner and intensity by which the Church uses such space.

The City, citing section 28.1 ¶ 3 of the Zoning Ordinance, argues that "if the parking standard appears inadequate or has the effect of creating an adverse situation the Zoning Ordinance affords the City Council the flexibility to impose mitigation conditions." However, the City's exercise of "flexibility" is subject to strict scrutiny when conditions are applied in a discriminatory fashion to a church. In this case, the City has no evidence by which to determine that application of the parking standard for Churches and Other Places of Worship would have an adverse influence or otherwise promote the public health, safety or general welfare. To the contrary, all credible evidence of the impact of the Church is that the parking required under Section 18.2.1 is more than enough to meet the Church's projected needs.

Moreover, the Church of Scientology did much more than simply describe to the City authorities that its use of course rooms and offices is much less intense than the typical use of such spaces by schools or businesses. In response to Staff's comment in their report that the entire 43,916 square foot

154006.5                                    13

building could be "recommended for approval by staff if the applicant can demonstrate that the on-site parking will be sufficient to meet the full use of the proposed building including the expansion through either a parking study or shared parking analysis," the Church presented the City with professional parking studies prepared by the national engineering firm of Kimley-Horn of similar Scientology churches, which confirmed Plaintiff's description and showed that the actual use of space in such churches generated much lower parking demands than those derived from the City's formulae. See discussion in Plaintiff's Brief in Support of Motion for Partial Summary Judgment, Doc. 37 at pp. 12-15. As Plaintiff shows, Defendants' response to this study was to ignore the results and professional opinion of the experts, and instead to mischaracterize it to justify the City's refusal to permit the Church from using the Property as it sought to do. Id. pp. 14-15.

This kind of result oriented "religious gerrymandering" is precisely what is prohibited under RLUIPA and cases such as Larson v. Valente, 456 U.S. at 255. The City cannot choose to ignore its own Ordinance specifications for churches on a rationale, based upon the specific manner in which Plaintiff will use its space to provide religious services to its parishioners, without also taking into account the evidence, including

154006.5                              14

uncontroverted expert studies, showing that such usage would not result in the need for additional parking. Such discriminatory application or construction of the Ordinance with respect to a church's religious use of its property fundamentally violates the anti-discrimination provision of RLUIPA and the prohibitions against denominational preferences and denominational discrimination that comprise the core of the Establishment and Free Exercise clause.

### B.   Plaintiff Has Established that It Is Substantially Burdened by Defendants' Rezoning Decision.

A substantial burden is "pressure that tends to force adherents to forego religious precepts or ... mandates religious conduct." Midrash, 366 F.3d at 1227. The Eleventh Circuit's definition is also consistent with that of its sister circuits. See Westchester Day Sch. v. Vill. of Mamaroneck, 504 F.3d 338, 349 (2d Cir. 2007); Guru Nanak Sikh Soc'y of Yuba City v. County of Sutter, 456 F. 3d 978, 988 (9th Cir. 2006); Civil Liberties for Urban Believers v. City of Chicago, 342 F.3d 752,761 (7th Cir. 2003). Other Circuits have held that "[o]nce the organization has bought property reasonably expecting to obtain a permit, the denial of the permit may inflict a hardship upon it." Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin, 396 F.3d 895, 898-900 (7th Cir. 2005); Cottonwood

Christian Ctr. v. Cypress Redev. Agency, 218 F. Supp. 2d 1203, 1226-28 (C.D. Cal. 2002).

The Church has made a prima facie case that Defendants' refusal to approve the entire 43,916 square foot building for church use prohibits it from practicing its religion in accordance with its scriptures. Defendants, therefore, do not recognize the necessity for the Church to provide its congregants with a facility, which meets minimum requirements of the Scientology religion. Scientology minister, Deborah Q. Danos, clearly testified that the current facility was meant to be temporary, and having different kinds of courses all taking place in one room is "completely non-standard," and that "when you cannot deliver [church services] in the ideal fashion, people don't come." Doc. 55, Danos Dep. pp. 34, 38. Ms. Danos further testified that "We need a given number of rooms and we have a minimum amount of space that's required." Id. p. 112. The 43,916 square foot building is the "minimum space that we can have that will house all of the spaces that we need to deliver our religion in the way that it has been prescribed to us." Id.[3]   Thus,

---

[3]     Ms. Danos never used the word "cramped" to describe the burden on the Church's religious practice, although in their brief, Defendants ascribed that word to her twice. See Doc. 43-1, Defendants' Brief in Support of Motion for Summary Judgment, pp. 15, 16, misstating Doc. 55, Danos Dep. pp. 36-38.

Defendants' contention that "nothing prevents the Plaintiff from practicing Scientology on the Subject Property" is a fallacy. The Church cannot practice Scientology as prescribed by its scriptures in the space approved by Defendants. Id. [4]

## C. Defendants Have Violated Plaintiff's Free Exercise Rights.

The Church does not argue that the right of free exercise relieves an individual of the obligation to comply with a valid and neutral law of general applicability. See Employment Div., Dept of Human Res. v. Smith, 494 U.S. 872, 879 (1990)(free exercise clause did not prohibit application of Oregon drug laws to ceremonial ingestion of peyote). However, "a law that is not neutral or generally applicable must undergo strict scrutiny." Midrash, 366 F.3d at 1231. Government interference with the right of free exercise is subject to strict judicial scrutiny, and may be justified only in furtherance of a compelling government interest and only by means that are the least restrictive of religious exercise and equality. Valente, 456 U.S. at 246.

---

[4]    Defendants' contention that they approved the Subject Property for "full use of its existing improved 32,053 sq. ft. facility as a church" is untrue. Defendants did not approve any of the basement floor, which is completely enclosed and sub-divided into various spaces, including office spaces, mechanical rooms, storage, and 30 parking spaces. Doc. 55, Danos Dep. p. 60.

The City, citing Section 28.1 ¶ 3 of the Zoning Ordinance,
argues that "if the parking standard appears inadequate or has
effect of creating an adverse situation the Zoning Ordinance
affords the City Council the flexibility to impose mitigation
conditions."   However, the City's exercise of "flexibility" is
subject to strict scrutiny when it refuses to apply the
applicable law and imposes conditions on the free exercise of the
Church's use of its building.  Midrash 366 F.3d at 1231.  As
discussed above, the City's decision cannot withstand strict
scrutiny.

## II.   PLAINTIFF'S REMAINING CLAIMS:

### A.   Plaintiff Has Identified Similarly Situated Comparators in Support of Its Equal Protection Claims.

Defendant contends that Plaintiff's equal protection claims
fail for lack of any similarly situated comparators.  Yet,
Plaintiff has identified eleven (11) different land use
applications that were approved by the City since its inception
in 2005 and provided specific detail regarding how four (4) of
those applications are similar to the instant case.  See Doc. 37,
Plaintiff's Brief in Support of Motion for Partial Summary
Judgment, pp. 17-24.  In every one of these cases, the City
analyzed the parking requirements for a church or place of
worship under Zoning Ordinance Section 18.2.1 and applied the

parking standard of one (1) parking space for every thirty (30) square feet of floor area in the largest assembly area without fixed seats or one (1) parking space for every 3.5 seats in the largest assembly area with fixed seats.[5] If Defendants had applied the standards from Section 18.2.1 to Plaintiff, 41 parking spaces would have been required for the 43,916 square feet facility with the largest assembly area of 1,218 square feet, not the arbitrary 130 parking spaces Defendants contend are required. The City has discriminated against the Church, not only by refusing to apply its own parking ordinance to the Church, but also by applying a different parking standard than it has applied to every other church or place of worship in its jurisdictional boundaries.

**B.   The City's Discriminatory Application of Its Parking Ordinance Is Subject to Strict Scrutiny Review.**

As succinctly noted by the court in Reaching Hearts International, Inc. v. Prince Georges County, "[r]eligion is an inherently suspect classification and the free exercise of religion is a fundamental right - either of which would entitle the Church to strict scrutiny review of the Zoning Decision. 584 F. Supp. 2d 766 (Md. 2008). Here, the City discriminated against

---

[5]      The exception is Kadampa Meditation Center, which includes parking for a boarding house.

Plaintiff by approving parking for other places of worship in the City, while imposing a parking requirement on the Church of Scientology that amounts to almost three (3) times the parking required by the City's Zoning Ordinance. Hence, the City has the burden to show that its discriminatory action is justified by a compelling governmental interest and must be narrowly tailored to advance that interest. Midrash, 366 F.3d at 1235.

It is not common for land-use decision makers to expressly offer religion as their reason to exclude a church. More often, "discrimination lurks behind such vague and universally acceptable reasons as traffic, aesthetics, or 'not consistent with the City's land use plan,' and unfortunately these forms of discrimination are very widespread." Reaching Hearts, 584 F. Supp. 2d at 784 (quoting joint statement of Senators Hatch and Kennedy on RLUIPA). Here, the record is simply devoid of evidence that supports parking as a compelling interest sufficient to limit the requested density of the Church building. Additionally, even if parking were a compelling government interest, the City's action is not narrowly tailored to achieve the expressed compelling interest in having sufficient parking. The City had the opportunity to approve the application for a 43,916 square foot building, subject to conditions addressing the public interest. See Westchester Day School v. Village of

Mamaroneck, 504 F.3d 338, 347 (2nd Cir. 2007)(noting that even if
a compelling state interest were involved, the zoning board
refused to consider approving the application subject to certain
conditions, and thus to use the least restrictive means available
to achieve such an interest).  Id. at 353.

In fact, the City admits that alternate solutions existed,
including the Alternate Conditions proposed by the Church and
incorporated into the Staff's recommendations, which address the
Staff's concerns regarding the proposed use.  By definition, the
alternate solutions, for which the City's professional staff
recommended approval, constitute a less restrictive means for the
City to further its interest.  Where such a less restrictive
means exists, the law requires that the City use such means
rather than unnecessarily burden the Church's free exercise of
its religion.  The City cannot satisfy the strict scrutiny review
required in this case.

## C.  The Record Contains Evidence that Defendants Violated Plaintiff's Freedom of Speech and Assembly.

Plaintiff's freedom of speech and assembly are violated
because Defendants' refusal to approve the entire 43,916 square
feet of Plaintiff's building prohibits Plaintiff from practicing
its religion in accordance with its scriptures.  See Doc. 55,
Danos Dep. pp. 34, 38, 112; (quoted at Section I (B) p. 16; Doc.

38-1, Affidavit of Allan Cartwright, ¶¶ 40-42; Doc. 38-3,
Affidavit of Robert Wright ¶ 26.  The ability of the Church to
practice its religion and expand its religious activity and to
spread the precepts of the Church is fundamental to the Church's
mission.  The argument that Plaintiff's failure to accept the
partial right to practice its religion somehow is a self-imposed
limitation, not a government-imposed limitation insults
Plaintiff's right to free religious exercise under the First
Amendment.  Without permanent and adequate space for religious
practice, ministry, education and fellowship, the Church's
ability to practice its religion and fully communicate its
messages of faith and fellowship in the doctrine of the Church of
Scientology has been unduly limited.

D.    **Plaintiff's Federal and State Taking and Inverse
      Condemnation Claims Are not Ripe for Adjudication by this
      Court.**

At the time this lawsuit was filed in federal court,
Plaintiff contemporaneously filed a companion case in the
Superior Court of Fulton County, Civil Action File Number 2010-
CV-180058.  Shortly thereafter, the parties filed a Joint Motion
to Stay Proceedings in Superior Court pending the resolution of
Plaintiff's federal claims by this Court, which the Fulton County

Superior Court entered on January 22, 2010.[6]  Accordingly,
Plaintiff concedes that its Fifth Amendment takings claim and
inverse condemnation claims are not ripe for adjudication until
the State court considers them.  Therefore, Defendants' Motion
for Summary Judgment should be denied and this Court should
retain jurisdiction of this case until such time as Plaintiff has
exhausted its remedies in State court.

### E.   Plaintiff Can Establish a Substantive Due Process Violation Under the Georgia Constitution.

Georgia courts have long recognized under the Due Process
Clause that if a zoning ordinance as applied to property is not
reasonable, then the ordinance should be declared void and
unenforceable as to that tract of land, just as any other
municipal ordinance adopted under the police power may be
declared void if it is unreasonable.  Tuggle v. Manning, 224 Ga.
29, 32-33 (1968).  In the landmark zoning case of Barrett v.
Hamby, the Georgia Supreme Court affirmed a superior court
judgment, which ruled that a county's zoning of property

---

[6]     In the Joint Preliminary Report and Discovery Plan
(Doc. 14) Defendants objected "to this Court determining any
issues as to purported taking of Plaintiff's property as a state
law remedy exists for hearing such takings claims and no federal
takings claim is ripe."

constituted an unconstitutional taking of that property without

just compensation.  The Court noted that

> as the individual's right to the unfettered use of his
> property confronts the police power under which zoning
> is done, the balance the law strikes is that a zoning
> classification may only be justified if it bears a
> substantial relation to the public health, safety,
> morality or general welfare. Lacking such
> justification, the zoning may be set aside as arbitrary
> or unreasonable.

235 Ga. 232, 265 (1975).

The Court specifically held "that for such unlawful

confiscation to occur, requiring that the zoning be voided, it is

not necessary that the property be totally useless for the

purposes classified."  Id. at 266.

> Moreover, a government
>
> has the duty and obligation to work with property
> owners to allow them the highest and best use of their
> property, by considering on its own motion ways in
> which the county's objections to a proposed development
> could be eased by county action.  Contrary to [the
> City's] position throughout this litigation, the burden
> is not on the applicant for rezoning to anticipate and
> counter every conceivable objection which the county
> might raise.

DeKalb County v. Flynn, 243 Ga. 679, 681 (1979).

With the decision in Barrett, Georgia courts made it clear

that the zoning power given a local government must be reasonably

used and is subject to review, pursuant to a balancing test by

which to judge whether the zoning power has been exercised without due process.

In this case, Plaintiff has been deprived of the full use of its property without just compensation.  Defendants' actions are unreasonable in light of the uncontroverted facts and circumstances and a violation of substantive due process under Georgia law.  Therefore, Defendants' Motion for Summary Judgment must be denied.

## CONCLUSION

For all of the foregoing reasons, the Court should deny the Defendants' Motion for Summary Judgment.

Respectfully submitted,

DILLARD & GALLOWAY, LLC

By:   G. Douglas Dillard
      Georgia Bar No. 221900
      dougd@dandglaw.com
      Andrea Cantrell Jones
      Georgia Bar No. 398440
      andrea@dandglaw.com
      Lauren M. Hansford
      Georgia Bar No. 497507
      lhansford@dandglaw.com
      Attorneys for Plaintiff
      3500 Lenox Road, N.E., Suite 760
      Atlanta, Georgia 30326
      (404) 965-3680
      (404) 965-3670 (fax)

154006.5

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** to the Clerk of Court using the CM/ECF system, which automatically sends an electronic mail notification of such filing to counsel of record who are CM/ECF participants, and mailed by United States Postal Service, first-class, mail, postage prepaid, a paper copy of the same document to counsel of record who are non-CM/ECF participants.  Counsel of record is:

Laurel E. Henderson, Esquire
HENDERSON & HUNDLEY, PC
160 Clairemont Avenue, Suite 430
Decatur, Georgia 30030

This 31st day of January 2011.

/s/ Andrea Cantrell Jones
Georgia Bar No. 398440
andrea@dandglaw.com