IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCH OF SCIENTOLOGY OF
GEORGIA, INC.,

    Plaintiff,

    v.

CITY OF SANDY SPRINGS, GEORGIA,
a Municipal Corporation of the State of
Georgia; CITY COUNCIL OF THE CITY
OF SANDY SPRINGS, GEORGIA; EVA
GALAMBOS, in her Official Capacity as
Mayor of the City of Sandy Springs,
Georgia; JOHN PAULSON, DIANNE
FRIES, WILLIAM COPPEDGE
COLLINS, JR., ASHLEY JENKINS,
TIBERIO DeJULIO and KAREN
MEINZEN MCENERNY, Individually
and in Their Official Capacities as
Members of the City Council of the City
of Sandy Springs, Georgia,

    Defendants.

CIVIL ACTION NO.
1:10-CV-00082-AT

## ORDER

This case arises from a zoning dispute over the Church of Scientology's desire to convert a 32,053 square foot office building into a roughly 44,000 square foot Church, referred to by Scientologists as an "Ideal Organization." The City of Sandy Springs approved the use of the subject property for a church but

limited the size of the building to the existing 32,053 square feet based on a lack of sufficient on-site parking. The Church of Scientology filed this suit pursuant to the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which prohibits governments from implementing land use regulations that impose a "substantial burden" on religious exercise or that discriminate against any religious assemblies or institutions on the basis of religious denomination. 42 U.S.C. §§ 2000cc(a) & (b)(2). However, as Plaintiff's counsel recognized before the City Council "[t]he issue in this case has not been one of land use. It has been one of parking and a perceived issue as it relates to traffic." (Tr. Dec. 15, 2009, City Council Hearing 4:18-20, Doc. 47-1).

The matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [Doc. 37], Defendants' Motion for Summary Judgment [Doc. 43], and Defendants' Motion to Strike [Doc. 61]. For the reasons set forth below, Plaintiff's Motion [Doc. 37] is **DENIED,** Defendants' s Motion [Doc. 43] is **GRANTED IN PART AND DENIED IN PART,** and Defendant's Motion to Strike [Doc. 61] is **DENIED**.

## I.   BACKGROUND

Keeping in mind that when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives,*

2

*Inc.*, 496 F.2d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, court must review all facts and inferences in light most favorable to non-moving party). This statement does not represent actual findings of fact. *In re Celotext Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

## A.    Church of Scientology

Plaintiff, the Church of Scientology of Georgia, is a religious organization that currently operates a church at 4588 Winters Chapel Road, in Doraville, Georgia ("the Winters Chapel Location"). (Pl.'s Statement of Material Facts ¶¶ 1, 4, Doc. 37-4, (hereinafter "PSMF"); Defs.' Response to Pl.'s Statement of Material Facts ¶¶ 1, 4, Doc. 60, (hereinafter "Defs.' Resp. SMF"); Cartwright Aff. ¶¶ 3,4, Doc. 38-1, Ex. A; Danos Aff. ¶ 4, Doc. 38-1, Ex. B). When the Complaint in this matter was filed, the Church operated in leased space at 4480 North Shallowford Road, Dunwoody, Georgia ("the Dunwoody Location"). (PSMF ¶ 3; Defs.' Resp. SMF ¶ 3; Danos Aff. ¶ 3).

Scientology is an applied religion based upon the research, writings and recorded lectures of L. Ron Hubbard, which collectively constitute the Scriptures of the religion. (PSMF ¶ 8; Defs.' Resp. SMF ¶ 8; Cartwright Aff. ¶¶ 6-8). The Scriptures are the source of the beliefs, practices, rituals, and policies of the religion. *Id.* The Church serves a state-wide congregation of 600 members, 100

3

of whom are currently active. It has a staff of 20 volunteer and paid employees. (Defs.' Statement of Material Facts ¶ 2, Doc. 43-2, (hereinafter "DSMF"); Pl.'s Response to Defs.' Statement of Material Facts ¶2, Doc. 67, (hereinafter "Pl.'s Resp. DSMF"); Compl. ¶ 17).  Plaintiff is the only church of Scientology in the state.  (DSMF ¶ 6; Pl.'s Resp. DSMF ¶ 2; Danos Dep. 40:10-20).   Scientology facilities are classified in one of four ways: (1) groups, (2) missions, (3) Class V Organizations, or (4) advanced organizations.  (DSMF ¶ 3; Pl.'s Resp. DSMF ¶ 3; Wright Dep. 10:19-11:10).  Plaintiff is a Class V Organization.  (DSMF ¶ 7; Pl.'s Resp. DSMF ¶ 7; Wright Dep. 11:21-24).

The Church of Scientology International (hereinafter "CSI") is the senior ecclesiastical management church in the Scientology religion.  (DSMF ¶ 7; Pl.'s Resp. DSMF ¶ 7; Compl. ¶ 34; Wright Aff. ¶ 3; Cartwright Aff. ¶¶ 35-38).  CSI mandates that all new Class V Organizations conform to the template of an "Ideal Central Organization" more commonly known as an "Ideal Org."  (DSMF ¶ 9; Pl.'s Resp. DSMF ¶ 9; Danos Dep. 50:11-51:24; Wright Aff. ¶ 3; Cartwright Aff. ¶¶ 35-38).  CSI expects that Plaintiff, as part of its function as an Ideal Org, will open up new missions and new groups that will eventually grow to become new Class V Churches.  (Wright Aff. ¶ 10).

The concept of the Ideal Org originated in Hubbard's writings on Scientology, but the actual implementation of the concept of the Ideal Org was developed more recently from approximately 2003 to 2007 when CSI undertook

a study of Hubbard's writings to determine the necessary physical requirements for a Church to ensure that religious services are orthodox and uniform, which is a fundamental requirement of Scientology religious doctrine. (PSMF ¶ 33; Defs. Resp. PSMF ¶ 33; Cartwright Aff. ¶¶ 38-43; Wright Aff. ¶ 4; Wright Dep. 43:16-45:21).   According to the December 12, 2010 Affidavit of Robert Wright,

> [B]eginning in 2003, CSI embarked on a program to create [Ideal Orgs]. . . An Ideal Class V Organization holds and houses all of the functions required for a Class V Church, according to the Scientology Scriptures, and is able to actually deliver all of those functions and services.  Even many today, an estimated 90% or more ) [sic] of our existing Church buildings are not of the correct size to house all the functions.  For that reason, for the last five (5) or six (6) years, Scientology churches around the world have been purchasing new buildings so that they can provide all the needed programs and functions of the church.

(Wright Aff. ¶ 4).   Plaintiff contends that CSI determined that a minimum of 40,000 square feet is required to provide all the necessary religious services, although ideally a "range of 50,000 to 65,000 square feet is easier" in terms of space planning.  (PSMF ¶ 34; Wright Aff. ¶ 9).[1]  However, Mr. Wright testified that there is no written document specifying the amount of square feet required. (Wright Dep. 46:19-47:3).

Scientology's core religious services are "Training" and "Auditing."  (PSMF ¶ 17; Defs.' Resp. SMF ¶ 17; Cartwright Aff. ¶ 18).  Through Scientology Training "one obtains the wisdom to understand who he is, what he is, where he comes

---

[1] Defendant contends that there is no requirement that an Ideal Org be completely housed in a single facility based on Mr. Wright's deposition testimony that the Seattle facility consists of two separate buildings that together make up the 43,000 to 44,000 square feet and are located a five minute drive apart.  (Wright Dep. 123:1-14).

from and his relationship to the Universe." (PSMF ¶ 20; Defs.' Resp. SMF ¶ 20; Cartwright Aff. ¶ 19). One half of the spiritual gains in Scientology come from Training. *Id.* Scientology Auditing is a form of religious counseling ministered at Scientology churches in confidential one-on-one sessions between a specially trained individual called an "auditor" and a parishioner. (PSMF ¶ 24; Defs.' Resp. SMF ¶ 24; Cartwright Aff. ¶¶ 22, 23).

Training is provided through Scientology religious courses at Scientology churches. (PSMF ¶ 19; Defs.' Resp. SMF ¶ 19; Cartwright Aff. ¶19). Most Training courses are divided into Theory and Practical sections. (PSMF ¶ 21; Defs.' Resp. SMF ¶ 21; Cartwright Aff. ¶ 20). The Theory course rooms are arranged differently from the Practical course rooms and are configured to use a variety of equipment. *Id.* Certain course rooms are designed to be located adjacent to other related course rooms. (PSMF ¶ 22; Defs.' Resp. SMF ¶ 22; Wright Aff. ¶ 17). Many course rooms relate to one another such that as many as five (5) course rooms may be utilized by the students of one class, who migrate from room to room at their own pace during a study period. (PSMF ¶ 23; Defs.' Resp. SMF ¶ 23; Cartwright Aff. ¶ 21).

Auditing must be provided in quiet and confidential surroundings, away from other activities that may be going on in a church. (PSMF ¶ 25; Defs.' Resp. SMF ¶ 25; Cartwright Aff. ¶ 24). Each Scientology church has numerous small Auditing rooms where auditing sessions take place. (Cartwright Aff. ¶ 23). With

the exception of certain advanced Scientology churches, each local Scientology church must have sufficient facilities to provide the full range of Training and Auditing religious practices necessary to follow the prescribed path of spiritual healing and enlightenment known as "The Bridge to Total Freedom." (PSMF ¶¶ 15, 18; Defs.' Resp. SMF ¶¶ 15, 18; Cartwright Aff. ¶¶ 16, 17; Wright Aff. ¶ 6).[2]

Scientology churches also hold congregational services on Sundays, religious holidays, and certain other occasions. (PSMF ¶ 28; Defs.' Resp. SMF ¶ 28; Cartwright Aff. ¶ 27; Wright Aff. ¶ 21). Scientologists believe that the expansion and dissemination of the religion is necessary to salvage human civilization. (PSMF ¶ 29; Defs.' Resp. SMF ¶ 29; Cartwright Aff. ¶ 32). All Scientology churches have a religious obligation to reach out to their community to spread the word of Scientology to new members and are therefore mandated to include large public display areas. (PSMF ¶¶ 30, 31; Defs.' Resp. SMF ¶¶ 30, 31; Cartwright Aff. ¶¶ 33, 34).

## B.   Subject Property and CSI's Space Requirements

The Church purchased property at 5395 Roswell Road, Sandy Springs, Georgia ("the property" or "the subject property") in 2005 to enable it to provide a full range of Scientology religious services and to allow for future growth, which it was unable to accommodate at the Dunwoody location or at its current Winters

___

[2]   An Ideal Org must also include space for a sauna and exercise program (referred to as the "purification rundown center"), a public bookstore, and a café. (*See* Danos Dep. 67:5-24; 74:19-75:2; 79:9-80:4).

Chapel Road location. (PSMF ¶¶ 5, 6; Defs.' Resp. SMF ¶¶ 5, 6; Danos Aff. ¶¶ 5, 6). The physical space needs of the Church are dictated by the nature of Scientology and its religious beliefs and practices. (PSMF ¶ 7; Defs.' Resp. SMF ¶ 7; Wright Aff. ¶ 8). While CSI had established some guidelines on the types of services to be provided in a Class V Ideal Org as of 2005 when Plaintiff purchased the property at issue, CSI had yet to complete its study of the minimum space requirements necessary to house those services. (DSMF ¶ 10; Pl.'s Resp. DSMF ¶ 10; Wright Dep. 44-46). Plaintiff contends that although the study was not complete as of 2005, the size of the building on the property was an important factor in CSI's approval of the property for purchase by Plaintiff. (Pl.'s Resp. DSMF ¶ 10; Wright Aff. ¶ 24). In accordance with the procedures that CSI has promulgated, Plaintiff submitted a Building Investment Committee Checklist ("Checklist") to CSI for approval prior to its purchase of the property. (PSMF ¶ 37; Defs.' Resp. SMF ¶ 37; Wright Aff. ¶ 24).[3] Plaintiff asserts that prior to

---

[3] The Checklist addresses CSI's potential concerns regarding whether the subject property will provide an adequate facility for an Ideal Org. With regard to whether "there are any obvious [renovations] needed," the Checklist states "possibly taking the underground parking and creating more delivery space so that the entire 43,000 sf are useable." (Ex. I to Pl.'s Resp. SMF, Doc. 67-1 at 7). With regard to "how many parking spaces are available at the building" the Checklist states "25 underground enclosed spaces, 86 surface spaces. An existing easement with the next door neighbor . . . makes available another 120 parking spaces," and noted the Church's belief that this parking arrangement satisfied the City's parking requirements. *Id.* at 8, 13. Although the Checklist found the gross square footage of the building to be sufficient, "due to the lack of foot traffic in this area, an additional testing center would have to be located." *Id.* at p. 10. The Checklist also lists numerous "pluspoints" and "outpoints" with the "outpoints" appearing to be negative factors weighing against the purchase of the subject property. The Checklist discusses on-site parking as an "outpoint" as follows: "An easement exists with the neighbor next door for parking (building has 86 spots, USPS next door has hundreds more) but

purchasing the property the Church "confirmed that a church was a permitted use in the property's O-I zoning designation and that the number of existing surface parking spaces would satisfy the applicable parking regulations." (PSMF ¶ 45). The City denies that any confirmation was requested by the Church or provided by the City as to whether the number of surface parking spaces on the property was sufficient to satisfy the requirements of the Parking Ordinance. (DSMF ¶ 45). The Certificate of Zoning provided by the City to the Church on June 6, 2005, states only that the subject property is currently zoned in the O-I (Office & Institutional District). (Danos Dep., Ex. 5).

The total square footage of the existing office building is roughly 43,000 square feet[4] including an approximate 12,000 square foot basement that was previously used, in part, as a parking garage.[5] (PSMF ¶¶ 41-42; Defs.' Resp. SMF

---

it is not final. There is no reason to think that it could not be finalized, but it is not at this time." *Id.* at 11. Additionally, with regard to whether the use for a church "is clearly allowed per the zoning regulations" the Checklist states "[a]lthough Church use is typically permitted in Office & Industrial, I discovered that this building has restrictions to allow only office use. This would require a variance in order to have a Church. The handling would be to have the seller get the rezoning done before purchase of the building was finalized." (Doc. 67-2 at 3).

[4] According to the parties' briefing, the total square footage of the building is 43,196. However, both the Reports prepared by the City during the zoning process state that the building is 43,246 square feet comprised of 32,053 square feet of office space and 11, 193 square feet of basement. Plaintiff's Parking Study makes a similar finding. (*See* Doc. 39-1; 42-2).

[5] There is some dispute regarding the layout of the existing building. (*See* PSMF ¶¶ 41-42; Defs.' Resp. SMF ¶¶ 41-42). The City disagrees with Plaintiff's characterization of the entire 43,000 square feet being improved office space. (*See* Defs.' Resp. SMF ¶ 41). According to the City, the building contains 32,053 square feet of improved office space in three finished stories and an 11,193 square foot basement parking garage. (*See* Defs.' Resp. SMF ¶ 41; *see also* Compl. ¶¶ 37, 38; Leathers Decl. ¶ 5). Defendant also disagrees with any implication that the existing basement is not part of the property's on-site parking. Plaintiff disagrees with the characterization of the basement as a garage used for parking. (*See* PSMF ¶¶ 41-42). It is clear that the basement garage was considered both by the Church and the City as part of the

¶ 41; DSMF ¶ 12; Pl.'s Resp. SMF ¶12; Compl. ¶ 38; Leathers Dep. Ex. 20 at 1). While the exact configuration is unclear from the record, the property was served by 111 parking spaces comprised of surface spaces, garage spaces, and spaces provided by an easement on the neighboring post office property. (PSMF ¶ 50, Ex. E, Kimley-Horn Parking Study, June 2009 Doc. 39-1; DSMF ¶ 13; Leathers Dep. Ex. 20 at 21).[6]  In order to accommodate its growing needs and to provide an adequate facility in which to exercise its religious precepts, the Church developed plans to redesign the existing building on the property and to convert the 11,193 square foot basement to religious uses, including a chapel, in the area formerly used for parking.  (PSMF ¶ 43; Defs.' Resp. SMF ¶ 43; Danos Aff. ¶ 9; Compl. ¶ 42).

## C. Rezoning Application

A church is a permitted use in the O-I (Office and Institutional District) zoning classification under the Sandy Springs Zoning Ordinance ("Zoning Ordinance").  (PSMF ¶ 46; Defs.' Resp. SMF ¶ 46; Danos Aff. ¶ 12; Compl. ¶ 41).

---

property's on-site parking during the rezoning process. (*See* Checklist, Ex. I to Pl.'s Resp. SMF, Doc. 67-2 at 15 ("The basement is approximately 11,916 square feet. It has been used as underground parking. It could be made usable service space with renovations."); Leathers Dep., Ex. 20 at 1, 9, Doc. 42-2 at 12, 22). Therefore, any disputes between the parties as to the extent of the use of the basement as garage parking is not material to the Court's resolution of the parties' motions.

[6] Defendants' briefing contends the parking spaces are broken out as follows:  51 surface spaces, 30 easement spaces, and 30 garage spaces.  According to the Reports prepared by the City the surface lot has 50 spaces, the basement garage has 30 spaces, and the easement provides 31 spaces.  (Leathers Dep., Ex. 20, p. 8, Leathers Dep. Ex. 24, p. 8).   It is undisputed that the existing basement provided 30 garage spaces. (Leathers Dep., Ex. 20 at 8, Leathers Dep. Ex. 24, p. 8;  June 2009 Kimley-Horn Parking Study at 1, Doc. 39-1 at 5).

However, prior to Plaintiff's purchase, the property's O-I zoning was conditioned on its use as office space, thus preventing its use as a church without a rezoning to remove the conditions. (PSMF ¶ 46; Defs.' Resp. SMF ¶ 46; DSMF ¶ 22; Danos Aff. ¶ 12; Leathers Aff. ¶ 4; Compl. ¶ 41). In March 2009, the Church submitted an application to the City of Sandy Springs ("the City") for a rezoning and for certain variances[7] to permit the use of the property as a church (hereinafter "the Application"). (PSMF ¶ 47; Defs.' Resp. SMF ¶ 47; DSMF ¶ 23; Danos Aff. ¶ 13; Leathers Aff. ¶4; Compl. ¶ 43). The Application also sought approval of the expansion of the building from 32,053 square feet to 43,916 square feet by conversion of the 11,193 square foot basement/garage area to religious uses. (PSMF ¶ 47; Defs.' Resp. SMF ¶ 47; DSMF ¶ 24; Danos Aff. ¶ 13; Leathers Aff. ¶ 5; Compl. ¶ 43). As a result of the needed expansion, the Church's Application proposed eliminating 30 parking spaces in the basement garage decreasing the amount of available parking from 111 existing spaces to 81 spaces. (Leathers Dep., Ex. 20 p. 8; Leathers Dep. Ex. 21 p. 8; PSMF Ex. E, Kimley-Horn Parking Study, June 2009, Doc. 39-1; PSMF ¶ 47; DSMF ¶ 25).

## D.  Zoning Requirements

The Zoning Ordinance defines "Church, Temple or Place of Worship" as "[a] facility in which persons regularly assemble for religious ceremonies. This

---

[7]  Plaintiff requested and received approval for three variances to allow (1) the existing parking within the required minimum front yard set back and side corner; (2) to allow the existing sign to encroach into the right-of-way; and (3) to reduce the twenty (20) foot side setback to five (5) foot to allow the existing building to remain. (Leathers Dep. Ex. 20 at 1).

shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 3.3.3, Doc. 49-1 at ; DSMF ¶ 32; Pl.'s Resp. SMF ¶ 32). Section 18.2.1 of the Zoning Ordinance (hereinafter "the Parking Ordinance") contains a schedule of parking requirements based on industry standards and broken down by use. (DSMF ¶ 29; Pl.'s Resp. SMF ¶ 29; Leather's Decl. ¶ 6; Zoning Ordinance § 18.2.1, Doc. 51-1 at 1-6). The Parking Ordinance provides that "[p]arking requirements shall be calculated based on the proportion that each use contributes to the total." (Zoning Ordinance § 18.2.1, Doc. 51-1 at 1). According to the City, based on the use of a property, the staff applies these standards to determine how much parking is required on the site, assuming operation at full capacity. (DSMF ¶ 30; Leather's Decl. ¶ 6)[8]. For "Churches and Other Places of Worship" parking is generally calculated on the total number of fixed seats or the total square footage of the largest assembly area. (DSMF ¶ 31; Pl.'s Resp. SMF ¶ 31; Leather's Decl. ¶ 7). Specifically, the Parking Ordinance requires 1 parking space per 3.5 fixed seats in the largest assembly area or 1 parking space per 30 square feet in the largest assembly area. (Zoning Ordinance § 18.2.1, Doc. 51-1 at 1-6). The Parking Ordinance requires 3 spaces per 1,000 square feet of office space and 5 spaces per

---

[8] The Court notes that Plaintiff disputes these facts on the basis that the language of the Parking Ordinance does not incorporate or assume operation at full capacity. (Pl.'s Resp. SMF ¶ 30). Plaintiff further contends, without citation to any evidence in the record, that "it has not been the City's policy to determine parking requirements based on full capacity of a church." *Id.*

1,000 square feet of classroom space.   (Zoning Ordinance § 18.2.1, Doc. 51-1 at 1-6;  Leathers Dep., Ex. 20 at 9).

## E.   Planning Staff & Commission Recommendations

In its initial Staff Report, the City's Planning Staff (hereinafter "the staff") determined the required parking for the property as follows:

> Article 18.2.1 indicates parking requirements are to be calculated based upon the proportion that each use contributes to the total.  For example, a building with multiple uses would be required to provide parking based upon the total parking requirement associated with each use.  On the other hand, parking requirements for uses with large public assembly areas relative to the remainder of the building (i.e. meeting halls or libraries) are based upon the largest public assembly area.  Normally, staff would analyze the parking needs for the Church of Scientology building relative to the size of the sanctuary.  However, because proposed development will have a sanctuary which comprises less than 5% of the total net floor area, staff has instead analyzed the parking impact using an aggregate of the uses in the building (sanctuary, offices and classrooms).

(Leathers Dep., Ex. 20 at 8; Leathers Dep. Ex. 21 at 8; PSMF ¶ 51; Defs.' Resp. SMF ¶ 51).   Using the City's typical parking calculation for "Churches or Other Places of Worship," Plaintiff's property would be required to provide 41 parking spaces.  (PSMF ¶ 49; Kimley-Horn Parking Study, Doc. 39-1).

Based on information provided by Plaintiff during the rezoning process regarding the nature of its religious practices, the City determined that the Church of Scientology is different from "traditional" churches or places of worship as defined by the Zoning Ordinance in that Scientology focuses on individualized study and course work rather than large congregational gatherings

in the sanctuary. (DSMF ¶ 33; Leather's Decl. ¶ 8; Leathers Dep., Ex. 20 at 12). During the November 19, 2009, Planning Commission meeting, counsel for Plaintiff stated "they have a chapel service that occurs on the weekend. And that is where they come together for chapel. It is not like a congregational style church like you may be accustomed to that everybody turns out at the same time every week for one particular hour or a series of several hours. They don't typically do that. . . . the general use of the building will be the offices, for counseling and classroom study." (Tr. Nov. 19, 2009, Planning Commission Meeting, Doc. 46-1 at 33:16-22). The City found that a lack of adequate parking on the property "could cause an excessive or burdensome use of the existing infrastructure." (Leathers Dep., Ex. 20 at 12). As a result, the staff calculated the parking requirement under Section 18.2.1 based on a breakdown by square footage of the facility's various proposed uses (office, classroom, sanctuary) by totaling the required parking for each type of use. (DSMF ¶ 36; PSMF ¶ 52; Defs.' Resp. SMF ¶ 52; Leathers Dep., Ex. 20 at 9). The staff determined that Plaintiff's proposed use of the property required 148 parking spaces broken out as follows: (1) Chapel (1,218 SF) – 41 spaces; (2) Classrooms (11,153 SF) – 56 spaces; (3) Offices (17,065 SF) – 51 spaces. (DSMF ¶ 37; Compl. ¶ 49; Leathers Dep., Ex. 20 at 9).

Accordingly, the staff made the following recommendations to the Planning Commission:

The proposed use (a place of worship) incorporates a build-out of the existing lower level parking deck to create a new sanctuary, additional office space and classrooms. An analysis was prepared by staff comparing the proposed uses within the building and minimum parking standards from Article 18.2.1 of the Zoning Ordinance associated with each use. According to this analysis (see Table 1), the site at full build-out would not provide the minimum number of parking spaces required per code. Because of this, staff recommends the total building area be limited to 32,053 square feet unless the applicant receives a variance from the minimum parking requirements or can demonstrate a reduction is warranted due to the operation of use such that parking spaces could be shared. . . . It is the opinion of the staff that the proposed use and density are consistent with the Future Land use Map and the policies of the Comprehensive Plan. The entire 43,246 square feet could be recommended for approval by staff if the applicant can demonstrate that the on-site parking will be sufficient to meet the full use of the proposed building including the expansion through either a parking study or shared-parking analysis. Therefore, based on these reasons, the staff recommends **APPROVAL CONDITIONAL** of the request to rezone the subject property from O-I (Office and Institutional District) to O-I (Office and Institutional District) conditional and the associated concurrent variance.

(Leathers Dep., Ex. 20 at 13; Leathers Dep. Ex. 21 p. 12; PSMF ¶ 55; Defs.' Resp. SMF ¶ 55). The City deferred consideration of the Church's Application to allow the Church time to provide staff with a parking study to demonstrate the parking needs for the property. (PSMF ¶ 56; Defs.' Resp. SMF ¶ 56; DSMF ¶ 40; Pl.'s Resp. SMF ¶ 40).

### 1. Parking Studies

Plaintiff submitted a parking study of its Nashville, Tennessee and Dunwoody, Georgia facilities conducted by Kimley-Horn in June 2009, and supplemented the study in July 2009, with an analysis of a third facility in

Buffalo, New York ( "the Parking Studies"). (DSMF ¶ 41; Pl.'s Resp. SMF ¶ 41;

PSMF ¶ 71; Defs.' Resp. SMF ¶ 71; Leather's Decl. ¶ 12; Compl. ¶ 52; Kimley-Horn

Parking Study, Docs. 39-1, 39-2). The Parking Studies determined that the

maximum number of parking spaces needed for Plaintiff's proposed use of the

property, based on peak demand per square foot of the Nashville facility, would

be 52 parking spaces. (PSMF ¶¶ 58-63; Defs.' Resp. SMF ¶¶ 58-63; Kimley-Horn

Parking Study, Docs. 39-1, 39-2).[9] Upon review of the Parking Studies, the staff

subsequently revised its parking recommendation and calculated an alternate

parking ratio, based on the information provided regarding the Nashville facility,

to reduce the required parking from 148 spaces to 130 spaces. (DSMF ¶ 42; Pl.'s

Resp. SMF ¶ 42; PSMF ¶¶ 66-67; Defs.' Resp. ¶¶ 66-67; Leather's Decl. ¶¶ 12-14;

Leathers Dep., Ex. 21 at 8; Leathers Dep., Ex. 22 at 8-9). Nonetheless, the staff

found that the available parking was still deficient to support Plaintiff's proposed

expansion at full capacity and once again recommended "restricting the use of the

subject property to the existing 32,053 square foot building with the existing 111

spaces."[10] (Leathers Dep., Ex. 22 at 8-9, 14). The Church's Application was again

deferred. (Leathers Dep., Ex. 23 at 2).

---

[9]   The City disputes the accuracy of the assessment of the expected parking demand for the property in the Parking Studies. The City contends that the Parking Studies failed to provide necessary evaluative information concerning the full operating capacity of each facility and the varying person-to-car ratios of the facilities. (Defs.' SMF ¶ 63).

[10]   It is undisputed that the property was purchased with the express purpose of facilitating the growth of the organization. It was clearly the expectation of both the Plaintiff and the City that the membership of the Church would grow beyond its current active enrollment of 100

## 2. Alternate Conditions

On September 1, 2009, representatives of the Church met with the staff and the City Attorney to discuss alternate conditions for approval of the Church's Application requesting conversion of the basement to religious uses. (PSMF ¶ 77; Defs.' Resp. ¶ 77; Leathers Decl. ¶15). The Church submitted an amendment to its Application proposing a limitation on the occupancy of the building to 283 people, based on the 81 parking spaces provided after conversion of the basement, and applying a parking ratio of 3.5 people per vehicle ("the First Alternate Conditions"). (PSMF ¶ 77; Defs.' Resp. ¶ 77; Leathers Decl. ¶ 15; Leathers Dep., Ex. 23 at 19). The staff recommended approval of the First Alternate Conditions. (PSMF ¶ 78; Defs.' Resp. ¶ 78; Leathers Dep., Ex. 23 p. 19). The City deferred consideration of the Application to allow the Planning Commission an opportunity to review and make a recommendation in light of these alternate conditions. (Compl. ¶58; Leathers Dep., Ex. 23 at 2). On September 17, 2009, the Planning Commission recommended denial of the Application with the First Alternate Conditions. (Leathers Dep., Ex. 23 at 2).

---

parishioners. It is not clear how the Parking Studies related to that anticipated growth or to address the undisputed fact that, as an Ideal Org, Plaintiff expected to have 100 staff members on site at all times. (DSMF ¶ 35; Pl.'s Resp. SMF ¶ 35; Danos Dep. 82-83). This latter piece of information, although very telling as to the reasonableness of the City's concerns over adequate on-site parking, does not appear to have been presented to the staff. As the City points out in its briefing, it is clear that the staff struggled with determining the actual capacity of the church in order to calculate a reasonable parking requirement.

Prior to the scheduled October 20, 2009, City Council Hearing, the Church submitted a second amendment to its Application. (Compl. ¶ 60). The Church proposed reconfiguring the property's surface lot to increase the total number of parking spaces from 81 to 111. (DSMF ¶ 43; Pl.'s Resp. SMF ¶ 43; Leathers Decl. ¶ 15). The Church then proposed lowering the occupancy limit to 170 people, based on 111 parking spaces provided after reconfiguration of the surface lot, and applying a parking ratio of 1.5 people per vehicle ("the Second Alternate Conditions"). (PSMF ¶ 78; Defs.' Resp. SMF ¶ 78; Leathers Decl. ¶ 15; Compl. ¶ 60). The staff recommended approval of the Second Alternate Conditions. (PSMF ¶ 78; Defs.' Resp. SMF ¶ 78; Leathers Decl. ¶ 16; Leathers Dep., Exs. 24 & 25; Compl. ¶ 61).

## F.    City Council Decision

On December 15, 2009, the City Council rejected the Second Alternate Conditions proposing an occupancy limitation based on a concern regarding how to enforce such a limitation, considering the current size of the Church's congregation and its potential for growth as a regional church. (Tr. Dec. 15, 2009, City Council Hearing at 38-40, 46-48, 54-55, Doc. 47-1; Dec. 15. 2009, City Council Minutes at 15-19, Doc. 48-1). The City Council approved Plaintiff's rezoning Application to allow the use of the property as a church with the condition that the property be limited to 32,053 square feet, but denied Plaintiff's request to expand the use of the property to the proposed 43,916 square feet

based on a lack of sufficient parking. (DSMF ¶¶ 27, 28; Pl.'s Resp. SMF ¶¶ 27, 28; Compl. ¶ 64; Dec. 15, 2009, City Council Minutes, Doc. 48-1 at 23-24).

According to Plaintiff, the City has issued development approval to eleven (11) other churches or places of worship since the City's formation on December 31, 2005, for which the "Church" parking standard was applied rather than the "multi-use" parking standard applied to Plaintiff.[11] (PSMF ¶¶ 81-82; Defs.' Resp. SMF ¶¶ 81-82).

## G.    Plaintiff's Complaint

On January 13, 2010, Plaintiff filed its Complaint in this matter against the City of Sandy Springs, its Mayor and Council members in their official capacity ("Defendants"), setting for the following claims: (1) various violations of RLUIPA, Counts I through III; (2) violations of the rights to free exercise, freedom of speech, freedom of assembly, and freedom of establishment, as guaranteed by the First Amendment, Counts V through VIII; (3) violation of the Equal Protection Clause of the Fourteenth Amendment, Count IX; (4)  an unconstitutional taking in violation of the Fifth Amendment, Count X; (5) costs of litigation under RLUIPA and 42 U.S.C. § 1988, Count IV; (6) deprivation of rights guaranteed by the Georgia Constitution and state law, Counts XI and XII; and (7) equitable relief, Counts XIII and XIV.

---

[11] The City admits that it has issued development approval to eleven other churches or places of worship. However, the City denies that it always applied the "Church" parking standard as opposed to a "multi-use" parking standard under Section 18.2.1 of the Zoning Ordinance. *See* Section III(A)(2)(b)(i) *infra*.

19

## H.     Parties' Contentions

The parties have filed cross motions for summary judgment.  Plaintiff seeks summary judgment on its RLUIPA claims and its Free Exercise claim only.  The City seeks summary judgment on all of Plaintiff's substantive claims and claims for relief.  In essence, Plaintiff's claim is that the City's conditional approval of its rezoning Application limiting its use of the building to 32,053 square feet and denying its proposed conversion of the 11,863 square foot basement area into religious use (based on the application of the multi-use parking standard rather than the church parking standard) impinges on Plaintiff's use of the building as a church in accordance with Scientology's Scriptures.  As such, Plaintiff asserts that the City's action substantially burdens its religious exercise and discriminates against the Church on the basis of its religious denomination in violation of the First Amendment and RLUIPA.  On the other hand, the City contends that Plaintiff has not been denied the use of its building as a church and that the City applied the same parking standard it has applied to other multi-use religious institutions.  The City further argues that any burden suffered by Plaintiff is the result of its own actions in purchasing the property prior to the completion of CSI's study on the minimum space requirements for a Class V Ideal Org.

## II.     SUMMARY JUDGMENT STANDARD

Both parties have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c).  Summary judgment is appropriate only when there are

no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The substantive law applicable to the case determines which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party. *Id.* An issue is material only if its resolution could affect the outcome of the action. *Id.* Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. *Id.*

"The district court should resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his favor." *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (citations and punctuation omitted). The court may not weigh conflicting evidence or make credibility determinations. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 919 (11th Cir. 1993), *reh'g denied*, 16 F.3d 1233 (1994) (en banc).

For issues upon which the moving party bears the burden of proof at trial, the moving party must affirmatively demonstrate the absence of a genuine issue of material fact as to each element of its claim on that legal issue. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). It must support its motion with credible evidence that would entitle it to a directed verdict if not controverted at trial. *Id.* If the moving party makes such a showing, it is entitled to summary

judgment unless the non-moving party comes forward with significant, probative evidence demonstrating the existence of an issue of fact.  *Id.*  As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); see *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).

When the non-moving party bears the burden of proof at trial, however, the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim.  *Id.*  Instead, the moving party may point out to the district court that there is an absence of evidence to support an element of the non-moving party's case.  *Id.*  The non-moving party must then respond with sufficient evidence to withstand a directed verdict motion at trial. Fed. R. Civ. P. 56(e); *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

## III.  ANALYSIS

As an initial matter, before addressing the substantive merits of the Church's claims, the Court expresses its concern as to whether Plaintiff's claims are ripe.  As the Second Circuit in *Murphy v. New Milford Zoning Comm'n* stated in the context of RLUIPA,

> Ripeness is a doctrine rooted in both Article III's case or controversy requirement and prudential limitations on the exercise of judicial authority. At its heart is whether we would benefit from deferring initial review until the claims we are called on to consider have arisen in a more concrete and final form. As the Supreme Court has explained, the ripeness doctrine's "basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." Ripeness, therefore, is "peculiarly a question of timing" as cases may later become ready for adjudication even if deemed premature on initial presentation.

402 F.3d 342, 347 (2d Cir. 2005) (internal citations omitted).  The Eleventh Circuit has held in the context of due process violations resulting from zoning decisions, relying on the Supreme Court's analysis in *Williamson County* that:

> Whether the violation alleged is a taking without just compensation or a deprivation of substantive due process, the decision of a municipality is not ripe for review unless that decision is final and definite with respect to the property at issue.  Until a property owner has obtained a final decision regarding the application of the zoning ordinance and subdivision regulations to its property, it is impossible to tell whether the land retains any reasonable beneficial use or whether existing expectation interests have been destroyed. . . . In determining whether an administrative agency or local government body has reached a final decision regarding the particular land in question, courts have found an absence of finality where property owners did not avail themselves of the opportunities

provided by state or federal statute to seek variances or waivers from zoning decisions.

*Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1573-74 (11th Cir.1989),

*reh'g denied, en banc*, 893 F.2d 346 (1989) (citing *Williamson County*, 473 U.S.

172 at 3116-17); *Eide v. Sarasota County*, 908 F.2d 716, 724-27 (11th Cir. 1990)

(following *Greenbriar's* holding and requiring that the zoning decision under

attack be finally made and applied to the property at issue). *See also Hodel v.*

*Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264 (1981)

(rejecting a claim that the Surface Mining Control and Reclamation Act effected a

taking because there was no indication in the record that the plaintiffs availed

themselves of the opportunities provided by the Act to obtain administrative

relief by requesting a variance from the specific requirements and reasoning that

if the property owners had sought administrative relief under these procedures

they might well have reached a mutually acceptable solution with regard to the

individual properties, thereby obviating any need to address the constitutional

questions).

The court in *Murphy* found that the reasoning behind *Williamson County's*

ripeness test was not strictly confined to the context of a regulatory takings

challenge and applied *Williamson County's* requirements to the plaintiff's

RLUIPA and First Amendment claims.   402 F.3d at 349-52.   The court in

*Murphy* held that the claims were not ripe because the plaintiffs may have been

able to obtain a variance from the Zoning Board of Appeals by showing that a literal enforcement of the zoning requirements would work an unusual hardship. Their failure to apply for a variance deprived the court of any certainty as to what use of the plaintiff's property would be permitted. *Id.* at 352. As noted by the court in *Murphy*, "the *Williamson County* ripeness test is a fact-sensitive inquiry that may, when circumstances warrant, be applicable to various types of land use challenges." *Id.* 350. In addition, as recognized in *Murphy*:

> [T]he finality requirement is not mechanically applied. A property owner, for example, will be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile. That is, a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied. And, a property owner will not be required to litigate a dispute before a zoning board of appeals if it sits purely as a remedial body. In sum, absent a futility or remedial finding, prong-one ripeness reflects the judicial insistence that a federal court know precisely how a property owner may use his land before attempts are made to adjudicate the constitutionality of regulations purporting to limit such use.

*Id.* (citations omitted).

The Eleventh Circuit has not expressly held that *Williamson County's* ripeness requirements apply to RLUIPA claims; however, its decision in *Konikov v. Orange County* can be read to support such a finding. *See Konikov v. Orange County*, 410 F.3d 1317, 1322 (11th Cir. 2005). In the context of the plaintiff's remaining RLUIPA and due process claims, the Eleventh Circuit separately analyzed the ripeness of the plaintiff's "as-applied" challenge to a zoning

ordinance. *Id.* The court found the plaintiff's claims were ripe because the board's imposition of daily fines for plaintiff's zoning violation indicated the finality of the board's application of the zoning requirement to the plaintiff even though plaintiff had not applied for a special exception to the zoning code or sought an appeal of the board's finding. *Id.*

Here, it is clear that Plaintiff could have applied for a variance as suggested by the City. Because Plaintiff failed to avail itself of this remedy, it is possible that the City's decision as to the property's proposed expansion is subject to modification via a variance and therefore not final. However, as neither party addressed this issue in the briefs, it is unclear from the record and arguments presented whether Plaintiff's attempts to seek a variance would have been futile. Accordingly, while the Court has concerns regarding whether the City has made a final decision as to the use of Plaintiff's property, the Court will assume ripeness for the purses of this Order because the parties have not addressed the issue. However, the Court orders the parties to submit briefing on whether Plaintiff's claims are ripe, not to exceed 15 pages, no later than October 21, 2011. Based on that briefing, the Court will determine whether it is necessary to reconsider any of the rulings herein.

The Court will now address the merits of the parties cross motions for summary judgment. Plaintiff's motion seeks partial summary judgment on its RLUIPA claims (Counts I – III) and its free exercise claim (Count V) and requests

an award of compensatory damages pursuant to 42 U.S.C. § 1983. Defendants' motion seeks summary judgment on all of Plaintiff's substantive claims (Counts I – III, and V - XII), and Plaintiff's claims for costs, damages and equitable relief (Counts IV, XIII and XIV).

## A. RLUIPA

Both parties seek summary judgment with respect to Plaintiff's RLUIPA claims (Counts I, II, and III). Plaintiff argues that the City's conditional approval of its rezoning application -- which limits the use of the building to the existing 32,053 square foot office building and excludes the proposed use of the 11,863 square foot basement for a chapel, executive offices, and classrooms -- is a violation of RLUIPA and its right to the free exercise of its religion. The Complaint alleges that the City violated RLUIPA in the following ways: (1) by imposing and implementing a land use regulation that substantially burdens religious exercise (Count I); (2) by applying the zoning ordinance in a way that treats this religious organization on less than equal terms with other religious and non-religious assemblies (Count II); (3) by implementing a land use regulation in a manner than discriminates on the basis of religion (Count II) ; and (4) by imposing a land use regulation that unreasonably limits religious assemblies, institutions, and structures within the City (Count III).[12]

---

[12] Count II of Plaintiff's Complaint is titled "Discrimination on the Basis of Religion" and appears to be a claim under 42 U.S.C. § 2000cc(b)(2), RLUIPA's nondiscrimination provision.

RLUIPA[13] prohibits governments from imposing a "substantial burden" on the religious exercise of a person or a religious assembly by imposing a land use regulation, unless that land use regulation is necessary to further a compelling state interest. 42 U.S.C. § 2000cc(a)(1). In addition, governments may not impose land use regulations that treat religious institutions on less than equal terms with secular institutions, discriminate against religious institutions, or unreasonably limit religious institutions. 42 U.S.C. § 2000cc(b). A land use regulation is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude or other property interest in the regulated land or a contract or option to acquire such an interest." 42 U.S.C. § 2000cc-5(5).

## 1. Section (a) Substantial Burden Provision

The Court's analysis of the Church's claim under Section (a) of RLUIPA involves three considerations: (1) whether the City made an individual assessment of the Church's proposed use of the property such that RLUIPA

However, Plaintiff lumps an Equal Terms violation under 42 U.S.C. § 2000cc(b)(1) into the same count as its Nondiscrimination argument and makes no attempt to distinguish these provisions. The Court construes the Complaint as alleging both violations.

[13]  RLUIPA is a statutory codification of the Constitution's Free Exercise, Establishment, and Equal Protection Clauses in the context of land use regulation (and, although not relevant here, institutionalized persons). *See generally Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004); *Konikov*, 410 F.3d at 1319 n. 1. Because Plaintiff's constitutional claims are inextricably intertwined with its RLUIPA claims, the Court need not separately address Plaintiff's constitutional claims where the relevant analysis would be duplicative. Rather, the Court will note whether triable issues remain as to any of Plaintiff's constitutional claims following its analysis under the relevant provisions of RLUIPA.

applies; (2) whether the Church has established a prima facie case that the City has imposed a substantial burden on its religious exercise; and (3) if the Church establishes its prima facie case, whether the City can justify the burden imposed by demonstrating a compelling interest achieved by the least restrictive means. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004); *Konikov,* 410 F.3d at 1323 (11th Cir. 2005).

### a. **Whether the City Made an Individualized Assessment**

First, RLUIPA's "individualized assessment test" has been characterized by the Eleventh Circuit as a jurisdictional determination. *Midrash,* 366 F.3d 1214, 1225; *Hollywood Community Synagogue, Inc. v. City of Hollywood*, 430 F.Supp.2d 1296 (S.D. Fla. 2006). The Court has jurisdiction over the City's alleged violation of Section (a) of RLUIPA only if the Church can show that the "burden is imposed in the implementation of a land use regulation or system of land use regulations, under which a government makes . . . individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2)(C). An individualized assessment involves a "case-by-case evaluation of the proposed activity." *Midrash*, 366 F.3d at 1225.

Plaintiff's Complaint alleges that "[b]y the imposition and implementation of a land use regulation that imposes a substantial burden on the Church's exercise of the Scientology religion within the City of Sandy Springs, Defendants made an individualized assessment of the proposed uses for the property

involved." (Compl. ¶ 73). Plaintiff asserts in its motion that the City does not dispute that its treatment of the Church's zoning application constitutes an individualized assessment. (Pl.'s Br. Summ. J. at 32). However, the City denied Plaintiff's allegation that the City made an individualized assessment in its Answer. (Answer ¶ 73). The City contends that Section 18.2.1 of the Zoning Ordinance is neutral and generally applied to determine the required amount of parking. (Defs. Br. Summ. J. at 11). According to the City,

> [The Parking Ordinance] establishes a table of parking standards keyed to types of uses. Zoning Ord. § 18.2.1. All of the terms in the table are neutrally defined in the Zoning Ordinance based on the nature of the operative use. Zoning Ord. § 3.3.1 In order to calculate required parking Defendants find a use on the table in Section 18.2.1 that best captures the applicant's proposed primary use or uses and then applies the parking standard that correlates to that use or uses assuming the facility operates at maximum capacity. Doc. 42-1 p. 77-79; Leathers Decl. ¶ 6. If the parking standard appears inadequate or has the effect of creating an adverse situation, the Zoning Ordinance affords the City Council flexibility to impose additional mitigating conditions. Zoning Ord. § 28.1 ¶ 3.

(Defs.' Br. Summ. J. at 11-12).

Even where the government's regulation is neutral and generally applicable, its application to particular facts can constitute an individualized assessment, particularly where "the application does not involve a mere numerical or mechanistic assessment," but involves criteria that are at least

partially subjective in nature.[14]  *Living Water Church of God v. Charter Township of Meridian*, 384 F.Supp.2d 1123, 1130 (W.D. Mich. 2005), *rev'd on other grounds*, 258 Fed. Appx. 729 (6th Cir. 2007); *Westchester Day School v. Village of Mamaroneck ("Westchester Day School VI")*, 417 F.Supp.2d 477, 541-42 (S.D.N.Y. 2006), *aff'd* 504 F.3d 338 (2d Cir. 2007).   In *Lighthouse Community Church of God v. City of Southfield*, the court found no individualized assessment where the government's application of a parking ordinance -- requiring the addition of all the uses of the building (including the worship space, Sunday school classrooms, and administrative offices) to calculate the total number of required parking spaces -- involved a numerical application with no subjective element.  2007 WL 30280, at *6 (E.D. Mich. Jan. 3, 2007).[15] The Court went on to find, however, that the Zoning Board of Appeals' ("ZBA") denial of the plaintiff's request for a parking variance, being partially subjective in nature, was an individualized assessment since the ZBA is able to authorize

---

[14]   Several courts have found that special use permit and variance applications involve individualized assessments. *See Fortress Bible Church v. Feiner*, 734 F.Supp.2d 409, 498-99 (S.D.N.Y. 2010); *Living Water Church of God v. Charter Township of Meridian*, 384 F.Supp.2d 1123, 1130-31 (W.D. Mich. 2005), *rev'd on other grounds*, 258 Fed. Appx. 729 (6th Cir. 2007); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1140, 1160 n. 10 (E.D. Cal. 2003), *aff'd*, 456 F.3d 978 (9th Cir. 2006).

[15]   The parties in *Lighthouse Community Church of God* raised strikingly similar arguments to those posed by the parties here.  For example, the plaintiff there asserted that (1) because all the uses of the building will not be used concurrently, it is improper to add all of the uses together when calculating parking spaces; and (2) the city has not uniformly applied the parking requirement in previous instances and was applying it against the plaintiff in an individualized manner.  2007 WL 30280 at *6.

relaxation of the ordinance provisions and to grant variances in certain cases. *Id.* at *7.

Here, as in *Lighthouse Community Church of God*, the Parking Ordinance, which provides that "[p]arking requirements shall be calculated based on the proportion that each use contributes to the total," appears to be a law of general and neutral numerical application with no subjective element. However, the City's application of the Parking Ordinance to the Church was based on consideration of the Church's individual case.

The staff determined that Plaintiff did not meet the definition of a "church" under the Zoning Ordinance based on information provided by Plaintiff during the rezoning process. A "Church, Temple or Place of Worship" is defined in the Zoning Ordinance as "[a] facility in which persons regularly assemble for religious ceremonies. This shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 3.3.3, Doc. 49-1 at 15). Here, "[s]ince Plaintiff was not an assembly-type use, Defendants determined that application of the 'church' use parking standard was inadequate to determine what level of parking was sufficient to service the proposed use," the staff used its flexibility to impose additional mitigating conditions pursuant to Section 28.1. (Defs.' Br. Summ. J. at 12-13).

According to the Staff Report,

> Article 18.2.1 indicates parking requirements are to be calculated based upon the proportion that each use contributes to the total. For example, a building with multiple uses would be required to provide parking based upon the total parking requirement associated with each use. On the other hand, parking requirements for uses with large public assembly areas relative to the remainder of the building (i.e. meeting halls or libraries) are based upon the largest public assembly area. Normally, staff would analyze the parking needs for the Church of Scientology building relative to the size of the sanctuary. However, because proposed development will have a sanctuary which comprises less than 5% of the total net floor area, staff has instead analyzed the parking impact using an aggregate of the uses in the building (sanctuary, offices and classrooms).

(Doc. 42-2, Ex. 20 at 19, R000173). The City found that the lack of adequate parking "could cause an excessive or burdensome use of the existing infrastructure." Based on this concern, the staff deviated from its normal practice of analyzing the parking needs for a church building relative to the size of the sanctuary without requiring additional parking for accessory uses, and instead applied a multi-use formula in its initial parking calculation. *Id.* Subsequently, the staff considered the Parking Studies and the Alternate Conditions submitted by Plaintiff and revised its parking calculation to reduce the number of parking spaces required for Plaintiff's property. Thus, the Court finds that the City made an individual assessment of the Church's proposed use of the property by taking into account the particular details of Plaintiff's proposed use of the property in its conditional approval of Plaintiff's rezoning Application. *Midrash,* 366 F.3d at 1225; *Guru Nanak Sikh Society of Yuba City,* 456 F.3d at 986 (holding that

33

RLUIPA applies when the government may take into account the particular details of an applicant's proposed use of land when deciding to permit or deny that use).

### b.   Whether the City's Decision Imposed a Substantial Burden on the Church's Religious Exercise

Section (a) of RLUIPA provides in relevant part:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution — (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  Plaintiff bears the burden of establishing a prima facie case under Section (a) of RLUIPA that the City has imposed a substantial burden on its religious exercise.  42 U.S.C. § 2000cc-2(b); *Midrash*, 366 F.3d at 1225.  If Plaintiff makes such a showing, then the burden shifts to the City to demonstrate that the challenged imposition or implementation of the Ordinance "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc(a)(1)(A)-(B).   Under RLUIPA, "religious exercise" includes the "use, building or conversion of real property for the purpose of religious exercise." 42 U.S.C. § 2000cc5(7)(B); *Midrash*, 366 F.3d at 1225 ("In passing RLUIPA, Congress recognized that places of assembly are needed to facilitate religious

practices, as well as the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes."). It is not necessary that religious exercise be "compelled by, or central to, a system of religious belief" in order to be protected under RLUIPA.[16] *Midrash*, 366 F.3d at 1225. Therefore, the question is whether the application of the City's Parking Ordinance imposes a "substantial burden" on Plaintiff's use of its property for the purpose of religious exercise. *Id.*

RLUIPA does not define the term "substantial burden." As a result, courts have looked to the Supreme Court's definition of substantial burden in its free exercise jurisprudence. *E.g., Midrash*, 366 F.3d at 1225 (citing cases). The Eleventh Circuit has held that a substantial burden "must place more than an inconvenience on religious exercise . . . [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly. Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id.* at 1227; *Westchester Day Sch. v. Vill. Of Mamaroneck,* 504 F.3d 338, 349 (2d Cir. 2007) ("when there has been a denial of a religious institution's building application, courts appropriately speak of government action that directly coerces the religious institution to change its behavior, rather

---

[16]   Accordingly, the City's argument that its Parking Ordinance does not impose a substantial burden because "Scientology does not have any beliefs, practices, or religious mandates with respect to parking at its facilities" fails as a matter of law. (*See* Defs.' Br. Summ. J. at 15).

than government action that forces the religious entity to choose between religious precepts and government benefits. . . . There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise); *Living Water Church of God v. Charter Tp. Of Meridian*, 258 Fed. Appx. 729, 741 (6th Cir. 2007) (finding that while the township's action will require the church to incur increased expense and to endure increased inconvenience if it is not able to build a facility of the desired size, the township's action did not impose a substantial burden where the action did not require the church to violate, modify, or forego its religious beliefs or precepts); *Williams Island Synagogue, Inc., v. City of Aventura,* 329 F.Supp.2d 1319, 1325-26 (S.D. Fla. 2004).

In the "Free Exercise" First Amendment context,[17] the Supreme Court has made clear that the substantial burden hurdle is high and that determining its existence is fact intensive. *See e.g., Hobbie v. Unemployment Appeals Comm'n,* 480 U.S. 136, 141 (1987) (finding burden when government puts "substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Wisconsin v. Yoder*, 406 U.S. 205, 234-35 (1972) (compulsory school attendance law and criminal sanctions for noncompliance interfered with free exercise rights of Amish); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (finding burden when

---

[17] As of this date, the Supreme Court has not specifically applied or defined "substantial burden" in the RLUIPA context.

individual is required "to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion ... on the other hand"). *But see Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 450-51 (1988) (no burden where government action interferes with, but does not coerce, individual's beliefs); *Braunfeld v. Brown*, 366 U.S. 599, 605 (1961) (no burden where regulation made religious observation more expensive). *See also Living Water Church of God v. Charter Tp. Of Meridian*, 258 Fed. Appx. 729, 734 (6th Cir. 2007) (citing cases). "Courts must ensure that the facts warrant protection under RLUIPA, rather than simply granting a blanket immunity from zoning laws." *Westchester Day Sch. IV*, 417 F.Supp.2d at 544, *aff'd*, 504 F.3d 338 (2d Cir. 2007); *Living Water Church of God,* 258 Fed. Appx. at 736 (noting that "a substantial burden is a difficult threshold to cross.  If the term substantial burden is not to be read out of the statute, RLUIPA cannot stand for the proposition that a construction plan is immune from a town's zoning ordinance simply because the institution undertaking the construction pursues a religious mission.").

Plaintiff argues that "the inability to utilize the entire 43,916 square feet of the existing building[18] owned by the Church of Scientology is far more than an inconvenience" and constitutes a substantial burden for the following reasons:

---

[18] As indicated in the Plaintiff's rezoning application, the plaintiff sought approval to expand the building from 32,053 square feet to 43,916 square feet by converting the 11,193 square foot basement/garage area to religious uses.

(1) the Church cannot meet its religious needs with the 32,053 limitation on the building; (2) restricting the Church's ability to use the whole building would severely compromise the religious programs the Church can offer its congregants, depriving them of the opportunity to fully practice their religion; (3) denying the Church the ability to utilize the basement would require the Church to revise its existing renovation plans and re-engineer the structural support of the building, which would be prohibitively expensive; (4) alternatively, if the Church were unable to use the entire 43,916 square foot building, it would have to sell the property and relocate; and (5) assuming the Church were able to find a property of suitable size and location, there will be delay, uncertainty, and a great deal of expense. (*See* Pl.'s Br. Summ J. at 36-37).

The implementation of a land use regulation that completely bars the use of the property for religious exercise *may* constitute a substantial burden. *See DiLaura v. Twp. v. Ann Arbor*, 112 Fed. Appx. 445, 446 (6th Cir. 2004) (finding that "designation as a bed and breakfast would have effectively barred the plaintiffs from using the property in the exercise of their religion and, hence, the defendants' refusal to allow a variance constituted a substantial burden on that exercise."); *Lighthouse Community Church of God*, 2007 WL 30280 at *7-9 (denying city's motion for summary judgment and holding that plaintiff established a prima facie case under RLUIPA where the city's denial of the church's application for certificate of occupancy was based on a lack of adequate

parking, thereby totally precluding the church from using the building for religious worship purposes); *Cottonwood Christian Center v. Cypress Redevelopment Agency*, 218 F.Supp.2d 1203, 1226 (C.D. Cal. 2002) ("Preventing a church from building a worship site fundamentally inhibits its ability to practice its religion.   Churches are central to the religious exercise of most religions.   If Cottonwood could not build a church, it could not exist.").

On the other hand, no substantial burden is imposed where the government action may make religious exercise more expensive or difficult but does not place substantial pressure on a religious institution to violate or forego its religious beliefs and does not effectively bar a religious institution from using its property in the exercise of its religion. *See Vision Church v. Village of Long Grove*, 468 F.3d 975, 997-100 (7th Cir. 2006) (noting that because the church would be permitted to build a smaller facility under the village's ordinance, the court held that the village's conditions on the approval of the permit limiting the size of the building, the number of services, and the number of major activities to be conducted did not impose a substantial burden on the church's religious exercise); *Living Water Church of God,* 258 Fed. Appx. at 739-741, (citing *Midrash* 366 F.3d at 1227) (finding that the inability of a church to construct its "ideal building" does not constitute a substantial burden); *Westchester Day School v. Village of Mamaroneck*, 504 F.3d 338, 349 (2d Cir. 2007) (noting that "when the denial of a religious institution's application to build is not absolute,

such would not necessarily place substantial pressure on the institution to alter its behavior"); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. City of West Lin*, 86 P.3d 1140, 1156 (Or. Ct. App. 2004) (finding, in part, that the burden resulting from the city's decision prohibiting the church from constructing the particular design of building and parking lot that it proposed on the particular property did not constitute a "substantial burden" under RLUIPA where record did not indicate that the particular size building or design proposed was required by its religious beliefs).

Plaintiff's professed burdens in the instant case are nearly identical to those alleged by the church in *Living Water Church of God*. There, although the church's request to build a religious school was granted (but denied as to its requested size), the Church argued that anything less than the addition of a 35,000 square foot building on its property prevented it from fulfilling its ministries and missions. *Living Water Church of God,* 258 Fed. Appx. at 737. Noting that "RLUIPA does not protect the church from all land use regulation, but only from those regulations that substantially burden its religious exercise," the court reasoned that simply because the church's current facility is too small does not give the church "free reign to construct on its lot a building of whatever size it chooses, regardless of the limitations imposed by the zoning ordinance." *Id.* at 739.

40

> Ideally, no doubt, Living Water would have an unlimited and ever-expanding place of worship with open doors to all who are interested – the same would surely apply to its school. The Township's action here, and the zoning ordinance in general, burdens this hope and objective. And although the Township's action may make Living Water's religious exercise more expensive or difficult, we cannot say that it places substantial pressure on this religious institution to violate its religious beliefs or that it effectively bars the institution from using its property in the exercise of its religion.

*Id.* at 739. Accordingly, the court found no substantial burden where the church failed to demonstrate that the Township's imposition of size restrictions prevented it from carrying out the full scope of its current church missions and ministries but "demonstrated only that it cannot operate its church on the *scale* it desires." *Id.* at 741.[19]

A government may regulate the number of parking spaces required for a church facility or restrict the size of assemblies or institutions, and as long as such restrictions are unrelated to the religious characterization of the property, RLUIPA is not implicated. *Midrash*, 366 F.3d at 1234 n.17. Moreover, the Eleventh Circuit has held that where a religious organization has not shown that its property carries religious significance, the inability to relocate a religious

---

[19] In so ruling, Sixth Circuit relied on its earlier finding that "[e]ven if Living Water's current needs are not the proper measuring stick, we do not find a substantial burden. Living Water has a building in which to worship. It may conduct its ministries and programs. It has permission to construct a school on its property, and it can build an additional 14,000 square-foot building without obtaining an SUP. While Living Water has outgrown its current facility, the record does not contain the kind of facts that would permit a finding that the building which the church can construct without an additional SUP would be so inadequate as to substantially burden Living Water's religious exercise in the future. RLUIPA does not protect the church from all land use regulation, but only from those regulations that substantially burden its religious exercise." *Id.* at 739.

facility is not a substantial burden under RLUIPA. *Id.* at 1227 n.11 ("That the congregations may be unable to find suitable alternative space does not create a substantial burden within the meaning of RLUIPA."); *Hollywood Community Synagogue, Inc.*, 430 F.Supp.2d at 1318-19.

The City's motion contends that Plaintiff is entitled to use the existing facility on the subject property for the practice of Scientology and that while the current facility might be less than "ideal," Plaintiff has made no showing that it is impossible to practice Scientology in the existing facility. (Defs.' Br. at 15). Plaintiff, a Class V Organization, currently practices Scientology in a facility one-quarter of the size of the subject property. Notably, Plaintiff does not assert that the City's action in denying its proposed use of the property has coerced or forced Plaintiff into foregoing practicing the religious precepts of Scientology. Rather, Plaintiff relies on the Affidavit of Deborah Danos to support its assertion that the Church does not presently have adequate space to provide the necessary Training, Auditing and other religious services mandated by Scientology and that the inability to utilize the entire 43,916 square feet of the existing building is "far more than an inconvenience." In applying RLUIPA, however, "the Court is not concerned simply with the inadequacy of Plaintiff's current location or the adequacy of the proposed location. Instead, the Court is required to determine whether Defendant's application of this Land Use Regulation has imposed

pressure so significant as to require Plaintiff's congregation to forego their religious beliefs." *Williams Island Synagogue*, 329 F. Supp. 2d at 1326.

In her deposition, Ms. Danos testified that the Church's 11,000 square foot Dunwoody facility provided adequate space to accommodate the number of people who presently want to practice Scientology at the facility. (Danos Dep. 36:12-38:24). However, Ms. Danos further testified that "when you cannot deliver in the ideal fashion, people don't come." (Danos Dep. 38:21-23). Although Plaintiff contends that 40,000 square feet is the minimum space required for an Ideal Organization, nothing in its written Scriptures mandates a building of 40,000 square feet in order to meet all of Scientology's necessary religious services. (Danos Dep. 122:22-123:11). There exists no document specifying the physical requirements for an Ideal Org. Rather, guidelines as to the physical requirements of an Ideal Org are part of a template created by CSI gleaned from bits and pieces of Hubbard's writings. *Id.* Although it is referred to as an Ideal Org., not all steps of the Bridge to Total Freedom can be achieved at such a facility.[20] (Danos Dep. 99:3-9). In terms of implementation, Scientology is "at the forefront of the Ideal Org evolution, there are not so many." (Danos Dep. 90:23-24; *see also* Wright Aff. ¶ 7) ("At first, there were no standards in place. We were trying out different concepts and evolving those concepts as we

---

[20] Indeed, even this location as planned does not provide for a testing center. (*See* Checklist, Doc. 67-1 at 10).

went along."). Even as recently as December 2010, as many as 90% of the existing Class V Scientology churches were "not of the correct size to house all the functions." (Wright Aff. ¶ 4).

The City further contends that any burden experienced due to a lack of space on the subject property is self-imposed and not a result of the City's denial of Plaintiff's proposed expansion. (*Id.* at 16). Plaintiff purchased the property in 2005 before CSI had completed its study of the minimum space requirements necessary to house those services. (Wright Dep. 44-46). Plaintiff waited nearly four years after its purchase to seek approval of its rezoning and proposed use of the property in 2009. (Danos Aff. ¶¶ 6, 13).

In light of these standards and based on the facts presented by both parties, the Court cannot hold that Plaintiff has been substantially burdened by the City's conditional approval as a matter of law. The Zoning Ordinance permits the use of the property as a church and the City approved Plaintiff's use of the entire property as a church subject to restrictions on its size to ensure adequate parking.[21] *See Midrash*, 366 F.3d at 1227 n.11 (noting that reasonable "run of the

---

[21] Plaintiff complains that the City Council's rejection of its proposed Alternate Condition limiting the occupancy of the building to 170 people imposes a substantial burden on its use of the property for religious exercise. The Court notes that had such a limitation been imposed, absent the parties' binding consent, it might possibly be viewed later as constituting a substantial burden on religious exercise in violation of RLUIPA because limiting the number of people who may attend a church would result in "turning people away" from religious services. See *Murphy v. Zoning Com'n of Town of New Milford*, 289 F.Supp.2d 87, 113-14 (D. Conn. 2003), *vac'd on other grounds* in 402 F.3d. 342 (2nd Cir. 2005)(holding that because plaintiff's claims were never ripe for judicial intervention, the district court's permanent injunction should be vacated and the plaintiff's complaint dismissed).

mill" zoning considerations such as size, congruity with existing uses, and availability of parking do not constitute substantial burdens on religious exercise). The City's action allows the use of the entire facility as it exists, with 32,053 square feet of improved space and 11,193 square feet of basement garage space serving, in part, as on-site parking. The City also indicated that Plaintiff's proposed expansion could be approved with either a variance from the minimum parking requirements, a shared on-site parking arrangement, or by obtaining sufficient off-site parking.

Alternatively, Plaintiff has not asserted that the subject property has any religious significance to its practice of Scientology.  Therefore, any financial burden Plaintiff may suffer as a result of being forced to locate a suitable alternative facility does not constitute a substantial burden under RLUIPA. Moreover, a reasonable jury could find that Plaintiff's own actions caused its burden as opposed to the City's conditioned approval limiting the size of the facility on the property.[22]  *West Pikeland*, 721 F.Supp.2d at 378-79 ("Plaintiff chose to have the property blessed before it had received approval from Defendant for its conditional use. Plaintiff therefore voluntarily took actions that caused any impingement. We cannot find that the Free Exercise Clause protects a plaintiff that willfully ties itself to a plot of land, knowing that zoning approval

---

[22]    In addition, according to the Checklist performed prior to approval of the property for purchase, Plaintiff indicated that the rezoning approval should be secured prior to purchase. (*See* Checklist, Doc. 67-2 at 3).

is required for its desired use, and then demands that the zoning board *not apply an ordinance to it because denying the desired use would impinge its* exercise of religion.").

The Court finds that genuine issues of material fact exist regarding whether the City's conditional approval effectively bars Plaintiff's use of its property thereby imposing a substantial burden on its religious exercise. *See Living Water Church of God*, 258 Fed. Appx. at 741 (noting that the Court's finding of no substantial burden was grounded on the facts before it and that if the plaintiff proffered evidence showing that it cannot carry out its church missions and ministries due to the government's actions it might have reached a different outcome). A jury must determine the substantial factual dispute regarding whether and to what degree Plaintiff was burdened by the City's action. *See Williams Island Synagogue, Inc.*, 329 F. Supp. 2d at 1325-26; *Bikur Cholim, Inc. v. Village of Suffern*, 664 F. Supp. 2d 267, 291 (S.D.N.Y. 2009); *Rocky Mountain Christian Church v. Board of County Comm'rs of Boulder County*, 612 F. Supp. 2d 1163, 1176-77 (D. Colo. 2009), *aff'd* 613 F.3d 1229, *cert. denied* 131 S.Ct. 978, 178 L.Ed.2d 750 (denying board's motion for judgment as a matter of law after twelve day jury trial and finding that the evidence was sufficient for jury to conclude, inter alia, that county's denial of the church's application for special use permit substantially burdened the church's religious exercise in violation of RLUIPA); *Reaching Hearts Intern., Inc. v. Prince George's County*, 584 F. Supp.

2d 766, 785-87 (D.Md. 2008), *aff'd* 368 F.Appx. 370 (denying county's motion for judgment as a matter of law following jury trial and finding that sufficient evidence supported the jury's finding that county's actions restricting religious congregation's ability to build church on only 0.7 acres out of its 17-acre parcel imposed a substantial burden on the congregation's religious exercise in violation of RLUIPA); *Couch v. Jabe*, 479 F. Supp. 2d 569, 589-91 (W.D. Va. 2006) (finding genuine issues of material fact existed precluding summary judgment in favor of prison officials where a reasonable jury could find that inmate was substantially pressured to break his fast, in violation of Islamic tenets, in order to satisfy his physical hunger in violation of his right to freely exercise his religion under RLUIPA). "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989). Summary judgment is therefore inappropriate. *See Tippens v. Celotex Corp.*, 805 F.2d 949, 953 (11th Cir.1986) ("Of the three elements required to establish a prima facie case . . . two continue as unresolved issues of fact. Summary judgment is justified only for those cases devoid of any need for factual determinations.") (internal quotations and citations omitted).

The Court cannot conclude as a matter of law that the City's action imposes a substantial burden on Plaintiff's religious exercise. Significant factual questions

remain in dispute affecting the resolution of the substantial burden issue.[23]   As

this threshold issue for resolution of a claim under RLUIPA remains outstanding,

the Court need not reach the question of whether the City can justify the burden

created by articulating a compelling government interest.  *Midrash*,  366 F.3d at

1228; *Williams Island Synagogue, Inc.,* 329 F. Supp. 2d at 1326.   Accordingly,

the parties' cross motions for summary judgment on Count I are denied.[24]

## 2.  Section (b): Equal Terms, Nondiscrimination, Exclusions and Limits

Plaintiff's remaining RLUIPA claims are brought pursuant to 42 U.S.C. §

2000cc(b), which provides as follows:

> (1) Equal terms. No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution.

> (2) Nondiscrimination. No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination.

> (3) Exclusions and limits. No government shall impose or implement a land use regulation that – (A) totally excludes religious assemblies from a jurisdiction; or (B) unreasonably limits religious assemblies, institutions, or structures within a jurisdiction.

---

[23] This conclusion does not foreclose the possibility that a directed verdict could be granted if the evidence at trial is insufficient to show a substantial burden on Plaintiff's ability to use its property for religious exercise by forcing Plaintiff to forego the practice of Scientology such that no reasonable jury could find in Plaintiff's favor on this issue.

[24]   For these same reasons, the parties' Motions for Summary Judgment on Plaintiff's free exercise claim (Count V) are denied and the City's Motion for Summary Judgment on Plaintiff's freedom of assembly claim (Count VIII) is denied.

When bringing a claim under section (b) the plaintiff is not required to demonstrate a substantial burden. *See Midrash*, 366 F.3d at 1229-35 (a zoning ordinance prohibiting churches in a certain district violated RLUIPA's equal terms provision although it did not impose a substantial burden on plaintiffs); *Lighthouse Inst. for Evangelism, Inc. v. City of Long Branch*, 510 F.3d 253, 262 (3rd Cir. 2007); *Civil Liberties for Urban Believers v. City of Chicago*, 342 F.3d 752, 762 (7th Cir.2003) ("the substantial burden and nondiscrimination provisions are operatively independent of one another").   Plaintiff has alleged violations of each of section (b)'s three subdivisions which the Court addresses separately in turn below.

### a. RLUIPA's Equal Terms Provision

The central premise behind RLUIPA's equal terms provision is that a land use regulation may not treat a religious assembly or institution on less than equal terms than a nonreligious assembly or institution.   42 U.S.C. § 2000cc(b)(1). Count II of Plaintiff's Complaint alleges that "[t]he Zoning Ordinance, as applied to the Church, treats this religious organization and institution on less than equal terms with other *religious and non-religious* assemblies and institutions in the City." (Compl. ¶ 78) (emphasis added).   Plaintiff points to several instances in which it alleges the City treated other similarly situated religious organizations more favorably in terms of its application of the Parking Ordinance.   However, RLUIPA's equal-terms provision does not require that all religious entities be

treated similarly, but instead requires that religious entities be treated equally to nonreligious entities. *West Pikeland* at 375; *see also Roman Catholic Bishop of Springfield v. City of Springfield*, 760 F.Supp.2d 172, 188-89 (finding unequal terms claim fails as a matter of law where plaintiff "presented no evidence of unequal treatment as compared to *any* secular comparator, whether similarly situated or not."). The Eleventh Circuit has concluded that:

> A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a similarly situated nonreligious comparator received differential treatment under the challenged regulation. If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof.

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1311 (11th Cir. 2006). As Plaintiff has not pointed to unequal treatment when compared to nonreligious entities, summary judgment is appropriate in Defendants' favor on this issue. *Id.*

### b. RLUIPA's Nondiscrimination Provision

Under RLUIPA's nondiscrimination provision, governments are prevented from discriminating on the basis of "religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). There are few published cases considering this provision of RLUIPA. The parties treat RLUIPA's nondiscrimination provision as a subset of the equal terms provision and assert that in order to make out a case of religious discrimination, Plaintiff must show that it was treated differently from a

similarly situated religious organization.   Plaintiff bears the initial burden of
producing prima facie evidence to support a claim for violations of section (b) of
RLUIPA.  *Primera*, 450 F.3d at 1308 (citing 42 U.S.C. § 2000cc-2).   Once the
plaintiff meets its initial burden and produces prima facie evidence supporting
such a claim, the government bears the burden of showing that its
implementation of the land use regulation passes strict scrutiny – that is, the
regulation "employs a narrowly tailored means of achieving a compelling
government interest." *Covenant Christian Ministries, Inc. v. City of Marietta*, ---
F.3d ---, 2011 WL 3903432, at *10 (11th Cir. Sept. 7, 2011) (citing *Primera*, 450
F.3d at 1308).

As construed by the Eleventh Circuit, RLUIPA's nondiscrimination
provision codifies the heightened strict scrutiny standard of constitutional review
the Supreme Court applies in religious free exercise and non-discrimination
cases, while incorporating the Court's holding in *Employment Div., Dept. of
Human Res. v. Smith*, 494 U.S. 872, 877, (1990), that strict scrutiny is
inapplicable to "neutral laws of general applicability that incidentally burden
religious exercise." *Midrash*, 366 F.3d 1231-32 ("Congress enshrined similar
nondiscrimination principles in § (b)'s requirement that religious and
nonreligious assemblies or institutions be treated equally."); *see also Primera*,
450 F.3d at 1313 (finding equal terms violation comparable to equal protection
claim); *Hollywood Community Synagogue, Inc.*, 430 F. Supp. 2d 1296, 1311

(applying selective enforcement analysis to plaintiff's claim under RLUIPA's nondiscrimination provision); *West Pikeland*, 721 F. Supp. 2d 361, 382-84 (applying equal protection analysis to RLUIPA nondiscrimination claim).

The Eleventh Circuit has identified three distinct kinds of statutory equal protection/nondiscrimination violations: (1) a statute that facially differentiates between religious assemblies or institutions;[25] (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on a particular religious assembly or institution; or (3) a truly neutral statute that is selectively enforced against one religious denomination as opposed to another. *Primera*, 450 F.3d at 1308. Plaintiff does not assert that the Zoning Ordinance facially differentiates between religious assemblies on the basis of denomination. Rather, Plaintiff asserts that the City has engaged in "religious gerrymandering" and selective enforcement of its parking requirements. (Pl.'s Resp. Summ. J. at 14; Pl.'s Br. Summ J. at 27-28).

A religious gerrymander that departs from basic principles of neutrality may support a RUILPA violation. *Id.* at 1309 (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (holding that drafting of an otherwise facially neutral classification essentially constituted a religious

---

[25] The Zoning Ordinance does not treat religious uses differently from secular uses. The parking requirements are imposed on all secular as well as religious uses. Facially, there is no evidence that the City's Ordinance treats religious and secular uses differently. Rather, the Ordinance appears to treat large and small scale uses differently, but this difference in treatment does not amount to discrimination.

"gerrymander" that departed from principles of neutrality because it revealed that the ordinances "had as their object the suppression of religion.")).  To prove this kind of statutory violation, Plaintiff would have to show that the Parking Ordinance separates permissible from impermissible assemblies or institutions in a way that burdens "almost only" religious uses.  *Id.*  Plaintiff has presented no such evidence to the Court.  Rather, Plaintiff's argument is that by ignoring the definition of "church" in its Ordinance and then ignoring the evidence provided by Plaintiff in its parking studies, the City engaged in the "kind of result oriented religious gerrymandering " prohibited under RLUIPA.  (Pl.'s Resp. Summ. J. at 13-14).    The  Court's  review  of  the  Ordinance  reveals  that  it  was  not "gerrymandered" to burden only religious uses such as Plaintiff's.  In fact, the Ordinance was enacted before Plaintiff purchased the property, undermining any suggestion  that  the  Ordinance  targeted  Plaintiff's  non-traditional  religious denomination.  *Id.* at 1310.

Plaintiff's claim is more appropriately couched as an "as-applied challenge" to the Parking Ordinance.  The application of a neutral ordinance may violate RLUIPA's nondiscrimination provision if it differentially treats similarly situated religious assemblies on the basis of denomination.  *See Primera*, 450 F.3d at 1311 (citing *Konikov v. Orange County, Fla.*, 410 F.3d 1317, 1327-29 (11th cir. 2005)) (in the context of an equal terms violation).  To prevail on a claim that the City's Ordinance  was  applied  to  Plaintiff,  and  not  other  religious  assemblies  or

institutions (basically a selective enforcement claim), Plaintiff must show: (1) that it was treated differently from other similarly situated religious assemblies or institutions, and (2) that the City unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff. *Campbell v. Rainbow City,* 434 F.3d 1306, 1314 (11th Cir. 2006) (citing *Strickland v. Alderman,* 74 F.3d 260, 264 (11th Cir. 1996)). These issues must be determined by a jury unless, as a matter of law, Plaintiff puts forth insufficient evidence of discrimination to create a triable issue of fact on the issue. *See Wright v. Southland Corp.,* 187 F.3d 1287 (11th Cir. 1999) ("The Supreme Court has stated that courts should not 'treat discrimination differently from other ultimate questions of fact.'"); *Campbell,* 434 F.3d at 1314-16; *Primera,* 450 F.3d at 1313-14; *West Pikeland,* 721 F.Supp.2d at 385-86).

### i. **Whether Plaintiff Identified Similarly Situated Comparators**

In the zoning context, a showing that two projects were similarly situated requires some specificity. *Campbell,* 434 F.3d at 1314 (citing *Racine Charter One, Inc. v. Racine Unified School Dist.,* 424 F.3d 577, 680 (7th Cir. 2005) (finding that "[t]o be considered 'similarly situated,' comparators must be *prima facie* identical in all relevant respects")). The Eleventh Circuit has held that in order for any religious assembly or institution to be similarly situated to Plaintiff,

it must be prima facie identical in all relevant respects. *Campbell*, 434 F.3d at

1315.

> The crux of Plaintiff's Complaint in this matter is that

> The City has discriminated against the Church, not only by refusing to apply its own parking ordinance to the Church, but also by applying a different parking standard than it has applied to every other church or place of worship in its jurisdictional boundaries. The City approved parking variances to reduce the required parking required for other places of worship in the City, while imposing a parking requirement on the Church of Scientology that amounts to almost three (3) times the parking required by the City's Zoning Ordinance.

(Pl.'s Br. Summ. J. at 27-28). Plaintiff identified eleven religious assemblies in

the City Plaintiff contends were treated more favorably than Plaintiff in terms of

how the Parking Ordinance was applied.[26] (PSMF ¶ 81). Neither party disputes

that the "parking standard" applied to Plaintiff was the multi-use formula under

Section 18.2.1 of the Ordinance rather than the "church use standard."

Plaintiff misconstrues the appropriate inquiry into whether other religious

assemblies or institutions are similarly situated by pointing to all religious

institutions that received approval by the City since 2005. "In any type of zoning

situation, the use of the proposed development is quite relevant." *Campbell*, 434

F.3d at 1314-15 (noting that the district court correctly recognized the importance

of use in its determination that only developers who sought approval of

---

[26] Plaintiff provided specific details only as to the alleged similarity of four of these other religious assemblies. (*See* Pl.'s Br. Summ. J. at 17-24). Therefore, under *Campbell*, the Court cannot determine whether these other religious assemblies or institutions were sufficient comparators.

apartment building plans could be considered similarly situated and finding that it would have been error for the district court to consider commercial developments to be similarly situated to the plaintiff's large residential complex). Plaintiff wants the definition of a "church or other place of worship" to apply to its proposed use for purposes of calculating the required parking for the site. The Zoning Ordinance defines church as "a facility in which persons regularly assemble for religious ceremonies. This shall include, on the same lot, accessory structures and uses such as minister's and caretaker's residences, and other uses identified under the provisions for Administrative and Use Permits." (Zoning Ordinance § 18.2.1(C)). The property is zoned O-I (Office Institutional) which defines "accessory uses" as "structures and land [that] may be used for uses customarily incidental to any permitted use." (*Id.* at § 8.1.2(B)).

Plaintiff's counsel represented to the City Council at the December 15, 2009, rezoning hearing that "it's not a congregational style of worship like you're used to. It is a lot of independent study. It is a lot of counseling, that type of thing."[27] (Tr. Dec. 15, 2009, Hearing 48:7-10, Doc. 47-1). Indeed, Ms. Danos,

---

[27] Although Plaintiff quibbles in its motion over whether the Zoning Ordinance requires congregational style worship for a facility to qualify as a church, it is clear from these representations as well as the evidence submitted on these motions for summary judgment that Plaintiff does not primarily intend to use the facility as a place for persons to regularly assemble for religious ceremonies as contemplated by the Zoning Ordinance. Merriam-Webster's Collegiate Dictionary (11th ed. 2009) defines "congregation" as "an assembly of persons." Plaintiff scoffs at the City's assumption that a church is an "assembly type use for large congregational religious worship services." Because the parking requirement is based on the square footage of the largest assembly area, the City's statement that the definition "assumes

56

Plaintiff's President, testified that the average attendance at the Church of Scientology's Sunday worship service is between 8 to 10 people. (Danos Dep. 45:24-46:4). Accordingly, in order for Plaintiff's comparators to be similarly situated, they must have sought rezoning approval for a primary use in addition to their "church" use (defined by the Zoning Ordinance as an "assembly-type use"), that would necessitate application of the considerations of section 18.2.1.

Defendant identified two examples where other religious institutions were determined by the City as not falling solely under the Zoning Ordinance's definition of "church" for purposes of applying the Parking Ordinance. (Defs.' Resp. SMF ¶82). For instance, in the case of the Kadampa Meditation Center (hereinafter "Kadampa"), Kadampa applied to rezone property from O-I conditional "to allow for a Place of Worship, having accessory uses, and to allow for a boarding house, all to operate within an existing 7,430 square foot building." (Leathers Dep., Ex. 31, Doc. 40-1). In calculating the parking requirement for Kadampa, the City applied a multi-use formula that totaled the amount of parking required for Kadampa's sanctuary (the "church" use) and boarding facility (the "boarding house" use). (Defs.' Resp. SMF ¶82; Leathers Dep. 164:14-167:15, Doc. 41 at 8-14).

[the primary use] is an assembly-type use for large congregational religious worship services" is reasonable. The City doesn't deny that Plaintiff is a church or will use part of the property for religious ceremonies. The City simply determined that Plaintiff will not use the property primarily for large congregational services in accordance with how the parking requirements were designed.

The City did not require separate parking for classrooms or offices because the boarding house and sanctuary accounted for the majority of the square footage of the building and "if the remaining space is relatively minor, it would be accessory and wouldn't be separately calculated." (Leathers Dep. 167:3-168:17) ("When ... the accessory uses become larger is when we would separately calculate them."). The City did not consider the boarding house to be an accessory use, but rather considered it to be a parallel primary use that required separate parking in addition to the sanctuary. As the Director testified, the boarding house is "something which is being done in conjunction with this church, but it is not, it is significant enough so that it is, and it is not what would be normally − most churches don't have this kind of facility. And so the parking ordinance [as applied to churches] really doesn't contemplate that kind of use at that location. And so it was separately addressed in part." (Leathers Dep. 172:17-173:7). Accordingly, the Court finds that while Kadampa is an appropriate comparator, it was treated no more favorably than Plaintiff (but apparently in the same manner as Plaintiff). Therefore, evidence relating to Kadampa's treatment does not support Plaintiff's claim that the City violated RLUIPA's nondiscrimination provision.

Similarly, in the case of the Congregation Beth Tefillah, although certain accommodations were made with regard to the total number of on-site parking spaces required, the City applied a multi-use formula to calculate the parking

required for Beth Tefillah's synagogue and proposed preschool. (Defs.' Resp. SMF ¶82; Leathers Dep. 196:6-201:9). Based on the multi-use formula, the City determined 76 parking spaces were required for the church use and 29 parking spaces were required for the preschool use for a total of 105 parking spaces required for the property. (Leathers Dep. 199:7-17). The property had 71 onsite parking spaces available, leaving a deficit of 34 parking spaces. (Leathers Dep. 197:1-198:6).

The City's Parking Ordinance section 18.2.2 allows for shared on-site parking between multiple uses on the same property. (Zoning Ordinance 18.2.2; Leathers Dep. 200:22-24). Section 18.2.2 allows churches to share up to 50% of their total parking with other uses on the property under certain conditions. (Zoning Ordinance 18.2.2; Leathers Dep. 198:8-14). In the case of Beth Tefillah, the City applied the shared on-site parking provision of section 18.2.2 to allow the synagogue and the preschool to share 38 of the 71 on-site spaces between them and reduce the total number of parking spaces required to 77. (Leathers Dep. 196:6-201:9). The application of the on-site parking provision to Beth Tefillah's application left a deficit of 6 parking spaces. (Leathers Dep. 199:7-20).

The City's Zoning Ordinance Section 19.3.6 provides that when parking under Section 18.2.1 cannot be satisfied, off-site shared parking may be allowed as long as no more than 20% of the shared parking is located off-site and the off-site location is no more than 300 feet from the principal use. (Zoning Ordinance

59

19.3.6).  The City permitted Beth Tefillah to meet its remaining parking needs
through an off-site shared parking arrangement with a nearby school. (Leathers
Dep. 196:6-201:9; PSMF ¶ 97).  Plaintiff asserts and Defendant acknowledges
that a variance should have been required for approval of Beth Tefillah's shared
off-site parking arrangement for an additional 6 required parking spaces. (*See
also* Leathers Dep. 199:25–200:25) (stating that in addition to a variance, an
administrative permit would also have been necessary to approve Beth Tefillah's
off-site parking arrangement under the requirements of the Zoning Ordinance).
Plaintiff contends that by failing to require Beth Tefillah to obtain a variance in
approving its use permit as was required under the Zoning Ordinance, the City
gave favorable treatment to Beth Tefillah.

The City argues that unlike Beth Tefillah, Plaintiff did not propose a shared
parking arrangement that would have allowed it to reduce the total number of
required on-site parking spaces.  However, the record demonstrates that while
Beth Tefillah produced documentation of its off-site shared parking arrangement,
there is no evidence in the record that Beth Tefillah similarly sought approval of
an on-site shared parking arrangement. (Leathers Dep. 199:20-24; PSMF ¶ 97).
Although it is not entirely clear from the limited record presented by the parties
on this issue, it appears that the City may have automatically applied the on-site
parking provision without any express request by Beth Tefillah.  While it is clear
from the initial Staff Report that Beth Tefillah proposed to meet its parking

deficit through an off-site shared parking arrangements, it is also possible that the on-site parking arrangement was discussed during subsequent portions of the zoning process.

The record demonstrates that Plaintiff was in the same position as Beth Tefillah in terms of potentially utilizing a shared parking arrangement to satisfy its parking deficit. Construing the facts and inferences in the light most favorable to Plaintiff, it appears that the City put the burden on Plaintiff to request a variance and demonstrate a reduction in required parking through an appropriate shared parking arrangement, and thereby treated Plaintiff less favorably than it did Beth Tefillah.[28]  (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12).    There is no evidence in the record that Plaintiff either applied for such a variance or attempted to demonstrate the appropriateness of an on-site shared parking arrangement.  Rather, it appears that Plaintiff remained wedded to its assertion that it should be required to provide only 41 parking spaces.[29]

Accordingly, construing the evidence in the light most favorable to Plaintiff on this issue, the Court finds there are genuine issues of material fact as to

---

[28] The Court notes that the City's staff recommended to the Planning Commission that "the total building area be limited to 32,053 square feet unless [Plaintiff]  receives a variance from the minimum parking requirements or can demonstrate a reduction is warranted due to the operation of use such that parking spaces could be shared." (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12).

[29] Plaintiff did undertake a Parking Study designed to show that the Church's peak usage was much lower than the City's parking calculation.  However the parking study was only one out of the three possibilities recommended by the staff as a potential method to alleviate the City's parking demand.  As discussed at the outset of this Order, Plaintiff's failure to respond to the City's suggestion that it request a variance or propose a shared parking arrangement may prove problematic.

whether Beth Tefillah, a similarly situated comparator, was treated more favorably than Plaintiff. The City's application of a shared parking analysis to Beth Tefillah's proposed expansion allowing the two primary on-site uses to share parking, an analysis that was not done in consideration of Plaintiff's Application, creates an issue of fact as to whether the City treated Beth Tefillah more favorably than Plaintiff.[30]

In a third case, Lutheran Church of the Apostles (hereinafter "Lutheran"), the Director testified that the City calculated the required parking for the construction of an 8,770 square foot "Family Life Center" (the "church" use) in addition to the required parking for an existing daycare facility (the "non-church" use). (Leathers Dep. 179:24-188:11). According to the Director, because the daycare is not a normal part of the church facility but is a separate parallel operation, the parking for the daycare facility was separately calculated. (Leathers Dep. 184:20-186:5). The Director further testified that the church and the daycare facility were able to operate under an on-site shared parking arrangement whereby 50 percent of the parking spaces of the church may be shared with the daycare. (Leathers Dep. 180:21-181:12; 184:25-185:2). Plaintiff asserts that by misapplying the church parking standard, Lutheran was treated more favorably

---

[30] The Court notes that the distinction between Beth Tefillah and Plaintiff is slim and may ultimately prove only to be different treatment but not unequal treatment.

than Plaintiff.[31] However, Plaintiff submitted as evidence only the first page from the Staff Report and the Letter of Intent regarding the proposed project from Lutheran's engineer. (*See* Leathers Dep., Exs. 33 & 34). For a reasonable jury to find Lutheran to be similarly situated to Plaintiff, Plaintiff would need to provide a record of what Lutheran presented to the City when it was granted approval for its expansion. *Campbell*, 434 F.3d at 1315. Because Plaintiff provided no such information, neither a jury nor this Court can find Lutheran to be similarly situated to Plaintiff so as to warrant a finding of a RLUIPA nondiscrimination violation.

Finally, Plaintiff points out as a comparator the case of Zainabia Islamic Education Center ("Zainabia") where the City approved a variance to reduce the parking requirement. (*See* Pl.'s Br. Summ. J. at 22-23; Leathers Dep., Ex. 45, Doc. 40-4). However, it is undisputed that Plaintiff did not apply for a variance from the parking requirement. As the Eleventh Circuit recognized in *Primera*, a rezoning and a variance are markedly different forms of zoning relief and have

---

[31] As noted briefly above, the parking requirements for churches are based either on the number of fixed seats in the larges assembly area or based on the gross square footage of the largest assembly area if no fixed seats are designated. (Zoning Ordinance 18.2.1). Plaintiff contends that the City should have applied the "per square foot" parking standard as opposed to the "fixed seat" parking standard for churches. According to Plaintiff, if the City had applied the per square foot parking standard, 293 parking spaces would have been required as opposed to the 129 spaces actually required by the City. Plaintiff misrepresents the full extent of the Director's testimony as to how the parking was calculated. Plaintiff contends that "according to the Director, 'fixed seats' are those seats that are either affixed to the facility or is difficult to move and where the permanent arrangement remains in place." However, the Director testified that "fixed does not mean it's affixed to the ground and can't be moved. I think I said that in the beginning . . . [F]ixed contemplates that's the maximum number that you will have in there at any time and it can be calculated." (Leathers Dep. 183:17-184:6).

63

plainly different purposes. *Primera*, 450 F.3d at 1311. A variance alleviates a particular landowner's hardship but does not alter the property's zoning classification. Therefore, a variance merely grants the present owner a right to deviate from the general rule. *Id.* at 1311. "By contrast, rezoning is not meant to alleviate a particular landowner's hardship; rather, it is a general adjustment of the zoning scheme that affects the rights of all future landowners." *Id.* Under these facts, the Court in *Primera* found that the plaintiff failed to present evidence of a similarly situated comparator. *Id.* at 1313 ("projects which seek different types of variances are not similarly situated.") The Court went on to hold that Primera failed to establish a prima facie case of discrimination because:

> [Primera] introduced no evidence that the County applied the BCZC in a manner that subtly or covertly departed from requirements of neutrality and general applicability. The evidence Primera adduced regarding its treatment and the School's treatment is consistent with the County's neutral application of different zoning regulations. Primera's evidence establishes only that the School received *different* treatment, not *unequal* treatment.

*Id.* (internal citations omitted). Thus, because Zainabia sought and obtained a variance as opposed to a rezoning, the Court finds that Zainabia is not a similarly situated comparator.

Construing these facts in the light most favorable to Plaintiff, the Court finds there are genuine issues of material fact regarding solely whether the City

treated Beth Tefillah more favorably than Plaintiff.[32]   Thee Court now turns to whether the City acted with a discriminatory purpose.

### ii. Whether the City Acted With a Discriminatory Purpose

In order to make out a prima facie case of discrimination under Section (b) of RLUIPA, Plaintiff must present evidence of intentional or purposeful discrimination by the City because of Plaintiff's religious denomination.   *See Covenant Christian Ministries, Inc. v. City of Marietta,* 2008 U.S. Dist. LEXIS 54304, at *46-47 (N.D. Ga. Mar. 31, 2008), *aff'd* --- F.3d ---, 2011 WL 3903432 (11th Cir. Sept. 7, 2011); *Roman Catholic Bishop of Springfield v. City of Springfield,* 760 F. Supp. 2d 172, 191 (D. Mass. 2011); *Denver First Church of the Nazarene v. Cherry Hills Village,* 2006 U.S. Dist. LEXIS 49483, at *9 (D. Colo. July 19, 2006) (citing *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005)); *West Pikeland,* 721 F. Supp. 2d at 377-381; *Reaching Hearts Intern., Inc. v. Prince George's County,* 584 F.Supp.2d 766, 781 (D.Md. 2008).   *See also Rutstein v. Avis Rent-A Car System*, 211 F.3d 1228, 1235 (11th Cir. 2000) (noting that the Equal Protection Clause can be violated only by purposeful discrimination.); *Tanner v. McCall,* 625 F.3d 1183, 1193 (5th Cir. 1980) ("Prima facie proof of a constitutional violation must include evidence of impermissible motive.").

---

[32]   Nonetheless, for the reasons discussed in Section III(2)(b)(ii) *infra,* Plaintiff's violation of RLUIPA's nondiscrimination claim does not survive Defendants' motion for summary judgment.  Therefore no factual issues remain for trial on this issue.

A plaintiff may either show intentional discrimination through direct evidence or establish an inference of discrimination through circumstantial evidence. *See* e.*g., Covenant Christian Ministries, Inc.,* 2008 U.S. Dist. LEXIS 54304, at *46-47; *Reaching Hearts Intern., Inc.,* 584 F.Supp.2d at 781-82. Only the most blatant remarks, the intent of which could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination. *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir. 2004) (in context of employment discrimination). Comments or conduct falling short of this mark are circumstantial evidence at best. *Id.*

While it is rare for a government to expressly offer religion as its reason to exclude a church, and discrimination may often lurk behind universally acceptable reasons such as traffic, it is also true that "zoning laws inherently distinguish between uses and necessarily involve selection and categorization, often restricting religious assemblies . . .". *Midrash*, 366 F.3d at 1234 (citing *Lukumi*, 508 U.S. at 542-43). "All laws are selective to some extent . . . [but] inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* The City's Zoning Ordinance does not prohibit or discriminate against churches or religious institutions. Indeed, a church is a permitted use in the O-I zoning district, along with other secular uses. The issue here is the City's application of the Parking Ordinance to Plaintiff's property.

The record here does not support a reasonable inference, much less a conclusion, that the City intentionally discriminated against Plaintiff on the basis of religion as a matter of law.  Plaintiff has presented no direct evidence of discrimination.  Nor can discrimination be inferred merely because Plaintiff was treated differently than other churches in terms of calculating its required parking where "as long as restrictions or distinctions are unrelated to the religious characterization, RLUIPA is not implicated."  *Id.* at 1234 n.17.  As the Director testified "[t]he issue for us is not whether it is a religious use but whether the parking is appropriately calculated." (Leathers Dep. 205:1-3).[33]  The City approved Plaintiff's use of the property as a Church with the existing 32,053 square foot building and 111 parking spaces.  The City also found that "the entire 43,246 square feet" proposed by Plaintiff could be recommended for approval if Plaintiff sought a variance from the minimum parking requirements or could demonstrate that the on-site parking will be sufficient to meet the full use of the building through either a parking study or a shared parking analysis.  (Leathers Dep., Ex. 20 at 13; Leathers Dep., Ex. 21 at 12).    The City deferred action on Plaintiff's rezoning application for nine months, allowing Plaintiff to present the Parking Studies and the Alternate Conditions to its Application in order to

---

[33] Plaintiff's counsel acknowledged as much at the December 15, 2009, City Council hearing when stating "[t]he issue in this case has not been one of land use. It has been one of parking and a perceived issue as it relates to traffic." (Tr. Dec. 15, 2009, City Council Hearing 4:18-20, Doc. 47-1).

alleviate any hardship resulting from the minimum parking requirement imposed by the Ordinance.[34]

The City's zoning decision did not discriminate based on the religious use of the property, but instead applied the Parking Ordinance in a way that characterized the different types of uses proposed by Plaintiff as required under the language of the Ordinance itself. The City demonstrated that the same application of the Parking Ordinance was applied to other multi-use religious facilities. The City's denial of Plaintiff's proposed expansion was based only on one thing – the lack of adequate parking.

Thus, the record fails to reflect any religious animus that served as the motivation for the City's application of a multi-use parking standard to Plaintiff's property. Accordingly, because Plaintiff failed to satisfy its burden of establishing a prima facie case of discrimination under Section (b), the City is entitled to summary judgment on Plaintiff's nondiscrimination claim (Count II) and the Court need not reach the question of whether the City can justify its action by articulating a compelling government interest.[35] *See Midrash*, 366 F.3d at 1228; *Covenant Christian Ministries*, 2008 WL 3903432, at *10.

---

[34] In fact, the Parking Studies submitted by Plaintiff did not address the parking demand on the property based on operation at full capacity but instead relied on other Scientology churches that the City found were not comparable to the subject property.

[35] Because Plaintiff failed to satisfy its burden of demonstrating a prima facie case under RLUIPA's equal terms and nondiscrimination provisions, Plaintiff's claims in Count IX (equal protection) and Count VI (establishment clause) also fail as a matter of law.

### c. RLUIPA's Exclusions and Limits Provision

RLUIPA's exclusions and limits provision prohibits a land use regulation that "unreasonably limits religious assemblies, institutions, or structures *within a jurisdiction.*" 42 U.S.C. § 2000cc(b)(3) (emphasis added).  It is clear from the plain language of the statute that the purpose of this provision is not to examine the restrictions placed on individual landowners, but to prevent municipalities from broadly limiting where religious entities can locate.  *West Pikeland*, at 387; *see also Rocky Mountain Christian Church v. Board of County Commissioners,* 613 F.3d 1229, 1238 (10th cir. 2010) (noting that district court's jury instruction properly required the plaintiff to establish that the county's "regulation, as applied or implemented, has the effect of depriving both [RMCC] and other religious institutions and assemblies of reasonable opportunities to practice their religion, including the use and construction of structures, within Boulder County."); *see also Vision Church v. Village of Long Grove,* 468 F.3d 975, 990 (7th Cir. 2006); *Chabad of Nova, Inc. v. City of Cooper City*, 575 F. Supp. 2d 1280, 1289 (S.D. Fla. 2008).  In fact, Plaintiff acknowledges that a church is a permitted use in the City.  Plaintiff asserts only that "[b]y refusing to allow the Church to use its building as requested, the City has limited the ability of the Church to practice its religion in accordance with the doctrine of Scientology." (Pl.'s Br. Summ. J. at 30).  Plaintiff has not demonstrated any conduct by the City that had the effect of depriving or limiting religious assemblies, institutions, or

structures within Sandy Springs. *Id.* Therefore, the City is entitled to summary judgment on Count III of Plaintiff's Complaint.

## B. Freedom of Speech

The City seeks summary judgment with respect to Plaintiff's freedom of speech claim in Count VII. Plaintiff argues that its freedom of speech was violated because the City's refusal to approve the entire 43,916 square feet of Plaintiff's building prohibits Plaintiff from practicing its religion in accordance with its Scriptures. Plaintiff cited no authority in support of its claim. Defendants contend that the property was approved for use as a church and nothing prohibits Plaintiff from speaking or assembling on the property for religious purposes.[36]

Plaintiff's Free Speech claim is identical to its constitutional free exercise claim which the Court found was encompassed in its RLUIPA claim. Having found that genuine issues of material fact exist with regard to whether the City has substantially burdened Plaintiff's religious exercise by effectively barring its use of the property for its particular form of religious expression and assembly, the Court denies Defendants' Motion for Summary Judgment with respect to Count VII.

---

[36] The Court notes the persuasiveness of this argument. However, RLUIPA's substantial burden provision is construed here as being congruent with the First Amendment protections under *Midrash*, etc. Construeing the evidence in the light most favorable to the Plaintiff, the Court finds therefore that a reasonable jury could find that the City's action effectively bars Plaintiff's use of the property in accordance with the tenants of Scientology.

**C.    Federal Takings and State Inverse Condemnation Claims**

Plaintiff concedes that its Fifth Amendment takings claim and inverse condemnation claims are not ripe for adjudication until the State court considers them in a pending related action filed by Plaintiff in the Superior Court of Fulton County.   However, Plaintiff asks the Court to deny Defendants' Motion for Summary Judgment and retain jurisdiction until such time as Plaintiff has exhausted its remedies in state court.   Plaintiff cites no authority for such a request.   Moreover, the state court action was stayed on January 22, 2010, pending this Court's resolution of Plaintiff's federal claims.

Under the Supreme Court's decision in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City*, 473 U.S. 172, 195 (1985), a federal constitutional takings claim is not ripe until the plaintiff has unsuccessfully pursued a compensation claim in state court.   Therefore, Plaintiff's takings claim does not present a case or controversy ripe for judicial review and this Court lacks subject matter jurisdiction over that claim.   *Tari v. Collier County*, 56 F.3d 1533, 1535-36 (11th Cir. 1995) ("The question of ripeness goes to whether the district court had subject matter jurisdiction.") (citations omitted). Accordingly, the City is entitled to summary judgment on Plaintiff's takings and inverse condemnation claims (Counts X & XII).

## D. Violation of Substantive Due Process Under Georgia Constitution

The City seeks summary judgment with respect to Count XI of Plaintiff's Complaint construed as alleging violations of its substantive due process rights under the Georgia Constitution. As an initial matter, the Court finds that Plaintiff's substantive due process claim may not be ripe. *See* Section III *supra*.

Nonetheless, the Court addresses the merits of Plaintiff's claim. The City's rezoning decision enjoys an initial presumption of validity, and this presumption may be overcome only by clear and convincing evidence from Plaintiff showing that the decision is significantly detrimental to it and insubstantially related to governing public interests. *Dekalb County v. Flynn*, 256 S.E.2d 679, 680-81 (Ga. 1979); *Westbrook v. Board of Adjustment*, 262 S.E.2d 785, 787 (Ga. 1980). Once Plaintiff has carried its initial burden, the burden then shifts to the City to justify its decision. *Id.*

A property owner's substantive due process rights are not violated by the application of a zoning ordinance unless it is "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *King v. City of Bainbridge*, 577 S.E.2d 772, 775 (Ga. 2003) (citing *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 395 (1926)); *Northside Corp. v. City of Atlanta*, 619 S.E.2d 691, 692 (Ga. App. 2005) (citing *Jackson v. Spalding*, 462 S.E.2d 361 (Ga. 1995)) ("The standard of review in such a case is

whether the board's decision was arbitrary or capricious."). *See also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1578 n. 15 (11th Cir.1989), *reh'g denied, en banc*, 893 F.2d 346 (1989) (applying standard where plaintiffs argued that a zoning regulation deprived them of substantive due process). Even if the validity of the land classification is "fairly debatable," the legislative judgment must control. *Village of Euclid*, 272 U.S. at 388.

The Eleventh Circuit has held that the "ultimate issue of whether a zoning decision is arbitrary and capricious is a question of law to be determined by the court." *Greenbriar*, 881 F.2d at 1578. It is, however, proper for the jury to make subsidiary fact findings upon which the court may ultimately rest its determination of arbitrariness. *Id.* (citing *Barnett v. Housing Authority of City of Atlanta*, 707 F.2d 1571, 1577–78 (11th Cir.1983); *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332–33, 1336 (11th Cir.1982)). *See also Tuggle v. Manning*, 159 S.E.2d 703, 705 (Ga. 1968) ("the determination of the reasonableness of zoning restrictions must be made in the light of facts presented in each case."). However, the ultimate question of whether substantive due process has been violated is for the court. *Id.*

In response to the City's motion, Plaintiff equates its substantive due process claim with a takings claim, arguing that Plaintiff has been deprived of the full use of its property without just compensation in violation of substantive due

process under Georgia law.[37] (Pl.'s Resp. Summ. J. at 24-25). Plaintiff does not assert that the City's action denies it the economic value of its property. Instead, Plaintiff argues that the City's action denies it the ability to use its property for its desired purpose. As stated above in Section III(A)(1)(b) *supra,* the City's conditional approval did not deprive Plaintiff of its use of the property as a church. Indeed, the City's action allows use of 32,053 square feet (i.e., the majority) of the building for religious purposes. In addition, the City also noted that use of the entire 43,000 square feet could be approved if Plaintiff could

---

[37] Although the Eleventh Circuit in *Eide v. Sarasota County,* 908 F.2d 716, 721-22 (11th Cir. 1990), distinguished a substantive due process claim (referred to as an "arbitrary and capricious due process claim") from a due process takings claim, it appears that both the United States Supreme Court and the Georgia courts recognize that a substantive due process claim can arise out of a regulatory taking. *See Williamson County,* 473 U.S. 199-200 (discussing but declining to decide the issue); *Tuggle v. Manning,* 159 S.E.2d at 706-07 ("Zoning laws and regulations must meet the demands of the constitutional prohibition against the taking of private property for public use without just compensation, and restrictions which are arbitrary or unreasonable or lacking in any substantial relation to the public health, safety, morals, or general welfare come within the constitutional inhibition, as where a regulation permanently so restricts the use of property that it cannot be used for any reasonable purpose."); *Barrett v. Hamby,* 219 S.E. 2d 399, 401-02 (Ga. 1975) (finding that zoning is a subject to the constitutional prohibition against taking private property without just compensation where "[a]s the individual's right to the unfettered use of his property confronts the police power under which zoning is done, the balance the law strikes is that a zoning classification may only be justified if it bears a substantial relation to the public health, safety, morality or general welfare. Lacking such justification, the zoning may be set aside as arbitrary or unreasonable."). In *Eide,* the Court stated that to prove a due process takings claim, "a landowner must establish that the regulation goes too far, destroying the value of the property to such an extent that it has the same effect as a taking by eminent domain. To prove an arbitrary and capricious due process claim, a plaintiff need only prove that the government has acted arbitrarily and capriciously. . . Such a claim does not have to establish that the regulation has gone too far; rather, a property owner's rights have been violated the moment the government acts in an arbitrary manner and (in an as applied challenge) that arbitrary action is applied to the owner's property." *Id.* at 722, 724 n. 13. Here, Plaintiff asserts, that the alleged arbitrary and capricious action was the application of the Parking Ordinance, denying Plaintiff of the full use of its property, as courts have recognized such an application may give rise to a potential substantive due process claim, albeit sounding in takings.

demonstrate the need for a variance or a reduction in required on-site parking through a shared parking arrangement. As noted earlier, Plaintiff's failure to pursue these remedies may have arguably contributed to or caused Plaintiff's inability to satisfy the minimum onsite parking and thereby obtain approval of its proposed conversion of the basement for religious use. While these facts may give rise to a valid RLUIPA claim under Section (a)'s substantial burden provision, they do not similarly support a substantive due process claim.

The City's conditional approval of Plaintiff's rezoning Application is presumptively valid unless Plaintiff demonstrates through clear and convincing evidence that the City's action was arbitrary and capricious. *Dekalb County v. Flynn*, 256 S.E.2d at 680-81; *Westbrook v. Board of Adjustment*, 262 S.E.2d at 787; *Village of Euclid*, 272 U.S. at 388 (Even if the validity of the land classification is "fairly debatable," the legislative judgment must control). Plaintiff has failed to show that the City's application of the multi-use parking standard was arbitrary and capricious. As stated above in Section III(2)(b)(i), the City's interpretation and application of the Parking Ordinance was a reasonable exercise of its zoning authority. *See Midrash*, 366 F.3d at 1234. Under the facts presented, even construed in the light most favorable to Plaintiff, there is simply no ground for a reasonable jury to conclude that Plaintiff's substantive due process rights were violated.

Accordingly, the Court finds that Plaintiff has not carried its burden of establishing a prima facie substantive due process claim.[38]   Defendants are therefore entitled to summary judgment on this claim.

**E.     Mandamus**

Plaintiff's Complaint also includes a claim for mandamus requesting that the Court order the City to apply the "church parking standard" to Plaintiff's property (Count XIII).   Federal district courts do not have the authority to issue writs of mandamus to direct state officials in the performance of their duties.   *See* 28 U.S.C. § 1361; *Moye v. Clerk, DeKalb Superior Court*, 474 F.2d 1275, 1276 (5th Cir.1973)[39]; *Noe v. Metropolitan Atlanta Rapid Transit Authority*, 485 F.Supp. 501, 504 (N.D.Ga.1980), *aff'd* 644 F.2d 434 (5th Cir.1980).   Accordingly, because this Court lacks jurisdiction over such a claim, Defendants' Motion for Summary Judgment as to Count XIII is granted.

**IV.   CONCLUSION**

For the foregoing reasons, Plaintiff's Motion for Summary Judgement [Doc. 37] is **DENIED**.   Defendant's Motion for Summary Judgment with

---

[38] The Court also notes that the City's stated reasons for its conditional approval of Plaintiff's Application due to a lack of sufficient on-site parking has been recognized as having a substantial relation to public health, safety or general welfare. *See Midrash*, 366 F.3d at 1234 n.17 (noting that zoning ordinances related to size and parking are reasonable "run of the mill" regulations); *Vineyard Christian Fellowship of Evanston, Inc. v. City of Evanston*, 250 F.Supp.2d 961, 978 (N.D.Ill.2003) (referring to traffic and parking problems as "important").

[39] Decisions of the former Fifth Circuit filed prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

respect to Counts II, III, Count IX, Counts XI - XIII is **GRANTED**.  Because triable issues of fact remain as to Counts I, and Counts V – VIII, Defendants' Motion for Summary Judgment as to these counts is **DENIED**.

As an additional matter, Defendants' Motion to Strike [Doc. 61] portions of the Deposition of Nancy Leathers and portions of the Affidavit of Deborah Danos is **DENIED**.  The courts in this district have repeatedly found that it is improper to strike an affidavit attached to a summary judgment brief.  *See Jordan v. Cobb County, Georgia*, 227 F.Supp.2d 1322, 1346 (N.D.Ga.2001); *Lentz v. Hospitality Staffing Solutions, LLC*, No. 1:06-cv-1893-WSD, 2008 U.S. Dist. LEXIS 6291, at *30-31, 2008 WL 269607, at *10 (N.D.Ga. Jan. 28, 2008) (noting that Federal Rule of Civil Procedure 12(f) permits the court to strike a pleading, not an affidavit attached to a motion for summary judgment).   As the Court in *Lentz* stated, "the proper method to challenge such an affidavit is to challenge the admissibility of the evidence contained in the affidavit." *Id.*; *see also Pinkerton & Laws Co. v. Roadway Express, Inc.*, 650 F.Supp. 1138, 1141 (N.D.Ga.1986).  The Court considered the objections raised by Defendants in its analysis of the motions for summary judgment and finds no grounds to strike the deposition testimony or affidavit from the record where the evidence was not relevant to the Court's ultimate determination of the issues presented.

Finally, the parties are **DIRECTED** to submit briefing on whether Plaintiff's claims are ripe, not to exceed 15 pages, no later than October 21, 2011.

It is so ORDERED this 30th day of September, 2011.

_____
Amy Totenberg
United States District Judge