IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| CHURCH OF SCIENTOLOGY OF GEORGIA, INC., a Georgia Corporation, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF SANDY SPRINGS, GEORGIA, et al. <br><br> Defendants. | CIVIL ACTION <br> FILE NO. 1:10-CV0082 CAP |

**PLAINTIFF'S MEMORANDUM OF LAW ON WHETHER THE CITY HAS MADE A FINAL DECISION AS TO THE USE OF PLAINTIFF'S PROPERTY**

The Court questions whether the Church's claims are ripe because the Church did not pursue a variance from the parking requirements in the Sandy Springs Zoning Ordinance (the "SSZO"). As shown below, the parking requirement for the Church of Scientology (the "Church") has been a moving target from the beginning of the zoning process. Initially, the Church submitted a rezoning application (the "Application") and requested a number of concurrent variances, including acceptance of the existing quantity of parking spaces. See Pre-application Review for Rezoning, Use Permits and Concurrent Variances and City of Sandy Springs letter of Initiation of Rezoning, dated March 9, 2009, filed herewith as Exhibits "J" and "K," respectively. Staff

161150_7                                1

informed the Church that it would not need a parking variance because "[t]he required parking count is 47 and according to the site plan you have 64." <u>See</u> March 24, 2009 e-mail from City Staff to Woody Galloway and Erin Greer, filed herewith as Exhibit "L." Therefore, the Church amended its application accordingly. See Exhibit "C" to First Amendment to Zoning Application and Concurrent Variance Application, filed herewith as Exhibit "M."

However, as opposition to the proposal mounted, Staff reversed its earlier position that on-site parking was adequate, disregarded the interpretation expressed in City Planner Linda Abaray's March 29, 2009 e-mail and the plain language of SSZO § 18.1, and instead, used a multi-use formula to determine the required parking by adding together the total number of spaces required by the Zoning Ordinance for a sanctuary, classrooms and offices (as if each were separate and distinct principal uses and not part of the same principal use of a church). Staff then applied the multi-use theory and said the Church needed a total of 148 spaces. <u>See</u> Staff Report prepared for the Planning Commission Hearing on May 21, 2009 p. 9, filed herewith as Exhibit "N." Staff also assumed that all course rooms, offices, and the sanctuary would be utilized simultaneously at their maximum capacity, contrary to the Church's showing that not all

of the spaces would be in use at the same time. <u>Id</u>. Based on this new analysis, Staff recommended the total building area be:

> limited to 32,053 square feet unless the applicant receives a variance from the minimum parking requirements or can demonstrate a reduction is warranted due to the operation of use such that parking spaces could be shared. . . . The entire 43,246 square feet could be recommended for approval by staff if the applicant can demonstrate that the on-site parking will be sufficient to meet the full use of the proposed building including the expansion through either a parking study or shared-parking analysis.

<u>Id</u>. p. 13 of 15 (emphasis added).

As a result of Staff's recommendation, the Church and its engineers, the national engineering firm of Kimley-Horn and Associates ("Kimley-Horn"), met with the City to set the parameters of the parking study the City wanted to receive (the "Parking Study"). Since the Church's contention was that the way in which the Church practices its religion did not necessitate a large number of parking spaces, the agreed upon purpose of the Parking Study was to demonstrate that the on-site parking proposed would be sufficient by showing how many parking spaces other Churches of Scientology actually used. Kimley-Horn then compared the needs of the proposed Sandy Springs Church to the Church of Scientology in Nashville, Tennessee (which was deemed to be most like the proposed Sandy Springs Church), the existing Church of Scientology in Dunwoody. Subsequently, the Church of

161150_7                                3

Scientology in Buffalo, New York was also studied to determine the number of parking spaces actually required to meet the needs of a Church of Scientology.  The Parking Study found that, if the actual parking usage from the Nashville Church were applied to the square footage of the proposed Sandy Springs Church of Scientology (utilizing the entire 43,916 square foot building) the maximum number of parking spaces needed for the Sandy Springs Church would be no more than 60 parking spaces.  Application of the Buffalo Church's usage yielded an even lower number of parking spaces needed. Doc. 39-1 through 3.  Note, at this point, the Sandy Springs Church proposed to provide a total of 81 (later 111) spaces, and thus substantially more spaces than the number that the Parking Study found to be necessary.

After receiving the Parking Study, Staff abandoned its multi-use formula and applied a parking ratio based on the size of the church building, purportedly based on the Kimley-Horn findings. Doc. 42-2, Ex. 21, p. 8.  However, this approach completely ignored the findings, expert analysis, and recommendations of Kimley-Horn, which examined how many parking spaces were needed for the Nashville Church based on actual usage and applied that to the Sandy Springs Church and concluded that a maximum of sixty (60) spaces would be needed.  Instead, Staff simply used the ratio of the 114 spaces to the building size of

161150_7                              4

the Nashville Church and represented that this somehow reflected the perceived need for spaces, when in fact it reflected only the number of spaces required by code for <u>the prior use of the building as a commercial office</u>.  There was no purpose in requiring a traffic study by traffic engineers if the only information the City wanted was the number of parking spaces at the Nashville Church and the square footage of the Nashville Church.  Such an approach ignored the very purpose of the Parking Study to determine usage and need.  It also ignored that under Nashville's Code, only twenty-seven (27) parking spaces were required for the reuse of the building as a church.  Based on this total misuse of the Nashville (and Buffalo) Parking Study it had requested, Staff changed its analysis to use a parking per square foot ratio of the total building size and concluded the Sandy Springs Church needed 130 spaces.  <u>Id</u>.

In early August 2009, the Church, Staff and the City Attorney met and developed a set of conditions, upon which Staff agreed to recommend approval of the 43,916 square foot church use (the "Alternate Conditions").  Thereafter, Staff recommended approval of the Application under two scenarios:  one, limiting the size of the building to 32,053 square feet; and the second simultaneously recommended approval of the Alternate Conditions for use of the entire 43,916 square foot building with eighty-one

(81) parking spaces and a maximum occupancy of 283 persons. Doc. 42-2, Ex. 22, p. 19. As part of the Church's continued effort to satisfy the City's expressed concerns about the loss of the thirty (30) spaces in the basement of the building, the Church submitted a revised site plan showing an increase in parking by thirty (30) spaces from eighty-one (81) spaces to 111 spaces by construction of additional spaces on the Property and by restriping the parking lot. Doc. 42-3, Ex. 24, p. 9. Additionally, the Church further offered to reduce the allowed occupancy from 283 to 170 persons. Id. at p. 16.

The suggestion that the Church should have refiled its request for a parking variance after eight (8) months of fruitless dialogue with the City is to suggest that the Church pursue a futile course with a known outcome: repeated rejection of its application for approval of a 43,916 square foot church building. At its final hearing, the City Council could have approved a 43,916 square foot church based on the 111 parking spaces proposed pursuant to the Staff's Alternative Conditions; deferred its decision to allow approval with a variance to reduce the number of required spaces to 111; or added a condition requiring the Church to obtain a parking easement for nineteen (19) off-site spaces in order to utilize the entire 43,916 square

feet for Church use. However, the reality is that the City Council did not want to approve a 43,916 square foot church and used the supposed lack of parking as the basis for denial. A review of the Staff's ever-changing determinations of the number of parking spaces required shows just how arbitrary and strained their recommendation was and just how futile any effort to obtain relief from the parking requirement would be. Further, if the Court reviews the Parking Study and then reviews the Staff's interpretation of that Parking Study, which it requested, the Court will gain an even greater understanding of the hurdles the Church faced in this case.

## ARGUMENT AND CITATION OF AUTHORITY

The Church's claims are ripe for adjudication because the zoning decision in this case is a final decision by the City Council of Sandy Springs. To put the Church's claims in context, the SSZO provides specific guidance for the number of required parking spaces for a church or other place of worship as set forth in SSZO § 18.1, which the Church maintains is clear and to date has only been applied in one way by the City of Sandy Springs.[1] A prime example of the City's application of SSZO §

---

[1] The "multi-use" analysis was appropriate in Kadampa and Beth Tefillah because the boarding house proposed by Kadampa and the pre-school proposed by Beth Tefillah are principal uses under the SSZO, and, therefore, have separate parking requirements

18.1 to calculate the required number of parking spaces for a church or other place of worship is the parking analysis for the Lutheran Church of the Apostle in which Staff simply multiplied the "fixed" seating times the square footage of the 8,770 square foot sanctuary, without calculating required parking for the existing 20,000 square foot building footprint, which includes a sanctuary (which can house 175 congregants), church offices, and Sunday School classrooms. Doc. 40-9 and -10, Exs. 34 and 35.[2] The Church met the plain requirements of SSZO § 18.1, and was initially so informed by the City. It was in reliance on the Staff's opinion that the Church withdrew its request for a concurrent variance for parking.

---

under SSZO 18.2.1 (Dormitories and Related and Child Care and Kindergarten, respectively). The multi-use parking analysis does not appear in Staff reports issued on the Church of Sciientology Application after June 16, 2009 and Staff ultimately did not apply the multi-use analysis in their final decision.

[2] In its Order at page 63, the Court stated that it could not find the Lutheran Church to be similarly situated to the Church of Scientology because Plaintiff did not provide "a record of what Lutheran presented to the City when it was granted approval for its expansion." However, the entire staff reports for both the Planning Commission and City Council hearings for the Lutheran Church were submitted in their entirety by Plaintiff and can be viewed at docket no. 42-9 and -10. These documents clearly show that the City considered only the additional new sanctuary in determining the parking requirement for the Lutheran Church.

161150_7                                8

Over the course of months, the Church repeatedly attempted to persuade the City to follow its own zoning ordinance, which would not require any kind of variance for the number of parking spaces for the 43,916 square foot Church, even before it increased the number of parking spaces proposed from eighty-one 81 to 111 for its expanded facilities. However, the City locked onto the fact that the Church of Scientology has a smaller assembly area than other churches in the City, although there are no standards for such a determination; and the expert evidence provided empirical proof that due to the way Scientologists practice their religion, Scientology churches do not, in fact, need more parking than could be provided by the Sandy Springs Church.

Going forward, the number of parking spaces the City required of the Church was a moving target throughout the zoning process. Accordingly, the Church had no basis to request a "variance" from the parking requirements of the SSZO because in the technical sense, the Church already complied with the ordinance and did not need a variance. The condition of zoning, limiting the Church to 32,053 square feet was super-imposed on the Church by the City Council. One can not obtain a variance

from a condition of zoning on a use purportedly imposed to ameliorate the adverse effect the use may have.

The City Council could have accepted the Alternate Conditions negotiated between its Attorney, Staff and the Church, but ultimately it rejected all offers made by the Church to mitigate the perceived negative impact the Church might have. Instead, the City arbitrarily approved a condition of zoning limiting the Church to use of only 32,053 square feet. Id. The decision to condition the zoning of the Property and limit the square footage of the building to 32,053 square feet was a final zoning decision that can only be modified by City Council action on a zoning petition. SSZO §§ 22.2.1 and 22.12.

Thus, if the Court finds that the issue is not ripe, the church's only option would be to file a new zoning application, requesting the increase in square footage and seek a concurrent variance to reduce the parking requirement to be heard by the City Council, which is exactly what the Church did in its original Application. The City has already decided not to permit full use of the 43,916 square foot building despite the numerous attempts by the Church to satisfy the City's concerns, including the negotiated compromise wherein Staff recommended approval of Alternate Conditions for usage of the larger space.
161150_7                                10

The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements. . . ." Midrash Sephardi v. Town of Surfside, 366 F.3d 1214, 1224 (11th Cir. 2004) (quoting Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated on other grounds). In deciding whether a claim is ripe for adjudication or review, the court looks "primarily at two considerations: 1) the fitness of the issues for judicial decision, and 2) the hardship to the parties of withholding court consideration." Midrash, 366 F.3d at 1224 (congregations' CUP conditional use permit (CUP) challenge not ripe because congregations did not apply for a CUP); Konikov v. Orange County, 410 F.3d 1317, 1322 (11th Cir. 2005) (for purposes of deciding ripeness of claim, when plaintiff brings an as-applied challenge to zoning ordinance, plaintiff must simply prove that the ordinance has been "finally applied to the property at issue.") (quoting Eide v. Sarasota County, 908 F.2d 716, 725 (11th Cir. 1990)).

The cases cited in the Court's order, which led to the provision of this brief, while generally applicable, are not on point with the facts in this case. Williamson County Regional Planning Comm'n v. Hamilton Bank of Johnson City was not a

rezoning case, but involved plat approval of previously zoned property. 473 U.S. 172 (1985). The focus in Williamson was whether the County's regulations had been applied to plaintiff's property to the extent that actual takings damages can be measured. Id. at 173 ("That effect cannot be measured until a final decision is made as to how the regulations will be applied to respondent's property"). In this case, the City's decision was a final zoning decision; therefore, the Church's claims are ripe.

In Greenbriar, Ltd. v. City of Alabaster, the Eleventh Circuit held that the City's decision to refuse to rezone Plaintiff's parcel was final for the purpose of a 1983 analysis. 881 F.2d 1570, 1577 (1989). As in Greenbriar, the instant matter went through numerous gyrations with the Planning Commission and City Council, until City Council made a zoning decision, denying the Church the ability to use the larger space. The Greenbriar Court noted that a takings claim requires a showing that the challenged action has deprived an owner of all or substantially all economically beneficial use of his property. 891 F.2d 1570, 1576 (11th Cir. 1989)(citing First English Evangelical Lutheran Church v. County of Los Angeles, 482 U.S. 304(1987). "Thus, a determination of precisely what use is permitted is of great relevance in ascertaining whether a taking has occurred. By

contrast, a substantive due process claim requires a demonstration that a decision is arbitrary and capricious." Greenbriar, 891 F.2d at 1576.

A property owner may "be excused from obtaining a final decision if pursuing an appeal to a zoning board of appeals or seeking a variance would be futile." Murphy v. New Milford Zoning Com'n, 402 F.3d 342, 349 (2d Cir. 2005). Hence, "a property owner need not pursue such applications when a zoning agency lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." Id. at 352 (holding Murphys' claims not ripe for their failure to pursue any official action, which would result in final, definitive position from local authority to assess precisely how they can use their property). The difference between the instant case and Murphy is that the Murphys did not pursue any official action in response to an informal letter from the city, advising them that their large prayer meetings in their family home violated zoning regulations. 402 F.3d at 347. In this case, the Church diligently pursued official action on its zoning application and the City made a final zoning decision with

conditions on the Property, which can only be changed through a new rezoning petition.[3]

Nor do the facts in <u>Hodel v. Virginia Surface Mining and Reclamation Association, Inc.</u>, 452 U.S. 264 (1981), support the proposition that the instant zoning decision is not final for purposes of ripeness. The <u>Hodel</u> plaintiffs' due process challenge to the Surface Mining Act's provisions for the imposition of civil penalties for violations of cessation orders was found to be a premature <u>facial</u> attack on the constitutionality of the Act. 452 U.S. at 266. The <u>Hodel</u> plaintiff did not allege that they, or any one of them, have had civil penalties assessed against them, and there was no finding that any of plaintiff coal mine operators had been affected or harmed by any of statutory procedures for the assessment and collection of fines. <u>Id</u>.

In this case, consideration of the <u>Midrash</u> and <u>Konikov</u> factors indicates that the Church's claims are ripe. First, the rezoning decision is a final decision. The conditions of zoning cannot be changed by a mere variance, but can only be changed by the process currently under appeal. Second, the Church will suffer great hardship if it is forced to resubmit a zoning

---

[3] Under the SSZO, the Board of Appeals is not authorized to increase the square footage of the Church. Without approval of additional square footage, there is no need for a variance.

application with a concurrent variance for parking to the same City Council, which imposed the condition of zoning to begin with. Thus, it is extremely doubtful that this same body will now grant a modification reversing its prior decision.

## CONCLUSION

For all of the foregoing reasons, the Court should find that the subject rezoning decision by the City is a final decision and that the Church's claims are ripe for adjudication.

Respectfully submitted,

DILLARD & GALLOWAY, LLC

By: G. Douglas Dillard
Georgia Bar No. 221900
dougd@dandglaw.com
Andrea Cantrell Jones
Georgia Bar No. 398440
andrea@dandglaw.com
Lauren M. Hansford
Georgia Bar No. 497507
lhansford@dandglaw.com
Attorneys for Plaintiff
3500 Lenox Road, N.E., Suite 760
Atlanta, Georgia 30326
(404) 965-3680;
(404) 965-3670 (fax)

## CERTIFICATE OF COMPLIANCE WITH L.R.5.1B

I certify pursuant to L.R. 7.1D that the above-titled document complies with L.R. 5.1B and was prepared using a 12 point Courier font.

<pre>
                                    /s/ Andrea Cantrell Jones
                                    Georgia Bar No. 398440
                                    andrea@dandglaw.com
</pre>

Attorney for Plaintiff
3500 Lenox Road, N.E., Suite 760
Atlanta, Georgia 30326
(404) 965-3680
(404) 965-3670 (fax)

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing **PLAINTIFF'S MEMORANDUM OF LAW ON WHETHER THE CITY HAS MADE A FINAL DECISION AS TO THE USE OF PLAINTIFF'S PROPERTY** to the Clerk of Court using the CM/ECF system, which automatically sends an electronic mail notification of such filing to counsel of record who are CM/ECF participants, and mailed by United States Postal Service, first-class, mail, postage prepaid, a paper copy of the same document to counsel of record who are non-CM/ECF participants. Counsel of record is:

>Laurel E. Henderson, Esquire
>William Charles Hayes, Esquire
>HENDERSON & HUNDLEY, PC
>160 Clairemont Avenue, Suite 430
>Decatur, Georgia 30030

This 21st day of October 2011.

>/s/ Andrea Cantrell Jones
>Georgia Bar No. 398440
>andrea@dandglaw.com

DILLARD & GALLOWAY, LLC
3500 Lenox Road, N.E., Suite 760
Atlanta, Georgia 30326
(404) 965-3680
(404) 965-3670 (fax)

161150_7                                17