IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CHURCH OF SCIENTOLOGY OF GEORGIA,  )
INC., a Georgia Corporation,       )
                                   )
        Plaintiff,                 )
                                   )
v.                                 )        CIVIL ACTION
                                   )        FILE NO. 1:10-CV0082 CAP
CITY OF SANDY SPRINGS, GEORGIA,    )
et al.                             )
                                   )
        Defendants.                )

## MOTION FOR RECONSIDERATION

COMES NOW Plaintiff Church of Scientology of Georgia, Inc. (the "Church"), and pursuant to Federal Rule of Civil Procedure 59(e) moves the Court for reconsideration of its grant of summary judgment to Defendants City of Sandy Springs on Count II of their Motion for Summary Judgment. Rule 59(e) permits a court to alter or amend a judgment if the moving party shows newly-discovered evidence or manifest error of law or fact. Jacobs v. Tempu-Pedic Intern., Inc., 626 F.3d 1327, 1344 (11th Cir. 2010). For the reasons set forth below, the Court's finding that the Church failed to satisfy its burden of establishing a prima facie case of discrimination under Section (b) is the result of a combination of errors of fact and law.

1

This Court's reliance on the holding in <u>Covenant Christian</u> <u>Ministries, Inc. v. City of Marietta</u>, 654 F.3d 1231 (11th Cir. 2011) to find that the Church failed to satisfy its burden of establishing a prima facie case of discrimination under section (b) is misplaced.  The issues on appeal in <u>Covenant</u> were (1) whether the claims challenging the 2004 Ordinance that seek injunctive relief are moot; (2) whether the claims challenging the 2004 Ordinance that seek damages should be dismissed on the merits; and (3) whether the district court erred in denying Covenant's motion for leave to amend the complaint to include claims relating to the 2008 Ordinance and May 2008 permit application.  654 F.3d 1231 at *4.  The Eleventh Circuit did not address the merits of plaintiff's RLUIPA claims individually, but affirmed the judgment of the District Court dismissing these claims <u>solely</u> on the ground that Covenant had failed to produce evidence that it suffered damages as a result of the 2004 Ordinance, which the District Court found violated RLUIPA's equal terms provision. <u>Id</u>. at *9.

The Church of Scientology does not dispute that a section (b)2 discrimination claim must be supported by evidence of intentional or purposeful discrimination by the City because of

2

Plaintiff's religious denomination.  2008 U.S. Dist LEXIS 54304
at *46, 47 (N.D. Ga. March. 31, 2008).  However, this
discrimination can be demonstrated through a facially
discriminatory act, or by providing extrinsic evidence such that
a discriminatory system designed to favor one class over another
can be inferred from the circumstances.  Reaching Hearts
International, Inc. v. Prince George's County, et al., 584 F.
Supp.2d 766 (D.C. MD. 2008). Denver First Church of the Nazarene
v. Cherry Hills Village, Case No. 1:05-cv-02463, USDC CO., filed
July 19, 2006, is an Order on Defendant's Motion for Protective
Order in which the District Court merely recognized that the
motives of council members are potentially relevant to whether an
ordinance was imposed on the basis of religion.  Roman Catholic
Bishop of Springfield v. City of Springfield, 760 F. Supp. 2d
172 (D. Mass. 2011) involved a challenge to a local ordinance
requiring submission of an application with the City's historical
commission before attempting to alter or demolish any exterior
architectural features of a closed parish church building.  The
court found that the only evidence on discriminatory intent was
concerns expressed to city officials by "disgruntled
parishioners, who feared the possibility of the church's

3

demolition" and the Defendants "imposed historic status on the church to appease them," was insufficient to create an issue of fact on discriminatory animus. <u>Id</u>. at 191.

In <u>Adhi Parasakthi v. Township of West Pikeland</u>, 721 F. Supp. 2d 361, 386 (E.D. Pa. 2010), the District Court actually found that a factual issue existed as to whether an ordinance had been discriminatorily applied, based on Plaintiff's claims that the process that it faced in requesting conditional-use permit approval was more extensive than that applied to the Montgomery School (a Christian school).

In the instant case, the Court erred factually in the following respects:

1.   The record does not support that "[n]either party disputes that the 'parking standard' applied to Plaintiff was the multi-use formula under Section 18.2.1 of the Ordinance rather than the 'church use standard.'" Order, p. 55. Nor was parking for Kadampa and Beth Tefillah calculated in the same manner as for Plaintiff. Order, pp. 58, 59. The "multi-use" analysis was appropriate in Kadampa and Beth Tefillah because the boarding house proposed by Kadampa and the pre-school proposed by Beth

Tefillah are principal uses under the SSZO and thus have a
separate parking requirement under the Ordinance.

However, Staff did not include the multi-use formula in any
report issued after the report prepared for the June 16, 2009
City Council and did not apply it to the Church.  Instead, after
receiving the Parking Study, Staff abandoned the multi-use
formula for the Church of Scientology and applied the ratio of
the available 114 spaces to the building size of the Nashville
Church (3 per 1,000) to the building size of the Sandy Springs
Church. Doc. 42-2, Ex. 21, p. 8.

2.  The Court failed to consider evidence in the record
regarding favorable treatment of the Lutheran Church of the
Apostles. In its Order at page 63, the Court stated that it could
not find the Lutheran Church to be similarly situated to the
Church of Scientology because Plaintiff did not provide "a record
of what Lutheran presented to the City when it was granted
approval for its expansion." However, the staff reports for both
the Planning Commission and City Council hearings for the
Lutheran Church were submitted in their entirety by Plaintiff and
can be viewed at docket no. 42-9 and -10.  These documents
clearly show that the City considered only the additional new

5

sanctuary in determining the parking requirement for the Lutheran Church.  <u>See</u> Doc. 37-1, pp. 18-19.

3.   The Court erred as a matter of law in finding that the definition of a "Church or other place of worship" does not apply to its proposed use for purposes of calculating the required parking for the Sandy Springs Church of Scientology.  Order, page 56. As a result of that fundamental error, the court permitted the City to apply the ordinance in a discriminatory manner based upon the manner in which Scientologists participate in Scientology religious services without meeting the strict scrutiny necessarily applied to such a denominational preference. See Church's Reply Brief at 10-16 (Docket Number 66).

The rule of construction in Georgia and the majority of states is that "[z]oning . . . is subject to constitutional demands of due process and equal protection and the constitutional prohibition against taking private property without just compensation. <u>Kingsley v. Florida Rock Industries, Inc.</u>, 259 Ga. App. 207, 211 (2002)(citing <u>Bailey Investment Co. v. Augusta-Richmond County Bd. of Zoning Appeals</u>, 256 Ga. 186, 187 (1986); <u>Gradous v. Bd. of Commrs. of Richmond County</u>, 256 Ga. 469 (1986); <u>Barrett v. Hamby</u>, 235 Ga. 262, 265 (1975).   The

Georgia Court of Appeals has also noted that "[s]ince statutes or ordinances which restrict an owner's right to freely use his property for any lawful purpose are in derogation of the common law, they must be strictly construed and never extended beyond their plain and explicit terms. [Cit.]" 259 Ga. App. at 211 (citing Duncan v. Entrekin, 211 Ga. 311, 312 (1955)).  Such rules of strict construction are especially required where a statute or ordinance is applied to a church or religion.  Yet the court has permitted the City to apply the ordinance pursuant to a construction in clear conflict with the language and terms of the ordinance.

    In this case, the plain language of the SSZO defines a "Church or Other Place of Worship" as "a facility in which persons regularly assemble for religious ceremonies."  The evidence of record is that Plaintiff's proposed primary use of the building fits completely within the definition of a "church" under the SSZO.  Plaintiff proposes to use the property as a facility where parishioners regularly come together for daily and weekly services and other regularly scheduled assemblies and religious ceremonies, all of which fit easily within the actual definition in the Ordinance.  Additionally, Plaintiff conducts

other regularly scheduled assemblies in the beliefs, conduct, practice and ceremonies of the Scientology religion, known as Training and Auditing.  Training and Auditing are central religious practices of Scientology and typically involve participation of parishioners and Church staff who assemble to participate in Scientology religious education and ceremonies. Although, Training and Auditing ceremonies do not have to be "congregational" in nature, the SSZO does not require "congregational" assemblies, let alone "large" congregational assemblies, to meet the definition of a church.

The Court's construction of the meaning of "Church and Other Places of Worship" as defined in the SSZO conflicts with RLUIPA's definition of "Religious exercise," which "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5 (A).  RLUIPA further provides that "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose.  Id. at (B).

The Church thus was manifestly a "church" as defined by the Ordinance.  Accordingly, any decision by the City not to apply the Ordinance's rules with respect to a church can be justified only under the strict scrutiny standard of review.  As we showed in our reply brief and brief in opposition to the City's motion, the City's challenged action here utterly fails to survive such strict scrutiny.

4.  The Church did not fail to satisfy its burden of establishing a prima facie case of discrimination under section (b)2.  Evidence of discrimination can be inferred from the circumstances and the manner in which the Church's application was handled by the City.  As in West Pikeland, the City of Sandy Springs employed a more extensive and intensive approval process to the Church of Scientology than to Kadampa, Beth Tefillah and Lutheran.  The parking requirement for the Church of Scientology dictated by the City was based solely on the City's misperception and misunderstanding of the manner in which the Church practices its religion.  The City ignored the plain language of the parking requirements and definition of "Church and Other Places of Worship" codified in the SSZO at section 18.2.1.  The City misused the facts in the Kimley-Horn Parking Study to create an

arbitrary ratio, which it then improperly applied to the Church
of Scientology's parking requirement.

The Church's application received higher scrutiny and less
favorable treatment than the comparator churches.  See Doc. 41-6,
10, 11, 20.  The City rejected the Church's Application, despite
extraordinary efforts by the Church to allay the City's concerns
by offering to put a deed restriction on the Property that would
notify any prospective purchaser that it would not have any
vested right to utilize the parking ratio approved for the Church
and would be required to demonstrate compliance with the then
existing parking requirements for the purchaser's proposed uses
and "may require demolition and reconstruction of all or a
portion of the lower enclosed area of the building for use as
parking prior to the occupancy and use of the property." Doc. 42-
3, p. 21.  The Church also offered to limit capacity to 170
persons to address the City's concern of insufficient parking.
However, Defendant rejected the proposed solution because of an
expressed fear that it could not enforce the limit, even though
the City monitors school capacity limits through a yearly
enrollment report and the Church offered to submit a sworn
written report detailing by month the occupancy of the building

for the preceding year or such other period designated by the
Director of Community Development.  Doc. 47-1, p. 38.

Moreover, the negative tenor of the following questioning by
Council Member Rusty Paul at the December 15, 2009 public hearing
indicates a hostile attitude toward the Church.  Doc. 47-1, pp.
39 through 48.

> Councilmember Paul:  Mr. Galloway, I've just got
> some basic general questions.  Maybe you can answer
> them.  Maybe someone, one of your clients might be able
> to do.
>
> It's been talked about this being a regional church
> that would reach across Atlanta metro as well as Georgia
> and the southeast.  Is that an accurate statement? Would
> there be people coming from different locations?
>
> Mr. Galloway:  It is; and it is an inaccurate
> statement.  This will be – this is their main church in
> Georgia for now.  But in terms – in Scientology you
> move up levels in terms of your understanding and the
> course work you've done, et cetera.
>
> Once you get above a certain level, anybody from
> the southeast would go to Clearwater, Florida, which is
> more their regional area and a higher level church in
> terms of that they offer.  And there are also other
> areas or other churches that offer a higher level of
> course study than would ever be offered at this
> location.
>
> If we ever exceed the need in terms of the number
> of people, if we ever get to that point or if the
> church ever gets to that point, then they would
> establish mission churches in the surrounding areas
> that would address the need in terms of space.

11

So this would not – it's seen as a statewide or
potentially even a multi-state location.  But there are
limitations on that and anyone that would again go to
Clearwater or another higher level church once you
reach a certain level.

Councilmember Paul:  So you have to move in
essence?

Mr. Galloway:  No, you don't.  You go there for a
period of time to do a course of study.

Councilmember Paul:  Okay.  You made the statement
that the practice of their religion requires an
inordinate – and I'm paraphrasing here.  You may not
have used exactly these words.  So clarify it for me if
I am incorrect.  That the practice of their religion
requires an inordinate amount of space.  Can you tell
me why that is the case? [Mr. Galloway actually said
"And so they have a need for a great deal of space."
Doc.  47-1, p. 32.]

Mr. Galloway:  I can go through the space plan
drawings if you want to.  I have those here...  But in
terms --

Councilmember Paul:   I'm asking about the –you
said "the practice."  What is it about their practice
that each individual person needs an inordinate amount
of space?  That's how I interpreted what you said.

Mr. Galloway:  Because, for example, there is a
classroom on the second floor that classroom-people
would go to that classroom at the beginning of a course
of study.  It's more of less a study hall-type
atmosphere.  You would then do self-directive study.

And they proceed to make application of what you
just learned in a number of associated classrooms, four
or five in some instances, such as you would go – you

12

might -there would be – there's an adjacent room where you might go in with a study buddy and go through an exercise.  In another room there's a film room.

So you would proceed, during that same period of time you would proceed through as many as five additional classrooms.  So there has to be five seats available for one person in that particular area.

In addition, they have a library.  They have a bookstore.  They have a large viewing area which is more or less a museum area.  They have a daytime staff.  They have a nighttime staff.  Yet they allocate square footage for each of those staffs in their – each staff member would have their own office, for example.

And in addition to that, each staff member also has other areas where they would come together to perform certain tasks.

Councilmember Paul:  Is this bookstore open to the public?

Mr. Galloway:  It is.  But --

Councilmember Paul: They sell books.  So they are by definition a retail enterprise.  If you're selling something to the public, isn't it your understanding that is a retail activity, or is a wholesale activity?

Mr. Galloway:  It is an associated use with the principal use.  So it is an accessory use that is allowed under the code, allowed under your ordinance.  And but --

Councilmember Paul:  But I as a member of the public could come in --

Mayor Galambos:  I don't think they should be arguing.

Councilmember Paul:  I'm trying to understand the practice.

Mayor Galambos:  Well, try to understand the --

Councilmember Paul:  Madame Mayor, this is my last one though.

Mayor Galambos:  Well, make sure it's allowable.

Councilmember Paul:  I know, but I've got some questions I need to get answered. Please bear with me. Okay?  I know that you're important, but please bear with me.

Mr. Galloway:  There are very few churches that don't have a bookstore that somebody from the public could walk in – and a lot of churches in Sandy Springs do.

Councilmember Paul:  But in the museum, is it open to the public?

Mr. Galloway:  It – is all of the space is highly regulated and secure.  You have to pass through security in order to get --

Councilmember Paul:  But it is open to the public?

Mr. Galloway:  It is technically open to the public.  And they would – people that are interested in the Church of Scientology can come in and go into those areas just like they can go in every other church in Sandy Springs.

Councilmember Paul:  Then, okay, that's the issue. It's a public building in essence, open to anybody who may – I mean, most churches have sort of a "y'all come" kind of mentality.

Mr. Galloway:  They, the Church of Scientology, have an open policy, but they are very strict about their security because of groups in the United States that oppose the Church of Scientology and have done some pretty awful things.  They've gone in and destroyed areas.  They've made threats.  They've made anthrax threats, for example.

Councilmember Paul:  But if you lived in the neighborhood, would you be concerned about the security?

Mr. Galloway.  No, because of their security.

Councilmember Paul: but that's inside.  What about adjacent areas?

Mr. Galloway:  Well, you mean to disallow a church because --

Councilmember Paul:  I didn't disallow anything. I was just asking a question.

Mr. Galloway:  I do not believe that it's a security threat at all.

Councilmember Paul:  Would the city of Sandy Springs, should they take that into consideration if there are threats to public safety?  Would that not be something that we should seriously consider?

Mr. Galloway:  It's something to be aware of. They've operated in the City of Atlanta and in the metropolitan area, in particular in Dunwoody.  They've been in Atlanta since the '70s.  They've not had an incident in terms of something that would cause a public problem.

But again, just because there are people that disagree with them, that is absolutely no reason to base a decision on zoning.

15

Councilmember Paul:  But as you said, that they have had threats and they have had actions taken that in essence could create a public safety issue.

Mr. Willard [City Attorney]:  So have bars and so do synagogues and --

Mayor Galambos:  I think you have made your point councilman.

Councilmember Paul:  How do they recruit members?

Mr. Galloway:  Same way other churches do.

Councilmember Paul:  So, and they are coming here because of growth, right?

Mr. Galloway.  They would like to grow.  And because they are out of room in their current location. They found this location in 2005, purchased it.  The entire church was going through an organizational effort to determine what - how each church should be organized.

That is part of the reason there was a delay in this process.  And, of course, we've been in this zoning process for a year.  But they are prepared and have complete building and architectural drawings ready to file to start construction.

Doc. 47-1, pp. 39 through 47.

Then, Councilmember Tibby DeJulio summed up the City's attitude toward the Church: "It's a non-traditional church and we should have non-traditional rules to go along with nontraditional churches."  Id. at p. 57.

The discriminatory animus implicit in the Council Members'
questions and comments is exactly the type of "frequently
occurring burden on religious liberty" targeted by Congress in
enacting the Religious Land Use and Institutionalized Persons
Act.  146 Cong. Rec. S7774-01, S7775 (July 27, 2000) ("Joint
Statement" of Sens. Hatch and Kennedy on the Religious Land Use
and Institutionalized Person Act of 2000).  In particular,
Congress found "massive evidence" that "[c]hurches in general,
and new, small, or unfamiliar churches in particular, [were]
frequently discriminated against on the face of zoning codes and
also in the highly individualized and discretionary processes of
land use regulation." Id.  Congress further found that, most
often, discrimination against religious entities had lurked
behind "vague and universally applicable reasons," such as a
concern for aesthetics, or concerns that allowing a church was
"not consistent with the city's land use plan," or was not
appropriate in commercial zones because churches don't generate
business.  Id.  On the basis of that record, in 2000 Congress
unanimously enacted RLUIPA as prophylactic legislation to prevent
discrimination against churches in the processes of land use
regulation.  Id.

In light of the above, this Court should reconsider and reverse the Court's grant of summary judgment to Defendant on Plaintiff's claim of discriminatory treatment under RLUIPA 2000cc-2(b).

<div style="margin-left: 50%;">

/s/ Andrea Cantrell Jones
G. Douglas Dillard
Georgia Bar No. 221900
Andrea Cantrell Jones
Georgia Bar No. 398440
DILLARD & GALLOWAY, LLC
3500 Lenox Road, N.E.
Atlanta, Georgia 30326
(404) 965-3680
(404) 965-3670 (fax)
Counsel for Plaintiff

</div>

CERTIFICATE OF SERVICE

I hereby certify that I have this day served the foregoing

PLAINTIFFS MOTION FOR RECONSIDERATION to the Clerk of Court using

the CM/ECF system, which automatically sends an electronic mail

notification of such filing to counsel of record who are CM/ECF

participants, and mailed by United States Post Service, first-

class mail, postage prepaid, a paper copy of the same document to

counsel of record who are non-CM/ECF Participants. Counsel of

record is:


            Laurel E. Henderson, Esquire
            Henderson & Hundley, PC
            160 Clairemont Avenue, Suite 430
            Decatur, Georgia 30030


    This 28th Day of October 2011.


                            /s/ Andrea Cantrell Jones
                            Georgia Bar No. 398440
                            andrea@dandglaw.com

Dillard & Galloway
3500 Lenox Road, N.E., Suite 760
Atlanta, Georgia 30326
(404) 965-3680
(404) 965-3670


19